UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————————
                                             )
KIMBERLY STOYLE,                             )
                         Plaintiff           )
                                             )
vs.                                          )          Civil Action No. 0510354DPW
                                             )
THE MANSFIELD MUNICIPAL ELECTRIC             )
DEPARTMENT, JOHN D'AGOSTINO,                 )
THE TOWN OF MANSFIELD BOARD OF               )
LIGHT COMMISSIONERS, LOUIS AMORUSO,          )
MICHAEL McCUE, DAVID McCARTER,               )
DANIEL DONOVAN, ROGER ACHILLE                )
and STEVEN MacCAFFRIE,                       )
                                             )
                         Defendants          )
———————————————————————

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION FOR LEAVE TO AMEND ANSWER

Now comes the plaintiff, Kimberly Stoyle, and opposes the defendant's Motion for leave to add counterclaims. As grounds therefore, plaintiff states that the counterclaims are *per se* retaliatory and must, therefore, be denied. Plaintiff states further that the counterclaims are not based upon newly discovered evidence, as defendant contends. Defendant was aware of the counterclaims in early 2002 and 2003. Thus, the counterclaims are barred by the statute of limitations.

### I. Procedural History

Ms. Stoyle filed the complaint in this matter on February 23, 2005. Pursuant to Fed. R. Civ. P. 12 (a), an answer including counterclaims was due within 20 days of receipt. Attorney John J. Davis filed an appearance on April 6, 2006 on behalf of all defendants. An answer was filed and on April 19, 2006. No counterclaims were filed at that time. Notably,

the Answer did not raise defenses of conspiracy, abuse of process or perjury.

On April 5, 2006, attorneys from the firm of Pierce, Davis & Perritano filed a Notice of Withdrawal of Appearance.  Attorneys Leonard H. Kesten and Deborah I. Ecker of Brody, Hardoon, Perkins & Kesten filed an appearance on behalf of the defendants on April 4, 2006.  On April 7, 2006, defendants filed a Motion to Consolidate Cases For Purposes of Trial Pursuant to Rule 42 of the Federal Rules of Civil Procedure requesting that this Honorable Court consolidate the instant suit with one filed by Dr. John Beliveau against the Town of Mansfield Municipal Electric Department.  Defendants also filed a Motion to Amend Answer to Add Counterclaims against Plaintiffs Stoyle and Beliveau.  Ms. Stoyle opposes defendant's motions.

## II.    Legal Argument

### A.  Counterclaims Based on MCAD/EEOC Complaints are *Per Se*  Retaliatory and Subject to Dismissal.

#### 1.    Retaliation Against Employees for Filing MCAD/EEOC Charges is Prohibited, Even if the Allegations in the Charge are Without Merit

Under Chapter 151B and Title VII, an employer may not retaliate against an employee for complaining of discrimination.  An employee filing an MCAD/EEOC complaint has unquestionably engaged in protected conduct. The anti-retaliation provision of Chapter 151B provides in part: "It shall be an unlawful practice: . . . 4. For any . . . employer . . . to . . . discriminate against any person because he has opposed any practices forbidden under this chapter or <u>because he has filed a complaint</u> . . ." (emphasis added). M.G.L. c. 151B, § 4(4); <u>see</u> 42 U.S.C. § 2000e-3(a).

Submission of a charge of discrimination is protected conduct, even if the employee's belief that discrimination has occurred is mistaken.  <u>Franchere & Baillargeon v. Power Test Gas Co.</u>, 8 MDLR 1219, 1246 (1986); <u>Brunson v. Belcherton State School</u>, 9

MDLR 1295, 1325 (1987); <u>Galotti v. Belmont</u>, 6 MDLR 1669 (1984). The filing of the

charge constitutes protected conduct, even if the charge is neither valid nor reasonable.

<u>Wyatt v. City of Boston</u>, 35 F.3d 13, 15 (1st Cir. 1994).

The obvious purpose behind the retaliation provisions is to permit those filing

charges to act without fear of retribution and unnecessary financial hardship.  The

legislatures intended a full airing of suspicions of discrimination, to permit the administrative

agencies to fully investigate potentially unlawful employment practices.

**2.   A Counterclaim Severely Disadvantages Plaintiff as to Constitute a
      Retaliatory Action**

The employer may not initiate an adverse job action against an employee based on

the filing of the complaint.  In addition, actionable retaliation includes reprisals that take

place outside the work context.  Retaliation occurs when an employer reacts by

"disadvantaging . . . persons engaged in protected activities."  <u>Hazel v. U.S. Postmaster

General</u>, 7 F.3d 1, 3 (1st Cir. 1993).  Retaliation may occur even after the employee has been

fired and is no longer in the employer's workforce.  <u>Robinson v. Shell Oil Co.</u>, 117 S. Ct. 843

(1997).

When an employer initiates an abuse of process or defamation counterclaim against

an employee, the employee is coerced into expending large sums to protect herself.

Moreover, the employee becomes fearful that a large monetary judgment may be awarded

against her.  The drudgery and expense of a counterclaim clearly disadvantages the

complaining (ex-)employee as to constitute retaliation.

**3.   Counterclaims Impair the Full and Effective Functioning of the
      Legislative Scheme that Encourages Agency Review of Employment
      Decisions that are Felt to be Discriminatory**

Protected conduct, such as filing a charge, loses its protected character if employers are permitted to second guess the merits of the charge and issue reprisals.  Resort to statutory remedies should not take on the character of a calculated risk, with litigants fearing inevitable and expensive legal attacks when they seek to vindicate their rights. Mitchell v. Robert De Mario Jewelry, Inc., 80 S. Ct. 332, 336 (1960) (were retaliation against those complaining of discrimination permitted, resort to statutory remedies would take on the character of a calculated risk).  The possibility of counterclaims should not be permitted to distract an employee considering the filing of a charge.

The implementation of policies expressed in anti-discrimination statutes depends on the filing of charges by individuals who perceive themselves as victims of discrimination. E.E.O.C. v. Astra USA, Inc., 94 F.3d 738, 746 (1st Cir. 1996); N.L.R.B v. Scrivener, 92 S. Ct. 798, 801 (1972); E.E.O.C. v. Associated Dry Goods, Inc., 101 S. Ct. 817, 824 (1981) (policies encouraging employment discrimination litigation are consistent with the intent of Title VII). Legislative policy also favors open and public litigation of such controversies, for its deterrence value as well as to provide information to other victims of discrimination.  The disclosure through litigation of incidents or practices which violate national policies respecting nondiscrimination in the work force is itself important, for the occurrence of violations may disclose patterns of noncompliance resulting from a misappreciation of the Act's operation or entrenched resistance to its commands, either of which can be of industry-wide significance. McKennon v. Nashville Banner Pub. Co., 115 S. Ct. 879, 885 (1995).

Employees filing administrative charges do so in conformity with these well-established policies. As such, they should be immunized from suit based on the contents of

the administrative charge. The disruption generated by counterclaims extends not only to individual complainants, but to the statutory schemes addressing discrimination. Therefore, counterclaims should be considered unlawful retaliation.

> **4.    Precedent Supports the Dismissal of Counterclaims Based on Discrimination Charges**

Precedent supports the proposition that there exists an absolute privilege against counterclaims of malicious prosecution and other torts resulting from the exercise of the right to file a charge of discrimination, even if the charge is considered false and malicious. A countersuit based solely on the fact that a complaint alleging discrimination has been filed has been held to be "unquestionably retaliatory" as a matter of law.  E.E.O.C. v. Virginia Carolina Veneer Corp., 495 F. Supp. 775, 778 (W.D. Va. 1980), appeal dismissed sub nom Cassidy v. Virginia Carolina Veneer Corp., 652 F.2d 380 (4th Cir. 1981) (defamation suit based on filing of sex discrimination charge dismissed); see also Cooper v. Pic-Walsh Freight Co., 27 FEP 344, 19 E.P.D. 8994 (E.D. Mo. 1976) ("To entertain claims in the nature of malicious prosecution for the filing of a single Title VII complaint would seriously undermine the clear policy of Section 2000e-3(a) to protect an employee who utilizes the procedures provided by Congress for the vindication of his right to be free from unlawful discrimination in employment"); Moran v. Simpson, 80 Misc. 2d 437, 362 N.Y.S.2d 666 (1974) (defamation claim based on the filing of a discrimination complaint dismissed); EEOC Decision 74-77, 8 FEP 558 (January 18, 1974) (defamation count based on administrative charge is _per se_ retaliatory).

"An employer may not counterclaim or defend [a Title VII action] based on tort claims." EEOC v. First Nat. Bank of Jackson, 614 F.2d 1004, 1006 (5th Cir. 1980), cert. denied 101 S. Ct. 1361 (1981); see also EEOC v. Sears Roebuck & Co., 504 F. Supp. 241,

275 n. 66 (N.D. Ill. 1980) (dismissing civil conspiracy counterclaim); <u>Giles v. Roadway Exp., Inc.</u>, 529 F. Supp. 37, 39 (S.D. Miss. 1981) (dismissing civil conspiracy and malicious prosecution counterclaims).

In order to claim the privilege protecting those filing discrimination complaints, the employee need not allege that the employer has filed its counterclaim with a malicious motive. The filing of the complaint should be privileged, even if the employer has proffered its counterclaim in good faith. "A protected activity acquires a precarious status if innocent employees can be [retaliated against for] engaging in it, even though the employer acts in good faith." <u>NLRB v. Burnup and Sims, Inc.</u>, 379 U.S. 21, 23 (1964) (applying NLRA).

The privilege against abuse of process counterclaims is especially strong, because abuse of process claims are generally disfavored as chilling potentially meretricious resort to the courts. <u>See</u> <u>Cohen v. Hurley</u>, 20 Mass. App. 439, 443 (1985). Moreover, an MCAD/EEOC charge is not "process" as defined pursuant to that tort. <u>See</u> <u>Jones v. Brockton Public Markets, Inc.</u>, 369 Mass. 387 (1975); <u>Chemawa Country Golf, Inc. v. Wnuk</u>, 9 Mass. App. 506 (1980); 14 Mass. Practice, § 1721 (Supp.). Beyond the protections afforded by the retaliation clauses, testimony provided in connection with administrative proceedings are absolutely privileged. <u>See</u> <u>Cignetti v. Healy</u>, 967 F. Supp. 10, 14 (D. Mass. 1997) (testimony at administrative hearing is absolutely privileged); <u>Stepanischen v. Merchants Despatch Transp. Corp.</u>, 722 F.2d 922, 932 (1st Cir. 1983) (same). As such, a variety of protections and immunities combine to protect those filing administrative charges.

**5. Defendant Should be Assessed Attorneys Fees and Costs for Initiating Retaliatory Counterclaims**

The prohibition against retaliatory counterclaims is so strong that Courts have awarded plaintiffs attorneys' fees and costs when dismissing retaliatory counterclaims. <u>E.g.</u>,

EEOC v. Virginia Carolina Veneer Corp., 495 F. Supp. 775 (W.D. VA. 1980). The award of attorneys fees and costs is similarly dictated under G.L. c. 231, § 59H, the Massachusetts SLAPP statute.

The purpose of Section 59H is to "protect citizens from lawsuits designed to chill their right to petition a matter of public concern." Andover Liquors, Inc. v. Den Rock Liquors, Inc., 5 Mass. L. Rptr. No. 11, 239, 240 (June 17, 1996). The right to petition protects a citizen every time he or she speaks out on matters of public interest, or participates in governmental proceedings implicating matters of public concern. Zoppo v. Foster, 6 Mass. L. Rptr. No. 25, 543, 543 (May 19, 1997).

In Commonwealth of Massachusetts v. Chatham Development Corp., 6 Mass. L. Rptr. No. 4, 76 (December 16, 1996), an individual named Shui filed an MCAD claim alleging that a number of Respondents discriminated against him in their refusal to rent housing to Shui. After the case was removed to Superior Court, the Respondents filed a counterclaim against Shui for abuse of process. The Court dismissed the counterclaim under the SLAPP statute and awarded Shui attorneys fees. Chapter 151B also provides for the award of attorneys fees for complainants opposing retaliatory conduct. M.G.L. c. 151B, § 9

### 6. Counterclaims are Unnecessary and Abusive

While there may exist a policy to protect employers from wrongful suits alleging discrimination and retaliation, there are greater, countervailing policies involved. Persons filing such charges should be immunized from counterclaims, or else their voices in opposition to unlawful practices will be stifled in the long run. Successful discrimination/ retaliation suits routinely turn on seemingly tenuous strands of evidence. In the vast majority of cases, in which an abundance of direct evidence of discrimination is not present,

the specter of an abuse of process counterclaim will have an enormous chilling effect. The Legislature has explicitly stated its preference to allow employees to freely assert claims for discrimination and retaliation, by making the filing of a complaint protected conduct.

Counterclaims belie their retaliatory nature, because they are somewhat pointless and wasteful. Even in the absence of the counterclaims, the truth of the allegations in the charge may be fully investigated and controverted when the merits of the charge are litigated. To the extent that the charge is proven frivolous, employers may have remedies under Rule 11, G.L. c. 231, § 6F, or the attorneys fees provisions of the various statutes. Since avenues of redress may be available to the employer, the initiation of counterclaims represent little more than a strategy to coerce claimants into submission. They may also be used to silence other possible claimants or witnesses. Such *per se* retaliatory litigation strategies should be firmly and quickly denied.

### B.  Defendant's Counterclaims are Time-Barred

Under Fed. R. Civ. P. 13 (e), a claim which either matured or was acquired by the pleader after serving a pleading may, with permission of the court, be presented as a counterclaim by supplemental pleading. <u>Read v. Baker</u>, (1977, DC Del.) 438 F.Supp 732. However, affirmative counterclaims may not be instituted after the applicable period of the statute of limitations. <u>Smith-Johnson S.S. Corp. v. United States</u>, 1964, DC Del.) 231 F.Supp 184. This rule applies to a party's attempt to set up a counterclaim, as in this case, by way of a Motion to Amend an Answer. <u>Federal Deposit Ins. Corp. v. Borne</u>, (1984, ED NY) 599 F.Supp 891. In this case, defendants attempt to circumvent the statute of limitations by amending the Answer.

The statute of limitations for all counterclaims is three years, and there is substantial

evidence that these counterclaims were known to defendants in early 2002 and 2003, more than three years ago. Fed. R. Civ. P. 13 (e) deals with the pleading of counterclaims maturing or acquired after pleading. There are, however, no provisions that the counterclaim can relate back to the date of the original pleading. Diematic Mfg. Corp. v. Packaging Industries, Inc., (1976, SD NY), 412 F. Supp 1367. It has been held that relation back of amendments described in Fed. R. Civ. P. 15 (c) is applicable only to amendments made under Fed. R. Civ. P. 15 (a), not to counterclaims under Rule 13, and that therefore amendments made pursuant to Rule 13 do not relate back to the original pleadings. Stoner v. Terranella, 372 F 2d 89 (1967); Goldlawr, Inc. v. Shubert (1967, ED Pa) 268 F.Supp 965. Accordingly, defendant's counterclaims are time-barred.

John D'Agostino is the Town Manager for Mansfield. He is also the manager of the Mansfield Municipal Electric Department ("MMED") where Ms. Stoyle was employed as the Chief Financial Officer. D'Agostino now claims that Ms. Stoyle and the Director of MMED, Dr. John Beliveau, conspired to use lawful process with malice to damage defendants, conspired to commit perjury to further their legal claims, and thereby intentionally inflicted emotional distress upon him. In support of the counterclaims, the defendants allege that documents were recently produced during discovery revealing that Dr. Beliveau and Ms. Stoyle "secretly worked together to manufacture both her lawsuit and his claims." Ms. Stoyle was supervised by Dr. Beliveau and concerns about her working conditions were clearly within the scope of this work/business relationship.

Moreover, Mr. D'Agostino admitted at his deposition and in public statements that he believed there was a conspiracy involving Ms. Stoyle and Dr. Beliveau in 2002 and in 2003. On January 10-11, 2006, Mr. D'Agostino testified that he requested telephone records from Ms. Stoyle in October 2002 based upon his belief that Ms. Stoyle and Dr. Beliveau

9

were sharing information with outside sources in an effort to embarrass him. (Exhibit 1.)
He also testified to his belief that in the spring of 2002, Ms. Stoyle collaborated to fabricate
sexual harassment charges against him. (Exhibit 2).

On January 4, 2003, Mr. D'Agostino was quoted in *The Sun Chronicle* stating that
"There are some people here who would like to destroy my character to the extent that I
cannot lead this town." (Exhibit 3). On January 10, 2003, Mr. D'Agostino was quoted by
*The Mansfield News* stating that "If there is litigation, it will be litigation I initiate. I will
include some citizens as well as some employees." He further stated that "I intend to take
whatever legal action necessary to exonerate my name and my family. If this isn't a setup, I
don't know what is." (Exhibit 4). On January 16, 2003, Mr. D'Agostino told *The Mansfield
Buzz* that he is "Convinced this is a setup, conspired by a group of people who would like
him to be out of Mansfield. (Exhibit 5).

Given Mr. D'Agostino's prior knowledge as contained in his public statements and
deposition testimony, defendant's Motion to Amend the Answer must fail. Clearly, the
counterclaims were not acquired after the responsive pleading was filed. Since pleadings are
for the purpose of notice, there is no reason why defendants could not comply with the
requirement of filing a counterclaim with their Answer within the statutory timeframe
pursuant to Fed. R. Civ. P. 13 (a). Nor is there any excusable neglect on the part of
defendant for the failure to include the counterclaims with the Answer. Defendants are held
to the strategy of counsel at their own peril. Here, defendant's attorney chose not to raise
the defense of conspiracy in his Answer to Stoyle's Complaint. The failure to do so further
supports defendant's malicious, retaliatory intent in raising the claims at this late stage of the
proceedings.

**III. Conclusion**

Based upon the foregoing arguments, the counterclaims are barred both by the three-year statute of limitations and by the Federal Rules of Civil Procedure governing counterclaims and amendments.  Justice requires that defendant's Motion to Amend be denied.

Respectfully submitted,
Kimberly Stoyle
By her Attorneys


/s/ Lynn A. Leonard                        /s/ Anita B. Sullivan
_____                    _____
Lynn A. Leonard                            Anita B. Sullivan
Attorney-At-Law                            Attorney-At-Law
527 Main Street, Suite 8                   458 Main Street
Melrose, MA  02176                         Wakefield, MA  10880
(781) 662-6161                             (781) 224-0701
B.B.O. No. 561662                          B.B.O. No. 628873

Dated:  April 21, 2006

EXHIBIT NO. 1

D'Agostino3

1

1                                  Volume   III
                                   Pages    1 - 112
2                                  Exhibits per index

3
                        UNITED STATES DISTRICT COURT
4
                          District of Massachusetts
5

6

7    DR. JOHN J. BELIVEAU,           )
                     Plaintiff       )
8                                    )
     vs.                             )     Civil Action
9                                    )     No. 04-11329-BPW
     TOWN OF MANSFIELD MUNICIPAL     )
10   ELECTRIC DEPARTMENT, JOHN O.    )
     D'AGOSTINO,                     )
11                   Defendants      )

12

13            CONTINUED DEPOSITION OF JOHN O. D'AGOSTINO, a

14   witness called by and on behalf of the Plaintiff, taken

15   pursuant to the applicable provisions of the Federal

16   Rules of Civil Procedure, before Sandra L. Bray,

17   Registered Diplomate Reporter, CSR Number 103593, and

18   Notary Public in and for Commonwealth of Massachusetts,

19   at the offices of Wolf Block, One Boston Place, Boston,

20   Massachusetts, on Monday, January 10, 2006, commencing

21   at 1:40 p.m.

22
                            REPORTERS, INC.
23                 GENERAL & TECHNICAL COURT REPORTING
                   23 MERRYMOUNT ROAD, QUINCY, MA 02169
24                 617.786.7783/FACSIMILE 617/786.7723

2

1    APPEARANCES:

2        JULIANE BALLIRO, ESQUIRE
         WOLF BLOCK
3        One Boston Place
         Boston, Massachusetts  02108
4        on behalf of the Plaintiff

D'Agostino3

| 23 | | Mr. Beliveau, dated January 27, 2002 |
| 24 | | was marked Exhibit Number 29 for |

6

| 1 | | identification.) |
| 2 | Q. | Let me know when you're through reviewing that |
| 3 | | exhibit, and I'll pose a question to you. |
| 4 | | (Discussion off the record) |
| 5 | Q. | Mr. D'Agostino, have you had an opportunity to |
| 6 | | read Exhibit 29 to yourself? |
| 7 | A. | Yes.  I skimmed it. |
| 8 | Q. | I'm going to try very hard not to go over |
| 9 | | ground that we already covered in the first |
| 10 | | two sessions of the deposition, but there are |
| 11 | | times I may have to touch on things or |
| 12 | | summarize in order to sort of make a segue |
| 13 | | into what I want to ask you about. |
| 14 | A. | Sure. |
| 15 | Q. | I apologize if I go over old ground.  Is it |
| 16 | | fair to say that Exhibit Number 29 concerns |
| 17 | | your request for certain cell phone records |
| 18 | | from the Light Department, specifically from |
| 19 | | Kimberly Stoyle in the Light Department, and |
| 20 | | her response to that request? |
| 21 | A. | It's not cell phones.  This is the office |
| 22 | | lines at the Light Department, not cell |
| 23 | | phones. |
| 24 | Q. | So is it your testimony that Exhibit Number 29 |

7

| 1 | | has nothing to do with your request for Brad |
| 2 | | Wills' telephone records? |
| 3 | A. | No, I already had that information.  I already |

D'Agostino3

 4           had that information.

 5     Q.    Okay.  So what does Exhibit Number 29 involve?

 6     A.    The office lines at the Light Department.

 7     Q.    Okay.  And why were you requesting copies of

 8           the office lines at the Telephone Department

 9           (sic)?

10     A.    Because at the time I believed there had been

11           some sharing of information between certain

12           individuals in the Town and the Light

13           Department regarding the commission.

14     Q.    Okay.  And is this -- are you referencing your

15           testimony at the last deposition session about

16           your suspicion that either Mr. Beliveau or

17           Miss Stoyle were sharing information with

18           George Dentino?  Is that correct?

19     A.    Yes, yes, or other individuals.

20     Q.    Or other individuals.  Who would then come to

21           meetings and ask embarrassing questions and

22           whatnot, correct?

23     A.    Tried to, yes.

24     Q.    By the way, does George Dentino still go to

                                                              8

 1           the selectmen meetings?

 2     A.    We don't have questions and comments anymore.

 3     Q.    You don't have questions and comments anymore.

 4     A.    So he doesn't come.  He has his own show.

 5     Q.    When did you -- when were questions and

 6           comments dispensed with?

 7     A.    With the election of the new chairman.  That

 8           was shortly thereafter that May of last year.

 9     Q.    Okay.  So up until the point of May of 2005

EXHIBIT NO. 2

D'Agostino4

1

1                                   Volume    IV
                                    Pages    1 - 168
2                                   Exhibits per index

3

4                    UNITED STATES DISTRICT COURT

5                      District of Massachusetts

6

7   DR. JOHN J. BELIVEAU,              )
                        Plaintiff     )
8                                      )
                                       )
    vs.                                )     Civil Action
9                                      )     No. 04-11329-BPW
    TOWN OF MANSFIELD MUNICIPAL        )
10  ELECTRIC DEPARTMENT, JOHN O.       )
    D'AGOSTINO,                        )
11                      Defendants    )

12

13           CONTINUED DEPOSITION OF JOHN O. D'AGOSTINO, a

14   witness called by and on behalf of the Plaintiff, taken

15   pursuant to the applicable provisions of the Federal

16   Rules of Civil Procedure, before Sandra L. Bray,

17   Registered Diplomate Reporter, CSR Number 103593, and

18   Notary Public in and for Commonwealth of Massachusetts,

19   at the offices of Wolf Block, One Boston Place, Boston,

20   Massachusetts, on Tuesday, January 11, 2006, commencing

21   at 10:21 a.m.

22
                              REPORTERS, INC.
23              GENERAL & TECHNICAL COURT REPORTING
                  23 MERRYMOUNT ROAD, QUINCY, MA 02169
24              617.786.7783/FACSIMILE 617/786.7723

2

1   APPEARANCES:

2        JULIANE BALLIRO, ESQUIRE
         WOLF BLOCK
3        One Boston Place
         Boston, Massachusetts  02108
4        on behalf of the Plaintiff

D'Agostino4

19    Q.    Is that what I asked you?  Did I ask you if
20          you promised that Andrea Hottleman would get
21          hired for the job?
22    A.    Yes.
23    Q.    I asked you, did you tell him you would do
24          what you could to help?

                                                          105

1     A.    I told him I would look into it.
2     Q.    Okay.  Has Andrea Hottleman applied for any
3           other positions with the town since she was
4           not hired for this one?
5     A.    I don't know.  I don't know.
6     Q.    All right.  Mr. D'Agostino, I'm going to move
7           on to your response to Mr. Beliveau's charge
8           of discrimination.
9                 (Response of John O. D'Agostino to
10                Allegations Contained in Charge of
11                Discrimination by John J. Beliveau was
12                marked Exhibit Number 45 for
13                identification.)
14    Q.    Mr. D'Agostino, you're looking at what's been
15          marked as Exhibit Number 45 to this
16          deposition.  It is response of John D'Agostino
17          to allegations contained in charge of
18          discrimination by John Beliveau.  I'd just ask
19          you to turn to the last page of that exhibit,
20          which is marked Page Number 9, has a number 9
21          at the bottom.
22    A.    Yes.
23    Q.    Could you tell me, is that your signature?
24    A.    Yes, it is.

D'Agostino4

106

1   Q.   It's dated February 26th, 2004?

2   A.   That's correct.

3   Q.   Did you read this document before you signed

4        it?

5   A.   Yes.

6   Q.   Okay.  Did you assist at all in the drafting

7        of this document?  Did you write it or did

8        you -- did someone else write it and you read

9        it and signed it?

10  A.   It was, I believe, a collaboration between

11       myself and counsel.

12  Q.   When was the last time you reviewed this

13       document?

14  A.   Probably at about the time I signed it.

15  Q.   Okay.  Now, I just want to direct your

16       attention to Paragraph 6 of your response,

17       Page 2.  It says, "6, Allegation.  Shortly

18       after the filing of the Stoyle charge,

19       Mr. D'Agostino held a press conference denying

20       Miss Stoyle's allegations and threatening to

21       sue other unnamed employees.  Upon information

22       and belief, I was one of the employees

23       Mr. D'Agostino was threatening to sue."  Now,

24       that is a -- that simply reiterates

107

1        Mr. Beliveau's allegation against you,

2        correct?

3   A.   It appears that way.

4   Q.   And then there's your response to that

D'Agostino4

| 5 | | allegation. Do you see that? |
|---|---|---|
| 6 | A. | I do. |
| 7 | Q. | And you responded, "After you learned of |
| 8 | | Miss Stoyle's allegations, I stated I would |
| 9 | | take whatever action necessary to clear my |
| 10 | | name. I didn't threaten to sue other |
| 11 | | employees, and I certainly never explicitly or |
| 12 | | implicitly threaten to sue Mr. Beliveau. In |
| 13 | | fact, more than one year has passed since |
| 14 | | Ms. Stoyle has filed her charge of |
| 15 | | discrimination, and I have not sued any |
| 16 | | employee." Do you see that? |
| 17 | A. | That's correct. |
| 18 | Q. | Did you give a press statement -- a press |
| 19 | | interview to Meredith Holford? |
| 20 | A. | Holford. |
| 21 | Q. | So you know who Meredith Holford is? |
| 22 | A. | Yes. |
| 23 | Q. | Did you grant Meredith Holford a press |
| 24 | | interview following Miss Stoyle's filing of |

108

| 1 | | her charge of discrimination? |
|---|---|---|
| 2 | A. | Yes. |
| 3 | | (Article was marked Exhibit Number 46 |
| 4 | | for identification.) |
| 5 | Q. | Okay. Mr. D'Agostino, you have before you a |
| 6 | | copy of an article written by Meredith |
| 7 | | Holford, a staff writer for what newspaper? |
| 8 | A. | The Mansfield News. |
| 9 | Q. | The Mansfield News. It's been marked Exhibit |
| 10 | | Number 46 to this deposition, and in the first |

D'Agostino4

| | | |
|---|---|---|
| 11 | | few paragraphs, she writes, "Town manager John |
| 12 | | D'Agostino says the charges of sexual |
| 13 | | harassment levied on him by Electric |
| 14 | | Department employee Kimberly Stoyle may well |
| 15 | | result in legal action in court, but he |
| 16 | | predicts the tables will turn.  Quote, if |
| 17 | | there is litigation, it will be litigation I |
| 18 | | initiate, unquote, he said in a press |
| 19 | | interview last week.  Quote, I will include |
| 20 | | some citizens as well as some employees, end |
| 21 | | quote." |
| 22 | A. | That's correct. |
| 23 | Q. | Do you deny saying that to Meredith Holford? |
| 24 | A. | No. |

109

| | | |
|---|---|---|
| 1 | Q. | So how is that or why is that not a threat to |
| 2 | | sue other employees? |
| 3 | A. | My intent here, the individuals that I was |
| 4 | | referring to were Carl Clemmey, George |
| 5 | | Dentino, and others who may have been involved |
| 6 | | in initiation of this lawsuit. |
| 7 | Q. | So you believe that somehow George Dentino was |
| 8 | | involved in Kimberly Stoyle's MCAD charge |
| 9 | | against you? |
| 10 | A. | That's my belief. |
| 11 | Q. | What do you base that belief on? |
| 12 | A. | On the fact that that gentleman has spent most |
| 13 | | of the last five years trying to take my |
| 14 | | property right away from me and my employment |
| 15 | | opportunity with the Town by doing whatever he |
| 16 | | can to hurt my reputation, to try to remove me |

D'Agostino4

17      from my position, and this, I believe in his

18      perception, could be a convenient way to

19      achieve that.

20  Q.  So let me make sure I have this right for the

21      record.  It's your testimony that you believe

22      that somehow George Dentino, Carl Clemmey, and

23      Kimberly Stoyle and some unnamed employees

24      conspired together to file a false charge of

                                                    110

1       discrimination against you to get you fired as

2       the Light Department -- as the town manager?

3   A.  Yes.

4   Q.  To your knowledge, did Kimberly Stoyle have

5       any kind of a personal, social, professional

6       relationship with George Dentino?

7   A.  I know that Mr. Dentino spent a lot of time at

8       the Electric Light Department.

9   Q.  Do you think he was there because of Kimberly

10      Stoyle?

11  A.  I think he was there for information purposes.

12  Q.  Do you think he was there to get Kimberly

13      Stoyle and make up a charge of discrimination

14      against you?

15  A.  I believe that people are influenced by other

16      people.

17  Q.  So you think Kimberly Stoyle was influenced by

18      Mr. Dentino's request for information against

19      you and that's why she filed a charge of

20      discrimination?

21  A.  No, that an individual citizen who is in the

22      Light Department on a consistent, regular

D'Agostino4

23     basis with his feet upon the desk as if he

24     belonged there is of concern to me.  I just

111

1     don't know --

2   Q.  What's the connection between Mr. Dentino

3     being at the Light Department with, as you

4     said, his feet upon the desk and Kimberly

5     Stoyle filing a charge of discrimination

6     against you?  What's the conspiracy there?

7   A.  I think the issue is one in which if they can

8     file these harassment charges and enough of it

9     may or may not stick that it would be enough

10    to get me either to leave -- force me to leave

11    on my own or force the board to take action if

12    any of the allegations are true.

13  Q.  Well, who other than Kimberly Stoyle at that

14    point had filed harassment charges against you

15    in Mansfield?

16  A.  She was the only one.

17  Q.  And what about Carl Clemmey?  What did you

18    think Carl Clemmey's role in this conspiracy

19    was?  Was he a mastermind or was he just a

20    small player?

21  A.  Everything of an evil consequence that happens

22    in the Town of Mansfield to some measurable

23    degree happens because of Mr. Clemmey.

24  Q.  Okay.  So Kimberly Stoyle filed the charge of

112

1     discrimination against you, so Mr. Clemmey

2     must be somehow responsible for that charge?

3   A.  I'm sure that he was aware of it.  I'm sure

D'Agostino4

4        that he knew it.  As a matter of fact, long

5        before this ever came out, Mr. Clemmey, who

6        can't keep his mouth shut -- I think it was

7        around Eastertime prior to this -- approached

8        me.  I was waiting for my mother-in-law in the

9        parking lot or -- in the lot that he had

10      owned.  He'd come up, rolled down his window,

11      and he said, "I wanted to bury the hatchet."

12      I said, "Yeah, Carl.  You're not going to bury

13      it in my back."  He said, "There are a lot of

14      things that are going to happen to you over

15      the next couple of months," and then he just

16      drove away.

17   Q.   And you interpreted that to mean Kimberly

18      Stoyle's charge of discrimination?

19   A.   That and other issues, sure.

20   Q.   I see.  Okay.  So who else -- who are the some

21      employees that you believe are involved in

22      this big conspiracy to get you fired by

23      collaborating on a charge of discrimination

24      against you?

113

1   A.   I believe that there might be some employees

2      at the Light Department.

3   Q.   I know, but who?  Who do you think was

4      involved?

5   A.   I think Mr. D'Ambra, I think Mr. Beliveau.  I

6      think there were others.

7   Q.   So when Mr. Beliveau said he believed that you

8      were one of the employees that you were

9      threatening to sue in this quote where you

D'Agostino4

10          said, "If there's going to be litigation, it
11          will be litigation I initiate," he was right,
12          correct?
13     A.   Yes.
14     Q.   Did you suggest to Kimberly Stoyle that she
15          come up to your hotel room to check out the
16          view?
17     A.   No.
18     Q.   Now, you said that Mr. Clemmey approached you
19          or drove up to -- I think you said he rolled
20          down the window and you had that hatchet
21          conversation sometime in the spring --
22     A.   What conversation did you say?
23     Q.   About burying the hatchet.
24     A.   That is a very appropriate conversation to

                                                    114

1           have with Mr. Clemmey, a hatchet conversation.
2      Q.   So I'm just going to refer to it as the
3           hatchet conversation.
4      A.   I like it.
5      Q.   I'm glad you like it.  It doesn't happen too
6           often.
7                 MR. KESTEN:  Close to a sneer.
8      Q.   Let's go back to the hatchet conversation.
9           You said that was in the spring of 2002?
10     A.   It was around Eastertime, I think.  I'm not
11          quite sure of the dates.
12     Q.   Around Eastertime.  And one of the charges
13          that Kimberly Stoyle made in her -- well,
14          strike that.  Strike that.
15                So in your response to the allegations

D'Agostino4

16        contained in the charge of discrimination by
17        John Beliveau which you signed under the pains
18        and penalties of perjury on 2-26-04, it is not
19        accurate that you didn't threaten to sue,
20        correct?
21   A.   I threatened to sue.
22   Q.   So why did you say that you didn't threaten to
23        sue under oath?
24   A.   I said that I --

                                                      115

1    Q.   I'm looking at it right here. Paragraph 6, it
2         says, "I didn't threaten to sue other
3         employees, and I certainly never explicitly or
4         implicitly threatened to sue Mr. Beliveau."
5    A.   That's true.
6    Q.   You're saying that is true?
7    A.   That is true. I haven't sued him.
8    Q.   What I'm asking you, sir, is how could you be
9         accurately quoted by a reporter saying, "If
10        there's litigation, it will be litigation I
11        initiate. I will include some citizens as
12        well as some employees" -- you've testified
13        here under oath that one of those employees
14        you were referring to was Mr. Beliveau -- and
15        then say in your MCAD charge -- MCAD answer
16        also under oath say, "I didn't threaten to sue
17        other employees, and I certainly never
18        explicitly or implicitly threatened
19        Mr. Beliveau"? How do you align those two
20        statements? How could they both be true?
21   A.   They're not.

D'Agostino4

22    Q.    So which one is not true, the one you said to

23          the reporter and that you've testified today

24          here under oath or the one that you signed

116

1           under oath on February 26th of 2002?

2     A.    I don't know how accurate the news reporter's

3           story is.

4     Q.    So now you'd like to change your testimony

5           about the --

6     A.    No, I'm not changing my testimony.

7     Q.    So which one was true?

8     A.    I believe my intention was to clear my name

9           and to sue whoever I had to, including

10          Mr. Beliveau or anybody else, in relationship

11          to this particular charge of sexual

12          harassment.

13    Q.    Mr. D'Agostino, my question to you is simply

14          this:  which of your statements are true, the

15          statements that you made here under oath today

16          wherein you agreed that you did threaten to

17          sue certain people --

18    A.    Yes.

19    Q.    -- and that among those people you were

20          thinking of was Mr. Beliveau?

21    A.    That's correct.

22    Q.    Is that the true statement under oath?

23    A.    That's true.

24    Q.    Or is the statement you made in response to

117

1           Allegation Number 6 in your MCAD response

D'Agostino4

| | | |
|---|---|---|
| 2 | | true?  Which one is true? |
| 3 | A. | The statement I made today. |
| 4 | Q. | Okay.  I want to direct your attention to |
| 5 | | response to Allegation Number 8 that's on Page |
| 6 | | 3 of Exhibit Number 45.  And sort of looking |
| 7 | | in the middle of that first paragraph of the |
| 8 | | response with the sentence that starts with |
| 9 | | "months passed with the situation remaining |
| 10 | | unsettled." Do you see that? |
| 11 | A. | Yes. |
| 12 | Q. | And then you go on to say, "Town employees, |
| 13 | | including me, continued to devote much time |
| 14 | | and energy towards reaching a solution."  Do |
| 15 | | you see that? |
| 16 | A. | Yes. |
| 17 | Q. | Now, this is in reference to the audit that |
| 18 | | Mr. Beliveau commissioned following a dispute |
| 19 | | over whether enough cash was contained in the |
| 20 | | Light Department operating account, correct? |
| 21 | A. | I believe so. |
| 22 | Q. | Okay.  And can you tell me what was it in your |
| 23 | | view that caused that issue to be unresolved |
| 24 | | for months? |

118

| | | |
|---|---|---|
| 1 | A. | Initially, I wanted the staff people to work |
| 2 | | this out internally. |
| 3 | Q. | Well, that didn't happen. |
| 4 | A. | Obviously, that didn't happen.  So that took |
| 5 | | some time. |
| 6 | Q. | And you were aware, were you not, that |
| 7 | | Kimberly Stoyle had alleged, she was |

Page 95

EXHIBIT NO. 3

Case 1:05-cv-10354-DPW    Document 35-4    Filed 04/21/2006    Page 2 of 3

# THE SUN CHRONICLE

Saturday, January 4, 2003

Home delivery $3.75 per week

50¢

## Official accused of sex harassment

### Mansfield Electric Department worker files complaint against town manager

**By RICK FOSTER**
SUN CHRONICLE STAFF

MANSFIELD — The office manager for the town-owned electric department is charging Town Manager John D'Agostino with sexual harassment.

Kimberly Stoyle filed a complaint with the Massachusetts Commission Against Discrimination charging D'Agostino with five instances of "gen-

der based and sexual harassment" between 1999 and last August.

She also alleged that the town manager attempted to retaliate against her by trying to cancel a pay raise, reprimanding her and falsely accusing her of failing to provide business records.

D'Agostino, who also serves as manager of the electric department, called the charges a "fabrication," and said the accusations might have been timed to

coincide with the renewal of his contract by the board of selectmen. Selectmen recently voted to extend the contract, but have not finalized terms.

Stoyle referred all comment to Jack Beliveau, director of the town electric department. Beliveau could not be reached Friday.

"I intend to vigorously defend my word, character and reputation to the full extent of the law," said the town

manager. He said the board of selectmen has hired an attorney to conduct an investigation of the matter.

Stoyle said the first instance of alleged harassment occurred in August 1999 when Stoyle, D'Agostino and other electric department personnel were attending a conference sponsored by the New England Public Power Association.

SEE MANSFIELD, PAGE A2 ▼

Ohio State No. 1 — in double OT!

Bush

acknowledged being an aggressive player who says what she thinks.

RICK FOSTER can be reached at 508-236-0372 or via e-mail at rfoster@thesunchronicle.com.

Celena McDonnell, in her team photograph.

SUBMITTED

## Commuters to pay more to park cars

FROM PAGE A1

New parking fees go into effect Monday at all MBTA-owned commuter rail and subway parking facilities, including the two parking lots for train commuters in Attleboro.

Fees at all commuter rail parking facilities will increase from $1 to $2, and fees at all transit parking facilities will jump by 50 cents. Parking at the Hingham Commuter Boat facility and the Lynn Garage will also cost $2.

It marks the first time the MBTA has increased parking fees since 1989.

The fee hikes are part of a plan to address a projected revenue shortfall of $15 to $18 million.

A number of cost-saving initiatives have also been implemented.

# ▶ MANSFIELD: Manager accused of sexual harassment

She said the town manager suggested that she come to his hotel room to "check out the view."

Other complaints listed by Stoyle concerned a sexually explicit e-mail and various remarks attributed to D'Agostino. The town manager linked the complaint to efforts by a "small group" of local residents who he said have attempted to attack his character in the past.

"There are some people there who would like to destroy my character to the extent that I cannot lead this town," said D'Agostino.

He said some have tried to capitalize on policy disagreements within the department concerning in lieu of tax payments by the utility.

Stoyle, in her complaint, said she told D'Agostino following each incident that she was offended, and reported his conduct on "numerous occasions" to the chairman of the board of electric commissioners.

D'Agostino denied making the

statements alleged by Stoyle and Amoruso, could not be reached Friday.

said neither he nor the board of selectmen, who also function as electric commissioners, have ever been informed of any alleged harassment.

The town manager also denied retaliating against Stoyle, saying he had not attempted to cancel Stoyle's authorized pay raise but merely requested additional documentation.

Stoyle's complaint addressed to the Massachusetts Commission Against Discrimination was dated Dec. 3. Neither commission representatives nor Stoyle's attorney, Lynn Leonard, could be reached Friday.

Daniel Donovan, completing his third year on the board of selectmen, said he was never told of any alleged harassment, and called the claims "far-fetched."

Lou Amoruso, who was elected chairman of the electric commission in May, said he was never made aware of any claims of sexual harassment. Brad Wills, who served as chairman before

D'Agostino said selectmen have hired attorney James Lample of Hingham to conduct the investigation.

Lample declined to comment concerning the complaint, but said it is a common procedure for communities or businesses to conduct internal investigations or call for outside help when sexual harassment is alleged. He said it is impossible to tell at this point how long the investigation may take.

The Massachusetts Commission Against Discrimination, normally has the power to investigate and issue formal complaints in cases of alleged discrimination, and can also hold hearings to determine full fault.

The commission can also impose penalties including administrative orders and requirements that employers pay damages and back wages.

RICK FOSTER can be reached at 508-236-0372 or at rfoster@thesunchronicle.com.



'I intend to vigorously defend my word, character and reputation to the full extent of the law.'

Mansfield
Town Manager
John D'Agostino

EXHIBIT NO. 4





Town Online Home

News & Opinion

Local News

Opinion

Obituaries

Police / Fire Log

Sports

Arts & Lifestyle

Town Resources

MCAS RANKINGS:
Enter Town Name:



Abington

Classifieds
  carfind.com
  homefind.com
  jobfind.com
  merchandise
  services
  personals
  buy tickets
  Place an Ad

Features
  Gift Guide
  Parents & Kids
  Shop TownOnline
  Tunes a Brewing
  weather
  horoscope
  crossword
  lottery results

Services / Help

Advertise with Us
  · Online
  · Print

Contact Us

Home Delivery

**LOCAL NEWS**

# Town manager faces sex harassment charge

*By Meredith Holford / Staff Writer*
Friday, January 10, 2003

Light Dept. worker complains to MCAD

Town Manager John D'Agostino says the charges of sexual harassment levied on him by Electric Department employee Kimberly Stoyle may well result in legal action in court, but he predicts the tables will turn.

"If there is litigation, it will be litigation I initiate," he said in a press interview last week. "I will include some citizens as well as some employees."

D'Agostino said he was surprised, angry, and hurt by the allegations, filed by Stoyle with the Massachusetts Commission Against Discrimination. The complaint was filed by Stoyle's lawyer, Lynn Leonard on Dec. 3.

"I intend to take whatever legal action necessary to exonerate my name and my family," he said . "If this isn't a setup, I don't know what is "

The charges date back to August of 1999, and include several incidents a year through November 2002.

Stoyle's complaint states that in August of 1999 at a Northeast Public Power Association conference, D'Agostino suggested that Stoyle come to his hotel room to "check out the view."

She also said that D'Agostino sent her a sexually charged audio e-mail message in 2000, that he made a derogatory comment about women in April 2002 and made comments about her appearance on several occasions during 2002.

Stoyle also stated that D'Agostino took retaliation against her by attempting to retract a salary increase; by reprimanding her in a way that was "contrived and relatiatory;" and by her of failing to provide information he requested.

Stoyle is the chief financial officer of the town's municipal Light Department, a post she has held sin

She states in her written testimony that the harassment has been ongoing and is not limited to the charges and three retaliation charges detailed in the account. She states in the complaint she inten "emotional distress damages and other compensatory damages," and is filing her complaint agains Mansfield Municipal Electric Plant, the town manager, and the town itself.

D'Agostino said the charges are an attempt to damage him and his family, contrived by a small grou who have banded together for the express purpose of driving him out of town. The filing of the comp same time selectmen are discussing the renewal of D'Agostino's contract.

"These incidents are supposed to have started in 1999 - but I was never notified by the selectmen, Department, or anyone else," he said. "It's no small wonder all of this was timed to coincide with the

LOCAL I

— RELATED

New station b
spring

Snow budget

New Norton b
fresh, handmade f

Norton shop a
paradise

— RELATI

Find a Job in

Yard Sales ar

MCAS Ranke

Boston Home
Guide

BostonHerald
Regional News

— HERALD I
TOO

Email this Arti

Email the Onl

Email the Nev

Printer Friend

Subscribe to t

renewal."

Stoyle said in her written statement she told D'Agostino she was offended by his conduct and that c occasions" reported each incident to the director of the electric plant, Jack Beliveau, who then repo complaints to the Light Commissioners, who are the selectmen.

Monday night, Selectmen Chairman Daniel Donovan, on his way into a Light Commission meeting, disturbed by the action.

Asked for comment, Donovan said, "I think it's a fabrication."

Donovan said not one light commissioner had ever indicated he had been informed of any complair against D'Agostino. He said he had spoken past Light Commission chairmen Lou Amoruso and Bra Donovan they had not been informed of any harassment complaints against D'Agostino.

Donovan also noted actual contact between the two parties is limited because of the physical locati Hall on Park Row and the Light Department offices on High Street.

The selectmen have hired an independent investigator, Attorney James Lamke of Hingham, to tracl and interview people involved in the issue.

The town's sexual harassment policy dictates that the selectmen hold a confidential and independe such claims, D'Agostino said.

D'Agostino said he has not met Lamke, and said he thinks the objectivity of the investigator is critic of the case. He also said that he would cooperate funnly.

Donovan said the investigator had only just begun the process because of the intervening holidays, whole process may take some time.

D'Agostino denied all of the charges, calling the them "felonious accusations perpetrated by a few i

He stated his constitutional rights have been violated, and vowed to set the record straight.

Complaints filed with the MCAD result in a complex and often lengthy series of investigations and h result in compensatory damages awarded to the complainant.

Donovan said he was saddened that even if exonerated, D'Agostino will bear the mark of the invest will likely appear on his job history wherever he goes.

When contacted, Stoyle said she declined to comment while investigation is ongoing.

Back to top



Live Singles Chat!

© Copyright by TownOnline.com and Herald Interactive Advertising Systems, Inc.
No portion of TownOnline.com or its content may be reproduced without the owner's written permission. Privacy Commitment

EXHIBIT NO. 5

Inside this issue....
* Check out the Bridal Section...................Page 3
* Best & Worst of Mansfield 2002..............Page 7
* Mansfield Sports with Larry Roberts.....Pages 20-21

# The Mansfield BUZZ

**Complimentary**  (508) 337-5335

*Serving Your Community*  •  Issue of January 16, 2003

## Sexual harassment suit filed against D'Agostino

*Light Dept. worker accuses Town Manager*

Charges of sexual harassment have been made against Town Manager John D'Agostino by Electric Department employee Kimberly Steyle, which she filed with the Massachusetts Commission Against Discrimination on December

• HARASSMENT
Continued on Page 17



d Daniel Shachat of Essex Street had fun building a snow dog during the last snowfall!!

# Ambulance Fund nears $100K in its first month

January 16, 2003     *The N*

## NEWS

# Light Dept. worker accuses Town Manager of sexual harassment

**• HARASSMENT**
*Continued from Page 1*

3. Stoyle has been the chief financial officer of the Light Department since March 1999.

Her complaint states that she plans to seek "emotional



**Town Manager John D'Agostino.**

distress damages" and other damages against the Town of Mansfield Municipal Electric Plant, the town manager and the Town of Mansfield. The complaint states the harassment began back in August of 1999, where Stoyle stated that, at a Northeast Public Power Association conference, the town manager made suggestive remarks to

her to come back to his hotel room. Stoyle stated in her complaint that over the next two years, until November 2002, D'Agostino sent sexually explicit e-mails and made comments about her appearance. She states that he falsely accused her of failing to provide information he requested and that he reprimanded her in a "contrived and retaliatory" way. She also states that D'Agostino attempted to halt her salary increase.

Stoyle said she could not comment on the complaint while the investigation is ongoing. D'Agostino said he was surprised by the complaint, and that he is convinced this is a setup, conspired by a group of people who would like him to be out of Mansfield. He said the timing of the filing "just happens" to coincide with the renewal of his town manager contract. Stoyle had stated in the complaint that she told D'Agostino numer-

ous times she was offended by his behavior, and reported it to the director of the electric plant, Jack Beliveau.

The selectmen have been reported as stating they were not aware of any complaints. Selectman and past Light Commissioner Lou Amoruso said, "I was never told there was sexual harassment. I was told Kim considered her workplace very tense, very difficult; but I was never told it was sexual harassment."

Amoruso said that the selectmen hired an investigator, Attorney James Lamke, to look into the situation. "I try not to draw any conclusions from it. I will wait to see what [Lamke] has to say. He's done this kind of investigating before," said Amoruso.

D'Agostino has denied all the charges, and is ready to cooperate completely with the investigator. "I am looking forward to a fair and thorough investigative process," D'Agostino said. "I am convinced that at the end it will show that there was no sexual harassment."

*More best of 2002*

# Doyle arrest impersonating a p

The holiday spirit wasn't too brotherly on Decemb arrived at the Cat Man Cafe to deliver a message t doing the brotherly thing — a Franklin police officer because he couldn't get through to his wife, who w teered to go over and tell her to call her husband.

According to Police Chief Arthur O'Neill, at the Kevin Doyle began harassing Ellsworth and callin showed Ellsworth a gold badge and told him he wa

Three other patrons known to the Mansfield poli The group, including Doyle, appeared to be intoxica

Unfortunately for Doyle, he isn't a cop. Or was worked for the MBTA, and O'Neill theorizes Doyle Ellsworth continued to back off, Doyle pressed forwa time Ellsworth called for back up.

Doyle was arrested for impersonating a police off officer, resisting arrest and disorderly conduct.

# The Buzz w hear from

*Let us know your the best and wors happen in town*

*Send your ent*

22 South Ma