UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 05-10354DPW

| | |
|---|---|
| KIMBERLY STOYLE, | ) |
| | ) |
| Plaintiff | ) |
| VS. | ) |
| | ) |
| THE MANSFIELD MUNICIPAL | ) |
| ELECTRIC DEPARTMENT, JOHN | ) |
| D'AGOSTINO, TOWN OF MANSFIELD | ) |
| BOARD OF LIGHT COMMISSIONERS, | ) |
| LOUIS AMORUSO, MICHAEL McCUE, | ) |
| DAVID McCARTER, DANIEL | ) |
| DONOVAN, ROGER ACHILLE and | ) |
| STEVEN MacCAFFRIE, | ) |
| | ) |
| Defendants | ) |

## CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Defendants, Lou Amoruso, Michael McCue, David McCarter, Daniel Donovan, Roger Achille and Steven MacCaffrie (collectively the "individual defendants"), pursuant to Local Rule 56.1, submit the following Concise Statement of Material Facts pursuant to Local Rule 56.1 in support of their Motion For Summary Judgment.[1]

1.    The Mansfield Municipal Light Department ("MMED") is a subdivision of the Town of Mansfield organized under Chapter 164 of the Massachusetts General Laws.  The Board of Light Commissioners

---

[1] As required for purposes of filing a Motion for Summary Judgment, the individual defendants take the facts in light most favorable to the Plaintiff for purposes of this summary judgment motion only.

is the municipal board that has supervisory control over the MMED and its Manager. **Complaint ¶¶ 6, 8, 74, & 78**.

2. In the Town of Mansfield, the Manager of the MMED is also the Town Manager who at all times relevant to this case was John D'Agostino. **Complaint ¶ 7.**

3. Likewise, in the Town of Mansfield, the individual members of the Board of Light Commissioners are the individual members of the Town of Mansfield Board of Selectmen. Louis Amoruso, Michael McCue, David McCarter, Daniel Donovan, Roger Achille and Steven MacCaffrie were members of the Board of Light Commissioners during some period of time during the Plaintiff's employment at MMED. **Complaint ¶¶ 9-14**.

4. The daily operation of the MMED is under the control of the Director, which from 1999 through the date of his termination was Jack Beliveau.  **Complaint at ¶ 48**.

5. On March 8, 1999, Beliveau hired Stoyle to work for the MMED under his supervision.  **Complaint at ¶ 16**.

6. On December 5, 2002, Stoyle filed a Charge of Discrimination with the MCAD in which she accused D'Agostino of gender based harassment, sexual harassment and retaliation.  **Plaintiff's Complaint at ¶ 37**.

7. The first time any of the individual defendants became aware of Stoyle's allegations that she was being harassed by D'Agostino because of her gender and was the subject of sexual harassment by D'Agostino was after she filed her MCAD Charge of Discrimination in December 2002.  Stoyle never complained to or notified any of the

2

individual defendants that she believed she was the subject of gender based harassment or sexual harassment by D'Agostino prior to her filing her MCAD Charge of Discrimination.  Likewise, Beliveau never notified or complained to any of the individual defendants about Ms. Stoyle's belief that she was being harassed by D'Agostino because of her gender or sexually harassed by D'Agostino.  **Exhibit 1 - Deposition testimony of Louis Amoruso Day 1 at pp. 181-182, Day 2 at pp. 28-30**; **Exhibit 2 -Deposition testimony of Roger Achille at p. 32, 40-45; Exhibit 3 - Deposition testimony of Michael McCue at pp. 65-66; Exhibit 4 - Deposition testimony of Steven MacCaffrie at pp. 45-49; Exhibit 5 - Deposition testimony of Daniel Donovan at pp. 25-28, 37; Exhibit 6 – Affidavit of McCarter.**

8.    When the individual defendants first learned of Stoyle's allegations in December 2002, they contacted Town Counsel and hired independent investigator to investigate Stoyle's claims.  The independent investigator hired was James Lampke. **Exhibit 4 at pp. 70-71; Exhibit 5 at pp. 28, 29, 31, 35; Exhibit 3 at p. 66; Exhibit 1 Day 1 at pp. 97, 98.**

9.    When individual defendant Donovan first learned of the MCAD complaint he gave a statement to two reporters that in his opinion the complaint was farfetched because of the geographic location of the two buildings.  D'Agostino and Stoyle worked in two separate locations. **Exhibit 5 at pp. 33 – 38**.

10.    Despite his initial opinion, Donovan believed that it was important to investigate Stoyle's claims. **Exhibit 5 at pp. 33-38.**

3

11.     Stoyle filed her Charge of Discrimination knowing that D'Agostino's
        contract was up for renewal by the Board of Selectmen one month
        later.  The Board of Selectmen, comprised of the individual defendants,
        voted to renew D'Agostino's contract one month later.  The individual
        defendants did not have an issue renewing D'Agostino's contract
        while Stoyle's discrimination charges were pending against him
        because they considered him to be "innocent until proven guilty".
        **Exhibit 4 at pp. 61-63; Exhibit 1 - Day 2 at pp. 21-25; Exhibit 3 at pp.
        80-81.**

12.     Lampke issued his report containing the findings of his investigation
        at the end of June 2003.  **Exhibit 7 – Lampke Report**.

13.     The Board of Light Commissioners reviewed the report and voted to
        accept Lampke's findings on June 25, 2003 and determined that there
        was no foundation for Stoyle's gender harassment and sexual
        harassment claims. **Exhibit 1, Day 1 at pp. 98-103; Day 2 at pp. 25-28;
        Exhibit 2 at pp. 43, 44; Exhibit 3 at pp. 72-78; Exhibit 4 at pp. 71-82.**

14.     After the vote, the Board made a public announcement concerning the
        outcome of the investigation on advice of counsel.  **Exhibit 1, Day 1 at
        pp. 98-99; Exhibit 4 at pp. 71, 109-110.**

15.     After learning that the Board of Light Commissioners voted to accept
        Lampke's findings and determined that there was no foundation for
        Stoyle's gender harassment or sexual harassment claims, Beliveau sent
        a memorandum dated August 13, 2003 to the Chairman of the Board of
        Light Commissioners Steve MacCaffrie claiming that Stoyle believed

that the sexual harassment was continuing.  **Exhibit 8 – Memorandum dated August 13, 2003; Exhibit 4 at pp. 100-101.**

16.   As Stoyle's litigation was still pending, the Board referred the matter to the attorneys representing the Town in Stoyle's then pending litigation. **Exhibit 4 at pp. 100-101, 160-161;**

Respectfully submitted,
The Defendants,
By their attorneys,


/s/ Deborah I. Ecker
Leonard H. Kesten, BBO# 542042
Deborah I. Ecker, BBO# 554623
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA 02116
(617) 880-7100


/s/ Susan Jacobs
Susan Jacobs, Esq.
Volterra, Goldberg & Jacobs
Three Mill Street
Attleboro, MA 02703
(508) 222-1463

DATED: February 28, 2007

# Exhibit 1

1

1          UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF MASSACHUSETTS
2
       C.A. NO. 05-10354 DPW
3

       KIMBERLY STOYLE,                   )
4               Plaintiff                 )
                                          )
5          VS.                            )
                                          )
6      THE MANSFIELD MUNICIPAL            )
       ELECTRIC DEPARTMENT,               )
7      JOHN D'AGOSTINO, TOWN OF           )
       MANSFIELD BOARD OF LIGHT           )
8      COMMISSIONERS,                     )
       LOUIS AMORUSO,                     )
9      MICHAEL MCCUE,                     )
       DAVID MCCARTER,                    )
10     DANIEL DONOVAN,                    )
       ROGER ACHILLE AND                  )
11     STEVEN MACCAFFRIE,                 )
                Defendants                )

12

13          DEPOSITION of LOUIS AMORUSO,

14     called as a witness by and on behalf of the

15     Plaintiff, pursuant to the applicable

16     provisions of the Federal Rules of Civil

17     Procedure, before Teresa E. Costello,

18     Registered Professional Reporter, Certified

19     Shorthand Reporter No. 1452S98, and Notary

20     Public within and for the Commonwealth of

21     Massachusetts, at the offices of

22     McNaught, Cecere & McNaught, 6 Eastman

23     Place, Melrose, Massachusetts, on Tuesday,

24     January 31, 2006, commencing at 10:45 a.m.

                COSTELLO COURT REPORTING

| | | |
|---|---|---|
| 12:33:21 | 1 | called into question.  He was saying that |
| 12:33:23 | 2 | there were -- that the questions were more |
| 12:33:25 | 3 | ones of whether things were being done |
| 12:33:31 | 4 | properly within the internal operations of |
| 12:33:35 | 5 | the financial part of the town treasurers |
| 12:33:37 | 6 | and accountants. |
| 12:33:39 | 7 | Q.  That was within his job description? |
| 12:33:53 | 8 | A.  Well, he's boss of it all. |
| 12:33:55 | 9 | Q.  Was he concerned about his professional |
| 12:33:57 | 10 | reputation? |
| 12:33:58 | 11 | A.  He never said that to me. |
| 12:33:59 | 12 | MR. SKRIP:  Objection.  You can |
| 12:34:00 | 13 | answer. |
| 12:34:00 | 14 | A.  He never said that to me. |
| 12:34:03 | 15 | Q.  And you testified earlier that complaints |
| 12:34:06 | 16 | about financial matters had started early |
| 12:34:11 | 17 | on.  Isn't that correct? |
| 12:34:13 | 18 | A.  Yes, correct. |
| 12:34:14 | 19 | Q.  Do you know, how did you come to choose the |
| 12:34:28 | 20 | investigator for the sexual harassment |
| 12:34:31 | 21 | claim? |
| 12:34:31 | 22 | A.  We asked town counsel for recommendation of |
| 12:34:33 | 23 | a couple of people, and then we chose one. |
| 12:34:37 | 24 | Q.  And did you oversee the investigation? |

98

```
12:34:41   1    A.   I'm not too sure what you mean by oversee.

12:34:46   2    Q.   What was the name of the investigator?

12:34:49   3    A.   Fellow's name was James Lampke.

12:34:55   4    Q.   Who did he report to with respect to his

12:34:57   5         investigation?

12:34:57   6    A.   He reported to the town counsel and

12:35:03   7         certainly reported back to us, came back to

12:35:05   8         us to give us a --

12:35:09   9    Q.   And do you recall the outcome of the

12:35:13  10         investigation?

12:35:14  11              MR. SKRIP:   Hold on.

12:35:17  12    A.   Yes, I do.

12:35:18  13              MR. SKRIP:   That's attorney/client

12:35:19  14         communication.

12:35:20  15              MS. LEONARD:   Well, it was stated

12:35:22  16         on public television.

12:35:23  17              MR. SKRIP:   I'm sorry.

12:35:24  18    Q.   Do you recall the outcome being disclosed

12:35:27  19         on public television?

12:35:28  20    A.   We announced it publicly at a meeting, yes.

12:35:31  21    Q.   What was that outcome?

12:35:32  22    A.   He found no grounds to support the claims

12:35:35  23         made by Miss Stoyle.

12:35:39  24    Q.   Did he generate a written report?
```

COSTELLO COURT REPORTING

| | | |
|---|---|---|
| 12:35:40 | 1 | A.   Yes, he did. |
| 12:35:41 | 2 | Q.   Did you maintain that written report? |
| 12:35:43 | 3 | A.   We did not. |
| 12:35:45 | 4 | Q.   What did you do with it? |
| 12:35:49 | 5 | A.   He retained it. |
| 12:35:52 | 6 | Q.   And did you discuss the outcome of the |
| 12:35:57 | 7 | investigation with Miss Stoyle? |
| 12:36:00 | 8 | A.   No, we did not. |
| 12:36:02 | 9 | Q.   Why not? |
| 12:36:04 | 10 | A.   Because the MCAD was still pending, so we |
| 12:36:09 | 11 | announced publicly -- there were two |
| 12:36:12 | 12 | prongs.   One of them is that we as an |
| 12:36:13 | 13 | employer have to investigate it, but the |
| 12:36:15 | 14 | MCAD was going on, and it was recommended |
| 12:36:18 | 15 | that we not do anymore than announce what |
| 12:36:21 | 16 | our findings were. |
| 12:36:22 | 17 | Q.   But she was still an employee? |
| 12:36:24 | 18 | A.   She was still an employee. |
| 12:36:25 | 19 | Q.   To whom you owed an obligation for a |
| 12:36:27 | 20 | harassment-free environment and |
| 12:36:30 | 21 | investigation, correct? |
| 12:36:31 | 22 | A.   Correct. |
| 12:36:31 | 23 | Q.   Did you discuss the outcome of the |
| 12:36:33 | 24 | investigation with Mr. D'Agostino? |

100

| | | |
|---|---|---|
| 12:36:36 | 1 | A. No more than we did with anyone else. |
| 12:36:39 | 2 | Q. Did he attend meetings regarding wherein |
| 12:36:45 | 3 | this report -- the investigative report was |
| 12:36:46 | 4 | discussed? |
| 12:36:48 | 5 | A. I don't believe he was in the room when the |
| 12:36:50 | 6 | report was given. |
| 12:36:51 | 7 | Q. Where was he? |
| 12:36:53 | 8 | A. He would have been in his office, but I'm |
| 12:36:55 | 9 | not positive. I would have to -- I mean, I |
| 12:36:57 | 10 | think he was not present. We tried to keep |
| 12:36:59 | 11 | that separate because there was an |
| 12:37:01 | 12 | investigation. |
| 12:37:02 | 13 | Q. So you're not sure? |
| 12:37:03 | 14 | A. But I'm not sure of where he was when we |
| 12:37:06 | 15 | actually received the written report. |
| 12:37:08 | 16 | Q. Did you convene the meeting with the board |
| 12:37:09 | 17 | when you received the report? |
| 12:37:10 | 18 | A. We had an executive session before our |
| 12:37:13 | 19 | regular meeting. |
| 12:37:14 | 20 | Q. Was he present? |
| 12:37:15 | 21 | A. I don't recall. |
| 12:37:15 | 22 | Q. You don't recall. Do you recall who was |
| 12:37:22 | 23 | present? |
| 12:37:22 | 24 | A. The members of the board were present. |

COSTELLO COURT REPORTING

101

| | | |
|---|---|---|
| 12:37:24 | 1 | Q. Anyone else? |
| 12:37:25 | 2 | A. Town counsel, I believe, was present. |
| 12:37:29 | 3 | Q. Do you recall the basis for the |
| 12:37:38 | 4 | conclusion -- what did you say the |
| 12:37:39 | 5 | conclusion was again? |
| 12:37:41 | 6 | A. That there was -- I believe that it said |
| 12:37:46 | 7 | that there was no foundation for the claims |
| 12:37:48 | 8 | and that they did not reach the level of |
| 12:37:50 | 9 | sexual harassment. |
| 12:37:54 | 10 | Q. Do you recall the specific facts that |
| 12:37:58 | 11 | supported that conclusion? |
| 12:38:00 | 12 | MR. SKRIP: If you learned those |
| 12:38:02 | 13 | facts through Attorney Lampke, you don't |
| 12:38:09 | 14 | have to answer the question. |
| 12:38:12 | 15 | A. Do I remember what he put into the report? |
| 12:38:16 | 16 | In general, yes, it was a very long report. |
| 12:38:20 | 17 | MS. LEONARD: I've asked for that |
| 12:38:22 | 18 | report, and I expect that it's going to be |
| 12:38:24 | 19 | produced in responses to my discovery. If |
| 12:38:27 | 20 | it's not, then I will motion the court for |
| 12:38:29 | 21 | it because I do think it's discoverable. |
| 12:38:32 | 22 | MR. SKRIP: Okay. |
| 12:38:34 | 23 | MS. LEONARD: We may have to |
| 12:38:35 | 24 | reconvene to talk about that, so just |

COSTELLO COURT REPORTING

102

| | | |
|---|---|---|
| 12:38:39 | 1 | reconvene this deposition since I don't |
| 12:38:41 | 2 | have it today.  So at the conclusion I'll |
| 12:38:43 | 3 | suspend the deposition pending receipt of |
| 12:38:46 | 4 | document. |
| 12:38:47 | 5 | MR. SKRIP:  Take up the issue when |
| 12:38:49 | 6 | it comes time. |
| 12:38:50 | 7 | MS. LEONARD:  Okay. |
| 12:38:54 | 8 | Q.  The town has a lawyer, is that correct? |
| 12:38:57 | 9 | A.  A town counsel, yes. |
| 12:38:59 | 10 | Q.  And that is? |
| 12:39:00 | 11 | A.  Mr. Robert Mangiaratti. |
| 12:39:04 | 12 | Q.  Does he handle all legal matters for the |
| 12:39:06 | 13 | town? |
| 12:39:06 | 14 | A.  His firm does. |
| 12:39:08 | 15 | Q.  Is it fair to say Mr. Lampke was employed |
| 12:39:11 | 16 | to conduct an investigation in this matter? |
| 12:39:14 | 17 | A.  I have to correct my last statement first. |
| 12:39:16 | 18 | The town, from time to time, employs other |
| 12:39:18 | 19 | lawyers to do specific jobs, so although |
| 12:39:22 | 20 | they may be managed by Mr. Mangiaratti's |
| 12:39:25 | 21 | office, he does not do every single thing. |
| 12:39:28 | 22 | I'm sorry.  Ask the question again, if you |
| 12:39:30 | 23 | would, because I realize that I hadn't |
| 12:39:32 | 24 | explained fully. |

COSTELLO COURT REPORTING

| | | |
|---|---|---|
| 12:39:34 | 1 | Q. Do you recall that you concurred with the |
| 12:39:39 | 2 | outcome of the investigation? |
| 12:39:40 | 3 | A. Yes. |
| 12:39:41 | 4 | Q. Did any member of the board disagree with |
| 12:39:43 | 5 | the outcome of the investigation? |
| 12:39:45 | 6 | A. That was done in executive session. I |
| 12:39:53 | 7 | don't believe we took any public vote on it |
| 12:39:56 | 8 | so that I'm not going to explain that to |
| 12:39:59 | 9 | you at this point. |
| 12:40:00 | 10 | MR. SKRIP: Can we go off for one |
| 12:40:02 | 11 | second? |
| 12:40:03 | 12 | (Discussion off the record.) |
| 12:41:02 | 13 | A. So I can't tell you what the discussion was |
| 12:41:05 | 14 | because everyone did say something, but |
| 12:41:08 | 15 | there was a vote of the board in executive |
| 12:41:10 | 16 | session which was to support that, in |
| 12:41:14 | 17 | general. |
| 12:41:14 | 18 | I don't remember what the vote was |
| 12:41:15 | 19 | specifically. I think I remember, but I |
| 12:41:17 | 20 | don't want to say because I've been told |
| 12:41:19 | 21 | not to say things that are totally, you |
| 12:41:22 | 22 | know, imagination or at least in that |
| 12:41:25 | 23 | level, but we did come out to public |
| 12:41:27 | 24 | session and announce the board had voted to |

COSTELLO COURT REPORTING

181

| | | |
|---|---|---|
| 03:14:34 | 1 | payment, who would take the fall for that |
| 03:14:37 | 2 | if it was subjected to scrutiny? |
| 03:14:40 | 3 | A.  Oh, quite likely she will. |
| 03:14:42 | 4 | Q.  And going back to the Affidavit you |
| 03:15:11 | 5 | referred to or you stated that you didn't |
| 03:15:13 | 6 | receive complaints during these meetings of |
| 03:15:15 | 7 | sexual harassment? |
| 03:15:17 | 8 | A.  Correct.  I never heard that term. |
| 03:15:18 | 9 | Q.  Did you hear a description of conduct of a |
| 03:15:21 | 10 | sexual nature? |
| 03:15:22 | 11 | A.  Not really.  Nothing that I -- nothing that |
| 03:15:25 | 12 | I saw it that way, but I heard -- |
| 03:15:27 | 13 | Q.  Did you hear something that might have been |
| 03:15:29 | 14 | perceived by someone else? |
| 03:15:31 | 15 | MR. SKRIP:  Did you finish?  Did |
| 03:15:33 | 16 | you finish whatever you were going to say? |
| 03:15:36 | 17 | A.  What I was listening to was what I thought |
| 03:15:38 | 18 | was all related to this difficulty and |
| 03:15:41 | 19 | these tensions that were existing there, so |
| 03:15:43 | 20 | in hindsight could somebody interpret that |
| 03:15:48 | 21 | way?  Perhaps. |
| 03:15:49 | 22 | Q.  So there were issues raised that involved |
| 03:15:53 | 23 | interactions between people that were more |
| 03:15:57 | 24 | intimate or -- |

182

| | | | |
|---|---|---|---|
| 03:15:58 | 1 | A. | No.  I never heard that.  I did not hear |
| 03:16:00 | 2 | | that.  It was all discussion of tension in |
| 03:16:02 | 3 | | the workplace, demands being put on, |
| 03:16:04 | 4 | | putting three people under pressure, |
| 03:16:07 | 5 | | disagreements over issues such as this. |
| 03:16:11 | 6 | | That's what I heard. |
| 03:16:13 | 7 | Q. | Nothing regarding suggestive conduct or |
| 03:16:17 | 8 | | sexual statements or e-mails or -- |
| 03:16:21 | 9 | A. | There was no discussion of the e-mail I was |
| 03:16:26 | 10 | | talking about earlier until after the MCAD |
| 03:16:30 | 11 | | complaint, and I honestly don't recall |
| 03:16:34 | 12 | | anybody saying anything that was sexual |
| 03:16:37 | 13 | | harassment was going on under any |
| 03:16:40 | 14 | | circumstances. |
| 03:16:44 | 15 | Q. | Okay.  Back to the memo that I just had you |
| 03:16:53 | 16 | | read. |
| 03:16:54 | 17 | A. | Okay.  I haven't really read it all. |
| 03:16:58 | 18 | | That's all right. |
| 03:16:59 | 19 | Q. | I tend to digress.  I apologize for that. |
| 03:17:10 | 20 | A. | So what is your question? |
| 03:17:12 | 21 | Q. | My question is do you recall what prompted |
| 03:17:15 | 22 | | Mr. Gazzolo to prepare this memoranda? |
| 03:17:19 | 23 | A. | The budget.  Undoubtedly it was the budget |
| 03:17:26 | 24 | | that caused this to be done.  This was the |

COSTELLO COURT REPORTING

Page 1

**COPY**

Volume: II

Pages: 1-64

Exhibits: 9-12

UNITED STATES DISTRICT COURT

For the District of Massachusetts

CIVIL ACTION NO. 05 10354 DPW

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

KIMBERLY STOYLE,                              :

            PLAINTIFF                      :

                                  :

  v.                                          :

                                    :

THE MANSFIELD MUNICIPAL ELECTRIC         :

DEPT., JOHN D'AGOSTINO, TOWN OF          :

MANSFIELD BOARD OF LIGHT                 :

COMMISSIONERS, LOUIS AMORUSO,            :

MICHAEL McCUE, DAVID McCARTER,           :

DANIEL DONOVAN, ROGER ACHILLE, and       :

STEVE MacCAFFRIE,                        :

            DEFENDANTS                     :

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    CONTINUED DEPOSITION OF LOUIS AMORUSO, a witness

called on behalf of the Plaintiff, pursuant to the

provisions of the Federal Rules of Civil Procedure,

before Lisa McDonald Valdario, (CSR #130093), a

Registered Professional Reporter and Notary Public

in and for the Commonwealth of Massachusetts, at the

Offices of Law Offices of McNaught, Cecere &

McNaught, Six Eastman Place, Melrose, Massachusetts

02176, on Thursday, August 10, 2006, commencing at

11:22 a.m.

Page 21

1    Q   So you had given him, during this January 30

2        evaluation, the highest grades you had given

3        him.

4    A   Yes.

5    Q   Since you were in the position.

6    A   Yes.

7    Q   Showing you this document entitled:  Agreement,

8        does that refresh your recollection as to when

9        Mr. D'Agostino's contract was renewed?

10   A   It does say the 23rd day of April, 2003 so I

11       would assume that would be the correct date.

12   Q   And it's signed on April 18, 2003.

13   A   Town counsel signed it on April 18, 2003.

14   Q   Okay.  Do you know when the contract became

15       effective?

16   A   I believe it was December, December 1 of '03.

17       That's, usually his contract renews on each

18       December.

19   Q   Actually, I'll strike that question.  Do you

20       recall the date that it was fully executed?

21           MR. KESTEN:  You mean when he signed it?

22   Q   When it was fully executed by everybody.

23           MS. JACOBS:  You mean the date on the

24       first page?

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 22

1          MR. KESTEN:  I think she wants to know

2      when did people sign it.

3    A   I don't recall.  I couldn't give you that

4      detail.

5    Q   In any event, the agreement, the decision to

6      renew his contract was in April 2003 based upon

7      this contract.

8    A   Yes, I would say that's correct.

9    Q   And directing your attention to page 2, and why

10     don't I mark this as the next numbered Exhibit.

11          (Agreement marked Exhibit No. 11 for

12           identification.)

13   Q   Directing your attention to page 2 of what is

14     Exhibit No. 11.

15          MR. KESTEN:  Yes, we have it.  Our

16     attention is directed there.

17   Q   Reviewing Section A, The Term, do you see there

18     that the effective dates are --

19   A   December 1.

20   Q   -- December 1, '03 until November, '06?

21   A   Yes.

22   Q   So it's fair to say then that this contract was

23     executed seven months prior to its effective

24     date.

Page 23

1            MR. KESTEN:  Good math.

2    A   Approximately.  Yes.  Doing math in my head.

3        That's been the typical approach that's been

4        taken, yes.

5    Q   Is that the town --

6    A   That would be the case for the previous contract

7        that he had too, I believe.

8    Q   So it's your testimony that previous contracts

9        then are negotiated six months in advance?

10   A   They at least have to be agreed upon to be done

11       six months in advance because of the contract

12       requirements.

13   Q   Are they signed that far in advance?

14   A   Sometimes yes, sometimes no.

15   Q   Okay.  And when is the vote taken to renew it,

16       the contract, do you know?  Is there some

17       average time?

18   A   There isn't some date, but usually a vote is

19       taken to renew or not renew, and then the

20       contract details are worked out.  In that time

21       is the variable in there.

22            MR. KESTEN:  If you look at page 4,

23       Section 4 of the contract, it will clarify for

24       you why this happens.

Page 24

1          MS. LEONARD:  Lenny, you'll have an

2      opportunity.

3          MR. KESTEN:  I'm just helping.

4          MS. LEONARD:  I appreciate your help.  I

5      really do.

6          MR. KESTEN:  If you take a look, if

7      there's a mystery as to why they do it six

8      months ahead of time, that will help.

9          MS. LEONARD:  If we could let the witness

10     testify, it will be greatly appreciated.

11  Q  Okay.  In any event, did you take into account

12     the fact that there was an outstanding

13     investigation for sexual harassment and

14     retaliation involving Mr. D'Agostino at the time

15     you decided to renew his contract in April of

16     2003?

17  A  Of course.

18  Q  And that did not impact your decision?

19  A  It had an influence on the decision, but it did

20     not change it.

21  Q  And did you consider, and I'll state it

22     generally, if you can answer it, all of the

23     things that you testified to in your previous

24     deposition regarding issues that arose during

Page 25

1       his administration in the prior year?

2    A  Those were certainly all, as I recall them, and

3       in terms of how my mind sorted those relative

4       importances, certainly they were all part of the

5       thinking.

6    Q  So you considered his, all of those issues --

7    A  Yes.

8    Q  -- in determining whether or not to renew his

9       contract.

10   A  Yes.

11              MS. LEONARD:  And off the record.

12                   (Off the record.)

13   Q  Do you recall that in July, 2003, the outside

14      investigation by Mr. Lamke was completed?

15   A  I recall it being completed.  I don't know the

16      exact date, but that sounds correct.

17   Q  And did you read the report in its entirety?

18   A  I read a draft of the report in its entirety.

19   Q  So you didn't read the final?

20   A  I don't think there ever was a final.  All we

21      ever saw was something that was stamped Draft.

22   Q  Was it a lengthy document?

23   A  Sure was.

24   Q  Did you meet as a Board regarding the

Page 26

1      investigation?

2    A    Yes.

3    Q    Who was present during that meeting?

4    A    It was an executive session.  I don't -- I

5         believe all of the then members were present.

6    Q    Was the town manager present?

7    A    No.

8    Q    Did you discuss the findings with the town

9         manager?  Or strike that.  Did you discuss the

10        investigation itself as, with the town manager?

11   A    No.  I mean, the outcome may have been

12        discussed, but certainly the individual,

13        specific items were not discussed.

14            MS. LEONARD:  Can you read his last answer

15        back, I'm sorry.

16                (Answer read back.)

17   Q    So the Board's conclusion was discussed?

18   A    He was told.  I mean --

19   Q    He was told.  And do you recall when he was

20        told?

21   A    I don't know the exact time, no.

22   Q    Do you recall if he was told prior to the public

23        announcement?

24   A    I don't recall.  I suspect, but I cannot, I

Page 27

1           cannot give you a definitive answer on that.

2    Q      Who told him?

3    A      It would have been the chairman.  I have to tell

4           you, I'm trying to remember whether we met with

5           him after we had met with Lamke, and I do not

6           recall for sure what happened.

7    Q      Did you discuss the Board's conclusion with

8           Kimberly Stoyle?

9    A      No, we did not.

10   Q      And it's fair to say that Mr. Lamke's report,

11          reported facts given to him by various

12          witnesses, isn't that correct?

13   A      Facts and opinions, yes.

14   Q      And it's fair to say, isn't it, that Mr. Lamke

15          left the ultimate investigative conclusion to

16          the Board.

17   A      Yes.

18   Q      And in addition to the facts set forth in

19          Mr. Lamke's report, did you take into account

20          your own assessment of the situation based upon

21          the meetings that you had with Kimberly Stoyle,

22          Jack Beliveau and John D'Agostino, and I mean

23          the meetings that you described at your prior

24          deposition?

Page 28

1    A    Could you say it again?  I'm sorry.

2    Q    Sure.  You testified at your prior deposition

3         that you had had meetings with Kimberly Stoyle,

4         Jack Beliveau and John D'Agostino at various

5         times, and I won't go back over them.

6    A    Yes.  Right.

7    Q    In coming to your conclusion, investigative

8         conclusion, did you take into account your own

9         assessment of the situation based upon those

10        meetings?

11   A    Oh, sure.  I think anyone would have to take

12        their own conclusions as well as the conclusions

13        of the report.  However, I think the report did

14        provide a number of individual points that

15        certainly were strongly influencing the Board.

16   Q    At that point in time, did you share the

17        details, do you recall whether or not you shared

18        the details of your meetings with Kim Stoyle,

19        Jack Beliveau and John D'Agostino with the Board

20        in any level of detail?

21   A    I don't think I did any kind of detail, no.

22   Q    Do you recall being interviewed during the

23        course of Mr. Lamke's investigation?

24   A    Yes.

Page 29

1   Q    Okay.

2              MS. LEONARD:   And I'd like to mark as the

3         next numbered Exhibit an excerpt from

4         Mr. Lamke's investigation, and that would be his

5         interview of Lou Amoruso.

6              (Amoruso's interview by Investigator

7               Lamke marked Exhibit No. 12 for

8               identification.)

9   Q    Okay.  I'd like to go through the statements

10        that you made to Mr. Lamke.  The second

11        paragraph says that, "Amoruso said that the

12        first time he became aware of allegations of

13        sexual harassment was when the town received the

14        notices of the Complaint filed with the MCAD.

15        He had heard about the Complaints prior to this

16        from Jack Beliveau and Stoyle about hostile work

17        environment and harassment, but it was never

18        presented to him in the context of anything

19        sexual.  He said that the complaints were not of

20        a sexual nature."

21             Do you agree that was your statement to

22        him?

23   A    Yes.

24   Q    And you agree with that statement today?

Page 30

1    A    Yes.

2    Q    Okay.  Directing your attention to the paragraph

3         that states, "Amoruso said that he recalls that

4         Beliveau contacted him about having a meeting

5         sometime in the fall of 2001, very likely it has

6         been identified by" --

7              MR. KESTEN:  Lynn, can I just suggest, do

8         you have to read it into the record?  You can

9         just tell him to look at the paragraph and if he

10        agrees -- I don't think we have to --

11             MS. LEONARD:  We can shorten it, Lenny, if

12        you want.

13   Q    Why don't you take a look at that paragraph

14        where it starts, "Amoruso said that he recalls."

15   A    Yes.

16   Q    Do you agree that's what you told Mr. Lamke?

17   A    I'm not sure whether I said Beliveau or Stoyle,

18        but one of them, yes.

19   Q    And that's your recollection today?

20   A    Yes.

21   Q    Okay.  And the next paragraph, why don't you

22        take a look at that.

23   A    Okay.

24   Q    Do you agree with that paragraph?

Exhibit 2

1

1               UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
2
    C.A. NO. 05-10354 DPW
3
    KIMBERLY STOYLE,             )
4           Plaintiff        )
                           )
5         VS.                 )
                           )
6    THE MANSFIELD MUNICIPAL   )
    ELECTRIC DEPARTMENT,      )
7    JOHN D'AGOSTINO, TOWN OF  )
    MANSFIELD BOARD OF LIGHT   )
8    COMMISSIONERS,            )
    LOUIS AMORUSO,            )
9    MICHAEL MCCUE,            )
    DAVID MCCARTER,          )
10   DANIEL DONOVAN,         )
    ROGER ACHILLE AND       )
11   STEVEN MACCAFFRIE,      )
           Defendants       )
12

13

14

15               **DEPOSITION** of **ROGER ACHILLE**,
    called as a witness by and on behalf of
16   the Plaintiff, pursuant to the applicable
    provisions of the Federal Rules of Civil
17   Procedure, before Teresa E. Costello,
    Certified Realtime Reporter, Registered
18   Professional Reporter, Certified Shorthand
    Reporter No. 1452S98, and Notary Public
19   within and for the Commonwealth of
    Massachusetts, at the offices of Wolf
20   Block, One Boston Place, Boston,
    Massachusetts, on Saturday, September 30th,
21   2006, commencing at 10:04 a.m.

22

23

24

| | | |
|---|---|---|
| 10:39:32 | 1 | Q. When was that? |
| 10:39:35 | 2 | A. What do you mean by internal complaint? |
| 10:39:40 | 3 | Q. That she had complained, made complaints in |
| 10:39:50 | 4 | the workplace, sexual harassment and |
| 10:39:52 | 5 | retaliation? |
| 10:39:53 | 6 | A. The first time I became aware was, I |
| 10:40:00 | 7 | believe it was in the newspaper prior to my |
| 10:40:03 | 8 | election. |
| 10:40:03 | 9 | Q. When was that? |
| 10:40:05 | 10 | A. I know it was prior to my election.  I |
| 10:40:11 | 11 | can't recall the month. |
| 10:40:12 | 12 | Q. After you became elected in 2003 were |
| 10:40:18 | 13 | incidents brought to your attention |
| 10:40:20 | 14 | regarding complaints made by Kimberly |
| 10:40:23 | 15 | Stoyle in the workplace? |
| 10:40:33 | 16 | MS. ECKER:  Outside of those |
| 10:40:34 | 17 | discussed in executive session. |
| 10:40:36 | 18 | MS. LEONARD:  Well, I stated my |
| 10:40:37 | 19 | objection in the past.  You're raising that |
| 10:40:40 | 20 | and I'll just reiterate the same objection. |
| 10:40:42 | 21 | MS. ECKER:  I understand.  I'm |
| 10:40:43 | 22 | instructing him not to testify to anything |
| 10:40:46 | 23 | discussed during executive session.  If |
| 10:40:48 | 24 | there's any information outside of that, |

40

| | | |
|---|---|---|
| 11:08:29 | 1 | of that? |
| 11:08:30 | 2 | A.  Well, I first became aware with the |
| 11:08:36 | 3 | newspaper article. |
| 11:08:37 | 4 | Q.  I'm talking about when you came on the |
| 11:08:39 | 5 | board. |
| 11:08:41 | 6 | A.  I became aware as part of becoming aware of |
| 11:08:49 | 7 | issues that are going around in the town as |
| 11:08:52 | 8 | a selectmen, right. |
| 11:08:53 | 9 | Q.  Do you recall how you became aware? |
| 11:08:57 | 10 | A.  I believe it was part of documentation that |
| 11:09:03 | 11 | was provided to me upon becoming selectmen. |
| 11:09:07 | 12 | Q.  And what documentation was that? |
| 11:09:12 | 13 | A.  There was an investigation that was done on |
| 11:09:20 | 14 | behalf of the town. |
| 11:09:21 | 15 | Q.  Was that an investigative report by |
| 11:09:23 | 16 | Mr. Lampke? |
| 11:09:24 | 17 | A.  Yes. |
| 11:09:24 | 18 | Q.  And was that the first time that you became |
| 11:09:27 | 19 | aware of the allegations by Miss Stoyle? |
| 11:09:31 | 20 | MS. JACOBS:  Well, he already |
| 11:09:32 | 21 | testified that he became aware when it was |
| 11:09:33 | 22 | in the newspaper. |
| 11:09:35 | 23 | THE WITNESS:  Right. |
| 11:09:36 | 24 | Q.  Let me just correct the question. |

| | | |
|---|---|---|
| 11:09:38 | 1 | A. Sure. |
| 11:09:38 | 2 | Q. Was that the first time you became aware |
| 11:09:40 | 3 | after you became a selectmen? |
| 11:09:42 | 4 | A. I believe so because it was, I think, |
| 11:09:48 | 5 | almost the same time. |
| 11:09:51 | 6 | Q. And did you have a meeting regarding the |
| 11:09:58 | 7 | Lampke investigation? |
| 11:10:00 | 8 | A. Yes. |
| 11:10:00 | 9 | Q. And who was in attendance at the meeting? |
| 11:10:03 | 10 | A. I know that all of the board of selectmen |
| 11:10:09 | 11 | were present, I believe, the town manager. |
| 11:10:23 | 12 | I'm assuming the town counsel was there, |
| 11:10:29 | 13 | and I don't recall if I ever met |
| 11:10:31 | 14 | Mr. Lampke. I'm not sure. |
| 11:10:33 | 15 | Q. So you don't recall if Mr. Lampke was |
| 11:10:36 | 16 | there? |
| 11:10:36 | 17 | A. I don't recall. |
| 11:10:36 | 18 | Q. But his report was there? |
| 11:10:37 | 19 | A. His report was there, yes. |
| 11:10:39 | 20 | Q. Do you recall if you assumed your position |
| 11:10:40 | 21 | in May? |
| 11:10:41 | 22 | A. Yes. |
| 11:10:41 | 23 | Q. Do you recall when that meeting was? |
| 11:10:44 | 24 | A. Shortly thereafter. |

42

| | | |
|---|---|---|
| 11:10:45 | 1 | Q. Okay. Was there more than one meeting? |
| 11:10:51 | 2 | A. I don't recall. |
| 11:10:52 | 3 | Q. And what was discussed at the meeting? |
| 11:10:55 | 4 | MS. JACOBS: I'm going to object |
| 11:10:56 | 5 | to that, any discussions would have |
| 11:10:59 | 6 | occurred during executive session. |
| 11:11:02 | 7 | Q. Was that an executive session meeting? |
| 11:11:05 | 8 | A. Yes. |
| 11:11:06 | 9 | Q. Did you have an opportunity to review the |
| 11:11:12 | 10 | report? |
| 11:11:13 | 11 | A. Yes. |
| 11:11:14 | 12 | Q. And did you make any determinations as to |
| 11:11:21 | 13 | the allegations? |
| 11:11:23 | 14 | MS. JACOBS: Again, I'm going to |
| 11:11:24 | 15 | object to the extent that that question |
| 11:11:27 | 16 | asks about any discussions that occurred |
| 11:11:29 | 17 | during executive session. |
| 11:11:31 | 18 | MS. LEONARD: That's fine. |
| 11:11:33 | 19 | Q. Did you review the report prior to |
| 11:11:34 | 20 | executive session? |
| 11:11:35 | 21 | A. Yes. |
| 11:11:36 | 22 | Q. And did you consider the content of the |
| 11:11:40 | 23 | report prior to executive session? |
| 11:11:42 | 24 | A. Yes. |

43

| | | |
|---|---|---|
| 11:11:42 | 1 | Q. And did you have -- and it's fair to say |
| 11:11:59 | 2 | that Mr. Lampke reported facts and |
| 11:12:02 | 3 | information obtained from interviews, |
| 11:12:06 | 4 | correct? |
| 11:12:07 | 5 | A. He reported interviews, yes. |
| 11:12:10 | 6 | Q. And did you discuss the report with |
| 11:12:22 | 7 | Kimberly Stoyle? |
| 11:12:24 | 8 | A. No. |
| 11:12:26 | 9 | Q. And did the board vote regarding whether |
| 11:12:43 | 10 | or not action should be taken against |
| 11:12:45 | 11 | Mr. D'Agostino? |
| 11:12:47 | 12 | A. I don't recall if there was a vote |
| 11:12:56 | 13 | regarding that. |
| 11:12:58 | 14 | Q. Do you recall that there was a public |
| 11:13:04 | 15 | announcement regarding the allegations |
| 11:13:06 | 16 | against the town manager? |
| 11:13:07 | 17 | A. Yes. |
| 11:13:07 | 18 | Q. And did you approve beforehand the |
| 11:13:11 | 19 | statement that was read? |
| 11:13:13 | 20 | A. I was aware of it. |
| 11:13:17 | 21 | Q. And did the board vote as a group regarding |
| 11:13:19 | 22 | that statement? |
| 11:13:22 | 23 | A. I don't recall. |
| 11:13:23 | 24 | Q. Do you recall supporting that statement? |

44

| | | |
|---|---|---|
| 11:13:28 | 1 | A.   I don't recall the statement. |
| 11:13:37 | 2 | Q.   Do you recall that the statement cleared |
| 11:13:41 | 3 | the town manager of charges of sexual |
| 11:13:45 | 4 | harassment? |
| 11:13:47 | 5 | A.   Yes. |
| 11:13:57 | 6 | Q.   And did you support that statement? |
| 11:14:02 | 7 | A.   I support the conclusion. |
| 11:14:04 | 8 | Q.   Clearing the town manager?  Is that the |
| 11:14:09 | 9 | conclusion you're referring to? |
| 11:14:11 | 10 | A.   Yes. |
| 11:14:11 | 11 | Q.   That was the conclusion that the board |
| 11:14:14 | 12 | arrived at, isn't that correct? |
| 11:14:18 | 13 | A.   Yes. |
| 11:14:18 | 14 | Q.   And it's your testimony that you voted in |
| 11:14:23 | 15 | support of that conclusion? |
| 11:14:25 | 16 | A.   Yes. |
| 11:14:25 | 17 | Q.   What was the basis for your vote to |
| 11:14:43 | 18 | exonerate town manager? |
| 11:14:47 | 19 | A.   Based on what was presented in the Lampke |
| 11:14:53 | 20 | report. |
| 11:14:54 | 21 | Q.   Do you recall after reviewing the Lampke |
| 11:15:18 | 22 | report becoming aware at any other time or |
| 11:15:22 | 23 | when next -- strike that.  When, next, |
| 11:15:25 | 24 | after reviewing the Lampke report, if at |

45

| | | |
|---|---|---|
| 11:15:27 | 1 | all, did you become aware of claims by |
| 11:15:29 | 2 | Miss Stoyle regarding sexual harassment and |
| 11:15:32 | 3 | retaliation in the workplace? |
| 11:15:34 | 4 | A.   I don't recall any additional allegations |
| 11:15:41 | 5 | then from what was in the Lampke report. |
| 11:16:00 | 6 | Q.   Do you recall the board discussing a memo |
| 11:16:17 | 7 | prepared by Mr. Beliveau regarding |
| 11:16:19 | 8 | continuing sexual harassment? |
| 11:16:21 | 9 | A.   No. |
| 11:16:22 | 10 | Q.   I want to show you what's been marked as |
| 11:16:31 | 11 | Exhibit 2 at the deposition of Lou Amoruso |
| 11:16:38 | 12 | and ask you if that refreshes your |
| 11:16:41 | 13 | recollection. |
| 11:16:43 | 14 | A.   Okay. |
| 11:17:29 | 15 | MS. JACOBS:   Are you going to mark |
| 11:17:31 | 16 | this? |
| 11:17:32 | 17 | MS. LEONARD:   Why don't we mark |
| 11:17:34 | 18 | that as Exhibit Number 1 to this |
| 11:17:40 | 19 | deposition. |
| | 20 | (Memo marked as |
| 11:18:00 | 21 | Exhibit Number 1.) |
| 11:18:00 | 22 | A.   I don't doubt the authenticity of the memo. |
| 11:18:03 | 23 | I don't recall the memo. |
| 11:18:07 | 24 | Q.   You don't recall discussing it as a board? |

Exhibit 3

1

1      UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
2
       C.A. NO. 05-10354 DPW
3
       KIMBERLY STOYLE,                    )
4              Plaintiff                   )
                                           )
5          VS.                             )
                                           )
6      THE MANSFIELD MUNICIPAL             )
       ELECTRIC DEPARTMENT,                )
7      JOHN D'AGOSTINO, TOWN OF            )
       MANSFIELD BOARD OF LIGHT            )
8      COMMISSIONERS,                      )
       LOUIS AMORUSO,                      )
9      MICHAEL MCCUE,                      )
       DAVID MCCARTER,                     )
10     DANIEL DONOVAN,                     )
       ROGER ACHILLE AND                   )
11     STEVEN MACCAFFRIE,                  )
              Defendants                   )
12

13

14

                  DEPOSITION of MICHAEL MCCUE,
15     called as a witness by and on behalf of
       the Plaintiff, pursuant to the applicable
16     provisions of the Federal Rules of Civil
       Procedure, before Teresa E. Costello,
17     Certified Realtime Reporter, Registered
       Professional Reporter, Certified Shorthand
18     Reporter No. 1452S98, and Notary Public
       within and for the Commonwealth of
19     Massachusetts, at the offices of
       Wolf Block, One Boston Place, Boston,
20     Massachusetts, on Friday, October 13, 2006,
       commencing at 10:00 a.m.
21

22

23

24

65

| | | |
|---|---|---|
| 12:01:06 | 1 | Q. At some point in time did you become aware |
| 12:03:33 | 2 | that Kimberly Stoyle -- |
| 12:03:35 | 3 | A. Yes. |
| 12:03:35 | 4 | Q. -- made complaints of sexual harassment and |
| 12:03:39 | 5 | retaliation? |
| 12:03:40 | 6 | A. Yes. |
| 12:03:40 | 7 | Q. Do you recall when you became aware of |
| 12:03:41 | 8 | that? |
| 12:03:41 | 9 | A. No, I don't recall. |
| 12:03:42 | 10 | Q. Do you recall how you became aware? |
| 12:03:46 | 11 | A. No, I don't recall how I became aware. |
| 12:03:48 | 12 | Q. Did somebody tell you? |
| 12:03:50 | 13 | A. I would assume somebody told me before I |
| 12:03:56 | 14 | saw anything in writing. |
| 12:03:58 | 15 | Q. Was it prior to the time there was a formal |
| 12:04:02 | 16 | complaint filed with the MCAD? |
| 12:04:05 | 17 | A. I don't recall. |
| 12:04:06 | 18 | Q. Do you recall what the allegations were? |
| 12:04:10 | 19 | A. Not specifically, no. |
| 12:04:15 | 20 | Q. Do you recall, as you sit here today, any |
| 12:04:17 | 21 | of the specifics of the complaint? |
| 12:04:19 | 22 | A. Just that the complaint was made against |
| 12:04:21 | 23 | the town manager. I don't recall the |
| 12:04:22 | 24 | specifics. |

66

| | | |
|---|---|---|
| 12:04:24 | 1 | Q. Did you take any steps to investigate it? |
| 12:04:29 | 2 | A. No. Well, I take that back. We hired an |
| 12:04:34 | 3 | independent counsel from Hull, I think. |
| 12:04:46 | 4 | Q. Do you recall discussing the allegations |
| 12:04:48 | 5 | with any other member of the board -- |
| 12:04:50 | 6 | A. I don't -- |
| 12:04:51 | 7 | Q. -- at any time? |
| 12:04:51 | 8 | A. I don't recall it other than if we would |
| 12:04:54 | 9 | have discussed it in executive session. |
| 12:04:56 | 10 | MS. GRIFFIN: I'm sorry. I |
| 12:04:57 | 11 | apologize. Can we go off the record for |
| 12:04:59 | 12 | just one second? |
| 12:05:00 | 13 | (Discussion off the record.) |
| 12:05:17 | 14 | Q. Did you ever discuss the allegations with |
| 12:05:19 | 15 | Kimberly Stoyle? |
| 12:05:20 | 16 | A. No. |
| 12:05:21 | 17 | Q. Did you ever -- |
| 12:05:22 | 18 | A. Not that I recall, no. |
| 12:05:23 | 19 | Q. Did you ever discuss the allegations with |
| 12:05:26 | 20 | John D'Agostino? |
| 12:05:27 | 21 | A. We would have in executive session. |
| 12:05:33 | 22 | Q. So your discussions with John were during |
| 12:05:37 | 23 | executive session? |
| 12:05:39 | 24 | A. To the best of my recollection. |

72

| 12:12:38 | 1 | Q. | So the answer is no? |
|---|---|---|---|

12:12:38   1    Q.   So the answer is no?

12:12:40   2    A.   Yes, no.

12:12:41   3    Q.   Did you have any reason to disbelieve her?

12:12:50   4    A.   Personal reasons to disbelieve?  No.

12:13:02   5    Q.   Do you have any reason, personal or

12:13:06   6         otherwise, to disbelieve her?

12:13:09   7    A.   Well, base my beliefs, my determinations on

12:13:16   8         the findings of the investigator.

12:13:18   9    Q.   What were your beliefs?

12:13:23  10    A.   At which time?  As a result of the --

12:13:31  11    Q.   The investigation.

12:13:32  12    A.   As a result of the investigation?

12:13:35  13    Q.   Yes.

12:13:35  14    A.   That the allegations don't reach the

12:13:44  15         standard by which one would call them

12:13:44  16         sexual harassment.  I based it basically on

12:13:46  17         the findings.

12:13:47  18    Q.   Did you consider that the allegations

12:13:51  19         violated the town sexual harassment policy?

12:13:54  20    A.   No.

12:13:55  21    Q.   You didn't?

12:13:56  22    A.   No.

12:13:57  23    Q.   Do you consider that the allegations

12:14:00  24         violated the town's e-mail policy?

73

| | | |
|---|---|---|
| 12:14:09 | 1 | A.  I believe the e-mail policy that was put in |
| 12:14:11 | 2 | front of me was dated 2003, and that the |
| 12:14:16 | 3 | things that were discussed took place prior |
| 12:14:19 | 4 | to 2003, so I would have to say no. |
| 12:14:25 | 5 | THE WITNESS:  Am I correct? |
| 12:14:27 | 6 | MR. KESTEN:  That there was no |
| 12:14:28 | 7 | e-mail policy before that? |
| 12:14:29 | 8 | MS. LEONARD:  Well, you know what? |
| 12:14:31 | 9 | There's no question before you. |
| 12:14:34 | 10 | A.  I'll say no. |
| 12:14:35 | 11 | Q.  There's no question before your lawyer. |
| 12:14:37 | 12 | MR. KESTEN:  There is a question |
| 12:14:38 | 13 | before the lawyer.  The question is on the |
| 12:14:40 | 14 | computer. |
| 12:14:53 | 15 | Q.  Did you ever discuss the allegations with |
| 12:14:55 | 16 | Brad Wills? |
| 12:14:56 | 17 | A.  Brad, no. |
| 12:14:58 | 18 | Q.  Never? |
| 12:14:58 | 19 | A.  Not to my recollection. |
| 12:15:00 | 20 | Q.  What, again, was the investigative |
| 12:15:22 | 21 | conclusion? |
| 12:15:23 | 22 | A.  That the findings were that sexual |
| 12:15:26 | 23 | harassment had not taken place. |
| 12:15:28 | 24 | Q.  Are you aware that the town manager |

74

| | | |
|---|---|---|
| 12:15:32 | 1 | admitted to certain allegations? |
| 12:15:34 | 2 | A. Yes. |
| 12:15:35 | 3 | Q. Are you aware that he admitted to sending |
| 12:15:37 | 4 | Miss Stoyle a sexually explicit e-mail? |
| 12:15:40 | 5 | A. I don't recall the particulars. |
| 12:15:46 | 6 | Q. The particulars of what? |
| 12:15:48 | 7 | A. To which you're referring.  There was an |
| 12:15:51 | 8 | e-mail exchange.  I don't remember what |
| 12:15:52 | 9 | e-mail that may have been. |
| 12:15:53 | 10 | Q. Do you recall an e-mail about a gerbil |
| 12:15:57 | 11 | climbing up someone's anus? |
| 12:15:59 | 12 | A. Yes.  Yes. |
| 12:16:00 | 13 | Q. That refreshes your recollection? |
| 12:16:01 | 14 | A. I remember that. |
| 12:16:02 | 15 | Q. Do you recall that he admitted sending that |
| 12:16:05 | 16 | sexually explicit e-mail? |
| 12:16:06 | 17 | A. I don't recall him making that statement to |
| 12:16:08 | 18 | me, no, but I do recall that situation. |
| 12:16:10 | 19 | Q. Do you recall the report indicating that he |
| 12:16:13 | 20 | admitted sending the e-mail? |
| 12:16:14 | 21 | A. I don't recall it.  Again, I haven't |
| 12:16:16 | 22 | reviewed the report prior to coming here, |
| 12:16:19 | 23 | so I can't say for sure. |
| 12:16:20 | 24 | Q. Are you aware as you sit here today that he |

| | | |
|---|---|---|
| 12:16:23 1 | | admitted sending that e-mail from any |
| 12:16:31 2 | | source? |
| 12:16:32 3 | A. | I don't remember.  I don't remember the |
| 12:16:37 4 | | origin of the e-mail and to whom it was |
| 12:16:40 5 | | sent, who sent it to whom.  I don't recall. |
| 12:16:43 6 | Q. | That's not my question. |
| 12:16:44 7 | A. | No. |
| 12:16:44 8 | Q. | My question is -- |
| 12:16:46 9 | A. | No. |
| 12:16:46 10 | Q. | So you're not aware that he admitted |
| 12:16:50 11 | | sending the e-mail? |
| 12:16:51 12 | A. | I don't recall. |
| 12:16:52 13 | Q. | Do you consider an e-mail like that in the |
| 12:16:54 14 | | workplace from employee to employee to |
| 12:16:56 15 | | violate the sexual harassment policy? |
| 12:16:59 16 | A. | No. |
| 12:17:10 17 | | MR. KESTEN:  Why don't you ask him |
| 12:17:12 18 | | if he ever -- |
| 12:17:13 19 | | MS. LEONARD:  Lenny, I'll ask my |
| 12:17:16 20 | | own questions.  Please don't interject. |
| 12:17:17 21 | | MR. KESTEN:  Can you establish |
| 12:17:19 22 | | whether he ever heard of the e-mail? |
| 12:17:21 23 | | MS. LEONARD:  You know what?  I'll |
| 12:17:23 24 | | ask my own questions. |

76

| | | |
|---|---|---|
| 12:17:25 | 1 | MR. KESTEN:  Okay, without a |
| 12:17:26 | 2 | question.  Just like to interject. |
| 12:17:31 | 3 | MS. GRIFFIN:  That's not |
| 12:17:33 | 4 | necessary. |
| 12:17:33 | 5 | MR. KESTEN:  But true.  He always |
| 12:17:36 | 6 | has grounds -- |
| 12:17:38 | 7 | MS. GRIFFIN:  That's enough. |
| 12:17:39 | 8 | We're short on time as it is. |
| | 9 | MR. KESTEN:  That's the other |
| 12:17:45 | 10 | thing. |
| 12:17:45 | 11 | Q.  Do you consider an e-mail involving a |
| 12:17:49 | 12 | gerbil climbing up someone's anus to be |
| 12:18:03 | 13 | sexual in nature? |
| 12:18:05 | 14 | A.  No. |
| 12:18:07 | 15 | Q.  You don't? |
| 12:18:08 | 16 | A.  No.  Crude humor. |
| 12:18:16 | 17 | Q.  Are you aware that Mr. D'Agostino admitted |
| 12:18:20 | 18 | to telling Miss Stoyle that she looked |
| 12:18:22 | 19 | delicious? |
| 12:18:23 | 20 | A.  I believe I recall that within the back and |
| 12:18:28 | 21 | forth of the reports or the investigation. |
| 12:18:32 | 22 | Q.  Do you recall that Mr. D'Agostino admitted |
| 12:18:47 | 23 | taking another female employee to lunch for |
| 12:18:50 | 24 | the purposes of helping her get a job?  Not |

77

| | | |
|---|---|---|
| 12:19:00 | 1 | employee, excuse me. |
| 12:19:02 | 2 | MR. KESTEN: Yes, employee. |
| 12:19:04 | 3 | MS. LEONARD: Oh, she was an |
| 12:19:05 | 4 | employee? |
| 12:19:05 | 5 | MR. KESTEN: Reserve police |
| 12:19:08 | 6 | officer took her to lunch, yes, out of |
| 12:19:11 | 7 | town. |
| 12:19:13 | 8 | Q. Do you recall that? |
| 12:19:13 | 9 | A. Now that I'm hearing the back and forth, it |
| 12:19:15 | 10 | refreshes my memory. Yes. |
| 12:19:16 | 11 | Q. Do you recall that he admitted doing that? |
| 12:19:19 | 12 | A. I believe that was in the investigation |
| 12:19:24 | 13 | report. |
| 12:19:25 | 14 | Q. Do you recall that he admitted referring to |
| 12:19:32 | 15 | another employee as a brit bomber? |
| 12:19:35 | 16 | A. No, I don't recall that. |
| 12:19:37 | 17 | Q. Do you recall -- you don't recall that. |
| 12:19:43 | 18 | You don't recall that reading that in the |
| 12:19:45 | 19 | report? |
| 12:19:45 | 20 | A. No, I don't recall that. |
| 12:19:46 | 21 | Q. If it was in there, then is it fair to say |
| 12:19:49 | 22 | you read it? |
| 12:19:50 | 23 | A. I read the report, yes. |
| 12:19:52 | 24 | Q. Did you meet with the board to discuss the |

78

| | | |
|---|---|---|
| 12:20:18 | 1 | investigative conclusions? |
| 12:20:21 | 2 | A.  Yes. |
| 12:20:22 | 3 | Q.  Who was present? |
| 12:20:23 | 4 | A.  Whomever would have been on the board at |
| 12:20:30 | 5 | the time.  David McCarter.  I believe I was |
| 12:20:38 | 6 | chair at the time, so Danny wouldn't have |
| 12:20:43 | 7 | been on the board.  Steve MacCaffrie, Roger |
| 12:20:44 | 8 | Achille and Lou Amoruso and Lampke, who was |
| 12:20:47 | 9 | the investigator, and I don't recall who |
| 12:20:51 | 10 | was there for town counsel. |
| 12:20:53 | 11 | Q.  Was Mr. D'Agostino present? |
| 12:20:54 | 12 | A.  No.  I don't believe he was.  I don't |
| 12:20:58 | 13 | believe we would have had him. |
| 12:21:00 | 14 | Q.  You don't believe so or you know he wasn't? |
| 12:21:05 | 15 | A.  I do not recall.  I do not believe so.  I |
| 12:21:08 | 16 | do not believe so. |
| 12:21:09 | 17 | Q.  But you don't know for sure as you sit here |
| 12:21:12 | 18 | today? |
| 12:21:12 | 19 | A.  No, he was not. |
| 12:21:18 | 20 | Q.  Did you come to learn of any further |
| 12:21:53 | 21 | allegations of Miss Stoyle after the |
| 12:21:58 | 22 | investigation was concluded? |
| 12:22:01 | 23 | A.  I don't recall. |
| 12:22:06 | 24 | Q.  Do you recall that in August of 2003 she |

80

| | | |
|---|---|---|
| 12:23:39 | 1 | recall.  I know that -- I don't believe |
| 12:23:44 | 2 | Lampke was brought in to do any additional |
| 12:23:48 | 3 | work. |
| 12:23:49 | 4 | Q.  Did you discuss the charge made by Miss |
| 12:23:58 | 5 | Stoyle with any member of the board outside |
| 12:24:00 | 6 | of the formal meeting? |
| 12:24:01 | 7 | A.  I don't -- no, no. |
| 12:24:03 | 8 | Q.  No? |
| 12:24:03 | 9 | A.  I was going to say I don't remember or |
| 12:24:05 | 10 | don't recall, but no.  I didn't. |
| 12:24:07 | 11 | Q.  Did you ever have any concerns about |
| 12:24:21 | 12 | Mr. D'Agostino's job performance? |
| 12:24:31 | 13 | A.  That's a broad question.  In what terms? |
| 12:24:43 | 14 | We give him an annual review and there has |
| 12:24:46 | 15 | been -- I don't remember the particulars, |
| 12:24:48 | 16 | but there certainly have been comments that |
| 12:24:50 | 17 | I have made in terms of the scope of that |
| 12:24:52 | 18 | review of things that perhaps needed to be |
| 12:24:54 | 19 | improved on.  If you're asking me the |
| 12:24:58 | 20 | question in the general sense, no. |
| 12:25:01 | 21 | Q.  Did the outstanding charges made by |
| 12:25:08 | 22 | Miss Stoyle affect your evaluation of |
| 12:25:12 | 23 | Mr. D'Agostino? |
| 12:25:14 | 24 | A.  Outstanding charges, no. |

81

| Time | Line | Text |
|---|---|---|
| 12:25:16 | 1 | Q.  Do you recall conducting an evaluation of |
| 12:25:31 | 2 | Mr. D'Agostino in January of 2003? |
| 12:25:36 | 3 | A.  I don't recall the particular dates.  I'm |
| 12:25:39 | 4 | sure one was done around that time. |
| 12:25:40 | 5 | Q.  Do you recall conducting his performance |
| 12:25:44 | 6 | evaluation prior to the conclusion of the |
| 12:25:48 | 7 | sexual harassment investigation? |
| 12:25:50 | 8 | A.  I believe it occurred before the |
| 12:25:53 | 9 | conclusion, but I don't know for sure.  I |
| 12:26:48 | 10 | don't recall. |
| 12:26:48 | 11 | Q.  Are you aware that you've filed a |
| 12:26:50 | 12 | counterclaim or that a counterclaim was |
| 12:26:53 | 13 | filed against Miss Stoyle alleging |
| 12:26:56 | 14 | conspiracy and abusive process? |
| 12:26:59 | 15 | A.  I'm aware of it. |
| 12:27:01 | 16 | Q.  And did you vote to -- |
| 12:27:05 | 17 | MS. JACOBS:  He can't answer that |
| 12:27:07 | 18 | question. |
| 12:27:07 | 19 | MS. GRIFFIN:  She hasn't asked it |
| 12:27:08 | 20 | yet. |
| 12:27:08 | 21 | MR. KESTEN:  Go ahead, finish the |
| 12:27:10 | 22 | question and then we'll object and tell him |
| 12:27:12 | 23 | not to answer the question. |
| 12:27:13 | 24 | Q.  Are you aware of the allegations in that |

Exhibit 4

1

1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
2

            C.A. NO. 05-10354 DPW
3

        KIMBERLY STOYLE,                    )
4              Plaintiff                    )
                                            )
5            VS.                            )
                                            )
6        THE MANSFIELD MUNICIPAL            )
        ELECTRIC DEPARTMENT,                )
7        JOHN D'AGOSTINO, TOWN OF           )
        MANSFIELD BOARD OF LIGHT            )
8        COMMISSIONERS,                     )
        LOUIS AMORUSO,                      )
9        MICHAEL MCCUE,                     )
        DAVID MCCARTER,                     )
10       DANIEL DONOVAN,                    )
        ROGER ACHILLE AND                   )
11       STEVEN MACCAFFRIE,                 )
                Defendants                  )
12

13

14

                DEPOSITION of STEVEN W. MACCAFFRIE,
15       called as a witness by and on behalf of the
        Plaintiff, pursuant to the applicable
16       provisions of the Federal Rules of Civil
        Procedure, before Teresa E. Costello,
17       Certified Realtime Reporter, Registered
        Professional Reporter, Certified Shorthand
18       Reporter No. 1452S98, and Notary Public
        within and for the Commonwealth of
19       Massachusetts, at the offices of
        McNaught, Cecere & McNaught, 6 Eastman
20       Place, Melrose, Massachusetts, on Tuesday,
        August 15th, 2006, commencing at 10:34 a.m.
21

22

23

24

45

| Time | Line | |
|---|---|---|
| 11:24:31 | 1 | Q. And if someone undertook an individual |
| 11:24:34 | 2 | investigation, would that board member |
| 11:24:36 | 3 | report back? |
| 11:24:37 | 4 | A. Hopefully. |
| 11:24:40 | 5 | Q. Do you recall during your tenure any -- |
| 11:24:54 | 6 | A. I always reported back. |
| 11:24:57 | 7 | Q. Well, let me ask you this then. What |
| 11:24:59 | 8 | issues did you investigate regarding the |
| 11:25:02 | 9 | town manager during your tenure, if any? |
| 11:25:04 | 10 | A. There were some issues and allegations of |
| 11:25:09 | 11 | unfair payroll practices. There was some |
| 11:25:12 | 12 | issues and allegations of improper use of |
| 11:25:21 | 13 | comp time and issues like that, all of |
| 11:25:27 | 14 | which I found in negative. The complaints |
| 11:25:29 | 15 | were not valid. |
| 11:25:30 | 16 | Q. Who raised the complaints? |
| 11:25:32 | 17 | A. Concerned citizens. I used to get these |
| 11:25:38 | 18 | funny little things left in my mailbox. |
| 11:25:41 | 19 | Q. Now at some point in time you became aware |
| 11:26:00 | 20 | that Miss Stoyle filed a lawsuit against |
| 11:26:02 | 21 | the Town of Mansfield, is that correct, |
| 11:26:05 | 22 | with the Commission Against Discrimination? |
| 11:26:07 | 23 | A. Kim Stoyle? |
| 11:26:11 | 24 | Q. Kim Stoyle. |

46

| | | |
|---|---|---|
| 11:26:15 | 1 | A. Yes. |
| 11:26:16 | 2 | Q. And do you recall a meeting that was held |
| 11:26:18 | 3 | by the board to discuss her claim? |
| 11:26:22 | 4 | A. Yes. |
| 11:26:23 | 5 | Q. Do you recall when that was? |
| 11:26:27 | 6 | A. I don't -- date-wise it was my first term. |
| 11:26:37 | 7 | Q. Okay. |
| 11:26:38 | 8 | A. The complaint was a court complaint that we |
| 11:26:42 | 9 | saw. It was issued and there were two |
| 11:26:46 | 10 | members of the board of selectmen excluded. |
| 11:26:49 | 11 | It was two previous members and then three |
| 11:26:55 | 12 | city members. |
| 11:26:56 | 13 | Q. Are you talking about a core complaint or |
| 11:26:58 | 14 | the MCAD? |
| 11:26:58 | 15 | A. MCAD complaint, yes. |
| 11:27:00 | 16 | Q. So who were the two members that weren't at |
| 11:27:02 | 17 | the meeting? Do you recall? |
| 11:27:09 | 18 | A. Probably Dan Donovan and maybe Dave |
| 11:27:25 | 19 | McCarter. I'm not one hundred percent |
| 11:27:26 | 20 | sure. |
| 11:27:26 | 21 | Q. Do you recall why they weren't there? |
| 11:27:28 | 22 | A. They were no longer members of the board of |
| 11:27:31 | 23 | selectmen. |
| 11:27:31 | 24 | MS. JACOBS: I just want to make |

| | | |
|---|---|---|
| 11:27:32 | 1 | sure that Mr. MacCaffrie is aware that |
| 11:27:33 | 2 | things that were discussed at executive |
| 11:27:35 | 3 | session in connection with ongoing |
| 11:27:37 | 4 | litigation have privilege and you can't |
| 11:27:38 | 5 | testify about them. |
| 11:27:39 | 6 | THE WITNESS:  Correct. |
| 11:27:43 | 7 | Q.  I want to show you what was marked as |
| 11:27:51 | 8 | Exhibit Number 1 at the deposition of |
| 11:27:53 | 9 | Lou Amoruso, and this is a copy of |
| 11:27:55 | 10 | Miss Stoyle's MCAD complaint.  Does that |
| 11:27:59 | 11 | refresh your recollection as to the date on |
| 11:28:00 | 12 | which it was filed? |
| 11:28:01 | 13 | MR. KESTEN:  How would he know |
| 11:28:03 | 14 | when it was filed? |
| 11:28:05 | 15 | MS. LEONARD:  Well, it's dated. |
| 11:28:06 | 16 | MR. KESTEN:  I know, but how would |
| 11:28:07 | 17 | he know when it was filed?  Nobody knows |
| 11:28:09 | 18 | when it was filed except the filer. |
| 11:28:17 | 19 | Q.  Well, does that refresh your recollection |
| 11:28:17 | 20 | as to when you got notice -- |
| 11:28:17 | 21 | A.  Could I read it, please? |
| 11:28:17 | 22 | Q.  Sure. |
| 11:29:26 | 23 | A.  It looks relatively familiar.  I can't tell |
| 11:29:29 | 24 | you if all the pages are the actual ones or |

48

| | | |
|---|---|---|
| 11:29:30 | 1 | not.   I remember something similar to that |
| 11:29:32 | 2 | if that's not the exact one. |
| 11:29:33 | 3 | MR. KESTEN:   I don't think that |
| 11:29:34 | 4 | was actually the question.   She's trying to |
| 11:29:37 | 5 | get a date out of you.   The question is do |
| 11:29:39 | 6 | you remember when you first saw it, right? |
| 11:29:40 | 7 | Is that the question? |
| 11:29:42 | 8 | MS. LEONARD:   Well, that wasn't |
| 11:29:44 | 9 | the question. |
| 11:29:44 | 10 | MR. KESTEN:   Oh, it wasn't? |
| 11:29:48 | 11 | Q.   Do you remember when you first got notice |
| 11:29:51 | 12 | that the complaint had been filed? |
| 11:29:52 | 13 | A.   No. |
| 11:29:53 | 14 | Q.   Well, if -- could I see that for a moment? |
| 11:29:57 | 15 | MR. KESTEN:   Sure. |
| 11:29:59 | 16 | MS. LEONARD:   You actually have a |
| 11:30:00 | 17 | copy of it in your stack of exhibits. |
| 11:30:06 | 18 | Q.   Do you recall that the complaint was filed |
| 11:30:14 | 19 | in December of 2002 or thereabouts? |
| 11:30:17 | 20 | A.   It was my recollection it was we received |
| 11:30:22 | 21 | it at some point in time in December. |
| 11:30:25 | 22 | Q.   Of 2002? |
| 11:30:25 | 23 | A.   Right, my first year on the board, yes. |
| 11:30:28 | 24 | Q.   And did you meet soon after the complaint |

49

| | | |
|---|---|---|
| 11:30:31 | 1 | was filed -- soon after you received the |
| 11:30:34 | 2 | complaint? |
| 11:30:35 | 3 | A. If I remember correctly, we turned it over |
| 11:30:40 | 4 | to town counsel and then had a meeting. |
| 11:30:44 | 5 | Q. Prior to the filing of the MCAD complaint |
| 11:30:49 | 6 | were you aware that Miss Stoyle had made |
| 11:30:51 | 7 | internal complaints about sexual harassment |
| 11:30:54 | 8 | and retaliation? |
| 11:30:55 | 9 | A. No, ma'am. |
| 11:30:56 | 10 | Q. Did you ever have any conversations with |
| 11:30:58 | 11 | any other member of the board regarding |
| 11:31:01 | 12 | internal complaints? |
| 11:31:02 | 13 | A. Not until this came up. |
| 11:31:05 | 14 | Q. After you reviewed the MCAD complaint did |
| 11:31:10 | 15 | you come to learn that Miss Stoyle had |
| 11:31:13 | 16 | complained prior to the filing of the |
| 11:31:15 | 17 | complaint about harassment retaliation? |
| 11:31:19 | 18 | A. I believe that falls under the executive |
| 11:31:26 | 19 | meeting sessions. |
| 11:31:28 | 20 | Q. Did you ever have any conversations with |
| 11:31:31 | 21 | any member of the board outside of |
| 11:31:32 | 22 | executive session in which you learned that |
| 11:31:34 | 23 | Miss Stoyle had complained internally prior |
| 11:31:37 | 24 | to the filing of the MCAD complaint? |

61

| 11:47:15 | 1 | A. | Correct. |
| 11:47:16 | 2 | Q. | And you were uncomfortable with that? |
| 11:47:22 | 3 | A. | Yes. |
| 11:47:24 | 4 | Q. | And you recall that to be one of |
| 11:47:30 | 5 | | Miss Stoyle's biggest concerns? |
| 11:47:32 | 6 | A. | Yes. |
| 11:47:33 | 7 | Q. | Are you running for reelection next month? |
| 11:47:51 | 8 | A. | Yes, ma'am. |
| 11:47:53 | 9 | Q. | Now after the MCAD charge was filed by |
| 11:48:01 | 10 | | Miss Stoyle, during the same month do you |
| 11:48:03 | 11 | | recall that the board voted to renew |
| 11:48:05 | 12 | | Mr. D'Agostino's contract? |
| 11:48:07 | 13 | A. | Yes, ma'am. |
| 11:48:09 | 14 | Q. | And did you have any concerns with that? |
| 11:48:11 | 15 | A. | Renewing his contract?  I voted no. |
| 11:48:15 | 16 | Q. | Why did you vote no? |
| 11:48:17 | 17 | A. | Because of money issue and because of the |
| 11:48:19 | 18 | | language. |
| 11:48:20 | 19 | Q. | Money issue meaning salary? |
| 11:48:23 | 20 | A. | Correct. |
| 11:48:24 | 21 | Q. | Do you feel that he was being overpaid? |
| 11:48:26 | 22 | A. | I believe the percentage that it ended up |
| 11:48:28 | 23 | | at the final tally was too high. |
| 11:48:31 | 24 | Q. | And what did you base that on? |

62

| | | |
|---|---|---|
| 11:48:39 | 1 | A. I did the math. |
| 11:48:41 | 2 | Q. Did -- |
| 11:48:43 | 3 | A. Everybody always used just a salary |
| 11:48:46 | 4 | increase. I took the multiple over his |
| 11:48:48 | 5 | insurance, his benefits, his health package |
| 11:48:51 | 6 | and everything else, and it wasn't a |
| 11:48:54 | 7 | two-and-a-half or three percent increase. |
| 11:48:57 | 8 | It was a seven-and-a-half percent increase |
| 11:48:59 | 9 | in the end. I thought that was too much. |
| 11:49:01 | 10 | Q. Did anybody else agree? |
| 11:49:02 | 11 | A. No. |
| 11:49:03 | 12 | Q. Was there any other reason why you had an |
| 11:49:08 | 13 | issue with his contract? |
| 11:49:10 | 14 | A. The language of the shall. |
| 11:49:15 | 15 | Q. That we talked about earlier? |
| 11:49:17 | 16 | A. Ah-hah. |
| 11:49:18 | 17 | Q. Did you have an issue with renewing his |
| 11:49:20 | 18 | contract pending allegation against him for |
| 11:49:23 | 19 | sexual harassment retaliation? |
| 11:49:24 | 20 | A. No, ma'am. Innocent until proven guilty. |
| 11:49:30 | 21 | Q. Well, why would the board vote to renew his |
| 11:49:40 | 22 | contract eight months in advance? |
| 11:49:45 | 23 | A. You have to ask the other four members |
| 11:49:48 | 24 | that, but there is a time frame when we |

63

| | | |
|---|---|---|
| 11:49:50 | 1 | have to let him know. According to the |
| 11:49:54 | 2 | thing we're supposed to do a review in |
| 11:49:59 | 3 | November, and then we have to notify him |
| 11:50:04 | 4 | within six months that he's going to be |
| 11:50:09 | 5 | renewed based on that evaluation, I think |
| 11:50:13 | 6 | it's the way -- when I went on the board, |
| 11:50:16 | 7 | his contract read, and then he has to give |
| 11:50:19 | 8 | us at least eight months notice he's |
| 11:50:22 | 9 | leaving, and if he doesn't do that we don't |
| 11:50:24 | 10 | have to pay him whatever it is in there, |
| 11:50:27 | 11 | whatever the language reads. |
| 11:50:28 | 12 | Q.  Did you have any concerns that there was a |
| 11:50:30 | 13 | vote to renew his contract before his |
| 11:50:33 | 14 | performance evaluation was completed? |
| 11:50:36 | 15 | A.  I believe I mentioned that at one of the |
| 11:50:37 | 16 | meetings. |
| 11:50:39 | 17 | Q.  And what was your concern in that regard? |
| 11:50:42 | 18 | A.  Because his contract says he gets a review |
| 11:50:46 | 19 | before and we did the review. |
| 11:50:49 | 20 | Q.  Do you recall the response of the other |
| 11:50:51 | 21 | members? |
| 11:50:53 | 22 | A.  Not offhand.  I just quoted his contract, |
| 11:50:59 | 23 | and I think I won one for a change. |
| 11:51:12 | 24 | Q.  Do you recall that the town manager |

70

| | | |
|---|---|---|
| 12:00:07 | 1 | that limitation he can discuss what steps |
| 12:00:10 | 2 | he took to investigate the MCAD complaint. |
| 12:00:13 | 3 | MS. LEONARD:  Let me ask the |
| 12:00:14 | 4 | question again. |
| 12:00:14 | 5 | Q. Did you take any steps, yourself, to |
| 12:00:17 | 6 | investigate the allegations contained in |
| 12:00:20 | 7 | the MCAD complaint? |
| 12:00:22 | 8 | A. No, ma'am.  I felt it was beyond me to do |
| 12:00:25 | 9 | it myself. |
| 12:00:25 | 10 | Q. Did the board take any steps? |
| 12:00:27 | 11 | A. Yes. |
| 12:00:28 | 12 | Q. And that was the hiring of an |
| 12:00:32 | 13 | independent -- what steps did the board |
| 12:00:33 | 14 | take? |
| 12:00:35 | 15 | A. The determination was -- is that we felt as |
| 12:00:40 | 16 | though that the accusations were serious |
| 12:00:44 | 17 | enough that Mr. Sherma was out at the time, |
| 12:00:48 | 18 | I believe, sick, and he was of the -- |
| 12:00:51 | 19 | supposedly the harassment officer, whatever |
| 12:00:53 | 20 | you call it, human resources person, that |
| 12:00:55 | 21 | somebody should go to. |
| 12:00:56 | 22 | The next person is the town |
| 12:00:57 | 23 | manager who certainly cannot hear his own |
| 12:01:01 | 24 | issue.  On advice of counsel we felt as |

71

| | | |
|---|---|---|
| 12:01:06 | 1 | though we'd have an independent and a |
| 12:01:09 | 2 | consensus, the board, an independent |
| 12:01:17 | 3 | review. |
| 12:01:18 | 4 | Those were the steps that we took. |
| 12:01:19 | 5 | We hired Mr. Lampke to hold an independent |
| 12:01:23 | 6 | review and he did so. |
| 12:01:25 | 7 | Q.   And do you recall that the investigation |
| 12:01:28 | 8 | was completed in or around July of 2003? |
| 12:01:32 | 9 | A.   Date I don't know, but I know that we |
| 12:01:36 | 10 | received a report and we took action on it. |
| 12:01:41 | 11 | Q.   Did you review the report? |
| 12:01:46 | 12 | A.   Cover-to-cover. |
| 12:01:47 | 13 | Q.   And do you recall that there was a public |
| 12:01:51 | 14 | statement regarding the board's conclusion? |
| 12:01:55 | 15 | A.   Yes, ma'am. |
| 12:01:56 | 16 | Q.   Did you concur with the conclusion? |
| 12:02:06 | 17 | A.   Was 5-0.  The answer is yes. |
| 12:02:14 | 18 | Q.   Aside from the public -- |
| 12:02:29 | 19 | A.   I think Roger may not have voted because I |
| 12:02:33 | 20 | think he was new to the situation at that |
| 12:02:34 | 21 | time, but whatever it was, in my |
| 12:02:38 | 22 | recollection, was unanimous. |
| 12:02:40 | 23 | Q.   Did you feel any pressure to concur with |
| 12:02:44 | 24 | that conclusion? |

72

| | | |
|---|---|---|
| 12:02:45 | 1 | A. Ma'am, nobody pressures me. |
| 12:02:48 | 2 | Q. Did you ever have any discussions with |
| 12:02:55 | 3 | Kimberly Stoyle one-on-one regarding her |
| 12:02:58 | 4 | complaint? |
| 12:02:58 | 5 | A. Yes, ma'am. |
| 12:02:59 | 6 | Q. And do you recall? |
| 12:03:00 | 7 | A. Actually it wasn't one-on-one. |
| 12:03:03 | 8 | Q. Do you recall when that was? |
| 12:03:05 | 9 | A. Well, other than conversation, not |
| 12:03:09 | 10 | necessarily one-on-one, but we had some |
| 12:03:12 | 11 | concerns from both sides, and we had a |
| 12:03:14 | 12 | meeting, Roger Achille and myself and |
| 12:03:18 | 13 | Miss Stoyle and Gary D'Ambra had a meeting |
| 12:03:23 | 14 | prior to the second filing, I believe, at |
| 12:03:26 | 15 | Dunkin' Donuts, corner of Route One and |
| 12:03:29 | 16 | whatever the cross street is by the |
| 12:03:31 | 17 | stadium. |
| 12:03:32 | 18 | Q. I'm going to get to that in a moment. |
| 12:03:34 | 19 | A. Okay. |
| 12:03:35 | 20 | Q. In coming to the conclusion -- strike that. |
| 12:03:42 | 21 | What was the board's conclusion on the MCAD |
| 12:03:46 | 22 | complaint, the investigation? |
| 12:03:48 | 23 | A. To the best of my recollection there was -- |
| 12:03:50 | 24 | we found that there was no cause for us |

73

| 12:03:56 | 1 | | doing anything because of sexual harassment |
| 12:03:59 | 2 | | complaint. |
| 12:04:01 | 3 | Q. | During the course of the investigation or |
| 12:04:05 | 4 | | in the review of the investigation did you |
| 12:04:08 | 5 | | come to learn that Mr. D'Agostino had sent |
| 12:04:12 | 6 | | Miss Stoyle an e-mail of a sexual nature? |
| 12:04:23 | 7 | A. | The way the question is phrased, the answer |
| 12:04:27 | 8 | | is yes. |
| 12:04:28 | 9 | Q. | Do you know that Mr. D'Agostino admitted |
| 12:04:34 | 10 | | sending Miss Stoyle an e-mail concerning -- |
| 12:04:43 | 11 | | strike the question. Do you recall the |
| 12:04:46 | 12 | | e-mail, the nature of e-mail? |
| 12:04:49 | 13 | A. | The nature of the e-mail, yes. |
| 12:04:50 | 14 | Q. | What was the nature of the e-mail? |
| 12:04:51 | 15 | A. | I don't know. Something about a tube and a |
| 12:04:54 | 16 | | gerbil and gay guys or something. |
| 12:04:56 | 17 | Q. | Did you ever hear the e-mail? |
| 12:04:58 | 18 | A. | No, I did not. |
| 12:04:59 | 19 | Q. | Did you ever read the text of the e-mail? |
| 12:05:03 | 20 | A. | Part of it. |
| 12:05:03 | 21 | Q. | Do you recall that it involved a gerbil in |
| 12:05:09 | 22 | | someone's rectum? |
| 12:05:11 | 23 | A. | Yes, I've seen it. I've seen it. It's |
| 12:05:14 | 24 | | been around. |

74

| | | |
|---|---|---|
| 12:05:14 | 1 | Q. Do you view that as sexual in nature? |
| 12:05:17 | 2 | A. I guess if it was a gay guy I'd take real |
| 12:05:25 | 3 | offense at it. |
| 12:05:27 | 4 | Q. Do you view that as a -- do you view that |
| 12:05:31 | 5 | e-mail as having sexual tones to it? |
| 12:05:36 | 6 | A. Personally, yes. |
| 12:05:37 | 7 | Q. And you're aware that Mr. D'Agostino |
| 12:05:43 | 8 | acknowledged sending that to Miss Stoyle, |
| 12:05:45 | 9 | correct? |
| 12:05:46 | 10 | A. I'm not aware he acknowledged it, no. |
| 12:05:48 | 11 | Q. Are you aware that Mr. D'Agostino |
| 12:05:54 | 12 | acknowledged telling Miss Stoyle that she |
| 12:05:57 | 13 | looked delicious? |
| 12:05:59 | 14 | A. Other than reading the files, no. What he |
| 12:06:07 | 15 | actually acknowledges. |
| 12:06:08 | 16 | Q. Do you consider telling someone that they |
| 12:06:10 | 17 | look delicious to be a statement that has |
| 12:06:13 | 18 | sexual overtones? |
| 12:06:14 | 19 | A. I tell me wife she looks delicious all the |
| 12:06:18 | 20 | time. |
| 12:06:18 | 21 | Q. Do you consider that to be a comment of a |
| 12:06:21 | 22 | sexual nature? |
| 12:06:22 | 23 | A. No, ma'am. |
| 12:06:26 | 24 | Q. What does it mean? |

75

| | | |
|---|---|---|
| 12:06:28 | 1 | A.   When I say it to my wife, I think she looks |
| 12:06:31 | 2 |      very good and I'm proud of her, in that |
| 12:06:37 | 3 |      context. |
| 12:06:37 | 4 | Q.   Would you say it to anybody? |
| 12:06:39 | 5 | A.   No. |
| 12:06:40 | 6 | Q.   Why not? |
| 12:06:43 | 7 | A.   It's an inappropriate comment. |
| 12:06:45 | 8 | Q.   Would you say it to your female colleagues |
| 12:06:47 | 9 |      at work? |
| 12:06:49 | 10 | A.   I work in construction, so it's a little |
| 12:06:52 | 11 |      different. |
| 12:06:55 | 12 | Q.   Why do you think it's inappropriate?  Why |
| 12:06:58 | 13 |      do you think it's inappropriate to say to |
| 12:07:01 | 14 |      someone that you don't know? |
| 12:07:02 | 15 | A.   That I don't know or I'm not -- I'm not |
| 12:07:04 | 16 |      that comfortable around per se.  Just it's |
| 12:07:07 | 17 |      not -- it's just not right and delicious |
| 12:07:09 | 18 |      has a dozen different connotations and it's |
| 12:07:13 | 19 |      just not appropriate. |
| 12:07:14 | 20 | Q.   And one of those connotations is sexual? |
| 12:07:16 | 21 | A.   Yes. |
| 12:07:17 | 22 | Q.   Do you think it's an appropriate comment |
| 12:07:25 | 23 |      for the town manager to make to the chief |
| 12:07:28 | 24 |      financial officer of the electric |

| | | |
|---|---|---|
| 12:07:29 | 1 | department? |
| 12:07:30 | 2 | A.  I would say it's inappropriate. |
| 12:07:32 | 3 | Q.  Inappropriate? |
| 12:07:33 | 4 | A.  Inappropriate. |
| 12:07:33 | 5 | Q.  Well, do you know if any action was ever |
| 12:07:53 | 6 | taken against Mr. D'Agostino for having |
| 12:07:55 | 7 | sent the e-mail? |
| 12:07:57 | 8 | A.  No, ma'am. |
| 12:07:59 | 9 | Q.  You don't know or there was not? |
| 12:08:00 | 10 | A.  There was none to the best of my knowledge. |
| 12:08:03 | 11 | Q.  Was that -- that was a collective decision |
| 12:08:06 | 12 | of the board, correct? |
| 12:08:07 | 13 | A.  No, it was not. |
| 12:08:09 | 14 | Q.  Did anybody on the board want to take |
| 12:08:12 | 15 | action against Mr. D'Agostino for that |
| 12:08:14 | 16 | e-mail? |
| 12:08:20 | 17 | THE WITNESS:  Does that fall under |
| 12:08:22 | 18 | the executive meeting? |
| 12:08:23 | 19 | MR. KESTEN:  I think with regard |
| 12:08:24 | 20 | this is as a result of the investigation of |
| 12:08:26 | 21 | Kim Stoyle's allegations, whatever is |
| 12:08:28 | 22 | related to that is not privileged. |
| 12:08:31 | 23 | THE WITNESS:  Yes. |
| 12:08:32 | 24 | MS. JACOBS:  If there's |

| | | |
|---|---|---|
| 12:08:34 | 1 | discussions in executive session. |
| 12:08:37 | 2 | MR. KESTEN: About what they |
| 12:08:39 | 3 | should do about the investigation. |
| 12:08:43 | 4 | Q. Who was it that -- |
| 12:08:45 | 5 | A. Wait a minute. You two are arguing. |
| 12:08:47 | 6 | MS. JACOBS: We're not arguing, |
| 12:08:48 | 7 | just discussing. |
| 12:08:49 | 8 | Q. Who was it that wanted to take action |
| 12:08:51 | 9 | against Mr. D'Agostino for that? |
| 12:08:53 | 10 | A. Me. |
| 12:08:53 | 11 | Q. Did anybody else? |
| 12:08:55 | 12 | A. There was discussion. |
| 12:09:02 | 13 | Q. Were you out-voted? |
| 12:09:07 | 14 | A. There was no vote. |
| 12:09:10 | 15 | Q. Why did you never take action against it? |
| 12:09:16 | 16 | A. Can only take action if there's a vote. |
| 12:09:18 | 17 | Q. Why was there not a vote? |
| 12:09:22 | 18 | A. I guess nobody thought my opinion was worth |
| 12:09:26 | 19 | it. |
| 12:09:26 | 20 | Q. Were you the only member that thought |
| 12:09:31 | 21 | Mr. D'Agostino deserved disciplinary action |
| 12:09:35 | 22 | for sending that e-mail? |
| 12:09:37 | 23 | A. Actually I thought based on the report that |
| 12:09:40 | 24 | I would put a letter in both of their files |

78

| Time | Line | | |
|---|---|---|---|
| 12:09:42 | 1 | | about the inappropriate use of the |
| 12:09:44 | 2 | | computer. |
| 12:09:45 | 3 | Q. | Both of their files meaning? |
| 12:09:47 | 4 | A. | Miss Stoyle and -- based on what's in the |
| 12:09:49 | 5 | | report, Miss Stoyle and Mr. D'Agostino. |
| 12:09:52 | 6 | Q. | Did you consider taking disciplinary |
| 12:10:15 | 7 | | action against Mr. D'Agostino for telling |
| 12:10:17 | 8 | | Miss Stoyle she looked delicious? |
| 12:10:19 | 9 | A. | That would probably fall under the whole |
| 12:10:26 | 10 | | scenario.  I didn't go one way or the other |
| 12:10:28 | 11 | | with that.  It was a -- it's a combination |
| 12:10:30 | 12 | | of everything that's in the report as to |
| 12:10:36 | 13 | | what action was taken.  No individual one |
| 12:10:39 | 14 | | piece was picked out of the puzzle. |
| 12:10:43 | 15 | Q. | Were you aware -- strike that.  Did you |
| 12:11:09 | 16 | | have some concern regarding e-mails on the |
| 12:11:11 | 17 | | part of Miss Stoyle? |
| 12:11:13 | 18 | A. | I had some concerns about e-mails |
| 12:11:15 | 19 | | throughout the whole town hall and light |
| 12:11:18 | 20 | | department. |
| 12:11:19 | 21 | Q. | At some point in time did you become |
| 12:11:34 | 22 | | aware that Mr. D'Agostino had referred to |
| 12:11:37 | 23 | | another employee of the electric department |
| 12:11:38 | 24 | | as the brit bomber? |

79

| | | |
|---|---|---|
| 12:11:42 | 1 | A. It came out in the report, yes. |
| 12:11:44 | 2 | Q. Did you consider that to be an appropriate |
| 12:11:46 | 3 | comment about a subordinate? |
| 12:11:49 | 4 | A. I don't know what context it came up. It |
| 12:11:52 | 5 | came up as part of the report that there |
| 12:11:54 | 6 | was reference made. |
| 12:11:55 | 7 | Q. Did you think that that was -- you had no |
| 12:12:00 | 8 | opinion whether that was inappropriate or |
| 12:12:01 | 9 | not? |
| 12:12:01 | 10 | A. I don't -- I really don't know what context |
| 12:12:04 | 11 | overall it was taken in. |
| 12:12:05 | 12 | Q. Did you ask him? |
| 12:12:07 | 13 | A. Mr. D'Agostino was not at those executive |
| 12:12:13 | 14 | sessions. |
| 12:12:13 | 15 | Q. So he was not present when the |
| 12:12:15 | 16 | investigation was discussed? |
| 12:12:16 | 17 | A. That's correct. |
| 12:12:17 | 18 | Q. Did you ever ask him after those meetings? |
| 12:12:19 | 19 | A. No, I did not. |
| 12:12:21 | 20 | Q. Did you become aware that Mr. D'Agostino |
| 12:12:30 | 21 | acknowledged taking a female applicant to |
| 12:12:41 | 22 | lunch to discuss job opportunities? |
| 12:12:44 | 23 | A. Yes, ma'am, within that report. |
| 12:12:47 | 24 | Q. Did you think that was appropriate? |

80

| | | |
|---|---|---|
| 12:12:49 | 1 | A. For the purpose of an interview, no. |
| 12:12:58 | 2 | Q. Did you not think it was appropriate? |
| 12:13:01 | 3 | A. I've taken people that I've been going to |
| 12:13:08 | 4 | employ because it's a much casual |
| 12:13:11 | 5 | atmosphere. I did afterwards indicate |
| 12:13:14 | 6 | that, you know, because of these issues |
| 12:13:16 | 7 | that it was my personal opinion that all |
| 12:13:18 | 8 | interviews should be conducted in town |
| 12:13:21 | 9 | hall. |
| 12:13:21 | 10 | Q. Did you ever discuss that with |
| 12:13:22 | 11 | Mr. D'Agostino? |
| 12:13:23 | 12 | A. I did and with the board. |
| 12:13:27 | 13 | Q. Did you -- were you aware that |
| 12:13:36 | 14 | Mr. D'Agostino had no hiring authority over |
| 12:13:38 | 15 | the job for which the applicant sought |
| 12:13:39 | 16 | employment? |
| 12:13:40 | 17 | A. No. |
| 12:13:45 | 18 | Q. You were not aware of that? |
| 12:13:47 | 19 | A. No. |
| 12:13:48 | 20 | Q. Would that be of concern to you? |
| 12:13:52 | 21 | A. Well, I would say as the manager of the |
| 12:13:55 | 22 | light department that's where the final |
| 12:13:57 | 23 | authority in the end rests. |
| 12:13:59 | 24 | Q. Are you aware that it was an application |

81

| | | |
|---|---|---|
| 12:14:02 | 1 | for employment with the school system or |
| 12:14:05 | 2 | the police rather? |
| 12:14:06 | 3 | A.  I've got confused who we're talking about |
| 12:14:15 | 4 | now. |
| 12:14:15 | 5 | Q.  When I referred to Mr. D'Agostino having |
| 12:14:19 | 6 | lunch with a female applicant for |
| 12:14:27 | 7 | employment, were you aware that that |
| 12:14:29 | 8 | individual was applying for employment |
| 12:14:31 | 9 | outside of the electric department? |
| 12:14:33 | 10 | A.  In the report it came out as a police |
| 12:14:36 | 11 | dispatcher, I think. |
| 12:14:38 | 12 | Q.  So you recall that? |
| 12:14:39 | 13 | A.  That's what was in the report, yes. |
| 12:14:41 | 14 | Q.  And are you aware that he has no hiring |
| 12:14:47 | 15 | authority for that position? |
| 12:14:50 | 16 | A.  The final decision would rest on the police |
| 12:14:53 | 17 | chief. |
| 12:14:54 | 18 | Q.  Now you're aware that one of Miss Stoyle's |
| 12:15:13 | 19 | allegations was that there was a derogatory |
| 12:15:19 | 20 | gender-based comment made to her in |
| 12:15:22 | 21 | response to her complaints about charges to |
| 12:15:25 | 22 | MCAD -- I mean, excuse me, charges to MMED, |
| 12:15:30 | 23 | do you recall that? |
| 12:15:32 | 24 | A.  What was the -- I probably remember the |

82

| | | |
|---|---|---|
| 12:15:36 | 1 | statement more than I remember. |
| 12:15:38 | 2 | Q. Let me show you the complaint. Directing |
| 12:15:50 | 3 | your attention to paragraph four of Exhibit |
| 12:15:52 | 4 | Number 1 from Lou Amoruso's deposition, do |
| 12:15:56 | 5 | you recall that being brought to your |
| 12:15:57 | 6 | attention? |
| 12:16:00 | 7 | A. I remember it being one of the complaints, |
| 12:16:15 | 8 | yes. |
| 12:16:16 | 9 | Q. Did you come to learn that there was a |
| 12:16:19 | 10 | witness to that event? |
| 12:16:22 | 11 | A. I don't remember it being in the report. |
| 12:16:28 | 12 | Q. Are you aware that Mr. Beliveau witnessed |
| 12:16:31 | 13 | the statements referenced in paragraph |
| 12:16:33 | 14 | four? |
| 12:16:34 | 15 | A. I don't believe I was involved with it. |
| 12:16:37 | 16 | Q. Did you have any reason to disbelieve the |
| 12:16:48 | 17 | allegations set forth in paragraph four? |
| 12:16:54 | 18 | A. I really have no -- until it was |
| 12:16:57 | 19 | investigated, I had no reason to believe |
| 12:16:59 | 20 | one way or the other. I don't -- I don't |
| 12:17:02 | 21 | attempt to prejudge whatever happens. |
| 12:17:05 | 22 | Q. And in fact -- |
| 12:17:07 | 23 | A. I've known Miss Stoyle for, you know, quite |
| 12:17:10 | 24 | a while and I don't -- I don't take |

100

| | | |
|---|---|---|
| 12:39:41 | 1 | came back, that's what we heard. |
| 12:39:44 | 2 | Q. Were you concerned at all that the town |
| 12:39:49 | 3 | manager was challenging Miss Stoyle's |
| 12:39:52 | 4 | membership? |
| 12:39:54 | 5 | A. I believe the town manager challenged a |
| 12:39:57 | 6 | number of other memberships by people over |
| 12:39:59 | 7 | the years. It's his job. That's not |
| 12:40:03 | 8 | really my job. |
| 12:40:05 | 9 | Q. Now do you recall being notified on yet |
| 12:40:38 | 10 | another occasion in July, 2003, that |
| 12:40:42 | 11 | Miss Stoyle had additional legal claims |
| 12:40:45 | 12 | against the town and against the board? |
| 12:40:50 | 13 | I show you what's been marked as |
| 12:40:51 | 14 | Exhibit Number 3 in the deposition of |
| 12:40:53 | 15 | Mr. Amoruso and ask you if you recall |
| 12:40:56 | 16 | reviewing that? |
| 12:40:58 | 17 | A. Yes. |
| 12:41:15 | 18 | Q. And as a result of receiving that letter |
| 12:41:18 | 19 | did you take any steps to investigate the |
| 12:41:21 | 20 | allegations in the complaint set forth in |
| 12:41:24 | 21 | that July 22nd, 2003 letter? |
| 12:41:27 | 22 | A. This was ongoing pending litigation that |
| 12:41:29 | 23 | was turned over to counsel. |
| 12:41:32 | 24 | Q. Why was it that the board chose to hire |

101

| | | |
|---|---|---|
| 12:42:00 | 1 | Attorney Lampke for the initial |
| 12:42:02 | 2 | allegations, but didn't undertake any |
| 12:42:04 | 3 | investigation as a result of additional |
| 12:42:07 | 4 | allegations? |
| 12:42:10 | 5 | A.  Well, I can't speak for the rest of the |
| 12:42:12 | 6 | board, but once it became pending |
| 12:42:14 | 7 | litigation, the attorneys are going to take |
| 12:42:15 | 8 | care of it. |
| 12:42:27 | 9 | MS. LEONARD:  Can we take five? |
| 12:54:14 | 10 | (Brief Recess.) |
| 12:57:24 | 11 | Q.  The meeting at which the change in fiscal |
| 12:57:29 | 12 | years was discussed, was Miss Stoyle |
| 12:57:32 | 13 | present at that meeting? |
| 12:57:34 | 14 | A.  I'm not sure. |
| 12:57:35 | 15 | Q.  You recall at some point in time a decision |
| 12:57:58 | 16 | was made to terminate Doctor Beliveau? |
| 12:58:02 | 17 | A.  Yes. |
| 12:58:03 | 18 | Q.  And were you consulted about that decision? |
| 12:58:08 | 19 | MR. KESTEN:  I object and advise |
| 12:58:10 | 20 | you not to answer any discussions during |
| 12:58:12 | 21 | executive session. |
| 12:58:14 | 22 | MS. LEONARD:  Well, let me ask you |
| 12:58:20 | 23 | this.  I'm going to ask him a couple more |
| 12:58:24 | 24 | questions, and you can let me know if you |

| | | |
|---|---|---|
| 01:04:36 | 1 | the report? |
| 01:04:37 | 2 | A. I don't know. |
| 01:04:38 | 3 | Q. Was she ever given an opportunity to |
| 01:04:42 | 4 | reflect statements of the findings of the |
| 01:04:46 | 5 | report? |
| 01:04:48 | 6 | A. I don't know what happened and what the |
| 01:04:51 | 7 | court cases. |
| 01:04:53 | 8 | Q. Other than a discussion regarding |
| 01:04:55 | 9 | Mr. Lampke, what else was raised at the |
| 01:04:57 | 10 | meeting? |
| 01:04:59 | 11 | A. There was some questions as to, you know. |
| 01:05:03 | 12 | One of the questions was why it was made |
| 01:05:07 | 13 | public, if I remember correctly, and I |
| 01:05:10 | 14 | think my statement that I made was after |
| 01:05:14 | 15 | looking back on it I think that we probably |
| 01:05:18 | 16 | acted appropriately, inappropriately, |
| 01:05:21 | 17 | because the way that the statute actually |
| 01:05:24 | 18 | reads is she's supposed to be notified, but |
| 01:05:29 | 19 | we did what we did on advice of counsel. |
| 01:05:32 | 20 | Q. In terms of notifying her about the |
| 01:05:34 | 21 | outcome? |
| 01:05:34 | 22 | A. Yes. The night we had the meeting we were |
| 01:05:38 | 23 | asked to go out and make a public |
| 01:05:40 | 24 | statement, and that public statement was |

110

| | | |
|---|---|---|
| 01:05:42 | 1 | reviewed by counsel, and it was made |
| 01:05:44 | 2 | public. |
| 01:05:44 | 3 | Q. And that was prior to any conversation with |
| 01:05:47 | 4 | Miss Stoyle regarding the outcome of the |
| 01:05:49 | 5 | investigation? |
| 01:05:49 | 6 | A. To the best of my knowledge you're correct. |
| 01:05:52 | 7 | Q. And that was a concern that she raised at |
| 01:05:55 | 8 | the meeting? |
| 01:05:56 | 9 | A. That is correct. |
| 01:05:57 | 10 | Q. Do you recall anything else that was raised |
| 01:05:58 | 11 | at the meeting? Let me back up. Do you |
| 01:06:04 | 12 | agree that that was a valid concern that it |
| 01:06:07 | 13 | wasn't discussed with her? |
| 01:06:07 | 14 | A. Yes, I do. Looking back on it now, |
| 01:06:09 | 15 | yes, I do. |
| 01:06:10 | 16 | Q. And again what else was discussed at the |
| 01:06:14 | 17 | meeting? |
| 01:06:16 | 18 | A. I think there was discussion about the |
| 01:06:30 | 19 | whole situation whether or not I thought |
| 01:06:34 | 20 | there was truthfulness or not truthfulness, |
| 01:06:36 | 21 | and I think my answer was I don't |
| 01:06:40 | 22 | disbelieve what she says but, you know, I'm |
| 01:06:44 | 23 | not going to not disbelieve what John says. |
| 01:06:48 | 24 | I'll reserve that. I just -- it's not up |

160

| | | |
|---|---|---|
| 02:06:50 | 1 | Mansfield if you're aware of any employee |
| 02:06:52 | 2 | in the town that has ever been terminated |
| 02:07:01 | 3 | in that fashion, escorted out by a police |
| 02:07:01 | 4 | officer, had his hard drives confiscated? |
| 02:07:01 | 5 | A.  I am -- I am unaware of any.  It may have |
| 02:07:06 | 6 | happened, but I am unaware of it at any |
| 02:07:09 | 7 | point in time. |
| 02:07:13 | 8 | MS. GRIFFIN:  All right, I think I |
| 02:07:13 | 9 | just need two minutes to check my notes, |
| 02:07:16 | 10 | but otherwise we're done.  Break for two |
| 02:07:18 | 11 | minutes. |
| 02:10:40 | 12 | (Brief Recess.) |
| 02:10:42 | 13 | MS. GRIFFIN:  I have no further |
| 02:10:43 | 14 | questions. |
| 02:10:44 | 15 | MS. LEONARD:  Nor do I. |
| 02:10:45 | 16 | MS. GRIFFIN:  Does anybody else? |
| 02:10:46 | 17 | MR. KESTEN:  I do, a couple of |
| 02:10:47 | 18 | things. |
| 02:10:48 | 19 | CROSS-EXAMINATION |
| 02:10:49 | 20 | BY MR. KESTEN: |
| 02:10:49 | 21 | Q.  You had said -- you were asked just a |
| 02:10:53 | 22 | little while ago as to whether you inquired |
| 02:10:55 | 23 | from Jack Beliveau as to anything else that |
| 02:10:57 | 24 | was going on with Kim? |

161

| | | |
|---|---|---|
| 02:10:58 | 1 | A. Correct. |
| 02:10:58 | 2 | Q. Why did you do that? |
| 02:10:59 | 3 | A. Part of the follow-up, I think, when I was |
| 02:11:02 | 4 | rereading the MCAD regulations as they came |
| 02:11:07 | 5 | down, that after a decision was rendered |
| 02:11:09 | 6 | and the employees still stayed there, that |
| 02:11:11 | 7 | there was a follow-up and I think that |
| 02:11:15 | 8 | that's what triggered the information. |
| 02:11:18 | 9 | Again, I was concerned with Kim |
| 02:11:19 | 10 | and there was a follow-up procedure, and I |
| 02:11:21 | 11 | think I'd asked for that follow-up to come |
| 02:11:23 | 12 | back and then that letter came back |
| 02:11:26 | 13 | forward. |
| 02:11:26 | 14 | Q. Now you were asked when the -- what do you |
| 02:11:33 | 15 | call it -- the cash balance issue came |
| 02:11:35 | 16 | up -- |
| 02:11:35 | 17 | A. Ah-hah. |
| 02:11:36 | 18 | Q. -- from the town side? |
| 02:11:37 | 19 | A. Right. |
| 02:11:37 | 20 | Q. You had talked to Rich and told him knock |
| 02:11:42 | 21 | off the crap? |
| 02:11:43 | 22 | A. Yes. |
| 02:11:43 | 23 | Q. In your mind what was the crap?  What crap |
| 02:11:46 | 24 | were you referring to? |

# Exhibit 5

Page 1

COPY

Volume: I

Pages: 1-81

Exhibits: 1&2

UNITED STATES DISTRICT COURT

For the District of Massachusetts

CIVIL ACTION NO. 05 10354 DPW

* * * * * * * * * * * * * * * * * *

KIMBERLY STOYLE,                                    :

            PLAINTIFF                                :

                                           :

  v.                                                :

                                           :

THE MANSFIELD MUNICIPAL ELECTRIC            :

DEPT., JOHN D'AGOSTINO, TOWN OF             :

MANSFIELD BOARD OF LIGHT                     :

COMMISSIONERS, LOUIS AMORUSO,                :

MICHAEL McCUE, DAVID McCARTER,               :

DANIEL DONOVAN, ROGER ACHILLE, and           :

STEVE MacCAFFRIE,                            :

            DEFENDANTS                               :

* * * * * * * * * * * * * * * * * *

   DEPOSITION OF DANIEL DONOVAN, a witness called on
behalf of the Plaintiff, pursuant to the provisions
of the Federal Rules of Civil Procedure, before Lisa
McDonald Valdario, (CSR #130093), a Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Law Offices of McNaught, Cecere & McNaught, Six
Eastman Place, Melrose, Massachusetts  02176, on
Thursday, August 10, 2006, commencing at 2:15 p.m.

Page 25

1    of overcharges for health insurance costs?

2  A  Yes, that was discussed.  We discussed -- we

3    discussed many things for the overcharges.

4  Q  Okay.  Do you recall that during your tenure,

5    Miss Stoyle filed a Complaint for sexual

6    harassment?

7  A  The first I saw that was in the paper.

8  Q  Okay.  Prior to the filing of the MCAD

9    Complaint, were you aware that she had made

10    internal complaints of sexual harassment

11    retaliation?

12  A  No.  There was no complaints.  I contacted the

13    chairman of the light department when I first

14    read it, asked him if he got any complaint.  He

15    said no.

16  Q  Let me stop you there.  Who did you contact?

17  A  Mr. Amoruso, which was the sitting chairman of

18    the light department at the time.

19  Q  You mean the Chairman of the Board of Light

20    Commissioners?

21  A  Right.  Board of Light Commissioners.  And he

22    said he got no complaints.  So I said to him,

23    How about past?  He says, No.  Because Mr. Wills

24    was not on the Board now, but Mr. Wills was the

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 26

1    chairman for the previous two years.  And he

2    never came to us with any complaint.

3  Q  Did you ask him if there had been any complaints

4    about harassment?

5  A  I asked him if he got any complaints, and he

6    said no.

7  Q  About anything?

8  A  Well, I asked, I was pertaining to the thing in

9    the paper, about the harassment charge against

10   the town manager.

11 Q  Okay.

12 A  I said, Have you, did anybody come to you and

13   complain?  He says, No.

14 Q  This is a discussion with Lou Amoruso.

15 A  This was a discussion with Lou Amoruso.  That

16   was the first.  And I said to him, Did Mr. Wills

17   or anybody else say anything to you, and he

18   said, No.  So Mr. Wills was chairman two years

19   previous, which was the main two years, 2000 to

20   2001, 2002.  And he never complained once.

21   There was no complaint of harassment any time.

22 Q  Do you recall Mr. Amoruso talking about meetings

23   that he had with Miss Stoyle and Mr. Beliveau in

24   October of 2001 regarding complaints of a

Page 27

1    hostile work environment?

2  A    I don't remember anything like that.

3  Q    He never told you anything like that, or you

4       don't remember?

5  A    He may have said he was at meetings with the

6       light department.  I believe that was his job

7       because he was the chairman, and I depended on

8       him to come back and tell me something, if there

9       was something out of line, I would know.

10  Q    You depended on Mr. Amoruso.

11  A    Yeah, the chairman would come back and tell us

12       if there was something wrong.  I hope.  Any

13       member of the Board that got a complaint would

14       have come and tell me, because that's what the

15       chairman's got to do.  He's got to know what, if

16       anybody got a complaint, and I never got a

17       complaint.

18  Q    You recall though that he may have told you

19       about meetings that he had with Miss Stoyle and

20       Mr. Beliveau?

21  A    I remember him saying something about meetings

22       but I didn't, didn't think it was anything about

23       harassment.

24  Q    Do you recall whether the meetings involved

Page 28

1     concerns by Miss Stoyle and Mr. Beliveau about

2     how they were being treated by Mr. D'Agostino?

3 A   No, I never heard that.

4 Q   You never heard that.

5 A   No.

6 Q   At the time you found out about the MCAD

7     Complaint, did you take any other steps to --

8     let me finish the question -- did you take any

9     other steps to investigate that?

10 A   Yes, I did.

11 Q   What did you do?

12 A   The town manager had in place a policy for

13     harassment, and he had appointed somebody in

14     charge of that, which is the veterans agent, and

15     it's his job because he was not really a town

16     employee, but he was the veterans agent, had an

17     office in town hall, that he would be one of the

18     fairest people to deal with any harassments.

19        So after that first meeting when I saw it

20     in the paper, I went to him next day.

21 Q   That's how you found out about it, the

22     newspaper?

23 A   Newspaper.  I went to him and I said, Did you

24     see the paper yesterday?  And I said, Did you

Page 29

1    see the article about accusing John on the

2    paper?  And I said, Did you get any complaints?

3    I says, I know now you were appointed by the

4    town manager and you got --

5  Q    Is this Jerry Sherman?

6  A    Jerry Sherman, yes.  And I told him, I asked

7    him, I said, Was there any complaints, and he

8    said, No.  So I said to him, Do you mind if we

9    get an independent investigator, because you

10    would be investigating an employee and reporting

11    it to somebody that appointed you, and I didn't

12    think that was fair for you, or fair to the

13    employee, or fair to the town manager.  And he

14    said, That's fine.  I'd love for that to happen.

15  Q    Did you talk to anybody else?

16  A    About that?  At the Selectman's meeting we

17    talked about it.  We raised it in executive

18    session and our attorney was there and we asked

19    him about --

20        MS. JACOBS:  Can I just stop you?  You

21    can't testify about things that happened in

22    executive session.

23        THE WITNESS:  Oh, I can't.  Okay.  I'm

24    sorry.  That's good to know.

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 31

1   Q   Okay.  You said you talked to Mr. Amoruso?

2   A   Yeah.

3   Q   And then you talked to Jerry Sherman.

4   A   That's right.

5   Q   And then you had these conversations in

6       executive session.

7   A   Yeah.

8   Q   Did you talk to anybody else when you found out

9       about the complaint?

10  A   Yes.

11  Q   So you decided there needed to be an independent

12      investigation?

13  A   Well, we discussed it amongst ourselves among

14      the Selectmen, that that was the fairest thing

15      to do, to have somebody independent, because I

16      did not want Mr. Sherman investigating anybody

17      who has to report to the person that appointed

18      him.

19  Q   Okay.

20  A   I felt that would be very unfair to anybody.

21  Q   Okay.  And you thought there should be an

22      investigation.

23  A   Oh, yeah, definitely.  Any allegations should be

24      investigated.  To me, that's the way I look at

Page 33

1   Q   January the 9th?

2   A   Could be somewhere around there, or maybe a

3       little sooner.

4   Q   Okay.  Well --

5   A   Around the 7th.  It came in the local paper on

6       the 7th.

7   Q   Oh, you brought the article?

8   A   I got the article.

9           MR. KESTEN:  Not this one.

10  A   Not this one.  That's the Sun Chronicle.  I got

11      the one in the local Mansfield News.  That was

12      an article outside the Mansfield News.

13  Q   Okay.  I'm going to give you one, except the one

14      that's marked.

15  A   Yeah.

16  Q   Okay.  Do you recall giving a statement to the

17      press?

18  A   Yes, on the way into the meeting, the young lady

19      stopped me and asked me, did I know about the

20      harassment case.

21  Q   Do you recall giving a statement to Rick Foster?

22  A   He called me on the phone.

23  Q   Oh, he did.

24  A   It was over the phone he called me, yeah.

Page 34

| | | |
|---|---|---|
| 1 | Q | And you spoke with him? |
| 2 | A | Yeah, I spoke with him on the phone. |
| 3 | Q | And you gave him a statement? |
| 4 | A | I gave them basically the same to both people. |
| 5 | Q | And did you tell him, if I direct your attention |
| 6 | | to the second page of this news article, second |
| 7 | | column, and do you recall telling him that Miss |
| 8 | | Stoyle's claims were farfetched? |
| 9 | A | I expressed my opinion on that for the reason I |
| 10 | | felt -- |
| 11 | | MR. KESTEN: The question is: Do you |
| 12 | | recall saying that? |
| 13 | A | Do I recall saying that? Yes, I may have said |
| 14 | | that. |
| 15 | Q | Okay. Well -- |
| 16 | A | But when it was first asked of me, I asked the |
| 17 | | lady to make a correction on that paper. She |
| 18 | | had put an article in that wasn't correct. |
| 19 | | MR. KESTEN: She's asking you questions |
| 20 | | about this article about Rick Foster. The |
| 21 | | question before you is, do you recall saying |
| 22 | | that. |
| 23 | A | Yes, I said that. |
| 24 | Q | You said it was farfetched. |

Page 35

1    A    And I gave a reason for that.  But the reason

2         isn't there.

3    Q    What's your reason?

4    A    Because of the geographical location of the two

5         buildings and the contact between them.  She's

6         about a quarter mile away from the town manager,

7         so I thought their back and forth together

8         everyday wasn't a thing where she could be

9         harassed.  There were separate buildings,

10        separate locations.

11   Q    So you had made a determination on January 4,

12        2003, that they were bogus claims, correct?

13   A    Well, I said that they may be bogus.

14   Q    Okay.

15   A    I said that because we hadn't heard any

16        complaints.  If somebody had come to me with a

17        complaint, then I couldn't say that.

18   Q    Well, it doesn't say here they may be bogus.  It

19        says you called the claim farfetched.

20   A    Farfetched, that's what I said, farfetched.

21   Q    So what was the purpose of the investigation?

22   A    To follow up on the allegations in the paper.  I

23        think it's incumbent on the Board of Selectmen,

24        because something is on the paper accusing our

Page 36

1    town manager of something he says he doesn't do,

2    I believe it was important for an investigation.

3  Q  So you needed to go through the motions of an

4    investigation?

5  A  Well, I wouldn't call them motions.  This is

6    very serious.  They're not motions at all.  This

7    is a very serious thing.

8  Q  Do you recall that -- what motive do you believe

9    that -- strike that.  Did you actually see the

10    MCAD Complaint?

11  A  I believe we saw a copy of it.

12  Q  Did you see a copy?

13  A  Yeah.

14  Q  And do you recall the allegations that there

15    were derogatory gender-based statements made by

16    Mr. D'Agostino?

17  A  Yes, that was in the paper too.  That was --

18  Q  And do you recall that there were allegations

19    that those statements were made in response to

20    Miss Stoyle's complaints about overcharges to

21    MMED?

22  A  I don't remember that part of it.  I don't

23    remember that at all.

24  Q  What motive do you think Miss Stoyle had -- do

Page 37

1      you think she made up those claims?

2   A  I don't know.  Because I saw no, nothing to

3      substantiate it.

4   Q  Well, did you see anything that didn't

5      substantiate it?

6   A  But what bother me was, if there's a chain of

7      command and nobody comes to me up the line,

8      there's something amiss here.  If Miss Stoyle

9      had come to any one of the Selectmen, and come

10     to me, I would have definitely suspended the

11     town manager immediately, but nothing ever came.

12  Q  So you concluded that they were farfetched based

13     on the fact that you hadn't heard them before?

14  A  Basically, because I spoke to Mr. D'Agostino and

15     he said no, that these claims wasn't true.

16  Q  Okay.

17  A  And again, you had a light manager that was

18     there, from the Selectmen, for two years and

19     never brought back a complaint, Mr. Wills.  If

20     he come back with a complaint, we would have

21     investigated immediately.

22  Q  Are you talking about Brad wills?

23  A  Yes.

24  Q  And he was a member of the Board of Light

Page 38

1  Commissioners?

2  A  Yes, and he was the Chairman of the Light

3  Commissioners for two years and he never brought

4  back a thing.

5  Q  Did you ever talk to Dr. Beliveau about the

6  allegations?

7  A  Nope.  The only investigation I talked to

8  Mr. Beliveau was where he was being accused of

9  harassment by Kim Geisel.  He came before us and

10  wanted us to settle that case.  It was going on

11  supposedly for long time.

12      MR. KESTEN:  Mr. Donovan, would you wait

13  for a question.  That's a whole other bag of

14  worms.  That was an investigation --

15      THE WITNESS:  That's the only other

16  harassment thing --

17      MR. KESTEN:  I know.  Just answer the

18  question.

19  Q  So you said you recalled speaking to

20  Mr. Beliveau about another case?

21  A  Yes.

22  Q  And what was that?

23  A  It was in executive session, so maybe again I

24  should confer.

# Exhibit 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 05-10354DPW

KIMBERLY STOYLE,                              )
                                             )
          Plaintiff                          )
VS.                                          )
                                             )
THE MANSFIELD MUNICIPAL                      )
ELECTRIC DEPARTMENT, JOHN                    )
D'AGOSTINO, TOWN OF MANSFIELD                )
BOARD OF LIGHT COMMISSIONERS,                )
LOUIS AMORUSO, MICHAEL McCUE,                )
DAVID McCARTER, DANIEL                       )
DONOVAN, ROGER ACHILLE and                   )
STEVEN MacCAFFRIE,                           )
                                             )
          Defendants                         )

## AFFIDAVIT OF DAVID MCCARTER

I, David McCarter, hereby depose and state as follows:

1.    I am currently a member of the Town of Mansfield Board of Selectmen and was a
      member of the Board of Selectmen at all times relevant to the Plaintiff's Complaint,
      except for the period from May 2004 through May 2005.

2.    I am currently a member of the Town of Mansfield Board of Light Commissioners
      and was a member of the Board of Light Commissioners at all times relevant to the
      Plaintiff's Complaint except for the period from May 2004 through May 2005.

3.    In the Town of Mansfield, the individual members of the Board of Light
      Commissioners are the individual members of the Town of Mansfield Board of
      Selectmen.

1

4.    The first time I became aware of Ms. Stoyle's allegations that she was being harassed by Mr. D'Agostino because of her gender and was the subject of sexual harassment by Mr. D'Agostino was after she filed her MCAD Charge of Discrimination in December 2002. Ms. Stoyle never complained to me or notified me that she believed she was the subject of gender based harassment or sexual harassment by D'Agostino prior to her filing her MCAD Charge of Discrimination.

5.    Likewise, Dr. Beliveau never notified or complained to me about Ms. Stoyle's belief that she was being harassed by Mr. D'Agostino because of her gender or sexually harassed by Mr. D'Agostino prior to her filing her MCAD Charge of Discrimination in December 2002.

6.    After we learned in December 2002 that Ms. Stoyle believed that she was the subject of gender based harassment and sexual harassment, the Board of Light Commissioners contacted Town Counsel and hired an independent investigator to investigate Stoyle's claims.

7.    That investigator, James Lampke, completed his investigation and issued a report in June 2003. As a member of The Board of Light Commissioners, I reviewed the report and voted to accept Lampke's findings on June 25, 2003 and determined that there was no foundation for Ms. Stoyle's gender harassment and sexual harassment claims.

8.    It is my understanding that after learning that the Board of Light Commissioners voted to accept Lampke's findings and determined that there was no foundation for Ms. Stoyle's gender harassment or sexual harassment claims, Dr. Beliveau sent a memorandum dated August 13, 2003 to the Chairman of the Board of Light Commissioners, Steve MacCaffrie, claiming that Stoyle believed that the sexual harassment was continuing. As Stoyle's litigation was still pending, the Board

2

referred the matter to the attorneys representing the Town in Stoyle's then pending litigation.

SIGNED under the pains and penalties of perjury, this _14_ day of February, 2007.

David McCarter

3

# Exhibit 7

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.

TOWN OF MANSFIELD
BOARD OF SELECTMEN

```
 _____
|                        )
| IN THE MATTER OF       )
| JOHN D'AGOSTINO        )
|_____)
```

## REPORT ON INTERNAL INVESTIGATION REGARDING JOHN D'AGOSTINO

INTERNAL INVESTIGATION
CONDUCTED BY:

JAMES B. LAMPKE, ESQ.

INTER/INTRA DEPARTMENTAL MEMORANDUM
REGARDING POLICY FORMULATION AND PERSONNEL MATTERS,
NOT A PUBLIC RECORD FOR WHICH DISCLOSURE IS MANDATED

3068

# TOWN OF MANSFIELD, BOARD OF SELECTMEN

## INTERNAL INVESTIGATION REGARDING JOHN D'AGOSTINO

### TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| A. | INTRODUCTION AND STATEMENT OF ASSIGNMENT | 1 |
| B. | SUMMARY OF ALLEGATIONS OF SEXUAL HARASSMENT | 2 |
| C. | PERSONS INTERVIEWED | 11 |
| D. | DOCUMENTS REVIEWED | 12 |

SELECTED DOCUMENTS EXAMINED ARE CONTAINED IN APPENDIX B

| E. | SUMMARY OF WITNESS INTERVIEWS | 13 |

SUMMARIES ARE CONTAINED IN APPENDIX B

| NAME | PAGE |
|---|---|
| Kimberley Stoyle | B-1 |
| John D'Agostino | B-11 |
| Howard Allen, Westin Hotel Security Director | B-25 |
| Lou Amoruso | B-25 |
| John Beliveau | B-32 |
| Richard Boucher | B-45 |
| Lou Costa | B-49 |
| Gary D'Ambra | B-51 |
| Ronald DeCurzio | B-54 |
| Pamela J. Fitzgerald, Esq. | B-55 |
| Michael Halpin, Esq. | B-55 |

Bea Kearney                                                   B-55

Police Chief Arthur O'Neil                                     B-57

Edward O'Neil                                                  B-59

Gerald Scherma                                                 B-60

Brad Wills                                                     B-62

**F.    ACTION BY TOWN**                                        13

**G.    GENERAL OUTLINE OF SEXUAL HARASSMENT**                  13

TEXT OF GENERAL OUTLINE OF SEXUAL HARASSMENT
APPEARS IN APPENDIX C

**H.    RECOMMENDED FINDINGS**                                  13

**I.    CONCLUSION AND RECOMMENDATIONS**                        55

# COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.

**TOWN OF MANSFIELD
BOARD OF SELECTMEN**

IN THE MATTER OF )
JOHN D'AGOSTINO )
)
)

## REPORT ON INTERNAL INVESTIGATION REGARDING JOHN D'AGOSTINO

**INTERNAL INVESTIGATOR:**    JAMES B. LAMPKE, ESQ.

## INTRODUCTION AND STATEMENT OF ASSIGNMENT

The undersigned was designated by the Town of Mansfield Board of Selectmen, (hereinafter called Town of Board) to conduct an Internal Investigation regarding **John D'Agostino**, who holds the position of Town Manager (hereinafter called Employee or D'Agostino). Certain allegations were made against the Employee by Kimberly Stoyle (Stoyle), a management employee in the Mansfield Municipal Electric Department (hereinafter called MED). Those allegations concerned generally purported inappropriate actions by D'Agostino, which Stoyle asserts constituted sexual harassment and retaliation (referred to collectively as sexual harassment unless otherwise noted).

The Internal Investigation was done to determine, among other things, whether there is a basis for the allegations so that the Town may determine whether there was sexual harassment.

During the course of this investigation, the undersigned interviewed numerous employees of the Town and others, including Stoyle and D'Agostino and reviewed numerous documents.

## SUMMARY OF ALLEGATIONS OF SEXUAL HARASSMENT

As in any investigation of sexual harassment, it is necessary to identify the incidents which the employee asserts as evidence of sexual harassment. This requires identifying the incidents alleged, reviewing whether the incidents did in fact occur and then determining whether the incidents if they occurred constitute sexual harassment. Sexual harassment does unfortunately continue to exist in many workplaces and takes various forms- sometimes direct and sometimes indirect. However, not every workplace problem or dispute constitutes sexual harassment.

Stoyle filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) asserting "Gender-Based and Sexual Harassment" and "Retaliation".

She identified the following as the "Gender-Based and Sexual Harassment":

1. "In August 1999, at a conference for the Northeast Public Power Association, Mr. D'Agostino suggested at the lunch hour that I come to his hotel room to "check out the view."

2. In October 2000, Mr. D'Agostino sent me a sexually charged audio e-mail message detailing a sexual encounter involving an animal.

3. In or about April 2002, during a discussion regarding pension allocations, Mr. D'Agostino stated: The only accounting I am familiar with is a broad plus a brain equals a problem."

4. In or about June 2002, after I voiced my opinion on the issue of payment in lieu of taxation and asked Mr. D'Agostino, "Why doesn't anyone listen to reason?"

Mr. D'Agostino stated I was too pretty and that no one would take me seriously.

He further stated that maybe people would listen to me if I cut my hair and got

fat. He also said that I should have been a hairdresser because then I could talk

as much as I wanted and maybe someone would listen.

5.    In August 2002, at a conference for the Northeast Public Power Association, Mr.

D'Agostino stated: "You look delicious."

I indicated to Mr. D'Agostino after each incident of harassment that I was

offended by his conduct. I also reported his conduct on numerous occasions beginning

in 1999 to the Director of the Mansfield Municipal Electric Plant. The Director in turn

report Mr. D'Agostino's conduct to the Chairman of the Town of Mansfield Board of

Municipal Electric Commissioners. Despite repeated complaints, the harassment

continues."

She identified the following as the "Retaliation":

1.    "In December 2001, Mr. D'Agostino attempted to retract an effective salary

increase pre-authorized by him.

2.    In October 2002, Mr. D'Agostino reprimanded me for failing to consult with the

Town MIS Director regarding an integrated purchase order system. His criticism

was contrived and retaliatory, given that the Electric Plant has no such system.

3.    In October and November 2002, Mr. D'Agostino falsely accused me of failing to

provide telephone account information that he requested. Mr. D'Agostino then

attempted to initiate disciplinary action against me, despite that I thoroughly and

timely responded to his request."

Using the above as a starting point in this investigation, and as a result of the

initial interview with Stoyle the following were identified as the examples of the sexual

harassment she asserts occurred. Each example is further referenced as to whether it

was included in the MCAD filing or not included and originating solely from the interview.

A.    **August, 1999, NEPPA Conference at Westin Hotel**

    **(MCAD Filing)**

    While at the New England Public Power Association Conference, Stoyle alleges D'Agostino invited her to lunch and first to go up to his room to see the view while he got his parking ticket. Stoyle alleges that there was nothing special about the view and that D'Agostino made facial expressions and kept moving his eyes to the bed and to her, back and forth, and saying, "Huh". Stoyle also alleges that D'Agostino touched himself in his crotch area as he looked back and forth between the bed and the window. Stoyle said that she replied words to the effect, "This is just wrong", that she was nervous and stuttering and offended by this. Following this incident, they went to lunch at the Mediterraneo Restaurant on Federal Hill, driving there in the Manager's car. She believes that the lunch was paid for with the Manager's Town business card.

    While at lunch, she claims the Manager discussed her then boyfriend, Michael Piccolomini, and that the Manager called him a "Mamma's boy".

B.    **October, 2000- Email Incident**

    **(MCAD filing)**

    Stoyle claims that D'Agostino sent to her an email about a gerbil being used in a sexual act and that she found it offensive.

C.    **June, 2001-Lock Box-**

    **(Not included in MCAD Filing; Originated from Interview)**

    Stoyle alleges that she brought up at a meeting a possible $130,000.00 cost

savings concerning the lock boxes vender and how that was being handled. Stoyle claims that at a meeting with bank officials and others, the Richard Boucher, the Town Treasurer said that she did not know what she was talking about and that he later told her to shut up in front of other people. Stoyle complained to Beliveau about this incident. Stoyle claims that Beliveau spoke to the D'Agostino and that D'Agostino told him that he spoke to the Treasurer regarding this during the ride home.

D:    **March, 2001-Overtime Incident-**

**(Not included in MCAD Filing; Originated from Interview)**

Stoyle claims that this incident occurred after a state declared state of emergency. She claims that D'Agostino called very irate over approved overtime for the Line Crew and spoke to her, as Beliveau was not present. Stoyle claims that D'Agostino used words to the effect, "I'm the f ....... Manager, I make all the f ....... decisions", and that he was "too f .......... mad to talk to Beliveau". D'Agostino denies doing this.

E.    **October, 2001 & Thereafter; Requests for Information; Meeting with Member of Board-**

**(Not included in MCAD Filing; Originated from Interview)**

Stoyle claims that D'Agostino would frequently contact her by email on work related matters, which matters did not involve her, and for which she believed he should have gone to other people for.

Stoyle claims that she had various meetings with other Town representatives, including Lou Amoruso of the Board of Selectmen. Stoyle claims that at these meetings, the alleged sexual harassment was discussed and that she expected Amoruso to do something about it but that he did not.

Page 5 of Internal Investigation Report
Re: John D'Agostino

F.    **December, 2001-Pay Raises-**

**(MCAD Filing)**

Stoyle claims that she and other employees were approved for pay raises and at a December 14, 2001 Christmas Party at Christina's in Foxboro, the Manager was giving her looks at the party, which she ignored. Stoyle claims that on December 20, D'Agostino had asked Beliveau to hold up on the raises, alleging that it would look bad if Stoyle received a raise, since she had a job offer for another job. Stoyle believes that Beliveau told D'Agostino that he cannot take back the raise that was already put in.

G.    **December, 2001-Town Christmas Party and Eileen Plant-**

**(Not included in MCAD Filing; Originated from Interview)**

Stoyle alleges that at this party D'Agostino spoke to an Eileen Plant, a Mansfield Reserve Police Officer, who was seeking a permanent employment with the Town as a Police Officer. Stoyle claims that Plant told her that D'Agostino wanted to speak to her regarding the job and took her to lunch at Luciano's Restaurant in Wrentham and discussed the possible hiring, and possibly the Town bypassing other candidates to reach her name on the civil service list. Stoyle also alleged that D'Agostino spoke to Plant about Plant's divorce and that D'Agostino told Plant that if she wanted a job in a prison, he could get it for her. Stoyle claims that knowing of this lunch and what she understands happened reinforces her belief that D'Agostino engages in sexual harassment and that this thus caused her to believe all the more that she was the victim of sexual harassment by D'Agostino.

D'Agostino admits that he did meet Plant for lunch at Luciano's. He said that he wanted to discuss her job aspirations with the Town and chose to do so there so that

Page 6 of Internal Investigation Report
Re: John D'Agostino

3076

the Police Chief would not know he was meeting with an auxiliary officer and wonder why. D'Agostino claims that he only wanted to help her.

H.    **January, 2002-Office Manager References-**

      **(Not included in MCAD Filing; Originated from Interview)**

      Stoyle claims that D'Agostino kept referring to her as Office Manager, when she believed her correct title was Chief Financial Officer. Stoyle believes that she was listed on the web site as Chief Financial Officer. She felt that this was demeaning to her. Also, when D'Agostino released his public statement regarding the allegations, he referred to her as Office Manager.

I.    **February, 2002-Involving Financial Assistant Carolyn Fitton-**

      **(Not included in MCAD Filing; Originated from Interview)**

      Stoyle alleges that Fitton told her that D'Agostino flirted with her in the mail room and made passes at her and that he also waived his American Express card at Fitton when talking about going to England.

      Stoyle claims that she told Beliveau about this. Stoyle claims that D'Agostino, after Fitton left the employ of the Town, asked Stoyle about whether or not they could help Fitton get a job back at the Light Department.

J.    **January/February, 2002- Inquiries Regarding Personnel File-**

      **(Not included in MCAD Filing; Originated from Interview)**

      Stoyle claims that D'Agostino raised questions regarding her personnel file.

K.    **April, 2002-Pension Costs Dispute-**

      **(MCAD Filing)**

      Stoyle claims that she questioned how the allocation was made for the MED

pension costs as it was different than what she thought it should be. She alleges that she told D'Agostino she did not understand why the Town Treasurer was not using the uniform accounting method for these calculations and that D'Agostino said words to the effect, "The only accounting I know is that a broad plus a brain equals a problem". Stoyle claims that she told D'Agostino he was a chauvinists and that this was not funny.

D'Agostino claims that the pension cost issue was another dispute between the MED and the general government side of the Town and in particular between Stoyle and Boucher. He denies making the statement alleged and claims that Stoyle made the statement herself.

L:     __June, 2002-Pilot Agreement and Other Costs-__
       __(MCAD Filing)__

Stoyle said that $120,000.00 in extra costs were being charged to the MED and that the Treasurer had admitted in a prior conversation (during the lock box issue) that the actual cost was $20,000.00. Stoyle claims that at a meeting where D'Agostino and Beliveau were present, Stoyle said words to the effect, "Why doesn't anyone listen to reason", and that D'Agostino said words to the effect, "You're too pretty to have people listen. Gain weight, be a hairdresser, and people would listen". Stoyle claims that she told D'Agostino he was not funny and was a chauvinists. She claims that he just laughed.

M.     __August, 2002- Conference in New Hampshire-__
       __(MCAD FILING)__

Stoyle claims that at the August, 2002, conference in North Conway, N.H., of the New England Public Power Association, while she was in line to get a drink at the

reception, D'Agostino stood behind her, very close to her, and said words to the effect, "You look delicious". Stoyle also claims that another person at the meeting, Ron DeCurzio, of MMWEC, later spoke to her and said that he saw that D'Agostino was "all over you". Stoyle claims that after these complaints became public, DeCurzio called her and made reference to the August, 2002, meeting and said that he saw D'Agostino "grinding" her and whispering in her ear.

D'Agostino admits that he made this statement, although he recalls it was made at the dinner table.

N.    <u>September, 2002- Meeting Re: Warrant-</u>

**(Not included in MCAD Filing; Originated from Interview)**

Stoyle described an incident concerning a warrant which was returned concerning the SCADA System. She claims that D'Agostino spoke to her in an aggressive manner, shaking the invoice at her. Stoyle said that Beliveau observed that D'Agostino was very hostile in doing this. Beliveau states that D'Agostino seemed upset and was forceful in his discussion with Stoyle on this.

D'Agostino states that he does not believe that he shook the invoice in the manner described by Stoyle. He acknowledges that he had some questions on the bill and asked Stoyle about them.

O.    <u>September, 2002 to December, 2002-Re:  Phone Bill From Verizon; Memo Re: Possible Reprimand-</u>

**(MCAD Filing)**

Stoyle claims that D'Agostino kept sending back to her a Verizon phone bill regarding fax lines. She claims that he kept asking her about payment of the regular phone lines, which are in fact paid through Town Hall. She found this to be harassing

and disturbing.

D'Agostino claims that he had questions on this bill which related to the MED and that it was appropriate to ask Stoyle about it.

Stoyle claims in relation to this incident that D'Agostino sent a note to Beliveau complaining about the difficulty of getting this information from Stoyle and indicating that he should discipline her.   Beliveau sent back a letter saying that he was not going to reprimand her as he did not feel there was cause.

P.    **October, 2002- Email Re: System Upgrade-**
      **(MCAD Filing)**

Stoyle claims that D'Agostino sent her and Beliveau an email asking why they did not inform Lou Costa of the MIS Department regarding certain system upgrades.  Stoyle said that she assumed that he was talking about a phone Internet upgrade.  Stoyle claims that D'Agostino wrote back that it was not about the phone lines, but an automated purchase system software.  Stoyle said they had no such system.

Q.    **October, 2002-Meeting with Board Member-**
      **(MCAD Filing)**

Stoyle states that a second meeting was held with Amoruso to discuss the complaints against D'Agostino.  At this meeting, she states that her complaints were put forth in the context of sexual harassment and that thus the Town had knowledge of the sexual harassment.  Amoruso acknowledges that there was a meeting in October, but states that none of the complaints were put forth or discussed in the context of sexual harassment.

Page 10 of Internal Investigation Report
Re: John D'Agostino

## PERSONS INTERVIEWED

The following persons were interviewed: Kimberley Stoyle, John D'Agostino, Lou Amoruso, John Beliveau, Richard Boucher, Lou Costa, Gary D'Ambra, Ronald DeCurzio, Michael Halpin, Esq., Bea Kearney, Police Chief Arthur O'Neil, Edward O'Neil, Gerald Scherma, Brad Wills, Pamela J. Fitzgerald, Esq. and, Howard Allen, Westin Hotel Security Director.

Efforts were made to interview Eileen Plant, who was described by Stoyle as another person who was subjected to sexual harassment by D'Agostino. Initially, Plant did not return messages left for her. She eventually returned a call and a meeting was scheduled in Mansfield. However, several hours prior to the meeting Plant called and left a message that she no longer felt comfortable meeting and did not want to meet. She also made reference to the undersigned having already received an affidavit she gave to Stoyle's attorney. [The fact that the undersigned had been sent the affidavit was only known by Stoyle's attorney who had sent it, and possibly Stoyle if she was so informed by her attorney. This suggests that Plant had contact about the scheduled meeting with either Stoyle's attorney or Stoyle or both.] Subsequent correspondence and phone messages to re-schedule the meeting proved unsuccessful.

Efforts were also made to interview Carolyn Fitton but were unsuccessful.

A concluding interview was sought with Stoyle so that some of the conflicting areas of information and documents her attorney had recently submitted could be discussed and clarified. Despite several requests with her attorney, they were unwilling to meet. Such a meeting would have resolved various issues which exist.

## DOCUMENTS REVIEWED

The following documents, among others were included in the review of this matter and are attached in Appendix A, attached hereto and incorporated by reference herein[1]:

1.  Town of Mansfield Sexual Harassment Policy;

2.  Complaint filed with the MCAD;

3.  Series of e-mails between Stoyle and D'Agostino over the period of August 17, 1999 to October 18, 2000;

4.  Memo from Stoyle to Beliveau dated February 24, 2000 re: Financial Assistant's Position;

5.  E-mail Memo from Beliveau to D'Agostino dated March 6, 2000 re: Basketball Court Lighting;

6.  E-mails between Stoyle and D'Agostino re: copier purchase;

7.  Memo from Beliveau to D'Agostino dated February 25, 2002 re: prior memos;

8.  E-mail memos between D'Agostino and Beliveau re: software upgrade;

9.  Memos and emails between D'Agostino, Stoyle and Beliveau concerning Verizon bill;

10. E-mails and memos between Beliveau and D'Agostino regarding pay increases (note: not included are departmental forms for pay changes; available if needed);

11. Affidavit of Eileen Plant dated January 24, 2003.

---

[1] Numerous other documents have been reviewed and are available for further inspection. The documents submitted in the Appendix are submitted as they relate specifically to some of the charges or are submitted so as to enable the Town to see the level of lack of cooperation between the MED and the general Town government and especially with the Town Manager. While they purport to either ask for information or provide information, the tension is apparent in the documents.

## SUMMARY OF INTERVIEWS

The summary of the interviews of the various persons interviewed are contained in Appendix B, attached hereto and incorporated by reference herein.

## ACTION BY THE TOWN

When the Town was made aware of the situation, the Town took action to ensure that D'Agostino would have minimal contact with Stoyle.   This was appropriate, given the complaints and was possible due to the fact that they worked in different locations.   As noted in the interview with Stoyle, she indicated that she was comfortable coming to work as she understood that there would be little likelihood of coming into contact with D'Agostino given the existing separation of their work places. In addition, D'Agostino was cautioned not to have any contact with Stoyle beyond that which was absolutely necessary and related to Town matters.

The Town also commenced an Internal Investigation.

## GENERAL OUTLINE OF SEXUAL HARASSMENT

A general outline on sexual harassment is contained in Appendix C, attached hereto and incorporated by reference herein.

## RECOMMENDED FINDINGS

Based on the evidence reviewed and the reasonable inferences to be drawn therefrom, the following findings can be made.  These findings are in two sections, one dealing with General Findings and the other with Particularized Findings.

Findings are set forth in the following manner: "inconclusive", meaning that no finding is made, typically because there is insufficient information to determine the allegation as happening or not happening; "established", meaning that there is a finding that inappropriate conduct as alleged occurred; and "not established", meaning that no inappropriate conduct is found to have occurred. It should be noted that these findings are made based on the evidence and information adduced as part of this Internal Investigation and are not made on a strict burden of proof basis. Thus, formal proceedings at another forum where the complaining party has a burden of proof, such as a court of law or agency hearing, may result in additional evidence and different findings.

I. General Findings-

1. D'Agostino is the Town Manager of the Town of Mansfield and by charter and appointment of the Board of Selectmen is also the Manager of the MED. As such, he is a senior management employee of the Town.

2. Stoyle is the chief financial person within the MED. While there has been some dispute as to exactly what her title is, she is viewed as the Chief Financial Officer of the MED and has responsibility for financial matters involved the MED. She is viewed as being a senior management employee of the Town.

3. Stoyle has complained that she feels she has been subjected to sexual harassment by D'Agostino.

4. Stoyle made said allegations in a complaint filed with the Massachusetts Commission Against Discrimination; at various times she made these allegations to her immediate supervisor and also during an interview with the undersigned investigator.

5.   The Town, in accordance with appropriate practices and procedures, took prompt action to ensure that D'Agostino would not have contact with Stoyle while this matter was under review, except as may be absolutely necessary. Stoyle has indicated that she has been comfortable with the steps taken by the Town to minimize contact between herself and D'Agostino during this matter.

II.  Particularized Findings

The allegations of sexual harassment include the following:

A.  August, 1999, NEPPA Conference at Westin Hotel

(MCAD Filing)

While at the New England Public Power Association Conference, Stoyle alleges D'Agostino invited her to lunch and first to go up to his room to see the view while he got his parking ticket. Stoyle alleges that there was nothing special about the view and that D'Agostino made facial expressions and kept moving his eyes to the bed and to her, back and forth, and saying, "Huh". Stoyle also alleges that D'Agostino touched himself in his crotch area as he looked back and forth between the bed and the window. Stoyle said that she replied words to the effect, "This is just wrong", that she was nervous and stuttering and offended by this. Following this incident, they went to lunch at the Mediterraneo Restaurant on Federal Hill, driving there in the Manager's car. She believes that the lunch was paid for with the Manager's Town business card.

While at lunch, she claims the Manager discussed her then boyfriend, Michael Piccolomini, and that the Manager called him a "Mamma's boy".

12.      Both D'Agostino and Stoyle attended the NEPPA Conference at the Westin Hotel at the time in question.

13.      They did have lunch together at Mediterraneo Restaurant.

Page 15 of Internal Investigation Report
Re: John D'Agostino

**3085**

14.    Stoyle claims that D'Agostino invited her to his hotel room, as described above.

15.    D'Agostino denies inviting her to his hotel room, as described above.

16.    The allegation of D'Agostino acting as described above by Stoyle is inconclusive, as there is insufficient information to confirm the allegation. Both parties were strong in their statements that this either happened or did not happen. The fact that the view from the room was not noteworthy, as claimed by Stoyle, was confirmed by the hotel security director. However, D'Agostino does not claim that the view from the room was anything spectacular. Stoyle declined to be interviewed further and thus this incident could not be further investigated beyond that information which was capable of being obtained and described herein. There is not sufficient evidence therefore to conclude that this allegation occurred as claimed by Stoyle.

**Discussion-**

To be certain, if this alleged conduct did in fact occur, it would have been inappropriate and constituted potential sexual harassment depending on other factors on which there is not sufficient information.

Certainly such alleged conduct is not to be tolerated and would be the basis of disciplinary action regardless of whether it was sexual harassment or not.

However, the totality of the evidence does not establish that the event happened as alleged by Stoyle.

It is approximately some three plus years since this conduct is alleged to have taken place. Stoyle claims to have been extremely upset by this alleged conduct, a

Page 16 of Internal Investigation Report
Re: John D'Agostino

**3086**

reaction which would be reasonable and expected in response to such alleged conduct.

However, according to e-mails which Stoyle and D'Agostino exchanged back and forth [See Appendix A, item 3], they maintained what appeared to be a friendly relationship which seemed to encourage maintaining contact between each other. These e-mails are contrary to the reaction which Stoyle claims to have had about D'Agostino following this alleged incident. Stoyle claimed during the interview that she sought to have little contact with D'Agostino after this incident, but the e-mails suggest the contrary. Furthermore, Stoyle stated that she did not exchange non-business e-mails with D'Agostino, yet these e-mails show otherwise.

The following is an example of the e-mails sent back and forth around the time of and following this incident:

Mid August, 1999- e-mails back and forth of a friendly nature; inquiring about sending funny e-mails; D'Agostino to Stoyle- references to candy; "Wouldn't mind stealing some of your candy though! You have enough sweetness to go around! That's what I've heard!" Email from Stoyle to D'Agostino, "You've heard correctly. Just call me Sugar!";[2] Cautionary note from D'Agostino to Stoyle re: public records and e-mails;

Email joke- Love is in the Air- sent by Stoyle to D'Agostino on August 18, 1999; D'Agostino does not have sound card and can't hear it. E-mails Stoyle about lack of sound card. E-mail from Stoyle to D'Agostino re ordering sound card; "Do I take care of you or what? You need anything, you let me know." D'Agostino to

---

[2] According to information supplied by Stoyle, these references to candy related to an issue at the MED concerning money being spent for candy. Even so, they display a friendly enough relationship between these two persons such that e-mails of jokes and the like were sent back and forth.

Page 17 of Internal Investigation Report
Re: John D'Agostino

**3087**

Stoyle- "You are great! I must say you do take care of me."

September, 1999 [note: this is following the alleged incident at Westin Hotel] further e-mail jokes between Stoyle and D'Agostino. D'Agostino sent Stoyle an e--mail September 1, 1999 re the Love is in the Air email; commented about "farting" played on email message. Stoyle replies same day about putting "farting" on agenda and having "Jack" demonstrate. D'Agostino responds with email.

September 2, 1999 e-mails; "Love Those Beach Hazards"; chain e-mail eventually sent to Stoyle by a Jennifer Trask; D'Agostino sends email back to Stoyle commenting about same email, [which suggests that Stoyle sent it to D'Agostino [no record yet of said email from Stoyle to D'Agostino but it is presumed given the banter back and forth]; Stoyle to D'Agostino, Sept. 3, 1999 re e-mail- "That was footage from your vacation in the Adirondacks(?) (Sic), you're busted! Have a nice long, wonderful weekend." D'Agostino to Stoyle Sept. 7, 1999- "Ya sure, my mother-in-law didn't look like the person laying on the beach. Actually, just meeting her has the same affects as pumping into a bear."

Email joke- Keep off the Grass- sent by Stoyle to D'Agostino on October 6, 1999; Further friendly e-mails back and forth.

January 19, 2000- Stoyle sent email joke to D'Agostino- Dog Day Afternoon; reference to dog having sex, etc. D'Agostino e-mailed Stoyle back; reference to Kym Gissel applying for job with North Attleboro.

E-mail joke- Dress File- sent by Stoyle to D'Agostino on February 3, 2000

Stoyle continued to proceed to have lunch with D'Agostino following this incident.

She claims that she did so because she did not want to offend him or jeopardize her employment. However, proceeding to have lunch with a person who is alleged to have just made, in a private hotel room, sexual advances, appears contrary to how a person of Stoyle's professional standing would have reacted.

One is mindful of the mixed emotions which a victim of sexual harassment has and uncertainty often in how to respond to continued contact with the harasser. However, they proceeded to go to a restaurant off the hotel property for lunch and subsequently continued e-mail contact of a social and friendly basis as described above.

The evidence does not support this act, if it occurred as alleged by Stoyle, being part of some pervasive course of conduct. There is no other allegation of a similar sexual nature. To be certain, Stoyle continues to allege that D'Agostino engaged in conduct which constitutes sexual harassment; however, not all the incidents alleged by Stoyle, even if they actually happened as she alleged, would constitute sexual harassment or retaliation. Certain incidents, such as the email and the inappropriate remark made at the August 2002 NEPPA conference are admitted to have happened and will be addressed below.

## B.  October, 2000- Email Incident

### (MCAD Filing)

Stoyle claims that D'Agostino sent to her an email about a gerbil being used in a manner that she found it offensive.

1.  Stoyle claims that in October of 2000 D'Agostino sent her an email which she claims was sexually offensive.

Page 19 of Internal Investigation Report
Re: John D'Agostino

3089

2. D'Agostino admits that he sent the email in question, but denies that it was sexually offensive.

3. The email was an audio with no pictures or text, purported to be a reading of a news account from the <u>Los Angles Times</u> newspaper about a gerbil and two gay men. The term "feltching" was stated in the email.

4. The email was sent to D'Agostino by his secretary, who had received it from her husband.

5. The e-mail can certainly be classified as gross.

6. The e-mail is believed to be a hoax and having never appeared in the <u>Los Angles Times</u> or any other legitimate media outlet.

7. Furthermore, to the extent that the sexual aspect of this e-mail arises from the use of the term "feltching", research disputes that this use of the gerbil constitutes "feltching".

8. The facts warrant a finding that the allegation of sending an offensive email is established.

## Discussion-

There is no dispute that the email was sent. There is no dispute that Stoyle was offended by it and did not like it. Beliveau confirms that Stoyle told him it was "disgusting". Beliveau also said that he found the email "disgusting".

Presuming that the email was disgusting, the appropriate response by Stoyle would have been to have told D'Agostino that she did not want to receive such e-mails in the future. This was not done. Nor is there any evidence that she had told him earlier that she did not want to receive non-work related e-mails from him.

The e-mails which went back and forth between them previously appeared to be

Page 20 of Internal Investigation Report
Re: John D'Agostino

friendly in nature. [See Appendix A, Item 3] In fact, Stoyle asked D'Agostino if he minded if she sent him funny e-mails. This was both before and after the incident alleged to have happened at the Westin Hotel. D'Agostino e-mailed back that he did not have a problem with funny e-mails as long as they were not political. Various terms were used in these e-mails which strongly indicated a friendly relationship between them.

The e-mail in question was sent to D'Agostino by his secretary, a female, who received it from her husband. D'Agostino apparently sent it also to others in the Town government, including at least Beliveau and Stoyle.

The email, while strange and one which could be viewed as "disgusting" (the term used by Stoyle and Beliveau) is not clearly of an objectively sexually offensive nature. While there is some inference in the email to the gerbil being used for sexual purposes, no specific words of a clearly understood sexual nature are used in the email. The word "sex" does not even appear.

The email itself, and the suggestion that it was about "feltching" appears to be what is called an "urban legend" or myth. Such myths are often circulated on the Internet and sent to people via e-mail. These are stories which, usually because of the inclusion of a name of a person or institution which is widely know, appear to be believable. However, when they are researched further, they are debunked. In this case, according to the website www.urbanlegand.com , this story never appeared in the Los Angles Times and there is no confirmation that this story is true. Also, that website debunks the suggestion that the use of the gerbil constitutes "feltching".

Stoyle herself has sent an email to D'Agostino (and possibly others in the town government) which could be viewed as being sexual in nature. This email concerned a

Page 21 of Internal Investigation Report
Re: John D'Agostino

joke about a municipal employee doing different things, including "having sex" and then filing a workers compensation claim. While that e-mail was not as raunchy as the gerbil e-mail, it did include a direct and specific reference to sex.

All of that said, that does not detract from the right of Stoyle to find the email offensive to her. What Stoyle should have done was to tell D'Agostino not to send to her any such e-mails.

## C. June, 2001-Lock Box-

## (Not included in MCAD Filing; Originated from Interview)

Stoyle alleges that she brought up at a meeting a possible $130,000.00 cost savings to the MED concerning the lock boxes vender and how that was being handled. Stoyle claims that at a meeting with bank officials and others, Richard Boucher, the Town Treasurer, said that she did not know what she was talking about and that he later told her to shut up in front of other people. Stoyle complained to her Supervisor about this incident. Stoyle claims that the Supervisor spoke to the D'Agostino and that D'Agostino told him that he spoke to Boucher regarding this during the ride back from the meeting.

1. Stoyle attended a meeting with bank officials at which the lock box subject was discussed.

2. D'Agostino was also present at the meeting.

3. Richard Boucher, the Town Treasurer-Collector, was also present.

4. At this meeting, Boucher said in front of others that Stoyle did not know what she was talking about.

5. Stoyle was upset and offended by this statement

6. Boucher is alleged to have also said "shut up" to Stoyle at the lunch with the

Page 22 of Internal Investigation Report
Re: John D'Agostino

**3092**

bank officials.

7. There is insufficient evidence to conclude whether or not Boucher did say "shut up" to Stoyle.

8. D'Agostino states that he reprimanded Boucher for his conduct in telling Stoyle that she did not know what she was talking about during the ride home. Boucher denies having a specific memory of any reprimand.

9. The allegation is established as relates to Boucher saying in front of others that Stoyle did not know what she was talking about.

**Discussion-**

It appears established that Boucher did say in front of non-town business people while Stoyle was present that Stoyle did not know what she was talking about. This was inappropriate conduct on his part. There is insufficient evidence to establish whether he also told Stoyle to shut up. Also, it is inconclusive as to whether D'Agostino did in fact reprimand him on the way home, as Boucher denies it happened, although he appeared more uncertain whether it happened as opposed to denying emphatically that it happened.

To be certain, one senior management person saying in front of other people that another senior management person also present did not know what she was talking about was inappropriate conduct by that person.

D'Agostino asserts that he reprimanded on the ride home Boucher for this conduct. Boucher does not recall whether he was reprimanded.

The offensive conduct was the statement by Boucher. This however was inappropriate conduct by Boucher, not D'Agostino. There is nothing to suggest that D'Agostino prompted Boucher to make this statement. Boucher is also not a person

Page 23 of Internal Investigation Report
Re: John D'Agostino

who could impact Stoyle's employment, as that would not be within his authority. There was nothing sexual about the comments and could have easily have been made about a female or male's level of knowledge.

### D.  March, 2001-Overtime Incident-

### (Not included in MCAD Filing; Originated from Interview)

Stoyle claims that this incident occurred following a State declared state of emergency. She claims that D'Agostino called very irate about approved overtime for the Line Crew and spoke to her, as Beliveau was not present. Stoyle claims that D'Agostino used words to the effect, "I'm the f ....... Manager, I make all the f ....... decisions", and that he was "too f .......... mad to talk to Beliveau". D'Agostino denies doing this.

1. D'Agostino called Stoyle to ask about overtime charges to the line crew following a storm.

2. Stoyle suggested that he contact Beliveau about it.

3. D'Agostino was upset with her response and likely swore during the conversation.

4. There are no other reported or known incidents where D'Agostino used profanity, suggesting that this was a single or at most limited incident.

5. This allegation is established in terms of D'Agostino using profanity towards Stoyle .

### Discussion-

Although D'Agostino asserts that he does not recall the incident, several other people confirmed that Stoyle reported it shortly after it happened. Beliveau claims he got a call from Stoyle and that he spoke to D'Agostino about the inquiry. Wills said he

Page 24 of Internal Investigation Report
Re: John D'Agostino

3094

heard about it from Beliveau. This would support it as being a fresh complaint made at the time it occurred.

D'Agostino acknowledges that he might have sworn if he was upset. However, he has no memory of this incident. Others have indicated that it is rare for D'Agostino to swear, if ever.

While some conversation appears to have happened which included inappropriate language, it is not clear that it included swearing to the extent alleged. Other witnesses who had information about it did not recall there being the full extent of the conversation alleged. It may very well have been that Stoyle did not want to repeat to others the full extent of whatever swearing may have occurred.

Sexual harassment laws are not designed to make a work environment free from all types of conduct, including language, which may be offensive. They are designed to remove from the workplace sexual harassment. Not every offensive, boorish, rude, crude or otherwise inappropriate remark constitutes sexual harassment.

There were no other reported incidents by Stoyle or anyone else concerning D'Agostino swearing. This could be an isolated incident involving offensive language. To that extent, it may be viewed as falling into the category of what is know as "stray remarks".

### E. October, 2001 & Thereafter; Requests for Information; Meeting with Member of Board-

**(Not included in MCAD Filing; Originated from Interview)**

Stoyle claims that D'Agostino would frequently contact her by e-mail or otherwise on work related matters, which matters she believed did not involve her, and for which she believed he should have gone to other people for.

Page 25 of Internal Investigation Report
Re: John D'Agostino

3095

Stoyle claims that she had various meetings with other Town representatives, including Lou Amoruso of the Board of Selectmen. Stoyle claims that at these meetings, this alleged harassment was discussed and that she expected Amoruso to do something about it but that he did not.

1. D'Agostino did contact Stoyle by email for information.

2. Stoyle took offense to these contacts.

3. These contacts appeared to have been for information relating to matters Stoyle would have information on or within the range of matters that D'Agostino, as the Town Manager and Manager of MED could reasonably request a senior management person of MED to obtain.

4. As a senior management person with the MED, it would not be inappropriate for D'Agostino to contact Stoyle for this information.

5. Stoyle did complain to Amoruso about these requests for information from D'Agostino.

6. This complaint did not include references to sexual harassment or appear to state anything which would reasonably cause one to believe that these requests were sexual in nature.

7. This allegation is established in terms of D'Agostino making requests for information from Stoyle, which requests she objected to, and that she relayed her objections to Amoruso.

**Discussion-.**

The gravamen here of Stoyle's complaint is that she felt bothered and harassed by D'Agostino contacting her for information. She felt that the requests concerned matters which should have been more appropriately directed to others with the MED.

Page 26 of Internal Investigation Report
Re: John D'Agostino

D'Agostino asserts that he is the Town Manager and the Manager of the MED and as such, has a right to contact employees, especially senior management employees, for information.

The problem here, as appears to be the problem in many of these incidents, is that Stoyle and D'Agostino no longer get along well with each other. Compounding that is the apparent fact that the situation is indicative of the all too frequent turf battle between the general government side of a municipality and a municipal light department if it has one. It is clear that there is a poor relationship and strong feelings between the MED and the general Town government.

However, D'Agostino is the Town Manager and as such has the right to contact any employee for information. He could be doing so not just for obtaining information but for seeing how the employee is performing. As Town Manager he is responsible for the orderly and effective operations of the Town.

Stoyle, as the person most directly responsible for financial matters involving the MED, is a senior management person. It would be within D'Agostino' right to contact her directly for information pertaining to the Town and the MED, even if the exact subject matter of the inquiry was not financial. Stoyle does not allege that the information was personal information or information having nothing to do with the Town or MED. The information all seemed to relate to the operations of the Town and the MED. Stoyle's objection is that she felt he should contact others for the information.

To be certain, her objection to being contacted by him appears to relate to the apparent lack of a good working relationship between the two. However, in the absence of specific illegally improper conduct between the two, D'Agostino would have a right to contact her for information.

Page 27 of Internal Investigation Report
Re: John D'Agostino

3097

If such contact is interfering with the orderly operation of the MED, then Beliveau should discuss it with D'Agostino and a proper protocol should be arrived at. Stoyle could also participate in such discussions. However, in the absence of more information or evidence, D'Agostino contacting the second most senior management person in the MED is not in and of itself inappropriate.

Amoruso, Stoyle, D'Ambra and Beliveau all acknowledge having a meeting on this matter in October of 2001. Stoyle asserts that her complaints were presented in the context of sexual harassment. Amoruso strongly denies that there was ever any reference or indication that the problems related to sexual harassment. His statements are persuasive because he appears to be sensitive to the issues of sexual harassment in the workplace, given his private business. At this meeting, Beliveau is not certain that sexual harassment was discussed, although he "believes" it was. He did not know however what the nature of the sexual harassment was. He opined that he thought the retaliatory conduct by D'Agostino was over the non-hiring of Andrea Hottlemen, an applicant for the position at the MED who D'Agostino wanted hired but who was not hired.

D'Ambra said that sexual harassment was discussed, but he is uncertain exactly what was said as being sexual harassment. According to Amoruso, when the complaint with the MCAD became public and Amoruso was quoted as saying he was unaware of any sexual harassment complaints, D'Ambra met with him and they discussed this. Amoruso states that he agreed with D'Ambra that the hostile work environment was discussed but said further that he heard no reference made to it being sexual harassment. Amoruso states that he asks D'Ambra if that was correct and D'Ambra replied "that's a rodger"- a way of agreeing in the affirmative.

Page 28 of Internal Investigation Report
Re: John D'Agostino

3098

It is clear that the topic was a hostile workplace. However, not every hostile workplace has its foundation in sexual harassment. While one would hope and expect that workplaces would be free from all hostile appearances, the issue here is whether the hostile workplace is based on sexual harassment. Other than Stoyle's assertion that this was discussed in the context of sexual harassment, there is no other evidence to suggest that Amoruso was informed of anything constituting sexual harassment.

It is noted that in a communication from Beliveau to D'Agostino in which he goes into some detail about the apparent problems between the two, reference is made to the meeting with Amoruso and hostile work environment being discussed. The absence of any reference to it being related to sexual harassment is telling in terms of whether it was discussed as a hostile work environment due to sexual harassment or non-sexual harassment based. This supports that it was not discussed in terms of sexual harassment. [See Appendix A, item 7, p. 5]

### F. December, 2001-Pay Raises-

### (MCAD Filing)

Stoyle claims that she and other employees were approved for a pay raise and at a December 14, 2001 Christmas Party at Christina's in Foxboro, D'Agostino was giving her looks at the party, which she ignored. Stoyle claims that on December 20, D'Agostino had asked Beliveau to hold up on the raises, alleging that it would look bad if she received a raise, since she had a job offer for another job. Stoyle believes that Beliveau told D'Agostino that he cannot take back the raise that was already put in.

1. Beliveau discussed with D'Agostino pay raises for Stoyle and other employees of the MED.

2. D'Agostino approved the requests and discussed with Beliveau documentation to

Page 29 of Internal Investigation Report
Re: John D'Agostino

**3099**

justify the raises.

3. Beliveau said that he would provide the documentation.

4. Beliveau did not provide the documentation when this was discussed.

5. D'Agostino had to ask more than one time for the documentation to justify the raises.

6. D'Agostino wanted to put a hold on the pay raises being effective until he got further documentation, but the pay raises had already gone through.

7. Eventually, D'Agostino was satisfied with the information.

8. No raises were placed on hold or nor was anyone denied their raise

9. The allegation is found not established.

It is clear that there was discussion concerning pay raises, and that D'Agostino had initially approved the raises. It is also clear and not disputed that he continued to seek documentation on the raises, which was not forthcoming for whatever reason.

No person suffered a loss or deprivation- even momentarily- of any pay.

Stoyle asserts that the actions on the pay raises relates to sexual harassment or retaliation.

There are insufficient facts to support the claim that D'Agostino's actions concerning the pay raises were the result of sexual harassment. As Town Manager, D'Agostino had a legitimate right to have information supporting the raises he approved. There is no dispute that Beliveau represented that he would provide the documentation, although it appears that there was no clear understanding on when the information would be provided. No action was taken which resulted in the pay raises being delayed or rescinded. The incident in which Stoyle claims that she rebuffed his sexual advances occurred some two years before and thus lack the temporal relationship

Page 30 of Internal Investigation Report
Re: John D'Agostino

which would be expected for there to be a valid connection.

The memos back and forth between D'Agostino and Beliveau on this matter [see Appendix A, Item 10] do not appear offensive or hostile.

Stoyle claims that this incident constituted retaliation. However, as there is insufficient evidence to conclude that Stoyle had in fact made a sexual harassment complaint about D'Agostino [see item E above], there is no reasonable basis to conclude that this action constitutes retaliation. No other complaint had been made to D'Agostino or Town management concerning D'Agostino's alleged sexual harassment.

### G.  December, 2001-Town Christmas Party and Eileen Plant-

### (Not included in MCAD Filing; Originated from Interview)

Stoyle alleges that at this party D'Agostino spoke to an Eileen Plant, a Reserve Police Officer, who was seeking a permanent employment with the Town as a Police Officer. Stoyle claims that Plant told her that D'Agostino wanted to speak to her regarding the job and took her to lunch at Luciano's Restaurant in Wrentham and discussed the possible hiring, and possibly the Town bypassing other candidates to reach her name on the civil service list. Stoyle also alleged that D'Agostino spoke to Plant about Plant's divorce and that D'Agostino told Plant that if she wanted a job in a prison, he could get it for her. Stoyle claims that knowing of this lunch and what she understands happened reinforces her belief that D'Agostino engages in sexual harassment and that this thus caused her to believe all the more that she was the victim of sexual harassment by D'Agostino.

D'Agostino admits that he did meet Plant for lunch at Luciano's. He said that he wanted to discuss her job aspirations with the Town and chose to do so there so that the Police Chief would not know he was meeting with an auxiliary officer and wonder why. D'Agostino claims that he only wanted to help her.

Plant has refused to be interviewed. Stoyle's attorney has supplied an affidavit from Plant, which albeit in rather brief form, describes her version of the lunch and indicates that she felt uncomfortable in having lunch with D'Agostino and that he seemed to want something from her.

1. Plant is an auxiliary police officer for the Town who was also interested in another position within the Police Department.

2. She met D'Agostino at a Town employee holiday party in December of 2001.

3. She expressed an interest to D'Agostino in this employment possibility.

4. D'Agostino made arrangements to meet her and did meet her for lunch at Luciano's.

5. Plant told Stoyle about this lunch and that she felt uncomfortable meeting D'Agostino in this way.

6. Stoyle felt that this lunch was an example of D'Agostino's inappropriate behavior with employees.

7. The allegations as relate to this incident are established.

This is another situation where the underlying facts are not in dispute. D'Agostino acknowledges that he did in fact meet Plant for lunch. He differs however with any suggestion that there was anything wrong in doing so.

Stoyle asserts that this lunch is an example of inappropriate conduct on the part of D'Agostino. She interprets the lunch to have been an occasion where D'Agostino sought to get inappropriately friendly with Plant. Given that they were discussing a job and that D'Agostino represented or implied that he had authority to hire people, one can

Page 32 of Internal Investigation Report
Re: John D'Agostino

see how this appeared to Plant and to Stoyle.

To be certain, the fact that Plant declined to meet during this investigation and relay what information she had is unfortunate. She did apparently produce an affidavit to Stoyle's attorney, which was provided by the attorney. The reluctance of Plant to meet to discuss this matter has hampered this aspect of the matter from being as complete as it should.

Nonetheless, given what is not disputed- that D'Agostino did have lunch with Plant at a restaurant out of Town and discussed her possible employment opportunities with the Town- enables one to conclude that this meeting was inappropriate on the part of D'Agostino.

Plant was interested in a position in the Police Department. The Appointing Authority for all positions in the Police Department is the Chief. D'Agostino has no role or involvement in hirings at the Police Department. He states that he has been interested in expanding the minority and women component of the Police Department and that it was with that in mind that he met with Plant.

However, D'Agostino never met with others who were interested in employment with the Town. Not did he, except for one exception involving the head of the Public Works Department, meet with other employees for lunch.

The positions that Plant appeared to be interested in were not management positions. They were rank and file type of positions.[3] It does not appear logical for the

---

[3] It should be noted that there appears to be some discrepancy between what Plant stated in her affidavit about the position she was interested and what appears to be the actual situation according to the Police Chief. For example, Plant seems to imply that she was seeking a police officer position. However, her name never appeared on a civil service list. Also, the position she refers to at the high

Page 33 of Internal Investigation Report
Re: John D'Agostino

3103

Town Manager to take to lunch at a restaurant like Luciano's an applicant for a lower level position, especially when he is not involved in the hiring process. The circumstances of meeting Plant, who was a single mother, at a place out of Town, only adds to the inappropriate nature of this meeting.

Stoyle states that knowing of this meeting reinforces her belief that D'Agostino was engaging in inappropriate conduct. One can certainly see how knowing of this meeting may have reinforced whatever thoughts or basis for such thoughts Stoyle may have had concerning D'Agostino. It was not appropriate for D'Agostino to have met for lunch a person interested in obtaining employment with the Town, especially in a department in which he has no role in the hiring process. By doing so, he has created this situation where the Town's actions, through his conduct, are called into question. By doing so, Stoyle's belief that D'Agostino was prone to engage in appropriate conduct to her was reinforced as it appeared that he engaged in inappropriate conduct with Plant.

It is noted that D'Agostino asserts that he later concluded that he would not recommend Plant for a position, but he never passed along that opinion to the Appointing Authority. That circumstance diminishes any argument he makes that his meeting with Plant was part of his appropriate functions as Town Manager. While there is no evidence that he pursued any further contact with her or made any direct requests to her, it has created the appearance of an inappropriate situation.

---

school was to go to a more senior officer so that a new entry level position would be created. Plant would not have been eligible for the position at the high school.

Page 34 of Internal Investigation Report
Re: John D'Agostino

## H.  January, 2002-Office Manager References-

### (Not included in MCAD Filing; Originated from Interview)

Stoyle claims that D'Agostino kept referring to her as Office Manager, when she believes her correct title was Chief Financial Officer.  Stoyle believes that she was listed on the web site as Chief Financial Officer.  She felt that this was demeaning to her. Also, when D'Agostino released his public statement regarding the MCAD allegations, Stoyle claims he referred to her as Office Manager.   Stoyle's attorney was to provide documentary evidence of this but none was received.

1.  Stoyle is listed on the Town Website for the MED as the Chief Financial Officer.

2.  Stoyle is the person at the MED responsible for the financial affairs of the MED.

3.  Beliveau heard D'Agostino refer a few times to Stoyle as Office Manager, but did not know if he was saying it as a joke or not.  In any event, he said that it was not received as being funny.

4.  Even if so, this does not appear to be frequent or repetitive on the part of D'Agostino.

5.  Beliveau did not correct D'Agostino by telling him Stoyle's correct job title.

6.  The allegation is established that D'Agostino had called Stoyle Office Manager on a few occasions.

## Discussion-

Stoyle claims that D'Agostino, in what she perceives as an effort to demean her, would refer to her as the Office Manager, when her correct title is Chief Financial Officer.

Page 35 of Internal Investigation Report
Re: John D'Agostino

**3105**

D'Agostino denies doing this.

Stoyle/her attorney had indicated that they would provide documents showing that D'Agostino did refer to her as Office Manager. No such documents were supplied.

The web page for the Light Department shows that Stoyle is in fact listed as the Chief Financial Officer.

Other than Beliveau, other employees did not recall D'Agostino calling her Office Manager.

A newspaper article following the filing of the MCAD charges does refer to Stoyle as Office Manager. There is nothing however to indicate that D'Agostino had anything to do with how the reporter wrote the story.

The calling of Stoyle Office Manager does not appear to be frequent or pervasive or done in settings which would be demeaning. It is not even clear if it was done in reference to her being viewed as second in command of the MED after Beliveau, as the manager of the financial affairs of the MED or just a general reference. Stoyle said that she corrected him.

While the reference may have bothered Stoyle given her correct title, there is an insufficient basis to conclude that it was done as part of any continual plan or was more than just a few occasions.

## I. February, 2002-Involving Financial Assistant Carolyn Fitton-

### (Not included in MCAD Filing; Originated from Interview)

Stoyle alleges that Fitton told her that D'Agostino flirted with her in the mail room and made passes at her and that he also waived his American Express card at Fitton

when talking about going to England.

Stoyle claims that she told Beliveau about this. Beliveau also states that Fitton complained to him about D'Agostino bothering her.

Beliveau states that he spoke to D'Agostino about the fact that Fitton had complained about him but as this conversation took place around the time Fitton left the employ of the MED, Beliveau said he considered the matter moot.

Stoyle claims that D'Agostino, after Fitton left the employ of the Town, asked Stoyle about whether or not they could help Fitton get a job back at the Light Department.

1. Fitton was an employee of the MED.

2. D'Agostino acted in a friendly manner with Fitton; whether this included flirtations as alleged or not is not established, but it appears that he had contact with her and knew of her.

3. Fitton left her employment voluntarily, supposedly to return to England

4. Fitton shortly thereafter returned to the area.

5. D'Agostino suggested in a note given to Stoyle at a light board meeting that the MED re-hire Fitton.

6. This allegation is established in terms of D'Agostino knowing of Fitton and writing a note to Stoyle about Fitton; however, it is not established in terms D'Agostino seeking to have Fitton re-hired.

Discussion-

Stoyle claims that this situation with Fitton is an example of the inappropriate

conduct D'Agostino had with female employees and caused her to feel that he did in fact engage in inappropriate contact with female employees in the Town.

Initially when interviewed, D'Agostino professed not to recall Fitton. However, upon further questioning, he recalled her. Initially he had no memory about anything concerning re-hiring her. Yet, when shown the note he acknowledged that he did in fact write the note which was given to Stoyle, although he offered no explanation as to why he may have written the note.

Attempts to interview Fitton have so far proven unsuccessful and thus the suggestion that D'Agostino was engaging in flirtatious conduct with her can not be verified by the best method- the alleged victim. However, it is clear that he found her to be affable, as this is suggested in the note he gave to Stoyle.

Given the attempted humor in the note, it does not appear that D'Agostino was serious about having the MED re-hire Fitton. Beliveau said that D'Agostino never spoke to him about hiring her back. The note to Stoyle appears to be more of an attempt at humor than anything seriously intended. It appears unreasonable to conclude that D'Agostino actually wanted her re-hired. He certainly made no serious efforts in that direction.

### J.  January/February, 2002- Inquiries Regarding Personnel File-

### (Not included in MCAD Filing; Originated from Interview)

Stoyle claims that D'Agostino raised inappropriate questions regarding her personnel file.

1.  D'Agostino denies making specific unwarranted inquiries about her file. He does

Page 38 of Internal Investigation Report
Re: John D'Agostino

acknowledge that he asked Beliveau to be sure that the files at Town Hall and at the MED contained the same information. This request would be a reasonable one.

2. D'Agostino acknowledges that he may have looked at Stoyle's file during the pay raise situation.

3. Stoyle claims that this was done to harass her.

4. D'Agostino had legitimate reasons for inquiring about the personnel file.

5. It is not established that D'Agostino made improper inquiries about Stoyle's file.

**Discussion-**

Stoyle claimed during her interview that D'Agostino's inquiries into her personnel file constituted retaliation against her for objecting to comments she claims he made which she found sexually offensive. However, the comments she has objected to are alleged to have occurred in April of 2002 (pension cost issue) and June of 2002 (PILOT Agreement issue). These matters, if they happened as claimed by Stoyle, happened after she alleges he made retaliatory inquiries into her personnel file.

The time of the inquiries into her personnel file are contemporaneous with the time period involving the pay raise issue, when she alleges that he sought to retract a pay raise to her. Given that he had approved a pay raise for Stoyle, it would not have been unreasonable for him to have examined her personnel file, especially when he was looking for back-up information for the approval of the raise.

The pay raise issue, addressed above, involved other employees of the MED besides Stoyle. While Beliveau and D'Agostino differ as to the intent of D'Agostino's

Page 39 of Internal Investigation Report
Re: John D'Agostino

objectives in the pay raise issue, they both agree that the discussion included requests by D'Agostino for back-up information to justify the raises on three employees. Such requests would not be unreasonable. Beliveau acknowledges that he had told D'Agostino that he would provide "pillows to land on" as justification for the pay raises. He acknowledges that he had not provided those "pillows" when D'Agostino spoke to him about the information. This appears to have been a month or so before Stoyle alleges that D'Agostino made inquiries into her personnel file.

The timing of these inquiries and the nature of them, given the acknowledged issue over the pay raise, do not support an inference that the inquiry had an improper motivation.

### K.  April, 2002-Pension Costs Dispute-

### (MCAD Filing)

Stoyle claims that she questioned how the allocation was made for the MED pension costs as it was different than what she thought it should be. She alleges that she told D'Agostino she did not understand why the Town Treasurer was not using the uniform accounting method for these calculations and that D'Agostino said words to the effect, "The only accounting I know is that a broad plus a brain equals a problem". Stoyle claims that she told D'Agostino he was a chauvinists and that this was not funny.

D'Agostino claims that the pension cost issue was another dispute between the MED and the general government side of the Town and in particular between Stoyle and Boucher. He denies making the statement alleged.

1. A dispute existed concerning the method by which pension costs attributable to

the MED were calculated.

2.  Stoyle advocated for a certain methodology.

3.  Boucher advocated for a different methodology.

4.  These different positions were a source of conflict between the MED and the general government side of the Town and in particular between Stoyle and Boucher.

5.  Stoyle claims that D'Agostino said words to the effect "The only accounting I know is that a broad plus a brain equals a problem."

6.  Stoyle asserts that she replied by telling D'Agostino that he was a chauvinist and that his comments were not funny.

7.  D'Agostino denies making the statement or being told by Stoyle that he was a chauvinist and that he was not funny.

8.  No other participant to these discussions recalls these statements being made.

9.  This allegation is not established.

This again appears to be an area of conflict between the MED and the general Town side of government. There is no dispute that there was a disagreement between how pension costs for employees of the MED should be calculated. It appears clear that there was a degree of frustration on the part of Stoyle, as she felt that Boucher and others, including D'Agostino, were not being receptive to her approach or argument as to why she felt she was correct in her position. Other witnesses confirm that this was an issue of contention.

None of the other participants in these meetings recall any such statements

being made as claimed by Stoyle. Several people who were at these meetings said that they would have recalled such a statement had it been made. It may be that if these statements were made they were made while the others were out of the room or not within hearing range. However, there is no verification as to these statements being made and thus this allegation is not established.

## L.  June, 2002-Pilot Agreement and Other Costs-

### (MCAD FILING)

Stoyle said that $120,000.00 in extra costs were being charged to the MED and that the Treasurer had admitted in a prior conversation (during the lock box issue) that the actual cost was $20,000.00. Stoyle claims that at a meeting where D'Agostino and Beliveau were present, Stoyle said words to the effect, "Why doesn't anyone listen to reason", and that D'Agostino said words to the effect, "You're too pretty to have people listen. Gain weight, be a hairdresser, and people would listen". Stoyle claims that she told D'Agostino he was not funny and was a chauvinists. She claims that he just laughed.

D'Agostino claims that Stoyle made the statement herself.

Beliveau states that he heard words to the same effect as claimed by Stoyle.

1.  A dispute existed concerning the PILOT Agreement costs attributable to the MED.

2.  Stoyle advocated for a certain methodology and a change in the agreement.

3.  Boucher advocated for a different methodology and while he agreed to certain changes, did not agree to the position advocated by Stoyle.

Page 42 of Internal Investigation Report
Re: John D'Agostino

3112

4. These different positions were a source of conflict between the MED and the general government side of the Town and in particular between Stoyle and Boucher.

5. Stoyle said words to the effect "Why doesn't anyone listen to reason."

6. Stoyle claims that D'Agostino said in reply words to the effect "You are too pretty to have people listen. Gain weight, be a hairdresser and people would listen."

7. Stoyle asserts that she replied by telling D'Agostino that he was a chauvinist and that his comments were not funny.

8. D'Agostino denies making the statement or being told by Stoyle that he was a chauvinist and that he was not funny.

9. D'Agostino claims that Stoyle also said words to the effect "What do I have to do to get people to listen to me- gain weight and become a hairdresser?"

10. Other than participants recalling generally Stoyle complaining that people were not agreeing with her, no other participant to these discussions recalls the other statements being made, other than Beliveau, who states he recalls the "hairdresseer" reference being made after Kearney and Boucher left the room. Beliveau describes the comment as an instance where D'Agostino thought he was funny..

11. The allegation is not established.

## Discussion-

Again, we are faced with a matter involving a dispute between the position of the MED and the general government side of the Town. The apparent hostility between

Page 43 of Internal Investigation Report
Re: John D'Agostino

3113

Stoyle and Boucher only serves to accentuate the problem.

However, none of the other persons who were present at this meeting recall the statement which Stoyle claims being made actually being said by D'Agostino or Stoyle, other than Beliveau who says D'Agostino making the statement.    D'Agostino claims (at a subsequent interview) that Stoyle made this statement.  At his first interview, he indicated that he did not hear anyone say anything about Stoyle having to gain weight to get people to listen to her.  At the subsequent interview, he indicated that he recalled Stoyle saying words to the effect "What do I have to be, ugly, (or fat) to get people to listen."  He was not sure if others were in the room at that time.  Other possible witnesses deny hearing such a statement being made by either Stoyle or D'Agostino, other than Beliveau.  Beliveau felt that this statement was one of those instances where D'Agostino was trying to be funny but was not.

Therefore, there is insufficient evidence to establish that such statements were said by either Stoyle or D'Agostino.    Furthermore, even if the statements were made, they appear more to be of the "stray remarks" type in perhaps a feeble attempt to be humorous.  This is especially so given Stoyle's lamenting that no one is taking her seriously and what has been described by several people, including Beliveau, as D'Agostino's attempts to be funny and not succeeding.

**M.  August, 2002- Conference in New Hampshire-**

**(MCAD Filing)**

Stoyle claims that at the August, 2002, conference in North Conway, N.H., of the New England Public Power Association, while she was in line to get a drink at the

reception, D'Agostino stood behind her, very close to her, and said words to the effect, "You look delicious". Stoyle also claims that another person at the meeting, Ronald DeCurzio, of MMWEC, later spoke to her and said that he saw that D'Agostino was "all over you". Stoyle claims that after these complaints became public, DeCurzio called her and made reference to the August, 2002, meeting and said that he saw D'Agostino "grinding" her and whispering in her ear; DeCurzio states however that he did not see D'Agostino actually touching Stoyle or "grinding"..

D'Agostino admits that he made this statement, although he claims it was made at the dinner table. He indicates that he regrets having made the remark and did not mean to be offensive by making it.

1. Stoyle attended the NEPPA Conference in North Conway, N.H.

2. D'Agostino also attended the conference.

3. During a reception D'Agostino moved close to Stoyle and said "You look delicious"

4. Stoyle was offended by this remark.

5. D'Agostino getting very close to Stoyle was seen by Ronald DeCurzio, Treasurer of MMWEC.

6. D'Agostino's closeness to Stoyle was of such a degree that it appeared odd and inappropriate to DeCurzio.

7. This allegation is established.

## Discussion-

There is no dispute that this remark was made by D'Agostino. He admits it,

although he claims he did not say it to be offensive and regrets saying it. The fact that he believes he said it at the dinner table and Stoyle says that he said it in line for a drink is not significant. The remark was clearly made and it was offensive to Stoyle.

A third party, the Treasurer of MMWEC, observed D'Agostino move unusually close to Stoyle. He has stated that given his past experience at a Manhattan firm he was familiar with appropriate and inappropriate business contact and that this struck him as inappropriate. Although he does not recall seeing any conduct which would constitute "grinding" or saying anything about "grinding", he clearly recalls D'Agostino getting what he observed to be uncomfortably close to Stoyle and Stoyle's facial expression not appearing comfortable.

Such a statement alone, and especially coupled with the physical closeness described, was inappropriate. The remark was patently offensive.

### N.  September, 2002- Meeting Re: Warrant-

### (Not included in MCAD Filing; Originated from Interview)

Stoyle described a meeting concerning a warrant which was returned concerning the SCADA System. She claims that D'Agostino spoke to her in an aggressive manner, shaking the invoice at her. Stoyle said that Beliveau observed that D'Agostino was very hostile in doing this. Beliveau states that D'Agostino seemed upset and was forceful in his discussion with Stoyle on this.

D'Agostino states that he does not believe that he shook the invoice in the manner described by Stoyle. He acknowledges that he had some questions on the bill and asked Stoyle about them.

Page 46 of Internal Investigation Report
Re: John D'Agostino

3116

1. D'Agostino did speak to Stoyle concerning the SCADA invoices.

2. He spoke to her in an abrupt manner and was agitated.

3. This allegation is established in terms of it happening.

#### Discussion-

Given the information available, it appears more likely than not that D'Agostino was hostile and angry over these bills. All or part of this may have been the result of the growing difficulty in maintaining a good working relationship between the MED and the Town Hall. .

### O. September, 2002 to December, 2002-Re: Phone Bill From Verizon: Memo Re: Possible Reprimand-

#### (MCAD Filing)

As part of her claim of retaliation, Stoyle claims that D'Agostino kept sending back to her a Verizon phone bill regarding fax lines. She claims that he kept asking her about payment of the regular phone lines, which are in fact paid through Town Hall. She found this to be harassing and disturbing.

D'Agostino claims that he had questions on this bill which related to the MED and that it was appropriate to ask Stoyle about it.

Stoyle claims in relation to this incident that D'Agostino sent a note to Beliveau complaining about the difficulty of getting this information from Stoyle and indicating that he should discipline her. Beliveau sent back a letter saying that he was not going to reprimand her as he did not feel there was cause.

1. D'Agostino had questions concerning certain telephone invoices involving the MED.

Page 47 of Internal Investigation Report
Re: John D'Agostino

**3117**

2. He inquired about these bills by contacting Stoyle.

3. Various e-mails and other messages went back and forth between Stoyle and D'Agostino concerning this matter.

4. Both displayed a degree of frustration and annoyance with the replies of the other.

5. It turns out the information was available at Town Hall, as the bills were processed and paid via the Public Works Office at Town Hall.

6. D'Agostino could have obtained this information from Town Hall.

7. D'Agostino appears in his communications to Stoyle on this matter to have been unaware or confused about the fact that the information was available in Town Hall.

8. It was not initially made clear to D'Agostino that the information was readily available in Town Hall.

9. D'Agostino expressed his frustration over the difficulty in getting this information to Beliveau and suggested that he might have to take disciplinary action against Stoyle.

10. Once D'Agostino was made clearly aware of the fact that the information was available in Town Hall, he ceased contacting Stoyle about it.

11. D'Agostino told Beliveau that he, D'Agostino, was in error on this matter and that he owes Stoyle an apology.

12. It is established that D'Agostino made several inquiries of Stoyle regarding these bills; it is not established that he continued to press for disciplinary action to be

taken.

## Discussion-

This is another incident which evidences the poor working relationship between the MED and the Town Manager. As Town Manager and as Manager of the MED, D'Agostino was well within his rights- if not his obligation- to inquire about bills he had questions on. His requests for information do not seem out of line. Stoyle, as the Chief Financial Officer of the MED, had a professional obligation to answer D'Agostino's inquiries.

To be certain, D'Agostino should be expected to be clear in his requests for information and to be professional. His notes, while evidencing a degree of frustration, do not indicate un-professionalism.

Stoyle felt that she was answering the inquiries, but that D'Agostino was never satisfied with her answers. It should have been apparent that if the information he was seeking was in Town Hall then Stoyle could have, in one of the many messages back and forth on this matter, clearly and more directly stated that fact. Perhaps she was not aware that that was what D'Agostino was seeking or that he was missing her point about the information being in Town Hall. However, it should have become apparent to her sooner in this back and forth situation that D'Agostino was either unaware or had forgotten or was confused about the fact that these bills and the information he was seeking was in Town Hall. A simple statement to that effect from Stoyle would have resolved this matter. In fact, when D'Agostino was reminded of the fact that the information was in Town Hall, this matter no longer continued to be an issue. Beliveau

Page 49 of Internal Investigation Report
Re: John D'Agostino

3119

states the D'Agostino admitted to him that he was wrong on this as the information was in fact in Town Hall. Although there is no record that D'Agostino retracted the reference to Beliveau that he consider taking some disciplinary action, it is evident from his remarks to Beliveau that he was in error that he no longer felt discipline was necessary.

This incident is submitted by Stoyle as an example of retaliation. Yet, there has not been sufficient documentation that Stoyle had complained about sexual harassment to D'Agostino or Amoruso.

**P.  October, 2002- Email Re: System Upgrade-**

**(MCAD Filing)**

Stoyle claims that D'Agostino sent her an and Beliveau an email asking why they did not inform Lou Costa of the MIS Department regarding certain system upgrades. Stoyle said that she assumed that he was talking about a phone Internet upgrade. Stoyle claims that D'Agostino wrote back that it was not about the phone lines, but an automated purchase system software. Stoyle said they had no such system and that this was done in retaliation to Stoyle.

1. D'Agostino wanted all Town departments to be on an electronic purchase order system.

2. This system was not in place for the MED but was in place for all the other Town departments.

3. Communications went back and forth between D'Agostino and the MED and in particular with Stoyle, over this issue.

4. Stoyle did not initially understand that D'Agostino was directing his comments

about the electronic purchase order system.

5. The MED did not appear to welcome or embrace the concept of an electronic purchase order system.

6. This was a source of frustration for D'Agostino.

7. His frustration became a source of frustration for Stoyle and others at the MED.

8. As Town Manager and Manager of the MED, D'Agostino was within his authority and responsibility to have the MED join the rest of the Town in the electronic purchase order system.

9. This allegation, while found established as to the facts alleged, does not show any inappropriate conduct.

**Discussion-**

Again, another area of dispute arises between D'Agostino and the MED over the direction which D'Agostino wants the MED to go in. Whether the staff of the MED approves of the electronic purchase order system or not, D'Agostino is the Town Manager and Manager of the MED. Such a change is within his area of authority.

It appears that the MED did not favor this new system. In speaking to the Town's MIS person, it appears the relationship between the general government side of the Town and the MED has improved in this area of bringing the two systems into harmony with each other. However, it appears that there was resistence and hesitancy over this at least in the beginning. It should have been clear to everyone at the MED that D'Agostino, as Town Manager, wanted all departments to be on the electronic purchase order system and they should have proceeded accordingly.

Page 51 of Internal Investigation Report
Re: John D'Agostino

3121

Stoyle cites this as an example of retaliation. However, as noted above, it is not established that she complained about sexual harassment prior to this.

Q. **October, 2002-Meeting with Board Member-**

**(MCAD FILING)**

Stoyle states that a second meeting was held with Amoruso to discuss the complaints against D'Agostino. At this meeting, she states that her complaints were put forth in the context of sexual harassment and that thus the Town had knowledge of the sexual harassment. Amoruso acknowledges that there was a meeting in October, but states that none of the complaints were put forth or discussed in the context of sexual harassment.

1. Because Stoyle felt that there were continued problems between D'Agostino and herself, a second meeting was held in October of 2002 with Amoruso.

2. Also in attendance were Beliveau and Stoyle.

3. The recent interaction between Stoyle and D'Agostino were discussed.

4. This was not presented in the terms of sexual harassment.

5. The interaction was presented in terms of there being a hostile workplace environment; however it was not discussed in the sense of that hostility arising from sexual harassment.

6. The allegation that sexual harassment was discussed and the Town put on notice as to same at this meeting is not established.

**Discussion-**

This second meeting with Amoruso is used by Stoyle as an example of the Town

Page 52 of Internal Investigation Report
Re: John D'Agostino

**3122**

being put on notice as to her complaints of sexual harassment. However, the facts do not support the allegation.

To be certain, the problems of the hostile workplace were discussed and Stoyle and Beliveau complained about D'Agostino creating that hostile workplace. However, the evidence does not support that these complaints were put forth on the basis of sexual harassment, as opposed to a non-sexual harassment hostile workplace climate.

Amoruso is emphatic in stating again that these complaints were not put forth in the context of sexual harassment. He readily acknowledges that the complaints focused on the poor working relationship between D'Agostino and Stoyle, and what Stoyle and Beliveau gave as examples of hostility from D'Agostino. However, according to Amoruso, it was not portrayed to him as being sexual.

Beliveau reports that at this meeting they discussed what appeared to be a dislike of Stoyle by D'Agostino. Beliveau reports that they did not understand why D'Agostino was acting in what they perceived to be a hostile manner towards Stoyle. D'Agostino's weight loss was noted by Beliveau at this meeting, suggesting that perhaps there was some medical reason for what he felt was hostility from D'Agostino.

Stoyle opined at this meeting that it appeared D'Agostino wanted her to leave the MED. Although Stoyle states that she discussed her concerns over sexual harassment, the others at the meeting did not report that the discussion addressed the reasons as having been related to sexual harassment. Even Stoyle reports that Amoruso felt that perhaps D'Agostino was mad at Stoyle over the pension issue which arose with Boucher.

It has been suggested that Amoruso agreed that D'Agostino wanted to get rid of Stoyle. Amoruso however says that he never said that to be the case. He reports that he may have said words to the effect "Maybe he does.", in reply to Beliveau suggesting that D'Agostino wanted to get rid of Stoyle. He states that he was not necessarily agreeing with that statement, but rather just making a comment in the conversation.

While Stoyle may believe that the discussion at this meeting addressed the sexual harassment aspect of the hostility, neither of the other two persons present support that as having been discussed. Perhaps because of the awkwardness of discussing sexual harassment, Stoyle may not have focused on it sufficiently for the others to clearly see the sexual harassment aspect. However, even if that is the case, the Town still did not know of the sexual harassment aspect of this from this meeting.

In analyzing the totality of this situation, the following question has been considered and are addressed in this report:

**Did inappropriate conduct occur?**

By the reasonable inferences to be drawn from the facts, inappropriate conduct as noted above did occur. However, in other instances as noted above, inappropriate conduct did not occur or no finding can be made as there are insufficient facts to warrant a determination of inappropriate or appropriate conduct.

It is indeed unfortunate that Stoyle feels that she has been treated inappropriately. No employee should feel that way and of course no employee should be subjected to any inappropriate conduct. She appears to be capable and

Page 54 of Internal Investigation Report
Re: John D'Agostino

**3124**

professional.  No references have been presented which relate to not performing her duties well.

A review of this matter also indicates that the Town took appropriate action consistent with the law and its policies.  An investigation was commenced and steps were taken to ensure that the complainant/employee not to be in contact with the alleged harasser.  The complainant/employee indicated that these steps were acceptable to her.

## CONCLUSION AND RECOMMENDATION

Based on the above, the Town will now address whether the incidents found to have been inappropriate conduct constitute sexual harassment.  If so, the Town should take appropriate remedial action and action to ensure that such conduct does not occur again.

It is recommended that the Town remind all officials and  personnel of the prohibitions on sexual harassment and other inappropriate conduct.  While privacy considerations dictate that specifics of this matter not be identified in such a reminder, it is important for any employer or institution to remind those associated with it of the rules of appropriate conduct.  A necessary component of any institution's activities to prevent harassment and other inappropriate conduct is to periodically remind those associated with it of the prohibition and procedure for reporting such conduct.

The undersigned has sought to reasonably and appropriately determine the facts.  The Board should consider the matter in view of the facts and law in Appendix C

Page 55 of Internal Investigation Report
Re: John D'Agostino

**3125**

and upon the advice of counsel.

This report is transmitted to the Town for such action as is deemed appropriate.

Respectfully submitted,

*(signature)*

JAMES B. LAMPKE, ESQ.

Date: August 20, 2003

# Exhibit 8

# Memo

**To:**   Steve MacCaffrie, Chairman Mansfield Board of Electric Light
Commissioners

**From:**   Jack Beliveau, Director, Mansfield Municipal Electric Light Department

**Date:**   August 13, 2003

**Re:**   Question of Continuing Sexual Harassment/Discrimination Re: Kim Stoyle

---

At the conclusion of the Monday August 11, 2003 meeting of the Electric Light
Commission, you spoke with me regarding the Massachusetts Commission
Against discrimination (MCAD) complaint of Kim Stoyle. Specifically, you asked
me, as Kim's immediate supervisor, to inquire of her if she believed there had
been any retaliation or continuing harassment of her subsequent to her filing a
complaint with the MCAD. You also stated that you believed there was a MCAD
regulation that mandated such inquiry.

The answer to your inquiry is, yes, Kim does believe she has been subjected to
continuing harassment, discrimination and retaliation as a result of her filing a
complaint with the MCAD in December 2002. Specifically, Kim cited to me the
following incidents that she believes are some examples of continuing
harassment, discrimination or retaliation since the filing of her complaint.

a. Kim believes that statements appearing in the press, attributed to the Town
   Manager and former and current selectmen, are intended to humiliate Kim
   and to intimidate Kim and other witnesses and are retaliatory;

b. Kim also believes that the public response of the Town Manager and certain
   selectmen have emboldened other Town employees to make sexually
   derogatory comments about Kim, which she also heard about;

c. Kim believes that certain statements made by the Selectmen at Selectmen's
   meetings are retaliatory and intended to intimidate her and other witnesses;

d. Kim has received anonymous phone calls at home at night which she is
   certain are connected to and retaliatory to her filing a MCAD complaint;

577

e.  Kim believes the manner in which the Town conducted an investigation of her complaints was not fair, thorough or objective;

f.  Kim is aware of repeated sexual comments attributed to the Town Manager made in public places;

g.  Kim is aware of repeated derogatory comments regarding her attributed to former and current Selectmen;

h.  Kim cites the Town Manager's continued attendance at the Light Commission meetings, in spite of her request that he not attend, as interference with her ability to perform her job;

i.  Kim has informed me that memos and false allegations questioning cash balances are retaliatory in that she believes they are unwarranted and untrue claims that adversely reflect upon her performance. She says this is only one example of how she is treated differently and she attributes it to retaliation for her filing a MCAD complaint.


I have observed the adverse emotional impact upon Kim contemporaneous with the occurrence of many of these events. With the exception of the anonymous telephone calls, which I just learned about, all of these matters occurred in public with the knowledge of the Selectmen or Town Manager so there was no need for me to independently report these events subsequent to her filing a formal complaint.