UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————  )
KIMBERLY STOYLE,                                    )
                                 Plaintiff           )
                                                     )
v.                                                   )          **C.A. No. 05-10354-DPW**
                                                     )
THE MANSFIELD MUNICIPAL ELECTRIC                    )
DEPARTMENT, JOHN D'AGOSTINO,                         )
THE TOWN OF MANSFIELD BOARD OF                      )
LIGHT COMMISSIONERS, LOUIS AMORUSO,                 )
MICHAEL McCUE, DAVID McCARTER,                      )
DANIEL DONOVAN, ROGER ACHILLE                       )
AND STEVEN MacCAFFRIE,                              )
                                                     )
                                 Defendants          )
———————————————————

                                                        **CONSOLIDATED WITH**

                                                        **C.A. No. 04-11329-DPW**

———————————————————  )
DR. JOHN BELIVEAU,                                  )
                                 Plaintiff           )
                                                     )
v.                                                   )
                                                     )
TOWN OF MANSFIELD MUNICIPAL                         )
ELECTRIC DEPARTMENT, JOHN O.                        )
D'AGOSTINO,                                          )
                                 Defendants          )
———————————————————

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The plaintiff, Kimberly Stoyle, hereby opposes Defendant's Motion for Summary Judgment. In support of her opposition, plaintiff submits the attached Memorandum of Law.

Respectfully submitted,
Kimberly Stoyle
By her Attorney


/s/ Lynn A. Leonard
_____
Lynn A. Leonard
Attorney At Law
527 Main Street, Suite 8
Melrose, MA  02176
(781) 662-6161
B.B.O. No. 561662


Dated:  March 30, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                    )
KIMBERLY STOYLE,                                    )
                              Plaintiff              )
                                                    )
v.                                                  )
                                                    )    C.A. No. 05-10354-DPW
THE MANSFIELD MUNICIPAL ELECTRIC                    )
DEPARTMENT, JOHN D'AGOSTINO,                        )
THE TOWN OF MANSFIELD BOARD OF                      )
LIGHT COMMISSIONERS, LOUIS AMORUSO,                 )
MICHAEL McCUE, DAVID McCARTER,                      )
DANIEL DONOVAN, ROGER ACHILLE                       )
AND STEVEN MacCAFFRIE,                              )
                                                    )
                              Defendants            )
_____

                                                         **CONSOLIDATED WITH**

                                                         **C.A. No. 04-11329-DPW**

_____
                                                    )
DR. JOHN BELIVEAU,                                  )
                              Plaintiff              )
                                                    )
v.                                                  )
                                                    )
TOWN OF MANSFIELD MUNICIPAL                         )
ELECTRIC DEPARTMENT, JOHN O.                        )
D'AGOSTINO,                                         )
                              Defendants            )
_____

**<u>PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS
IN OPPOSITION TO SUMMARY JUDGMENT</u>**

Plaintiff Kimberly Stoyle submits the following Concise Statement of Material Facts,

pursuant to Local Rule 56.1, in support of her Opposition to Defendants' Motion for

Summary Judgment.

1. The Mansfield Municipal Light Department ("MMED") is a subdivision the Town of Mansfield organized under Chapter 164 of the Massachusetts General Laws. The Board of Light Commissioners is the municipal board that has supervisory control over the MMED and its Manager. Complaint ¶¶ 6, 8, 74, 78.

2. In the Town of Mansfield, the Manager of the MMED is also the Town Manager, who at all times relevant to this case was John D'Agostino. Complaint ¶¶ 7.

3. Likewise, in the Town of Mansfield, the individual members of the Board of Light Commissioners ("Commission") are the individual members of the Town of Mansfield Board of Selectmen ("Board"). Louis Amoruso, Michael McCue, David McCarter, Daniel Donovan., Roger Achille and Steven MacCaffrie were members of the Board of Light Commissioners during plaintiff's employment at MMED. Complaint ¶¶ 9-14.

4. The daily operation of the MMED is under the control of the Director, which from 1999 through the date of his termination was Jack Beliveau. Complaint at ¶ 48.

5. The Board has overall responsibility for public funds and approves the Town budget prepared by the Town Manager (Town Charter, Exhibit 1, p. 5; Deposition of Steven MacCaffrie, Exhibit 4, p. 32; Deposition of Roger Achille, Exhibit 2, p. 21; Deposition of Michael McCue, Exhibit 6, p. 34).

6. Defendants were aware that, throughout her employment, plaintiff complained about illegitimate overcharges to MMED for Town services. (Deposition of Daniel Donovan, Exhibit 3, pp. 18-25, 51-52; Exhibit 4, pp. 37-39, 52; Deposition of Lou Amoruso, Exhibit 5, p. 70; Exhibit 6, p. 67; Verified Complaint, pp. 4-13). Defendants knew that the charges were false because the Town treasurer admitted that they were inflated. (Exhibit 5, pp. 46-47).

7. Defendants knowingly misappropriated ratepayer funds to balance the Town budget. (Deposition of Michael McCue, Vol. II, Exhibit 8, pp. 91-93; Board Meeting Minutes dated May 20, 2003, Exhibit 11, p. 2). Regarding the misuse of MMED funds, defendant MacCaffrie stated that he "would not want to tell [MMED], would not like it to become public and would not want anyone to know about it." (Board Meeting Minutes dated April 29, 2003, Exhibit 11, p. 3).

8. Defendants publicly praised D'Agostino for "creativity in developing budgetary alternatives/options." (Exhibit 3, p. 48; Deposition of Lou Amoruso, Aug. 10, 2006, Exhibit 9, p. 17; Board Meeting Minutes dated January 15, 2003, Exhibit 10, p. 4).

9. Plaintiff first met with Amoruso in October 2001 for the specific purpose of reporting sexual harassment and retaliation by MMED Manager John D'Agostino. (Deposition of John Beliveau, Exhibit 12, pp. 87-88).

10. Beliveau and MMED line foreman Gary D'Ambra also attended the October 2001 meeting. (Exhibit 12, pp. 87-88).

11. Amoruso did not think the plaintiff was lying when she said she was being mistreated and that he reported the issues raised to other members of the Commission. (Exhibit 5, p. 179; Exhibit 9, p. 5).

12. In February 2002, plaintiff requested a second meeting with Amoruso. (Deposition of Kimberly Stoyle, Feb. 13, 2006, Exhibit 16, p. 200-201). Beliveau spoke with Amoruso and reported his concerns about sexual harassment and differential treatment of plaintiff and other women at MMED. (Exhibit 12, pp. 92-95).

13. On October 1, 2002, plaintiff requested a second meeting. (E-mail, Exhibit 15; Deposition of Kimberly Stoyle, Exhibit 16, pp. 295-296). Beliveau notified Amoruso by e-mail about the continuing hostile work environment. (E-mail, Exhibit 15A).

Plaintiff, Beliveau and Amoruso then met again in October 2002 to discuss incidents of sexual harassment and retaliation. (Exhibit 12, pp. 101-102, 104-105, 115).

14. Amoruso failed to take any remedial action in response to plaintiff's ongoing concerns. (Exhibit 2, p. 44, Exhibit 4, p. 71; Exhibit 12, p. 116).

15. Plaintiff filed an MCAD complaint after efforts to remediate the harassment failed. (Exhibit 16, p. 209; Exhibit 26).

16. Plaintiff notified defendants by letter dated July 2003 that sexual harassment and retaliation were ongoing. (Exhibit 2, pp. 46; Exhibit 4, pp. 88-89; Exhibit 5, p. 118; Exhibit 6, p. 79; Letter, Exhibit 17).

17. In August 2003, Beliveau also sent a memorandum to defendant MacCaffrie detailing incidents of continuing sexual harassment and retaliation. (Exhibit 2, p. 46; Exhibit 4, pp. 88-89; Exhibit 9, p. 118; Memorandum, Exhibit 18). Defendants took no action in response to plaintiff's complaints, even though D'Agostino admitted some of the allegations. (Deposition of John D'Agostino, Aug. 8, 2006, Exhibit 19, p. 139; Exhibit 2, p. 46; Exhibit 4, pp. 83-84, 87-89; Exhibit 5, pp. 118, 120-122).

18. Defendants were aware of complaints from plaintiff that her job duties were diminished, that she was denied union membership and that she was accused of poor performance in balancing MMED's books. (Exhibit 9, pp. 36, 42-43; Exhibit 4, pp. 65-68). In fact, defendants observed the diminution of plaintiff's job duties firsthand at public meetings. (Exhibit 2, p. 57; Exhibit 4, pp. 114-116; Exhibit 5, p. 200).

19. An investigative report cites "inappropriate behavior" by D'Agostino. (Lampke Report, Exhibit 20, p. 54). D'Agostino sent plaintiff a sexually charged e-mail, which defendants acknowledge was crude, sexual in nature and inappropriate. (Exhibit 19A, pp. 62-63; Exhibit 20, p. 14; Exhibit 2, p. 38; Exhibit 4, p. 73; Deposition of

Amoruso, Jan. 9, 2006, Exhibit 14, p. 56; Exhibit 5, p. 107; Exhibit 6, p. 76).

D'Agostino told plaintiff at a professional conference that she looked "delicious,"

which defendants likewise viewed as sexual and inappropriate.  (Exhibit 20, p. 20;

MCAD Position Statement by D'Agostino, Exhibit 20A, p. 3; Exhibit 3, p. 74;

Exhibit 4, p. 75; Exhibit 6, p. 76).

20. On January 10, 2003, Daniel Donovan announced publicly that the MCAD

allegations were "fabricated" and "farfetched" simply because "D'Agostino said they

were not true."  (Exhibit 3, p. 37; Exhibit 5, p. 121).

21. Defendants personally interviewed D'Agostino about the allegations, but never

interviewed Kimberly Stoyle.  (Exhibit 2, p. 43; Exhibit 3, p. 32; Exhibit 9, p. 9).

22. Donovan believed it acceptable for D'Agostino to publicly threaten to sue employees

for asserting their legal rights.  (Exhibit 3, p. 47; Exhibit 19A, p. 108).

23. Defendant McCarter stated that plaintiff "should be fired" for filing the MCAD

complaint.  (E-mail, Exhibit 21)

24. Defendants denied plaintiff's request that D'Agostino be removed from monthly

Commissioner's meetings and precluded from further contact with her.  (Exhibit 16,

p. 317).

25. Defendants expedited the renewal of D'Agostino's employment contract in

December 2002, after the MCAD charges were filed.  (Exhibit 9, pp. 24-25).  The

Board was obligated by the contract to provide D'Agostino six month's notice of its

intent to renew or not renew his contract, but was under no obligation to execute a

new contract.  (Contract, Exhibit 22, pp. 2-3).  Such notice was not required until

May 30, 2003.  (Contract, Exhibit 22A).

26. The Board renewed D'Agostino's contract on April 23, 2003, six months before required to do so and well before the investigation into plaintiff's allegations was completed in July 2003. (Exhibit 5, pp. 22-23).

27. The Board voted to renew the contract prior to D'Agostino's annual review in January 2003. (Exhibit 9, pp. 24-25; Exhibit 10, pp. 2-6). The annual review is a condition precedent to contract renewal. (Exhibit 4, pp. 62-63). Although the investigation was pending, the Commission gave D'Agostino a glowing review and a pay raise. (Board Meeting Minutes dated April 16, 2003, Exhibit 7, p. 9; Exhibit 10, pp. 2-7).

28. In July 2003, defendants voted unanimously to clear D'Agostino of all charges. (Exhibit 2, p. 44; Exhibit 4, p. 71). Donovan voted to clear D'Agostino, despite never having heard the details of the allegations against him. (Exhibit 3, pp. 72-76). Amoruso voted to clear D'Agostino, even though he admitted there was a hostile work environment and retaliation against the plaintiff and did not dispute plaintiff's description of events in the MCAD complaint. (Exhibit 5, p. 130; Exhibit 9, p. 57).

29. Defendants were that D'Agostino had a "power control issue." (Exhibit 4, pp. 90-91) and that an unwillingness to go along with what he said as unacceptable. (Exhibit 5, p. 147).

30. D'Agostino was present at the time defendants reviewed and discussed Lampke's investigative report, but plaintiff was first allowed access to the report after a legal Request for Production of Documents in this matter. (Exhibit 2, p. 41).

31. Defendants had no reason to believe that plaintiff would fabricate the allegations in the MCAD complaint. (Exhibit 2, p. 38; Exhibit 4, pp. 52, 83; Exhibit 5, p. 179; Exhibit 6, p. 72; Exhibit 9, p. 57). They never had difficulty working with plaintiff

and never found her to be insubordinate.  (Exhibit 2, p. 82; Exhibit 4, p. 126; Exhibit 14, p. 26).

32. Defendants nevertheless voted to file a counterclaim against the plaintiff. (Exhibit 9, p. 59).  The counterclaim, authorized on behalf of MMED and D'Agostino, charges plaintiff with conspiring to file false claims to ruin the career of the Town Manager. (Counterclaim).


Respectfully submitted,
Kimberly Stoyle
By her Attorney


/s/ Lynn A. Leonard
_____
Lynn A. Leonard
Attorney At Law
527 Main Street, Suite 8
Melrose, MA  02176
(781) 662-6161
B.B.O. No. 561662

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

—————————————————————
                                        )
KIMBERLY STOYLE,                        )
                    Plaintiff           )
                                        )
v.                                      )
                                        )    **C.A. No. 05-10354-DPW**
THE MANSFIELD MUNICIPAL ELECTRIC        )
DEPARTMENT, JOHN D'AGOSTINO,            )
THE TOWN OF MANSFIELD BOARD OF          )
LIGHT COMMISSIONERS, LOUIS AMORUSO,     )
MICHAEL McCUE, DAVID McCARTER,          )
DANIEL DONOVAN, ROGER ACHILLE           )
AND STEVEN MacCAFFRIE,                  )
                                        )
                    Defendants          )
—————————————————————

**CONSOLIDATED WITH**

—————————————————————
                                        )
DR. JOHN BELIVEAU,                      )
                    Plaintiff           )
                                        )
v.                                      )    **C.A. No. 04-11329-DPW**
                                        )
TOWN OF MANSFIELD MUNICIPAL             )
ELECTRIC DEPARTMENT, JOHN O.            )
D'AGOSTINO,                             )
                    Defendants          )
—————————————————————

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    Introduction

Plaintiff, Kimberly Stoyle, is the former Chief Financial Officer of the Mansfield

Municipal Electric Department ("MMED").  She initiated this action against the defendants

David McCarter, Louis Amoruso, Michael McCue, Roger Achille, Steven MacCaffrie and Daniel Donovan (hereinafter "the defendants"), individually and in their capacity as members of the Town of Mansfield Board of Light Commissioners, for aiding and abetting unlawful discrimination and retaliation (Counts III and IV) and for their failure to supervise the MMED Manager, John D'Agostino (Count XII).

The Motion for Summary Judgment filed on behalf of the individual defendants must be denied. As grounds therefore, plaintiff states that (1) supervisors are individually liable for violations of Title VII and G.L. c. 151B; (2) that public officials acting in bad faith and with malice are personally liable for failure to supervise an employee; and (3) that there are genuine and material factual disputes as to all counts filed against the defendants. Plaintiff's legal arguments are set forth in detail below.

## II. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56 (c)). To prevail on summary judgment, the moving party must show that there is an absence of evidence to support the non-moving party's position. See Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990); See also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party satisfies this requirement, the burden shifts to the non-moving party to establish the existence of at least one factual issue that is both genuine and material. See LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018 (1994); See also Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986). To successfully oppose summary judgment, the non-moving party "may not rest upon mere allegation or denials of his pleading," but must set forth specific facts showing

that there is a genuine issue for trial.  <u>LeBlanc</u>, 6 F.3d at 841, quoting <u>Anderson</u>, 477 U.S. at

256.  The Court must "view the facts in the light most favorable to the non-moving party,

drawing all reasonable inferences in that party's favor."  <u>Barbour</u>, 63 F.3d at 36.

### III.    There Are Genuine and Material Factual Disputes Regarding Plaintiff's Claim For Aiding And Abetting Under G.L. c. 151B § 4(5)

Massachusetts General Law c. 151B provides a cause of action for individual liability

against the defendants.  G.L. c. 151B, § 4(5) states that it is an unlawful practice "[f]or any

person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce

the doing of any of the acts forbidden under this chapter or to attempt to do so."  "A claim

that an individual is liable under Chapter 151B is a claim which on its face seeks to establish

accessory liability."  <u>Harmon v. Malden Hospital</u>,  19 MDLR 157 (1997).

To prevail on a claim of personal liability under G.L. c. 151B, § 4(5), plaintiff must

demonstrate that a wholly individual and distinct wrong was committed by the individual

defendants.  This wrong must be separate and distinct from the main claim.  <u>Harmon v.

Malden</u>, 19 MDLR at 158.  "Further, plaintiff must provide credible evidence that the aider

or abettor shared an intent to discriminate not unlike that of the alleged principal offender,

and that the aider or abetter knew of his . . . supporting role in an enterprise designed to

deprive an individual of a right guaranteed . . . under G.L. c. 151B."  <u>Id</u>. at 158.

A "conscious act of will and deliberate indifference to the plight of the complaining

employee" will state a claim under the aiding and abetting provisions of Chapter 151B.

<u>Chapin v. Univ. of Mass</u>., 977 F.Supp. 72, 78-80 (D.Mass. 1998) (Lindsay, J.).  A supervisory

employee's inaction must occur in a situation where there is a clear duty to act in order for

liability to attach for aiding and abetting.  <u>Morehouse v. Berkshire Gas Co</u>., 989 F.Supp. 59

(D. Mass. 1994) (Posner, J.).  There are material factual disputes regarding defendants'
accessory liability for discrimination against the plaintiff, as set for the below.

### A. Defendants' Acted With Deliberate Indifference To Known Acts of Sexual Harassment and Retaliation

#### 1. Bad Faith Motive

Defendants were deliberately indifferent to sexual harassment and retaliation against
the plaintiff under circumstances where there was a clear duty to act, but a bad faith motive
not to act.  It is undisputed that defendants were members of the Town of Mansfield Board
of Selectmen ("Board") during the relevant time period.  (Defendants' Statement of Facts, p.
2).  The Board also serves as the Municipal Electric Commission ("Commission") and, as
such, is responsible for overall policy of the Municipal Electric Department ("MMED").
(Town Charter, Exhibit 1, p. 4).  The defendants oversee the Town Manager and alleged
perpetrator, John D'Agostino.  (Deposition of Roger Achille, Exhibit 2, p. 28; Deposition of
Daniel Donovan, Exhibit 3, p. 10; Deposition of Steven MacCaffrie, Exhibit 4, p. 32;
Deposition of Lou Amoruso, Jan. 31, 2006, Exhibit 5, p. 21; Deposition of Michael McCue,
Vol. I, Exhibit 6, p. 16).  D'Agostino is also the manager of MMED, charged with the duty
to ensure that all general laws and policies of the Board are faithfully executed in the
administration of the MMED.  (Exhibit 1, p. 9).

The Board has overall responsibility for public funds and approves the Town budget
prepared by the Town Manager (Exhibit 1, p. 5; Exhibit 4, p. 32; Exhibit 2, p. 21; Exhibit 6,
p. 34).  Defendants were aware that, throughout her employment, plaintiff complained about
illegitimate overcharges to MMED for Town services.  (Exhibit 3, pp. 18-25, 51-52; Exhibit
4, pp. 37-39, 52; Exhibit 5, p. 70; Exhibit 6, p. 67; Verified Complaint, pp. 4-13).
Defendants also knew that the charges were false because the Town treasurer admitted that
they were inflated.  (Exhibit 5, pp. 46-47).  Defendants knowingly misappropriated ratepayer

funds to balance the Town budget. (Deposition of Michael McCue, Vol. II, Exhibit 8, pp. 91-93; Board Meeting Minutes dated May 20, 2003, Exhibit 11, p. 2). Regarding the misuse of MMED funds, defendant MacCaffrie stated that he "would not want to tell [MMED], would not like it to become public and would not want anyone to know about it."[1] (Board Meeting Minutes dated April 29, 2003, Exhibit 11A, p. 3). Not surprisingly, defendants publicly praised D'Agostino for "creativity in developing budgetary alternatives/options." (Exhibit 3, p. 48; Deposition of Lou Amoruso, Aug. 10, 2006, Exhibit 9, p. 17; Board Meeting Minutes dated January 15, 2003, Exhibit 10, p. 4). Defendants' unlawful desire to balance the Town budget with ratepayer funds provided an illegal, bad faith motive to support D'Agostino's harassment and retaliation against the plaintiff.

### 2. Notice of Sexual Harassment and Retaliation

There is a genuine and material factual dispute regarding notice to defendants of plaintiff's complaints and hence the willfulness of defendants' inaction. Defendants claim to have been unaware of plaintiff's complaints of sexual harassment and retaliation prior her filing a formal complaint with the Massachusetts Commission Against Discrimination ("MCAD") in December 2002. However, there is evidence that plaintiff filed the MCAD complaint only after internal efforts to resolve the issues failed. Plaintiff first met with Amoruso in October 2001 for the specific purpose of reporting sexual harassment and retaliation by MMED Manager John D'Agostino. (Deposition of John Beliveau, Exhibit 12, pp. 87-88).

Plaintiff's supervisor, John Beliveau, and MMED line foreman Gary D'Ambra also attended the October 2001 meeting. (Exhibit 12, pp. 87-88). Both Beliveau and D'Ambra

---

[1] Defendant McCarter twice cancelled his deposition prior to the filing of defendants' Motion. Plaintiff submits this Opposition without the benefit of McCarter's deposition, which was re-scheduled to April 27, 2007.

corroborate that sexual harassment against the plaintiff as well as another female employee was reported to Amoruso at the meeting. (Affidavit of Gary D'Ambra, Exhibit 13; Exhibit 12, pp. 87-89). Amoruso testified that he did not think the plaintiff was lying when she said she was being mistreated and that he reported the issues raised to other members of the Commission. (Exhibit 5, p. 179; Exhibit 9, p. 5). Nevertheless, no action was taken against D'Agostino. (Exhibit 2, p. 44, Exhibit 4, p. 71).

In February 2002, plaintiff requested a second meeting with Amoruso. (Deposition of Kimberly Stoyle, Feb. 13, 2006, Exhibit 16, p. 200-201). Beliveau spoke with Amoruso and reported his concerns about sexual harassment and differential treatment of plaintiff and other women at MMED. (Exhibit 12, pp. 92-95). On October 1, 2002, plaintiff requested a third meeting. (E-mail, Exhibit 15; Exhibit 16, pp. 295-296). At the same time, Beliveau notified Amoruso by e-mail about the continuing hostile work environment. (Exhibit 12, p. 99; E-mail, Exhibit 15A). Plaintiff, Beliveau and Amoruso then met again in October 2002 to discuss incidents of sexual harassment and retaliation. (Exhibit 12, pp. 101-102, 104-105, 115). After the meeting, Amoruso failed to take any remedial action in response to plaintiff's ongoing concerns. (Exhibit 12, p. 116). Plaintiff filed an MCAD complaint two months later after efforts to remediate the harassment failed. (Exhibit 16, p. 209; Exhibit 24). Notice of the MCAD complaint is undisputed. (Motion for Summary Judgment, p. 8).

Defendant's Motion ignores reported incidents of harassment and retaliation after December 2002. Defendants acknowledge receipt of a letter from plaintiff, through counsel, dated July 2003 that sexual harassment and retaliation were ongoing. (Exhibit 2, pp. 46; Exhibit 4, pp. 88-89; Exhibit 5, p. 118; Exhibit 6, p. 79; Letter, Exhibit 17). In August 2003, Beliveau also sent a memorandum to defendant MacCaffrie detailing incidents of continuing sexual harassment and retaliation. (Exhibit 2, p. 46; Exhibit 4, pp. 88-89; Exhibit 9, p. 118;

Memorandum, Exhibit 18).  Defendants took no action in response to plaintiff's complaints, even though D'Agostino admitted some of the allegations.[2]  (Deposition of John D'Agostino, Aug. 8, 2006, Exhibit 19, p. 139; Exhibit 2, p. 46; Exhibit 4, pp. 83-84, 87-89; Exhibit 5, pp. 118, 120-122).  Moreover, defendants were aware of complaints from plaintiff that her job duties were diminished, that she was denied union membership and that she was accused of poor performance in balancing MMED's books.  (Exhibit 9, pp. 36, 42-43; Exhibit 4, pp. 65-68).  In fact, defendants observed the diminution of plaintiff's job duties firsthand at public meetings.  (Exhibit 2, p. 57; Exhibit 4, pp. 114-116; Exhibit 5, p. 200).

## C.  Defendants Acted With Deliberate Indifference

Defendants were deliberately indifferent to the plight alleged by the plaintiff in that their failure to act was not merely passive, but an affirmative condonation of the wrongdoing against her.  See, Chapin, supra at 78-80, quoting Lipsett v. University of Puerto Rico, 864 F.2d 881, 902 (1st Cir. 1988).  Furthermore, their separate and distinct actions supported the perpetrator.  Defendants contend that a so-called investigation into plaintiff's MCAD claim exonerates them from liability in this matter, but the totality of the evidence supports that the investigation was done in bad faith.  In their Motion, defendants suggest that they accepted the findings of a neutral investigator, James Lampke, who determined that there was no foundation for plaintiff's sexual and gender-based harassment clams.  (Defendants' Statement of Facts, p. 4).  This is false and misleading.  Defendants McCue and Amoruso testified that Lampke reported facts and opinions obtained through witness interviews, but that the ultimate conclusion was left to the Commission.  (Exhibit 8, p. 126; Exhibit 9, p.

---

[2] Defendants' decision to turn the matter over to legal counsel does not waive the obligation to conduct an investigation and to take effective remedial action, as required by the Town Sexual Harassment Policy.  (Sexual Harassment Policy, Exhibit 25).  Moreover, defendants failed to circulate MMED's sexual harassment policy on a yearly basis, as required G.L. c. 151B, §3(A)(a). (Exhibit 12, p. 181).

27).[3]

Indeed, defendants intentionally rejected Lampke's findings supporting plaintiff's claims. The Lampke report cites "inappropriate behavior" by D'Agostino. (Lampke Report, Exhibit 20, p. 54). Specifically, D'Agostino admitted sending plaintiff a sexually charged e-mail, which defendants acknowledge was crude, sexual in nature and inappropriate. (Exhibit 19A, pp. 62-63; Exhibit 20, p. 14; Exhibit 2, p. 38; Exhibit 4, p. 73; Deposition of Amoruso, Jan. 9, 2006, Exhibit 14, p. 56; Exhibit 5, p. 107; Exhibit 6, p. 76). D'Agostino also admitted telling plaintiff at a professional conference that she looked "delicious," which defendants likewise viewed as sexual and inappropriate. (Exhibit 20, p. 20; MCAD Position Statement by D'Agostino, Exhibit 20A, p. 3; Exhibit 3, p. 74; Exhibit 4, p. 75; Exhibit 6, p. 76). Finally, defendants deliberately disregarded corroborating evidence in the Lampke report provided by Beliveau. (Exhibit 20, pp. 32-45).

Defendants' conduct in the wake of the investigation also raises questions about the credibility of and motive for the decision to exonerate D'Agostino. On January 10, 2003, Daniel Donovan announced publicly that the allegations were "fabricated" and "farfetched" simply because "D'Agostino said they were not true." (Exhibit 3, p. 37; Exhibit 5, p. 121). It is significant that defendants personally interviewed D'Agostino about the allegations, but never interviewed Kimberly Stoyle. (Exhibit 2, p. 43; Exhibit 3, p. 32; Exhibit 9, p. 9). Donovan also believed it acceptable for D'Agostino to publicly threaten to sue employees for asserting their legal rights. (Exhibit 3, p. 47; Deposition of John D'Agostino, Jan 11, 2006, Exhibit 19A, p. 108). Defendant McCarter stated that plaintiff "should be fired" for

---

[3] Lampke concluded: "Based upon the above, the Town will now address whether the incidents found to have been inappropriate conduct constitute sexual harassment. If so, the Town should take appropriate remedial action and action to insure the conduct does not occur again." (Exhibit 20, p. 55).

filing the MCAD complaint. (E-mail, Exhibit 21).[4] These comments, made prior to an investigation into the matter, show defendants' misplaced loyalty to D'Agostino. (Exhibit 3, p. 44). Defendants also denied plaintiff's request that D'Agostino be removed from monthly Commissioner's meetings and precluded from further contact with her. (Exhibit 16, p. 317).

Despite the seriousness of the allegations against D'Agostino, defendants expedited the renewal of his employment contract in December 2002, after the MCAD charges were filed.[5] (Exhibit 9, pp. 24-25). The Board was obligated by the contract to provide D'Agostino six month's notice of its intent to renew or not renew his contract, but was under no obligation to execute a new contract. (2000-2003 Contract, Exhibit 22, pp. 2-3). The contract did not expire until November 30, 2003; therefore, such notice was not required until May 30, 2003. (Exhibit 22, pp. 2-3.) The Board renewed D'Agostino's contract on April 23, 2003, six months before required to do so and well before the investigation into plaintiff's allegations was completed in July 2003. (2003-2006 Contract, Exhibit 22A; Exhibit 5, pp. 22-23). Moreover, the Board voted to renew the contract prior to D'Agostino's annual review in January 2003. (Exhibit 9, pp. 24-25; Exhibit 10, pp. 2-6). The annual review is a condition precedent to contract renewal. (Exhibit 4, pp. 62-63.) Although the investigation was pending, the Commission gave D'Agostino a glowing review and a pay raise. (Board Meeting Minutes dated April 16, 2003, Exhibit 7, p. 9; Exhibit 10, pp. 2-7). The premature renewal of D'Agostino's contract assisted and encouraged

---

[4] The deposition David McCarter is pending.
[5] Defendant suggests that plaintiff filed an MCAD charge in bad faith knowing that D'Agostino's contract was up for renewal. However, defendant Amoruso's testimony makes clear that the subject of D'Agostino's contract renewal was not raised until after plaintiff filed her complaint. (Exhibit 9, pp-24-25).

D'Agostino's unlawful conduct, which continued for two years thereafter. (Verified Complaint, pp. 9-13)

In July 2003, defendants voted unanimously to clear D'Agostino of all charges. (Exhibit 2, p. 44; Exhibit 4, p. 71). Donovan voted to clear D'Agostino, despite never having heard the details of the allegations against him. (Exhibit 3, pp. 72-76). Amoruso voted to clear D'Agostino, even though he admitted there was a hostile work environment and retaliation against the plaintiff and did not dispute plaintiff's description of events in the MCAD complaint. (Exhibit 5, p. 130; Exhibit 9, p. 57). Defendants were also well aware of D'Agostino's propensity for retaliatory conduct. MacCaffrie testified that D'Agostino has a "power control issue." (Exhibit 4, pp. 90-91). Amoruso testified that D'Agostino viewed an unwillingness to go along with what he said as unacceptable. (Exhibit 5, p. 147). It is noteworthy that D'Agostino was present at the time defendants reviewed and discussed Lampke's investigative report, but that plaintiff was allowed access to the report only after a legal Request for Production of Documents in this matter. (Exhibit 2, p. 41).

Defendants testified that they had no reason to believe that plaintiff would fabricate the allegations in the MCAD complaint. (Exhibit 2, p. 38; Exhibit 4, pp. 52, 83; Exhibit 5, p. 179; Exhibit 6, p. 72; Exhibit 9, p. 57). They never had difficulty working with plaintiff and never found her to be insubordinate. (Exhibit 2, p. 82; Exhibit 4, p. 126; Exhibit 14, p. 26). Nevertheless, defendants publicly announced their support for D'Agostino. On July 25, 2003, a statement regarding the outcome of the purported investigation was read on local television. (Transcription of Board's Public Statement, Exhibit 23). Defendants then voted to file a counterclaim against the plaintiff. (Exhibit 9, p. 59). The counterclaim, authorized on behalf of MMED and D'Agostino, charges plaintiff with conspiring to file false claims to ruin the career of the Town Manager. (Counterclaim).

The filing of the plaintiff's MCAD charge constitutes protected conduct, even if the charge is neither valid nor reasonable.  Wyatt v. City of Boston, 35 F.3d 13, 15 (1st Cir. 1994). Retaliation occurs when an employer reacts by "disadvantaging . . . persons engaged in protected activities."  Hazel v. U.S. Postmaster General, 7 F.3d 1, 3 (1st Cir. 1993). Retaliation may occur even after the employee has been fired and is no longer in the employer's workforce.  Robinson v. Shell Oil Co., 117 S. Ct. 843, 848 (1997).  The obvious purpose behind the retaliation provision is to permit those filing charges to act without fear of retribution and unnecessary financial hardship.  The drudgery and expense of the counterclaim clearly disadvantaged plaintiff as to constitute further retaliation by D'Agostino.  Plaintiff was faced with the expense of protecting herself and the fear that a large monetary judgment would be awarded against her.  The counterclaim, approved by defendants in spite of evidence to the contrary, demonstrates a shared intent to discriminate and a supporting role in an enterprise designed to deprive plaintiff of her civil rights. Harmon v. Malden Hospital,  19 MDLR at 158.

## IV.    Defendants Are Individually Liable For Violations Of Title VII

Title VII makes it unlawful for an "employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual because of such individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a) (1).  "A hostile work environment, tolerated by the employer, is cognizable as a retaliatory adverse employment action for purposes of 42 U.S.C. § 2000e-3(a).  Just as an employer will be liable for discrimination if it tolerates a racially or sexually hostile work environment, it will be liable for retaliation if it tolerates severe or pervasive harassment motivated by the plaintiff's protected conduct."  Marrero v. Goya of P.R., Inc., 304 F.3d 7 (1st Cir. 2002); Noviello v. City of Boston, 398 F.3d 76 (1st Cir. 2005).

Title VII defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees" and "any agent of such person." Id. at § 2000e (b).  The inclusion of the words "and any agent" allows agents of the employer, such as a supervisory employees, to be held individually liable for their conduct.  See Ruffino v. State Street Bank and Trust Co., 908 F. Supp. 1019, 1047-49 (D. Mass. 1995) (holding supervisors "bound by Title VII's dictates").  Supervisors are statutory employers in that they are common law agents empowered by the employer to make economic decisions such as hiring, promotion and firing that affect other employees under their control.  Id.

A literal reading of the "and any agent" clause's plain language indicates clearly and unambiguously that Congress intended supervisors who qualify as agents of the employer to be personally liable.  See Tomka v. Seiler Corp., 66 F.3d 1295, 1318–24 (2d Cir. 1995) (dissenting opinion); Ruffino, 908 F. Supp. at 1047-49.  Title VII's broad remedial purpose is best served by reading the "and any agent" clause to provide for joint and several liability because the threat of individual liability deters supervisors directly.  Tomka, 66 F.3d at 1318–24 (dissenting opinion); Ruffino, 908 F. Supp. at 1047-49; Weeks v. State of Maine, 871 F. Supp. 515 (D. Me. 1994) (interpreting the clause to allow individual liability of supervisors).  A narrow reading of the "and any agent" clause reduces it to mere surplusage.  Ruffino, 908 F. Supp. at 1047-49.  This violates the longstanding rule of statutory construction that every word and clause of a statute must be given effect.  Id. at 1047.

In Robinson v. Shell Oil, the Supreme Court unanimously held that Title VII prohibits respondents from retaliating against former employees as well as current employees for participating in any proceeding under Title VII or opposing any practice made unlawful by the Act.  The Supreme Court stated that coverage of post-employment retaliation is more consistent with the broader context of the statute and with statutory

purpose of maintaining unfettered access to the statute's remedial mechanisms. <u>Robinson v. Shell Oil Co.</u>, 117 S.Ct. at 848. Defendants' conduct described in Section III, <u>supra,</u> including the authorization of a counterclaim against plaintiff after she separated from employment, violates Title VII.

## V. Public Officials Acting in Bad Faith Are Individually Liable For The Failure to Supervise

Plaintiff concedes that the Massachusetts Tort Claims Act precludes claims against public employees acting within the scope of their employment. However, the act does not apply to intentional torts.[6] <u>See</u> <u>South Boston Betterment Trust Corp. v. Boston Redevelopment Auth.</u>, 438 Mass. 57, 69 (2002). The doctrine of common law immunity applies to claims against public officials involving intentional torts. <u>Id</u>. Under common law, a public official exercising judgment and discretion is not liable for negligence or other error in making an official decision if the official acted in good faith, without malice, and without corruption. <u>Gildea v. Ellershaw</u>, 363 Mass. 800 (1973); <u>See</u> <u>Duarte v. Healy</u>, 405 Mass. 43, 50 n.5 (1989). Here, there is a genuine and material factual dispute as to the bad faith motive for defendants' supervisory decisions.

The defendants have a duty to exercise reasonable care in the supervision of employees brought into contact with members of the public. <u>Foster v. Loft, Inc.</u>, 26 Mass.App.Ct. 289 (1988). A breach of duty occurs "when the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action . . . ." <u>Id</u>. at 291. Defendants are liable in their individual capacities because they were directly responsible for hiring, reviewing and

---

[6] The Complaint charges defendants with the negligent failure to supervise. However, given defendants' malicious intent, this claim is more appropriately framed as an intentional failure to supervise. Plaintiff is free to amend the Complaint, with leave of Court, to conform to the evidence. Fed.R.Civ.P.15(a).

supervising John D'Agostino, and in so doing, acted in bad faith, with malice and corruption. (See Section III, supra).

As described in detail in Section III, supra, D'Agostino targeted the plaintiff after she challenged his misappropriation of public funds and workplace discrimination.[7] The defendants failed to adequately supervise D'Agostino, despite their knowledge of ongoing sexual harassment and retaliation against the plaintiff. Defendants' failure to take action to prevent ongoing retaliation was malicious in that their supervisory decisions were motivated by support for D'Agostino's illegal misappropriation of MMED ratepayer funds to balance the Town's budget. To prevail on a failure to supervise claim, plaintiff must also show a causal relationship between any breach of duty and the harm suffered. Nelson v. Salem State College, 445 Mass. 525, 538 (2006). Defendants' failure to supervise D'Agostino caused the plaintiff significant emotional distress resulting in her separation from employment. (Verified Complaint).

## VI. Conclusion

Based upon the foregoing, justice requires that this Honorable Court deny defendants' Motion for Summary Judgment.

---

[7] Plaintiff also challenged illegal hiring practices by D'Agostino. (Verified Complaint, pp. 5, 12). Defendants were aware that illegal hiring was a concern. (Deposition of Bradford Wills, Exhibit 26, p. 22-23)

Respectfully submitted,
Kimberly Stoyle
By her Attorney


/s/ Lynn A. Leonard
_____

Lynn A. Leonard
Attorney At Law
527 Main Street, Suite 8
Melrose, MA  02176
(781) 662-6161
B.B.O. No. 561662


Dated:  March 30, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————————— )
KIMBERLY STOYLE,                        )
                          Plaintiff      )
                                         )
v.                                       )
                                         )    **C.A. No. 05-10354-DPW**
THE MANSFIELD MUNICIPAL ELECTRIC        )
DEPARTMENT, JOHN D'AGOSTINO,            )
THE TOWN OF MANSFIELD BOARD OF          )
LIGHT COMMISSIONERS, LOUIS AMORUSO,     )
MICHAEL McCUE, DAVID McCARTER,          )
DANIEL DONOVAN, ROGER ACHILLE           )
AND STEVEN MacCAFFRIE,                  )
                                         )
                          Defendants     )
————————————————————————

**CONSOLIDATED WITH**

———————————————————————— )
DR. JOHN BELIVEAU,                       )
                          Plaintiff      )
                                         )
v.                                       )    **C.A. No. 04-11329-DPW**
                                         )
TOWN OF MANSFIELD MUNICIPAL             )
ELECTRIC DEPARTMENT, JOHN O.            )
D'AGOSTINO,                              )
                          Defendants     )
————————————————————————

**PLAINTIFF'S OBJECTIONS TO DEFENDANTS'
CONCISE STATEMENT OF FACTS**

Now comes plaintiff, Kimberly Stoyle, in the above-referenced matter and submits the following response to defendant's Concise Statement of Facts:

1. Plaintiff agrees with paragraph 1 for purposes of summary judgment only.

2.  Plaintiff agrees with paragraph 2 for purposes of summary judgment only.

3.  Plaintiff agrees with paragraph 3 for purposes of summary judgment only.

4.  Plaintiff agrees with paragraph 4 for purposes of summary judgment only.

5.  Plaintiff agrees with paragraph 5 for purposes of summary judgment only.

6.  Plaintiff agrees with paragraph 6 for purposes of summary judgment only.

7.  Plaintiff disagrees and objects to paragraph 7.

8.  Plaintiff disagrees and objects to paragraph 8.

9.  Plaintiff disagrees and objects to paragraph 9.

10. Plaintiff disagrees and objects to paragraph 10.

11. Plaintiff disagrees and objects to paragraph 11.

12. Plaintiff disagrees and objects to paragraph 12.

13. Plaintiff disagrees and objects to paragraph 13.

14. Plaintiff agrees with paragraph 14 for purposes of summary judgment only.

15. As to paragraph 15, plaintiff agrees only that Beliveau sent a memorandum dated August 13, 2003 to the Board of Light Commissioners.

16. Plaintiff disagrees and objects to paragraph 16.

Respectfully submitted,
Kimberly Stoyle
By her Attorney


/s/ Lynn A. Leonard
_____

Lynn A. Leonard
Attorney At Law
527 Main Street, Suite 8
Melrose, MA  02176
(781) 662-6161
B.B.O. No. 561662


Dated:  March 30, 2007

EXHIBIT NO. 1

# HOME RULE CHARTER

## MANSFIELD, MASSACHUSETTS



EFFECTIVE:  March 1, 1973
AMENDED:  March 21, 1983
AMENDED:  May 22, 2000
AMENDED:  August 6, 2003
AMENDED:  June 20, 2005
AMENDED:  May 9, 2006
AMENDED:  May 26, 2006

A TRUE COPY
ATTEST: _____
            TOWN CLERK

Section 3 - 2   Board of Selectmen

amended
1983

There shall be a Board of Selectmen consisting of five members elected by the voters of the Town for three-year overlapping terms such that the term of office of at least one member but not more than two expire each year. If on the same ballot there are two or more seats vacant with varying terms of office, the longest terms of office shall accrue the candidates receiving the highest number of votes in succession.

If a vacancy occurs in the membership of the Board, the remaining members shall call a special election to fill the vacancy for the remainder of the unexpired term. However, if a vacancy occurs less than 90 days prior to the annual election and if not less than three selectmen remain in office, the vacancy shall remain unfilled until such annual election. In no case shall a special election be held within 30 days prior to the annual election.

The Board of Selectmen shall be the chief policy-making body for the municipal government, except the school department. It will be the primary responsibility of the Board to coordinate the long-range objectives of the Town, particularly those of a comprehensive planning program, and to formulate policy for the implementation of programs necessary to fulfill those objectives, and shall report thereon semiannually to the voters. In addition, the Board shall have the following powers and duties:

The Board of Selectmen shall be the Board of Directors of corporate Mansfield, and shall appoint a town manager as the town's chief executive and administrative officer, and it shall deal through him with town officers and employees subject to his direction or supervision.

The Board shall be responsible for public safety and shall formulate policies in accordance with higher legal authority that will insure protection of the citizens from fire, crime, natural disasters, and other emergencies.

The Board shall be the Public Works Commission and shall formulate policies that will insure that proper services and public facilities are provided for the citizens.

The Board shall be the Municipal Electric Commission and, as such, shall be responsible for over-all policy of the Municipal Electric Department, and shall appoint the Municipal Electric Department Manager.

The Board shall have the responsibility of maintaining a system of job classifications, descriptions and grades of compensation for all municipal employees, and may appoint a temporary committee consisting of at least three members to establish such a system.

The Board shall determine the salaries and compensation of all Town officers and officials appointed by them.

The Board shall be the licensing authority for the Town in accordance with the General Laws.

The Board shall call elections and town meetings.

The Board shall have over-all responsibility for the public funds and shall appoint a town accountant to keep, audit, and approve the accounts; the Board shall inspect and approve such accounts regularly.

The Board shall on a bimonthly basis conduct a joint meeting of the chairmen of all other boards, commissions and committees to discuss pertinent matters of the Town.

In order to fulfill its long-range policy-making responsibility the Board shall annually appoint two of its members to serve on the Capital Improvement Program Committee, and if applicable shall make appointments to regional planning organizations. Further, the Board shall appoint the Planning Board, Board of Health, Board of Appeals, Airport Commission, Recreation Commission, Conservation Commission, Municipal Building Committee, Finance Committee, Industrial Development Finance Authority, and Council on Aging.

In addition, the Board shall appoint the Board of Assessors, Registrars of Voters, Constables, Town Counsel, Election Officers, Library Trustees and Veteran's Affairs Officer.

The Board may employ such experts as it deems necessary to fulfill its obligations.

The Board shall defend the interests of the citizens at higher levels of government and before quasi-public or quasi-judicial organizations, and shall represent the citizens at official ceremonies.

A vacancy in one of the elected seats shall be filled until the next annual election by a majority vote of a joint meeting of the remainder of the Housing Authority and Board of Selectmen. At the next Annual Municipal Election the remainder of the unexpired term shall be filled by election.

The Housing Authority shall exercise all the powers and duties of housing authorities under the General Laws.

## ARTICLE 4  TOWN MANAGER

Section 4 - 1    Appointment, Qualifications, Term

Upon the effective date of this Charter the Board of Selectmen shall appoint to the office of Town Manager, for a three-year term, a person especially qualified by education, training and experience in public or business administration. He be may removed for cause during a term of office, subject to the provisions of Section 9-7 of the Charter. He may be reappointed to successive three-year terms at the discretion of the Board of Selectmen. The Town Manager shall not have held elective office in Mansfield within two years prior to his appointment. The Town Manager may not engage in any other compensable occupation or profession unless approved in writing by a 4/5 vote of the Board of Selectmen. The Town Manager shall establish residence in Mansfield within one year of his appointment. The Board of Selectmen shall fix the Town Manager's salary within and solely from the annual appropriation for Town Manager's salary.

Section 4 - 2    Powers and Duties

amended
1983

The Town Manager shall be the chief executive and administrative officer of the Town, and shall have full administrative authority over its departments, and shall manage the Town's affairs in accordance with the policies of the Board of Selectmen.

He shall have the power to appoint, employ or dismiss all department heads and members of his staff, and to resolve any differences among them.

He shall appoint a town clerk; town treasurer-collector; town engineer; planning director in accordance with Section 7-6; department of public works director; parks and recreation director; chief of police department; chief of fire department; inspector of buildings; and civil defense director. He shall appoint the industrial and development commission and historical commission. He shall further appoint all other officers whose appointment is not otherwise provided for by this Charter or Town Meeting vote.

7

He may organize, reorganize or discontinue departments as he deems necessary, in accordance with the policies of the Board of Selectmen and within the provisions of this Charter.

He shall be the purchasing agent for all activities and departments, and shall purchase all materials and services and negotiate and execute all contracts for the town.

He shall annually submit the proposed budget for the ensuing fiscal year in accordance with Section 8-2 of this Charter.

He shall attend and provide information for Town Meetings. He shall attend meetings of the Board of Selectmen whenever possible and shall have a voice but no vote in such meetings.

He shall keep the Board of Selectmen informed of the needs of the Town, shall recommend policy changes to the Board as he deems necessary, and shall report to the Board on the conduct of his office.

He shall keep full and accurate public records of his office, and shall annually report to the voters on the condition of the Town and its needs for the future.

He shall inquire into the operations and financial condition of departments under his control as he deems necessary to insure the efficient conduct of office.

He shall have full jurisdiction over all town property and shall be responsible for its maintenance, except where otherwise provided by this Charter.

He shall be the Personnel Director of the Town, shall administer the Job Classification System, and shall conduct or appoint an agent to conduct collective bargaining sessions with the employees of his departments.

He shall be a non-voting member of the Capital Improvement Program Committee.

He may be the Agent of the Board of Health.

He may be the manager of the municipal electric department for the purposes of administrative control and purchasing authority.

He shall cause to be prepared, published and readily available for sale from the office of Town Clerk current copies of all Town laws and regulations.

He shall insure that, within his areas of responsibility, all-general laws, provisions of this Charter, Town Meeting votes and policies of the Board of Selectmen are faithfully executed.

He shall perform other duties as required by the Board of Selectmen.

Section 4 - 3   Acting Town Manager

In the event of a vacancy in the office of Town Manager, the Board of Selectmen shall immediately thereafter appoint a qualified person to be the acting Town Manager who shall exercise all the authority and responsibilities of the Town Manager. The Board of Selectmen shall endeavor to appoint a new Town Manager as soon as possible.

## ARTICLE 5   APPOINTED TOWN OFFICIALS

Section 5 - 1   General Provisions

amended
1975

An appointed official is hereby defined as any person appointed to any board, commission, committee or authority.

amended
1983

The Town Clerk shall maintain a list of all interested voters from which appointments of town officials shall be made. In order to have one's name placed on the list, the interested voter shall contact the Town Clerk in person or in writing indicating areas of interest and a brief background description. Such list shall be updated annually by the Town Clerk.

At least three weeks prior to appointments, excepting vacancies, appointing authority shall advertise in the newspaper any openings to be filled and shall advertise a closing date for the list of applicants. No less than 5 days prior to any appointment, excepting vacancies, the list of candidates shall be closed and publicly posted by the Town Clerk.

Any vacancy occurring in a board, commission or committee shall be filled by the appointing authority in accordance with the General Laws.

Any vacancy occurring in a commission, or committee appointed by the Town Manager or Moderator shall be filled for the unexpired term by the appointing authority.

Appointed town officials shall receive for they're services such compensation as may annually be provided for that purpose by appropriation of the Town Meeting.

9

EXHIBIT NO. 2

1

1        UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF MASSACHUSETTS
2
3     C.A. NO. 05-10354 DPW

4     KIMBERLY STOYLE,                    )
              Plaintiff                   )
                                          )
5           VS.                           )
                                          )
6     THE MANSFIELD MUNICIPAL             )
      ELECTRIC DEPARTMENT,                )
7     JOHN D'AGOSTINO, TOWN OF            )
      MANSFIELD BOARD OF LIGHT            )
8     COMMISSIONERS,                      )
      LOUIS AMORUSO,                      )
9     MICHAEL MCCUE,                      )
      DAVID MCCARTER,                     )
10    DANIEL DONOVAN,                     )
      ROGER ACHILLE AND                   )
11    STEVEN MACCAFFRIE,                  )
              Defendants                  )

12

13

14

              DEPOSITION of ROGER ACHILLE,
15    called as a witness by and on behalf of
      the Plaintiff, pursuant to the applicable
16    provisions of the Federal Rules of Civil
      Procedure, before Teresa E. Costello,
17    Certified Realtime Reporter, Registered
      Professional Reporter, Certified Shorthand
18    Reporter No. 1452S98, and Notary Public
      within and for the Commonwealth of
19    Massachusetts, at the offices of Wolf
      Block, One Boston Place, Boston,
20    Massachusetts, on Saturday, September 30th,
      2006, commencing at 10:04 a.m.

21

22

23

24

21

| | | |
|---|---|---|
| 10:25:06 | 1 | responsibilities with respect to |
| 10:25:08 | 2 | preparation of the budget, responsibility |
| 10:25:09 | 3 | for the budget? |
| 10:25:10 | 4 | A. I don't recall. |
| 10:25:11 | 5 | Q. You don't recall? |
| 10:25:12 | 6 | A. No. |
| 10:25:14 | 7 | Q. Well, could the town manager prepare a |
| 10:25:17 | 8 | budget without having the imprimatur of |
| 10:25:23 | 9 | board of selectmen? |
| 10:25:28 | 10 | A. I don't believe so and for practical |
| 10:25:31 | 11 | purposes, I mean -- |
| 10:25:33 | 12 | Q. You don't believe so or he couldn't? |
| 10:25:37 | 13 | A. I don't believe so. |
| 10:25:39 | 14 | Q. Could -- so could the town manager prepare |
| 10:25:44 | 15 | a budget for town meeting without the |
| 10:25:46 | 16 | imprimatur of the board of selectmen? |
| 10:25:49 | 17 | A. I don't believe so. |
| 10:25:50 | 18 | Q. So what does that mean, that you don't know |
| 10:25:54 | 19 | for sure? |
| 10:25:55 | 20 | A. It means I don't believe so. |
| 10:25:56 | 21 | Q. Does it mean yes? |
| 10:26:00 | 22 | MS. JACOBS: Lynn, he's answered |
| 10:26:02 | 23 | the question as best he can answer it. |
| 10:26:04 | 24 | That's his answer. He doesn't believe so. |

28

| | | |
|---|---|---|
| 10:33:05 | 1 | recalling and it possibly occurring.  I |
| 10:33:17 | 2 | mean, I'm trying to be -- I don't recall |
| 10:33:19 | 3 | when it happened, but it's been such a blur |
| 10:33:22 | 4 | that I wouldn't be surprised if it did |
| 10:33:25 | 5 | occur. |
| 10:33:26 | 6 | Q.  Did you have an opportunity to read the |
| 10:33:28 | 7 | complaint that was filed against you in |
| 10:33:30 | 8 | this case? |
| 10:33:32 | 9 | A.  I had an opportunity. |
| 10:33:33 | 10 | Q.  And do you recall that complaint raising |
| 10:33:36 | 11 | issues, specific issues of overcharges? |
| 10:33:39 | 12 | A.  I don't recall the complaint. |
| 10:33:41 | 13 | Q.  You don't recall the complaint at all?  You |
| 10:33:47 | 14 | know that you're named personally? |
| 10:33:49 | 15 | A.  Yes. |
| 10:33:49 | 16 | Q.  Was it part of your duties and |
| 10:34:19 | 17 | responsibilities to oversee the town |
| 10:34:21 | 18 | manager? |
| 10:34:21 | 19 | A.  Yes. |
| 10:34:22 | 20 | Q.  And does that include -- how did you |
| 10:34:35 | 21 | oversee the town manager?  How did you do |
| 10:34:38 | 22 | that? |
| 10:34:38 | 23 | A.  Well, we oversee the town manager by |
| 10:34:42 | 24 | implementing policies that he has to carry |

10:47:48  1    admitted sending Miss Stoyle an e-mail

10:47:51  2    involving anal sex with a gerbil?

10:47:57  3  A.  I'm aware of that, yes.

10:47:59  4  Q.  Do you recall that the town manager

10:48:09  5    acknowledged telling Miss Stoyle that she

10:48:12  6    looked delicious?

10:48:16  7  A.  I don't recall whether he acknowledged that

10:48:28  8    or not.  I recall the incident.  I recall

10:48:28  9    the incident.  I don't recall the

10:48:28 10    particulars of whether he acknowledged

10:48:29 11    that.

10:48:30 12  Q.  Did you ever have any conversations with

10:48:39 13    Jack Beliveau regarding Kimberly Stoyle's

10:48:42 14    allegations?

10:48:44 15  A.  I don't believe so.

10:48:48 16  Q.  Did you have any reason to believe that

10:49:09 17    Miss Stoyle would fabricate the

10:49:11 18    allegations?

10:49:12 19  A.  No.  No.

10:49:23 20  Q.  And do you recall the complaint included

10:49:33 21    allegations of derogatory gender-based

10:49:36 22    statements that were made toward Miss

10:49:41 23    Stoyle in response to her complaints about

10:49:43 24    financial improprieties?

41

| Time | Line | | |
|---|---|---|---|
| 11:09:38 | 1 | A. | Sure. |
| 11:09:38 | 2 | Q. | Was that the first time you became aware |
| 11:09:40 | 3 | | after you became a selectmen? |
| 11:09:42 | 4 | A. | I believe so because it was, I think, |
| 11:09:48 | 5 | | almost the same time. |
| 11:09:51 | 6 | Q. | And did you have a meeting regarding the |
| 11:09:58 | 7 | | Lampke investigation? |
| 11:10:00 | 8 | A. | Yes. |
| 11:10:00 | 9 | Q. | And who was in attendance at the meeting? |
| 11:10:03 | 10 | A. | I know that all of the board of selectmen |
| 11:10:09 | 11 | | were present, I believe, the town manager. |
| 11:10:23 | 12 | | I'm assuming the town counsel was there, |
| 11:10:29 | 13 | | and I don't recall if I ever met |
| 11:10:31 | 14 | | Mr. Lampke. I'm not sure. |
| 11:10:33 | 15 | Q. | So you don't recall if Mr. Lampke was |
| 11:10:36 | 16 | | there? |
| 11:10:36 | 17 | A. | I don't recall. |
| 11:10:36 | 18 | Q. | But his report was there? |
| 11:10:37 | 19 | A. | His report was there, yes. |
| 11:10:39 | 20 | Q. | Do you recall if you assumed your position |
| 11:10:40 | 21 | | in May? |
| 11:10:41 | 22 | A. | Yes. |
| 11:10:41 | 23 | Q. | Do you recall when that meeting was? |
| 11:10:44 | 24 | A. | Shortly thereafter. |

43

| | | |
|---|---|---|
| 11:11:42 | 1 | Q. And did you have -- and it's fair to say |
| 11:11:59 | 2 | that Mr. Lampke reported facts and |
| 11:12:02 | 3 | information obtained from interviews, |
| 11:12:06 | 4 | correct? |
| 11:12:07 | 5 | A. He reported interviews, yes. |
| 11:12:10 | 6 | Q. And did you discuss the report with |
| 11:12:22 | 7 | Kimberly Stoyle? |
| 11:12:24 | 8 | A. No. |
| 11:12:26 | 9 | Q. And did the board vote regarding whether |
| 11:12:43 | 10 | or not action should be taken against |
| 11:12:45 | 11 | Mr. D'Agostino? |
| 11:12:47 | 12 | A. I don't recall if there was a vote |
| 11:12:56 | 13 | regarding that. |
| 11:12:58 | 14 | Q. Do you recall that there was a public |
| 11:13:04 | 15 | announcement regarding the allegations |
| 11:13:06 | 16 | against the town manager? |
| 11:13:07 | 17 | A. Yes. |
| 11:13:07 | 18 | Q. And did you approve beforehand the |
| 11:13:11 | 19 | statement that was read? |
| 11:13:13 | 20 | A. I was aware of it. |
| 11:13:17 | 21 | Q. And did the board vote as a group regarding |
| 11:13:19 | 22 | that statement? |
| 11:13:22 | 23 | A. I don't recall. |
| 11:13:23 | 24 | Q. Do you recall supporting that statement? |

44

| 11:13:28 | 1 | A. | I don't recall the statement. |
| 11:13:37 | 2 | Q. | Do you recall that the statement cleared |
| 11:13:41 | 3 | | the town manager of charges of sexual |
| 11:13:45 | 4 | | harassment? |
| 11:13:47 | 5 | A. | Yes. |
| 11:13:57 | 6 | Q. | And did you support that statement? |
| 11:14:02 | 7 | A. | I support the conclusion. |
| 11:14:04 | 8 | Q. | Clearing the town manager?  Is that the |
| 11:14:09 | 9 | | conclusion you're referring to? |
| 11:14:11 | 10 | A. | Yes. |
| 11:14:11 | 11 | Q. | That was the conclusion that the board |
| 11:14:14 | 12 | | arrived at, isn't that correct? |
| 11:14:18 | 13 | A. | Yes. |
| 11:14:18 | 14 | Q. | And it's your testimony that you voted in |
| 11:14:23 | 15 | | support of that conclusion? |
| 11:14:25 | 16 | A. | Yes. |
| 11:14:25 | 17 | Q. | What was the basis for your vote to |
| 11:14:43 | 18 | | exonerate town manager? |
| 11:14:47 | 19 | A. | Based on what was presented in the Lampke |
| 11:14:53 | 20 | | report. |
| 11:14:54 | 21 | Q. | Do you recall after reviewing the Lampke |
| 11:15:18 | 22 | | report becoming aware at any other time or |
| 11:15:22 | 23 | | when next -- strike that.  When, next, |
| 11:15:25 | 24 | | after reviewing the Lampke report, if at |

45

| | | |
|---|---|---|
| 11:15:27 | 1 | all, did you become aware of claims by |
| 11:15:29 | 2 | Miss Stoyle regarding sexual harassment and |
| 11:15:32 | 3 | retaliation in the workplace? |
| 11:15:34 | 4 | A. I don't recall any additional allegations |
| 11:15:41 | 5 | then from what was in the Lampke report. |
| 11:16:00 | 6 | Q. Do you recall the board discussing a memo |
| 11:16:07 | 7 | prepared by Mr. Beliveau regarding |
| 11:16:19 | 8 | continuing sexual harassment? |
| 11:16:21 | 9 | A. No. |
| 11:16:22 | 10 | Q. I want to show you what's been marked as |
| 11:16:31 | 11 | Exhibit 2 at the deposition of Lou Amoruso |
| 11:16:38 | 12 | and ask you if that refreshes your |
| 11:16:41 | 13 | recollection. |
| 11:16:43 | 14 | A. Okay. |
| 11:17:29 | 15 | MS. JACOBS: Are you going to mark |
| 11:17:31 | 16 | this? |
| 11:17:32 | 17 | MS. LEONARD: Why don't we mark |
| 11:17:34 | 18 | that as Exhibit Number 1 to this |
| 11:17:40 | 19 | deposition. |
| | 20 | (Memo marked as |
| 11:18:05 | 21 | Exhibit Number 1.) |
| 11:18:00 | 22 | A. I don't doubt the authenticity of the memo. |
| 11:18:05 | 23 | I don't recall the memo. |
| 11:18:07 | 24 | Q. You don't recall discussing it as a board? |

| | | | |
|---|---|---|---|
| 11:18:09 | 1 | A. | No. |
| 11:18:09 | 2 | Q. | Do you recall any discussion regarding |
| 11:18:19 | 3 | | anything that's set forth in the |
| 11:18:27 | 4 | | memorandum? You've had an opportunity to |
| 11:18:29 | 5 | | review it, correct? |
| 11:18:30 | 6 | A. | Right, right. I mean, there was discussion |
| 11:18:35 | 7 | | regarding Miss Stoyle's matter and many of |
| 11:18:40 | 8 | | it seems to overlap. I'm sure there was |
| 11:18:43 | 9 | | discussion. I don't recall the discussion. |
| 11:18:46 | 10 | | I mean, there was discussion, you know, |
| 11:18:48 | 11 | | throughout my term regarding these matters. |
| 11:18:52 | 12 | Q. | And these matters being Miss Stoyle's |
| 11:18:55 | 13 | | allegations of sexual harassment and |
| 11:18:57 | 14 | | retaliation? |
| 11:18:58 | 15 | A. | Yes. |
| 11:18:59 | 16 | Q. | Do you recall if, as a result of the |
| 11:19:05 | 17 | | August, 2003 memo, the board took any |
| 11:19:07 | 18 | | further steps to investigate? |
| 11:19:09 | 19 | A. | I don't recall any steps being taken. |
| 11:19:15 | 20 | Q. | I apologize if I'm being redundant, but |
| 11:19:41 | 21 | | other than what you've already testified to |
| 11:19:43 | 22 | | do you recall any other occasion when |
| 11:19:50 | 23 | | complaints or claims of sexual harassment |
| 11:19:55 | 24 | | and retaliation were brought to your |

57

1    A.   Right.  I don't recall that.

2    Q.   Do you recall at one time you used to

3         receive a monthly report from her?

4    A.   Yes.

5    Q.   Do you recall that thereafter you didn't

6         receive a report?  Some time thereafter you

7         didn't receive that report anymore?

8    A.   Right.  I don't believe we received the

9         same report that I first received when I

0         was elected.

1    Q.   And at some point in time she no longer was

2         an active participant in the meetings,

3         isn't that correct?

4    A.   I don't recall that.

5    Q.   You don't recall that?

6    A.   Right.

7    Q.   Do you recall a complaint from Miss Stoyle

8         that her job duties as chief financial

9         officer had been diminished?

0    A.   I recall that being an allegation, yes.

1    Q.   How did you become aware of that

2         allegation?

3    A.   I believe it was part of my

4         responsibilities and access to information

| 12:23:28 | 1 | | officer was present. |
| 12:23:29 | 2 | Q. | A police officer? |
| 12:23:30 | 3 | A. | I believe so. |
| 12:23:31 | 4 | Q. | Okay. And did they tell you any other |
| 12:23:34 | 5 | | details of how Jack was terminated? |
| 12:23:37 | 6 | A. | I know they discussed the termination. |
| 12:23:41 | 7 | | That's what stands out in my mind. |
| 12:23:46 | 8 | Q. | But you don't remember any other specifics? |
| 12:23:49 | 9 | A. | I believe they also mentioned that he |
| 12:23:54 | 10 | | didn't know he was going to be terminated |
| 12:23:55 | 11 | | or was in the middle of the day and that's |
| 12:23:58 | 12 | | about all I recall. |
| 12:24:00 | 13 | Q. | And do you remember why they were concerned |
| 12:24:04 | 14 | | about it having taken place in that manner? |
| 12:24:08 | 15 | A. | Well, I believe they were concerned because |
| 12:24:12 | 16 | | they enjoyed working with Jack and they |
| 12:24:18 | 17 | | wanted Jack to stay on, and they didn't |
| 12:24:21 | 18 | | believe it was justified. |
| 12:24:24 | 19 | Q. | Did you ever have any difficulty working |
| 12:24:26 | 20 | | with Jack Beliveau while you worked for the |
| 12:24:28 | 21 | | town? |
| 12:24:28 | 22 | A. | No. |
| 12:24:29 | 23 | Q. | Did you ever have any difficulty working |
| 12:24:31 | 24 | | with Kim Stoyle while you worked for the |

EXHIBIT NO. 3

# ORIGINAL

Volume: I

Pages: 1-81

Exhibits: 1&2

UNITED STATES DISTRICT COURT

For the District of Massachusetts

CIVIL ACTION NO. 05 10354 DPW

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

KIMBERLY STOYLE,                          :

        PLAINTIFF                   :

                               :

 v.                                       :

                               :

THE MANSFIELD MUNICIPAL ELECTRIC          :

DEPT., JOHN D'AGOSTINO, TOWN OF           :

MANSFIELD BOARD OF LIGHT                  :

COMMISSIONERS, LOUIS AMORUSO,             :

MICHAEL McCUE, DAVID McCARTER,            :

DANIEL DONOVAN, ROGER ACHILLE, and        :

STEVE MacCAFFRIE,                         :

        DEFENDANTS                  :

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

  DEPOSITION OF DANIEL DONOVAN, a witness called on
behalf of the Plaintiff, pursuant to the provisions
of the Federal Rules of Civil Procedure, before Lisa
McDonald Valdario, (CSR #130093), a Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Law Offices of McNaught, Cecere & McNaught, Six
Eastman Place, Melrose, Massachusetts  02176, on
Thursday, August 10, 2006, commencing at 2:15 p.m.

Page 10

1    got appointed.  Those dates could be off a

2    little bit out the way.  I didn't bring the

3    exact dates to -- but I'm there about a year.

4    Close to a year maybe, or nine months or ten

5    months, something like that.

6  Q  Were you on any other boards between being on

7    the Board of Selectmen and the Zoning Board?

8  A  No.

9  Q  As a member of the Board of Light Commissioners,

10    you oversee the Town Manager -- Board of

11    Selectmen, excuse me?

12  A  We oversee the whole Board of Light

13    Commissioners.  I mean, we're the commissioners

14    of the light department so we oversee,

15    supposedly, everything that goes on there.

16  Q  In the light department.

17  A  Yeah.

18  Q  And as a member of the Board of Selectmen, you

19    oversee the town manager?

20  A  That too.

21  Q  With respect to the operations of the light

22    department, do you rely on the representations

23    of the manager of the light department?

24  A  Basically, yes.  We depend on them because they

```
 1        I don't remember her getting vocal about it.

 2   Q    Do you recall there being an issue, her raising

 3        an issue that there were overcharges by the town

 4        for services rendered to the electric

 5        department?

 6   A    Yes, I remember that very well because it was,

 7        the town, instead of taxes, we got a stipend

 8        instead in lieu of taxes, and that was a

 9        concern, I believe, that maybe they didn't think

10        that was correct.  I don't know.

11   Q    Do you recall what the specific concerns were?

12   A    Well, basically, they thought it was too much

13        money; that it was too costly the way they were

14        doing it.  They were looking for a lock box and

15        different things, and I thought a lock box was

16        the wrong thing for elderly people in town.

17        They would like to go up and pay their bill and

18        get it stamped and leave.  You know, a lock box

19        could be out in Worcester or Springfield or

20        somewhere else.

21   Q    Well, do you recall discussions at Board of

22        Light Commissioners meetings that the treasurer

23        was submitting a bill to the Electric Department

24        that was excessive?
```

1   A   That may have come up.  That probably did, but I

2       believe the town manager was going to look into

3       it and see what excessive was.  At that

4       particular time they were doing the collecting

5       and probably mailing out the bills.  I don't

6       know.  I don't know what excessive is in that

7       part of it.  That I don't know what excessive

8       would be.

9   Q   Do you recall that the town treasurer was

10      overcharging, that there was a complaint raised

11      by Miss Stoyle that the town treasurer was

12      overcharging MMED by more than a hundred

13      thousand dollars for his services?

14  A   That may have been.  That may have happened, but

15      I wasn't sure if a hundred thousand dollars was

16      enough, you know.  It, maybe it's more.  I don't

17      know.

18  Q   And how did you resolve that dispute?

19  A   I believe the town manager and them straightened

20      that out, whatever, went down to straighten it

21      out.  There was a big discussion on dropping

22      down the stipend; that was too much money for

23      the stipend in lieu of taxes and stuff.  It was

24      worked out eventually, I believe.

Page 20

```
 1    Q    Okay.  And --
 2    A    I didn't get involved in the daily meetings of
 3         it.  I didn't sit in on their meetings how they
 4         resolve it.
 5    Q    Do you recall at some point -- do you recall
 6         when that issue was raised, by the way?
 7    A    It was at a regular meeting.
 8    Q    Do you recall what year?
 9    A    Well, it must have been maybe 2002.  Could be
10         2002.  I'm not sure.  I'd have to go home and
11         look at my notes.  I'd have to take up the
12         minutes of the meeting and look at it and see
13         what the --
14    Q    Do you recall issues over overcharges arising
15         early in your tenure as Board of Light
16         Commissioner?
17    A    No, not really.  In the beginning it was very
18         smooth.  That came a little later.  Because as I
19         said, I wasn't there until 2000, 2000 to 2003.
20    Q    Do you recall in 2001 there being concerns
21         raised by the electric department regarding
22         payment in lieu of tax?
23    A    There could have been.  We discussed it many
24         times, so to get the exact date on it, I would
```

1      have to go home and pull the meeting.  It's

2      definitely in the minutes of the meeting.  It's

3      nothing that I don't want to deny.  We did

4      discuss it.

5   Q  Do you recall there was an ongoing issue?

6   A  You could probably say it might be ongoing.  I

7      don't know.  A lot of it was again, tailored

8      towards the complaint about payment in lieu of

9      taxes.

10  Q  I want to show you what was marked as an Exhibit

11     4 at the deposition of Lou Amoruso and ask you

12     if that refreshes your recollection as to when

13     the issue first arose regarding charges,

14     overcharges.

15  A  What was the date on this?  6/01.  I might have

16     been there, 6.  I got it.

17          MR. KESTEN:  What was the question?  Do

18      you want him to read it?

19  Q  Does that refresh your recollection that the

20     issue of overcharges dated back --

21  A  6/01.

22  Q  -- dated back to at least 2001?

23  A  Yeah, it could have been.  I mean, it's right

24     here.

1   Q  So do you agree that it did?

2   A  If it happened on that date, then I'm definitely

3      sure I was there.  I mean it's a discussion

4      about.

5   Q  Okay.  Do you recall that there was also a

6      concern raised by Miss Stoyle regarding pension

7      costs and overcharges related to pension costs?

8   A  Excuse me, what did you say again?

9   Q  Go ahead.  You can keep reading again.  I was

10     just --

11   A  You butted in there so I gotta answer the

12     question.

13   Q  You're right.  I did.  You can finish taking a

14     moment to read.

15   A  That's okay.

16   Q  No, I'm asking you to.

17         MR. KESTEN:  What would you like him to

18     do?

19         MS. BALLIRO:  Read it.

20   Q  Finish reading.  I apologize, Mr. Donovan.  I

21     didn't realize that you were still reading the

22     document.

23             (Pause.)

24   A  Okay, again, this relates back again, like I was

Page 23

```
 1        saying, of payment in lieu of taxes.  So that's

 2        where that all boiled down to.

 3   Q    Okay.  So that was an issue back in 2001,

 4        correct?

 5   A    Um hmm.

 6   Q    And it refers also to prior years, isn't that

 7        correct?

 8   A    Yeah.

 9   Q    Okay.

10   A    I have no doubt we did discuss it.

11            MR. KESTEN:  Wait for a question,

12        Mr. Donovan.

13            THE WITNESS:  Well, I'm finishing up for

14        her now.

15            MR. KESTEN:  Okay.

16   Q    Also mentioned in this Exhibit No. 4 is the

17        charges for treasurer services, isn't that

18        correct?

19   A    That's correct.

20   Q    So does that refresh your recollection that that

21        issue dated back even earlier than 2002?

22   A    Well, it probably did.  I mean, if it's in the

23        minutes of the meeting when we had it, it could

24        have started in 2001.
```

| | | |
|---|---|---|
| 1 | Q | Okay.  Do you recall, I don't know if you |
| 2 | | answered this question, I apologize if you have, |
| 3 | | do you recall that Miss Stoyle also raised |
| 4 | | concerns about overcharges by the town to the |
| 5 | | electric department for pension costs? |
| 6 | A | That was discussed.  That was discussed. |
| 7 | Q | Do you recall whether or not the town manager |
| 8 | | disagreed with that? |
| 9 | A | I don't recall the answer to that.  I believe he |
| 10 | | was supposed to work it out and find out the |
| 11 | | information on it.  What he meant was |
| 12 | | overcharges, I don't know.  There was a lot |
| 13 | | because people had retired, and the cost of the |
| 14 | | pension money that the town was paying was very |
| 15 | | expensive.  That depends on how many people |
| 16 | | retired and how much money they were paying. |
| 17 | Q | Did you rely upon the information provided by |
| 18 | | the town manager on that issue? |
| 19 | A | Well, basically, the town manager and the light |
| 20 | | department themselves, and the treasurer, is the |
| 21 | | one that pays the bills, so the accountant would |
| 22 | | know how much is to be paid so -- |
| 23 | Q | Okay.  Do you recall that Miss Stoyle also |
| 24 | | raised concerns at some point during your tenure |

1     it.

2  Q  Did you ever talk to Kim Stoyle?

3  A  No.

4  Q  So you never asked her what her position was on

5     it?

6  A  Well, I didn't because she never came to me.  It

7     was up to her to come, chain of command, go up

8     the line.  Nobody ever came to me, so I'm not

9     getting involved in something that I don't know

10    anything about over here.

11 Q  Did you talk to Mr. D'Agostino?

12 A  He was at one of those meetings when he first

13    denied it.  He was there and he denied that it

14    ever happened, so that's when I asked for a

15    special independent investigator.

16 Q  Okay.

17         MS. LEONARD:  I'd like to mark this as the

18    next numbered Exhibit.

19         (Sun Chronicle news article marked

20          Exhibit No. 1 for identification.)

21 Q  Do you recall that news article, the date of it,

22    when you first heard about the MCAD Complaint?

23 A  The news article?  I believe it was around

24    January the 9th maybe.

| 1 | | you think she made up those claims? |
|---|---|---|
| 2 | A | I don't know.  Because I saw no, nothing to |
| 3 | | substantiate it. |
| 4 | Q | Well, did you see anything that didn't |
| 5 | | substantiate it? |
| 6 | A | But what bother me was, if there's a chain of |
| 7 | | command and nobody comes to me up the line, |
| 8 | | there's something amiss here.  If Miss Stoyle |
| 9 | | had come to any one of the Selectmen, and come |
| 10 | | to me, I would have definitely suspended the |
| 11 | | town manager immediately, but nothing ever came. |
| 12 | Q | So you concluded that they were farfetched based |
| 13 | | on the fact that you hadn't heard them before? |
| 14 | A | Basically, because I spoke to Mr. D'Agostino and |
| 15 | | he said no, that these claims wasn't true. |
| 16 | Q | Okay. |
| 17 | A | And again, you had a light manager that was |
| 18 | | there, from the Selectmen, for two years and |
| 19 | | never brought back a complaint, Mr. Wills.  If |
| 20 | | he come back with a complaint, we would have |
| 21 | | investigated immediately. |
| 22 | Q | Are you talking about Brad wills? |
| 23 | A | Yes. |
| 24 | Q | And he was a member of the Board of Light |

Page 47

1    Q    Do you recall the categories that you reviewed

2         him on?

3    A    Yes, basically, the standard list that we got

4         every year of different things.

5    Q    Do you recall that when the MCAD case broke in

6         the newspapers, that he made some statements to

7         the press?

8    A    Yes, I believe I read the papers.  It was in the

9         press.

10   Q    And he actually made statements in Exhibit, in

11        the Mansfield News, isn't that correct?

12   A    Yeah.

13   Q    Okay.  And do you recall, did he threaten to sue

14        employees?

15   A    Yeah, I remember that.  I remember him -- I

16        remember that.  That was in the paper.  Yeah, I

17        remember that.

18   Q    Do you think that was appropriate?

19   A    If he felt he was being wronged, I feel it is

20        appropriate.

21   Q    So that didn't affect your grading him.

22   A    No, didn't affect me one bit.  I had to see some

23        evidence of some misdoing, something wrong, and

24        I hadn't seen one iota so far.

Page 48

1   Q   When you reviewed him, on -- did you think he

2       did a good job with the budget?  You testified

3       you did.

4   A   Yes, I did.

5   Q   And when you reviewed him on the budget, did you

6       take into account that there had been

7       overcharges in the prior year?

8   A   We took everything into account; the overall

9       town budget and the light budget, and we took

10      everything into account.  So the budget is a

11      very tough process and he did a great job on the

12      budget.

13  Q   Did you come to learn through that process that

14      those overcharges actually violated some laws?

15      Was that discussed?

16  A   Well, basically, the biggest thing that was

17      discussed was, again, was payment in lieu of

18      taxes, and I believe some towns ask their light

19      departments for a million dollars.  Other towns

20      600,000, 400,000.  And it was basically on that

21      thing all the overcharges hinged on.

22  Q   But do you recall expenses separate from the

23      PILOT that were overcharges?

24  A   Basically, the overcharges were between the town

1   A   If I saw mistakes, yes.  I would say that I

2       didn't say that or somebody else didn't say

3       that.  I didn't know it said that.

4   Q   So it's fair to say then that this was an issue

5       at the meeting as it's stated on page 3923.

6   A   Yes.

7   Q   And do you recall an ongoing dispute by the

8       light department that paying grossly inflated

9       charges would violate the law?

10  A   I believe it was discussed about that, but that

11      was a very loose situation because again,

12      everything hinged on payment in lieu of taxes.

13  Q   But just focus on the question regarding the

14      treasury services, okay, Mr. Donovan?

15  A   Yes.

16  Q   Let's put aside the payment in lieu of taxes for

17      a moment.

18  A   But that's what it boiled down to though.  I

19      can't tell you anything else but what it all,

20      the whole thing hinges on how much payment in

21      lieu of taxes, and what was, the light

22      department said was overcharged.

23  Q   Do you recall, Mr. Donovan, that the overcharges

24      were charges that were separate and apart from

| | | |
|---|---|---|
| 1 | | the PILOT in lieu of taxes for that particular |
| 2 | | year, and that's what the concern was? |
| 3 | A | Yes, there was a concern. |
| 4 | Q | So it's separate than the PILOT. |
| 5 | A | Probably was eventually straightened out.  I |
| 6 | | don't know what they did with it because I left |
| 7 | | there in June. |
| 8 | Q | But that was the complaint. |
| 9 | A | That was the complaint, yeah. |
| 10 | Q | And the complaint was that that violated -- |
| 11 | A | It wasn't a complaint per se.  It was just |
| 12 | | mentioned in the report, that, you know, -- it |
| 13 | | was no complaint. |
| 14 | Q | Do you recall that Miss Stoyle didn't want to |
| 15 | | pay false bills, that that was the essence of |
| 16 | | the issue? |
| 17 | A | Yes, but I didn't know how you meant false |
| 18 | | bills.  I didn't know who was giving her false |
| 19 | | bills. |
| 20 | Q | But you recall that was the issue. |
| 21 | A | Might have been an overcharge bill or something |
| 22 | | like that, but I never heard of anybody saying |
| 23 | | false bills anywhere. |
| 24 | Q | But you recall she was concerned she couldn't |

Page 72

```
 1        paper that a complaint had been filed?

 2   A    Correct.

 3   Q    And you knew one of the concerns in the

 4        complaint was that Mr. D'Agostino had sent an

 5        Email to Miss Stoyle that she found to be

 6        offensive.

 7   A    That's why we hired the private investigator.

 8   Q    Well, what is your understanding about what that

 9        Email was about?

10   A    I have no idea.  I never saw it.  Don't know

11        what it is.

12   Q    You don't know what it is?

13   A    Don't know.

14   Q    Did you ever ask anyone?

15   A    No, never asked anyone.

16   Q    What's the story with this Email?

17   A    Never asked anyone.  I never saw it.

18   Q    Why didn't you ask?

19   A    Why should I?  It didn't affect me.

20   Q    It didn't affect you.

21   A    No, it didn't.

22   Q    Well, I thought you said you would be very

23        concerned if there were allegations of sexual

24        harassment.
```

Page 73

```
 1   A   Yes, if somebody brought me that and said,

 2       Here's what Miss Stoyle got, I might think it

 3       different.  Or if Miss Stoyle brought it to me

 4       and said, Here's what I got from the town

 5       manager, then it would be different.

 6   Q   Do you realize, sir, Mr. D'Agostino has

 7       acknowledged, he's admitted that he sent Miss

 8       Stoyle the gerbil Email?

 9   A   That could be.  I don't know.

10   Q   You still don't know that.

11   A   If it was in the paper and it said, it's

12       probably true.

13   Q   Okay, but I'm asking you if you realize as you

14       sit here today, that Mr. D'Agostino has actually

15       admitted under oath that he sent her the gerbil

16       Email.

17   A   Right.  That's got nothing to do with me.  I

18       didn't know that.  I mean I don't -- I wasn't

19       here to see Mr. D'Agostino's oath whether that

20       happened or not.  As I said, I couldn't

21       recognize an Email if you put it in front of me

22       and you tell me that's an Email.

23   Q   Well, do you know, are you aware, sir, that Mr.

24       D'Agostino also admitted that he told Miss
```

1        Stoyle that she looked delicious at a electric

2        department social gathering?

3   A   I don't know.  That's to me, as I say, that's a

4        comment for him.  I don't know.  That's his

5        comment, I mean.

6   Q   I'm not suggesting you made the comment, sir,

7        but I am asking you, do you think that that's an

8        appropriate thing for a town manager to say to a

9        female who works in the electric department?

10  A   I wasn't there, so I don't know.

11  Q   Well, would you say that to a female that worked

12       for you?

13  A   I might.

14  Q   At a social gathering?

15  A   I might if she looked beautiful.

16  Q   And you'd tell her she looked delicious?

17  A   I don't know about the word delicious.  That's

18       his word, not mine.

19  Q   I'm asking you.

20  A   I would say, You look beautiful.

21  Q   My question to you, sir, is do you think it

22       would be appropriate for you to say to someone

23       like Kimberly Stoyle at a social gathering

24       related to work, You look delicious?

Page 75

| 1 | A | Not for me.  I wouldn't say that. |
|---|---|---|
| 2 | Q | But you think it's okay for Mr. D'Agostino to do |
| 3 | | it? |
| 4 | A | That's up to him.  Whatever he said.  I |
| 5 | | didn't -- I can't -- |
| 6 | Q | My question to you is, sir, is do you have an |
| 7 | | opinion as to whether -- |
| 8 | A | The opinion is, I wouldn't say that. |
| 9 | Q | But do you think it would be appropriate, what's |
| 10 | | your opinion as to whether it would be |
| 11 | | appropriate for Mr. D'Agostino to say it? |
| 12 | A | I wasn't there so I don't know. |
| 13 | Q | Did anyone ever tell you that another female |
| 14 | | employee, a Caroline Fitton had accused |
| 15 | | Mr. D'Agostino of cornering her in the mail room |
| 16 | | and making a pass at her? |
| 17 | A | No. |
| 18 | Q | You never heard that either? |
| 19 | A | Never heard that. |
| 20 | Q | Hmm. |
| 21 | | MR. KESTEN:  Hmm.  Puzzling, isn't it. |
| 22 | Q | Do you know who Caroline Fitton is? |
| 23 | A | No, don't know her at all.  Does she work for |
| 24 | | the town? |

1    Q    Do you know that Mr. D'Agostino has acknowledged

2         that he wrote a note wherein he called Caroline

3         Fitton a blonde bomber, Brit bomber?

4    A    No, don't know anything about it.  Does she work

5         for the town?  Is she a town employee?

6    Q    I'd love to answer your questions.

7    A    I don't know who you're talking about.

8              MR. KESTEN:  She was for two and a half

9         months, worked for the light department.  Brief

10        but memorable career.

11   A    I never met her.  Know nothing about it.

12   Q    Have you ever heard of a woman by the name of

13        Eileen Plante?

14   A    I don't remember.  Don't recall.

15   Q    No?  Have you ever heard that Mr. D'Agostino

16        took Eileen Plante to lunch to discuss getting a

17        job for her in the town?

18   A    I never heard of that.

19   Q    Never heard about that one either?

20   A    First time I heard.

21   Q    If I could just have one minute here.

22             When you were sitting on the Board, did

23        you ever hear any rumors that Mr. D'Agostino

24        wanted the light department to hire Tommy

Page 25

1    of overcharges for health insurance costs?

2  A  Yes, that was discussed.  We discussed -- we

3    discussed many things for the overcharges.

4  Q  Okay.  Do you recall that during your tenure,

5    Miss Stoyle filed a Complaint for sexual

6    harassment?

7  A  The first I saw that was in the paper.

8  Q  Okay.  Prior to the filing of the MCAD

9    Complaint, were you aware that she had made

10    internal complaints of sexual harassment

11    retaliation?

12  A  No.  There was no complaints.  I contacted the

13    chairman of the light department when I first

14    read it, asked him if he got any complaint.  He

15    said no.

16  Q  Let me stop you there.  Who did you contact?

17  A  Mr. Amoruso, which was the sitting chairman of

18    the light department at the time.

19  Q  You mean the Chairman of the Board of Light

20    Commissioners?

21  A  Right.  Board of Light Commissioners.  And he

22    said he got no complaints.  So I said to him,

23    How about past?  He says, No.  Because Mr. Wills

24    was not on the Board now, but Mr. Wills was the

EXHIBIT NO. 4

1

```
                UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS

     C.A. NO. 05-10354 DPW

     KIMBERLY STOYLE,                    )
                 Plaintiff              )
                                        )
           VS.                          )
                                        )
     THE MANSFIELD MUNICIPAL            )
     ELECTRIC DEPARTMENT,               )
     JOHN D'AGOSTINO, TOWN OF           )
     MANSFIELD BOARD OF LIGHT           )
     COMMISSIONERS,                     )
     LOUIS AMORUSO,                     )
     MICHAEL MCCUE,                     )
     DAVID MCCARTER,                    )
     DANIEL DONOVAN,                    )
     ROGER ACHILLE AND                  )
     STEVEN MACCAFFRIE,                 )
                 Defendants             )
```

            DEPOSITION of STEVEN W. MACCAFFRIE,
     called as a witness by and on behalf of the
     Plaintiff, pursuant to the applicable
     provisions of the Federal Rules of Civil
     Procedure, before Teresa E. Costello,
     Certified Realtime Reporter, Registered
     Professional Reporter, Certified Shorthand
     Reporter No. 1452S98, and Notary Public
     within and for the Commonwealth of
     Massachusetts, at the offices of
     McNaught, Cecere & McNaught, 6 Eastman
     Place, Melrose, Massachusetts, on Tuesday,
     August 15th, 2006, commencing at 10:34 a.m.

32

| | | |
|---|---|---|
| 11:09:00 | 1 | was John D'Agostino the town manager? |
| 11:09:02 | 2 | A.  Yes, he was. |
| 11:09:03 | 3 | Q.  Did you know Mr. D'Agostino prior to that |
| 11:09:05 | 4 | time? |
| 11:09:06 | 5 | A.  Other than the fact that he was town |
| 11:09:09 | 6 | manager, personally, no. |
| 11:09:10 | 7 | Q.  Did you ever socialize with him? |
| 11:09:15 | 8 | A.  Not to any extent.  I mean, if we were at a |
| 11:09:21 | 9 | function together or something of that |
| 11:09:22 | 10 | nature, socialize -- I avoid socializing |
| 11:09:25 | 11 | with town government people to the extent |
| 11:09:28 | 12 | that it's necessary. |
| 11:09:33 | 13 | I, personally, think it's |
| 11:09:35 | 14 | inappropriate if you're on the board of |
| 11:09:38 | 15 | selectmen or any other committee. |
| 11:09:39 | 16 | Q.  And as a member of the board of selectmen |
| 11:09:42 | 17 | do you and the board as a whole have the |
| 11:09:47 | 18 | overall responsibility for public funds? |
| 11:09:51 | 19 | A.  Yes, ma'am.  At least we believe we do.  In |
| 11:09:59 | 20 | the final say we have to approve it, I |
| 11:10:01 | 21 | believe, the town. |
| 11:10:04 | 22 | Q.  And do you oversee the town manager? |
| 11:10:08 | 23 | A.  We're supposed to. |
| 11:10:12 | 24 | Q.  Does that not always happen? |

| | | |
|---|---|---|
| 11:15:07 | 1 | was often a difference of opinion between |
| 11:15:11 | 2 | what was represented by Miss Stoyle on |
| 11:15:13 | 3 | financial matters and what was represented |
| 11:15:15 | 4 | on the town side? |
| 11:15:17 | 5 | A.  Yes. |
| 11:15:19 | 6 | Q.  What, specifically, do you recall in that |
| 11:15:24 | 7 | regard? |
| 11:15:24 | 8 | A.  There were a number of issues about the |
| 11:15:26 | 9 | financial transfer of -- because we're all |
| 11:15:33 | 10 | sort of the same, and the money actually |
| 11:15:33 | 11 | comes out of the town back and forth; there |
| 11:15:36 | 12 | was a number of cases whereby there was |
| 11:15:39 | 13 | accusations made by the town that |
| 11:15:41 | 14 | Miss Stoyle's accounting practices were |
| 11:15:44 | 15 | improper. |
| 11:15:45 | 16 | The accountant in charge came back |
| 11:15:48 | 17 | they were proper and the money was actually |
| 11:15:50 | 18 | there and transferred in time.  It was also |
| 11:15:52 | 19 | for a number of years even prior to that |
| 11:15:55 | 20 | that the light department -- and this is |
| 11:15:59 | 21 | from people at town meetings including |
| 11:16:01 | 22 | myself -- that the light department was |
| 11:16:02 | 23 | actually overpaying the town for services |
| 11:16:05 | 24 | rendered.  There was no practical |

38

| | | |
|---|---|---|
| 11:16:07 | 1 | accounting between the two, and we had an |
| 11:16:10 | 2 | issue about that time about how we could |
| 11:16:12 | 3 | take care of that situation, and my first |
| 11:16:15 | 4 | year on the board the idea of lock box came |
| 11:16:18 | 5 | up which means the money goes there; it's |
| 11:16:22 | 6 | counted there and we don't have to worry |
| 11:16:23 | 7 | about -- the bills are taken care of over |
| 11:16:26 | 8 | there. We don't have to worry about what |
| 11:16:28 | 9 | they do in the town treasurer's office, so |
| 11:16:31 | 10 | that's what I kind of remember as far as |
| 11:16:36 | 11 | that portion of it. |
| 11:16:38 | 12 | Q. And -- |
| 11:16:39 | 13 | A. There were also other things about what we |
| 11:16:42 | 14 | could do under Chapter 164, we couldn't do |
| 11:16:45 | 15 | under Chapter 164, issues like that. |
| 11:16:51 | 16 | Q. Do you recall specifically that the lock |
| 11:17:03 | 17 | box issue was first raised in response to |
| 11:17:10 | 18 | MMED's contention that there was an |
| 11:17:14 | 19 | overcharge for treasury services -- |
| | 20 | A. Correct. |
| 11:17:15 | 21 | Q. -- for processing electric bills? |
| 11:17:18 | 22 | A. Correct, correct. I don't know if it was |
| 11:17:22 | 23 | MMED, where it actually came from, but it |
| 11:17:25 | 24 | came across us that there was an issue. |

39

```
11:17:28   1   Q.   Do you recall that Miss Stoyle raised that
11:17:30   2        issue at --
11:17:31   3   A.   Yes.
11:17:31   4   Q.   -- meetings?
11:17:32   5   A.   Yes.
11:17:34   6   Q.   And do you recall the town
11:17:38   7        collector/treasurer acknowledging that it
11:17:42   8        really didn't cost the amount of money that
11:17:45   9        he was charging?
11:17:45  10   A.   Yes.
11:17:46  11   Q.   And do you recall that as a consequence of
11:17:54  12        that revelation that the charge was reduced
11:17:56  13        significantly?
11:17:57  14   A.   Reduced from $172,000 down to about
11:18:06  15        $43,000, if that portion of my memory.  I
11:18:08  16        have a big shotgun down in the truck that
11:18:11  17        would take care of that.
11:18:39  18   Q.   Do you recall -- I'll return to these
11:18:42  19        issues in a moment.
11:18:44  20   A.   Okay.
11:18:44  21   Q.   But do you recall raising, at some point in
11:18:46  22        time during your tenure on the board of
11:18:49  23        light commissioners, that you would like to
11:18:50  24        see a separate manager for the electric
```

52

| | | |
|---|---|---|
| 11:34:20 | 1 | Q. So was it your testimony that Mr. Donovan |
| 11:34:23 | 2 | was not present at the meeting where the |
| 11:34:24 | 3 | complaint was discussed? |
| 11:34:26 | 4 | A. First year he was still on the board. He |
| 11:34:28 | 5 | may have been. He didn't run in 2003. |
| 11:34:43 | 6 | Q. Did you have any reason to disbelieve the |
| 11:34:58 | 7 | allegations made by Miss Stoyle in her |
| 11:35:01 | 8 | complaint filed with the MCAD? |
| 11:35:04 | 9 | A. I neither believed or disbelieved. It's an |
| 11:35:08 | 10 | issue. I saw the complaint when it came |
| 11:35:13 | 11 | in. I wasn't party to it prior to that. |
| 11:35:19 | 12 | Q. You attended board of light commissioner |
| 11:35:29 | 13 | meetings during your tenure, correct? |
| 11:35:31 | 14 | A. I think I missed one. |
| 11:35:33 | 15 | Q. So you're aware then that Miss Stoyle was |
| 11:35:39 | 16 | vocal regarding what she perceived as |
| 11:35:42 | 17 | financial improprieties? |
| 11:35:45 | 18 | A. Absolutely. |
| 11:35:46 | 19 | Q. That included bills for treasury services? |
| 11:35:48 | 20 | A. Correct. |
| 11:35:49 | 21 | Q. Do you recall that that included |
| 11:35:50 | 22 | overcharges for pension costs? |
| 11:35:51 | 23 | A. Correct. |
| 11:35:52 | 24 | Q. Did you concur that they were overcharges |

62

| | | |
|---|---|---|
| 11:48:39 | 1 | A.   I did the math. |
| 11:48:41 | 2 | Q.   Did -- |
| 11:48:43 | 3 | A.   Everybody always used just a salary |
| 11:48:46 | 4 | increase.  I took the multiple over his |
| 11:48:48 | 5 | insurance, his benefits, his health package |
| 11:48:51 | 6 | and everything else, and it wasn't a |
| 11:48:54 | 7 | two-and-a-half or three percent increase. |
| 11:48:57 | 8 | It was a seven-and-a-half percent increase |
| 11:48:59 | 9 | in the end.  I thought that was too much. |
| 11:49:01 | 10 | Q.   Did anybody else agree? |
| 11:49:02 | 11 | A.   No. |
| 11:49:03 | 12 | Q.   Was there any other reason why you had an |
| 11:49:08 | 13 | issue with his contract? |
| 11:49:10 | 14 | A.   The language of the shall. |
| 11:49:15 | 15 | Q.   That we talked about earlier? |
| 11:49:17 | 16 | A.   Ah-hah. |
| 11:49:18 | 17 | Q.   Did you have an issue with renewing his |
| 11:49:20 | 18 | contract pending allegation against him for |
| 11:49:23 | 19 | sexual harassment retaliation? |
| 11:49:24 | 20 | A.   No, ma'am.  Innocent until proven guilty. |
| 11:49:30 | 21 | Q.   Well, why would the board vote to renew his |
| 11:49:40 | 22 | contract eight months in advance? |
| 11:49:45 | 23 | A.   You have to ask the other four members |
| 11:49:48 | 24 | that, but there is a time frame when we |

63

| | | |
|---|---|---|
| 11:49:50 | 1 | have to let him know.  According to the |
| 11:49:54 | 2 | thing we're supposed to do a review in |
| 11:49:59 | 3 | November, and then we have to notify him |
| 11:50:04 | 4 | within six months that he's going to be |
| 11:50:09 | 5 | renewed based on that evaluation, I think |
| 11:50:13 | 6 | it's the way -- when I went on the board, |
| 11:50:16 | 7 | his contract read, and then he has to give |
| 11:50:19 | 8 | us at least eight months notice he's |
| 11:50:22 | 9 | leaving, and if he doesn't do that we don't |
| 11:50:24 | 10 | have to pay him whatever it is in there, |
| 11:50:27 | 11 | whatever the language reads. |
| 11:50:28 | 12 | Q.  Did you have any concerns that there was a |
| 11:50:30 | 13 | vote to renew his contract before his |
| 11:50:33 | 14 | performance evaluation was completed? |
| 11:50:36 | 15 | A.  I believe I mentioned that at one of the |
| 11:50:37 | 16 | meetings. |
| 11:50:39 | 17 | Q.  And what was your concern in that regard? |
| 11:50:42 | 18 | A.  Because his contract says he gets a review |
| 11:50:46 | 19 | before and we did the review. |
| 11:50:49 | 20 | Q.  Do you recall the response of the other |
| 11:50:51 | 21 | members? |
| 11:50:53 | 22 | A.  Not offhand.  I just quoted his contract, |
| 11:50:59 | 23 | and I think I won one for a change. |
| 11:51:12 | 24 | Q.  Do you recall that the town manager |

| | | |
|---|---|---|
| 11:53:11 | 1 | A.   Only to the extent of that item. |
| 11:53:14 | 2 | Q.   Do you recall concerns from Miss Stoyle |
| 11:53:21 | 3 | about improper use by Mr. D'Agostino of his |
| 11:53:27 | 4 | credit card? |
| 11:53:28 | 5 | A.   There was an allegation, yes. |
| 11:53:29 | 6 | Q.   And do you recall -- |
| 11:53:30 | 7 | A.   I don't know who the allegation -- word |
| 11:53:33 | 8 | came from, but there was an allegation, |
| 11:53:34 | 9 | yes. |
| 11:53:34 | 10 | Q.   You were aware of that? |
| 11:53:35 | 11 | A.   Yes. |
| 11:53:36 | 12 | Q.   Did you take any steps to investigate that? |
| 11:53:39 | 13 | A.   It was -- I remember the allegation, but |
| 11:53:45 | 14 | offhand what I looked at I couldn't -- I |
| 11:53:53 | 15 | couldn't really find anything, but then |
| 11:53:56 | 16 | again I'm not an accountant and I would |
| 11:53:59 | 17 | have, you know, not to pull out -- there |
| 11:54:07 | 18 | was no specific.  It was just an |
| 11:54:07 | 19 | allegation. |
| 11:54:07 | 20 | Q.   Who did you hear that from? |
| 11:54:08 | 21 | A.   Concerned citizen. |
| 11:54:11 | 22 | Q.   Do you recall who? |
| 11:54:14 | 23 | A.   Offhand?  No. |
| 11:54:19 | 24 | Q.   Were you concerned that there were |

| | | |
|---|---|---|
| 11:54:42 | 1 | accusations lodged against Miss Stoyle for |
| 11:54:44 | 2 | carrying negative cash balances? |
| 11:54:51 | 3 | A. Yes. |
| 11:54:51 | 4 | Q. And did you take any action to address |
| 11:54:53 | 5 | that? |
| 11:54:54 | 6 | A. Yes. |
| 11:54:57 | 7 | Q. And what action did you take? |
| 11:55:00 | 8 | A. With the negative balance I asked -- I had |
| 11:55:04 | 9 | asked Miss Stoyle to give me a scenario of |
| 11:55:08 | 10 | what happens. She told me how it worked |
| 11:55:11 | 11 | because I'm not -- like I said, I'm not an |
| 11:55:13 | 12 | accountant, how the system works, and it's |
| 11:55:15 | 13 | a case of money withdrawals against |
| 11:55:24 | 14 | balances that go to the town and then when |
| 11:55:24 | 15 | they are supposed to make their withdrawal |
| 11:55:24 | 16 | transaction to make a payment, and the |
| 11:55:28 | 17 | questions I asked were of a timing nature. |
| 11:55:33 | 18 | I mean, you know, when you should |
| 11:55:35 | 19 | have done it, was the balance there? And |
| 11:55:39 | 20 | what I found out was there was, like, a |
| 11:55:41 | 21 | three- or a four-day, what I would say, |
| 11:55:46 | 22 | missing window; is that the light |
| 11:55:51 | 23 | department had until a certain time to put |
| 11:55:55 | 24 | money where it was supposed to be so that |

| | | |
|---|---|---|
| 11:55:57 | 1 | the town could take it.  The town was |
| 11:56:00 | 2 | supposed to be back and forth.  I looked at |
| 11:56:02 | 3 | it from the standpoint of we have to |
| 11:56:05 | 4 | straighten out the accounting and timing, |
| 11:56:07 | 5 | and if there's an issue at least somebody |
| 11:56:10 | 6 | pick up the telephone and say, you know, |
| 11:56:12 | 7 | when are we anticipating when it is? |
| 11:56:16 | 8 | My investigation showed that I |
| 11:56:19 | 9 | think the town made the payment before it |
| 11:56:24 | 10 | should have which would cause a negative |
| 11:56:26 | 11 | cash balance because the balance went to |
| 11:56:29 | 12 | the positive side, and then in the |
| 11:56:31 | 13 | accounting that came out that same year |
| 11:56:33 | 14 | there was a request from the accountant, |
| 11:56:36 | 15 | accounts to up the -- I'm looking at her |
| 11:56:41 | 16 | because I don't know the terminology. |
| 11:56:45 | 17 | MR. KESTEN:  They know.  Trust me. |
| 11:56:49 | 18 | A.   Whatever that account is that they're |
| 11:56:50 | 19 | supposed to hold for reserve. |
| 11:56:52 | 20 | Q.   Okay.  Was this an investigation you did |
| 11:56:56 | 21 | yourself? |
| 11:56:56 | 22 | A.   Just myself. |
| 11:57:01 | 23 | Q.   And you went and talked to Miss Stoyle? |
| 11:57:01 | 24 | A.   I talked to Kim first and then I went over |

| | | |
|---|---|---|
| 11:57:01 | 1 | to the accountant's office and asked him |
| 11:57:03 | 2 | how this whole -- I think I pulled it, if I |
| 11:57:09 | 3 | were a bill and I went from here to here to |
| 11:57:11 | 4 | here to here, how I would get to the end |
| 11:57:13 | 5 | and get paid type of situation, and in that |
| 11:57:15 | 6 | I found that there was a little |
| 11:57:19 | 7 | miscommunication for lack of a better word. |
| 11:57:23 | 8 | Q. Who did you speak with on the town side? |
| 11:57:26 | 9 | A. Richard Boucher. |
| 11:57:27 | 10 | Q. And did you come to learn that Mr. Boucher |
| 11:57:37 | 11 | had the information in his possession to be |
| 11:57:38 | 12 | able to identify that it was, in fact, a |
| 11:57:41 | 13 | timing issue? |
| 11:57:42 | 14 | A. Yes. |
| 11:57:44 | 15 | Q. Did that concern you? |
| 11:57:51 | 16 | A. I made him very aware that I was |
| 11:57:56 | 17 | disappointed, yes. |
| 11:57:57 | 18 | Q. And can you elaborate? Disappointed |
| 11:58:06 | 19 | meaning? |
| 11:58:06 | 20 | A. How would I say it? I was tired of the |
| 11:58:10 | 21 | crap and I can't continue, but again I'm |
| 11:58:16 | 22 | one person. |
| 11:58:17 | 23 | Q. And by tired of the crap do you mean |
| 11:58:22 | 24 | because he knew what the issue was? |

| | | |
|---|---|---|
| 12:01:06 | 1 | though we'd have an independent and a |
| 12:01:09 | 2 | consensus, the board, an independent |
| 12:01:17 | 3 | review. |
| 12:01:18 | 4 | Those were the steps that we took. |
| 12:01:19 | 5 | We hired Mr. Lampke to hold an independent |
| 12:01:23 | 6 | review and he did so. |
| 12:01:25 | 7 | Q. And do you recall that the investigation |
| 12:01:28 | 8 | was completed in or around July of 2003? |
| 12:01:32 | 9 | A. Date I don't know, but I know that we |
| 12:01:36 | 10 | received a report and we took action on it. |
| 12:01:41 | 11 | Q. Did you review the report? |
| 12:01:46 | 12 | A. Cover-to-cover. |
| 12:01:47 | 13 | Q. And do you recall that there was a public |
| 12:01:51 | 14 | statement regarding the board's conclusion? |
| 12:01:55 | 15 | A. Yes, ma'am. |
| 12:01:56 | 16 | Q. Did you concur with the conclusion? |
| 12:02:06 | 17 | A. Was 5-0. The answer is yes. |
| 12:02:14 | 18 | Q. Aside from the public -- |
| 12:02:29 | 19 | A. I think Roger may not have voted because I |
| 12:02:33 | 20 | think he was new to the situation at that |
| 12:02:34 | 21 | time, but whatever it was, in my |
| 12:02:38 | 22 | recollection, was unanimous. |
| 12:02:40 | 23 | Q. Did you feel any pressure to concur with |
| 12:02:44 | 24 | that conclusion? |

| 12:03:56 | 1 | | doing anything because of sexual harassment |
| 12:03:59 | 2 | | complaint. |
| 12:04:01 | 3 | Q. | During the course of the investigation or |
| 12:04:05 | 4 | | in the review of the investigation did you |
| 12:04:08 | 5 | | come to learn that Mr. D'Agostino had sent |
| 12:04:12 | 6 | | Miss Stoyle an e-mail of a sexual nature? |
| 12:04:23 | 7 | A. | The way the question is phrased, the answer |
| 12:04:27 | 8 | | is yes. |
| 12:04:28 | 9 | Q. | Do you know that Mr. D'Agostino admitted |
| 12:04:34 | 10 | | sending Miss Stoyle an e-mail concerning -- |
| 12:04:43 | 11 | | strike the question.  Do you recall the |
| 12:04:46 | 12 | | e-mail, the nature of e-mail? |
| 12:04:49 | 13 | A. | The nature of the e-mail, yes. |
| 12:04:50 | 14 | Q. | What was the nature of the e-mail? |
| 12:04:51 | 15 | A. | I don't know.  Something about a tube and a |
| 12:04:54 | 16 | | gerbil and gay guys or something. |
| 12:04:56 | 17 | Q. | Did you ever hear the e-mail? |
| 12:04:58 | 18 | A. | No, I did not. |
| 12:04:59 | 19 | Q. | Did you ever read the text of the e-mail? |
| 12:05:03 | 20 | A. | Part of it. |
| 12:05:03 | 21 | Q. | Do you recall that it involved a gerbil in |
| 12:05:09 | 22 | | someone's rectum? |
| 12:05:11 | 23 | A. | Yes, I've seen it.  I've seen it.  It's |
| 12:05:14 | 24 | | been around. |

| | | |
|---|---|---|
| 12:06:28 | 1 | A. When I say it to my wife, I think she looks |
| 12:06:31 | 2 | very good and I'm proud of her, in that |
| 12:06:37 | 3 | context. |
| 12:06:37 | 4 | Q. Would you say it to anybody? |
| 12:06:39 | 5 | A. No. |
| 12:06:40 | 6 | Q. Why not? |
| 12:06:43 | 7 | A. It's an inappropriate comment. |
| 12:06:45 | 8 | Q. Would you say it to your female colleagues |
| 12:06:47 | 9 | at work? |
| 12:06:49 | 10 | A. I work in construction, so it's a little |
| 12:06:52 | 11 | different. |
| 12:06:55 | 12 | Q. Why do you think it's inappropriate?  Why |
| 12:06:58 | 13 | do you think it's inappropriate to say to |
| 12:07:01 | 14 | someone that you don't know? |
| 12:07:02 | 15 | A. That I don't know or I'm not -- I'm not |
| 12:07:04 | 16 | that comfortable around per se.  Just it's |
| 12:07:07 | 17 | not -- it's just not right and delicious |
| 12:07:09 | 18 | has a dozen different connotations and it's |
| 12:07:13 | 19 | just not appropriate. |
| 12:07:14 | 20 | Q. And one of those connotations is sexual? |
| 12:07:16 | 21 | A. Yes. |
| 12:07:17 | 22 | Q. Do you think it's an appropriate comment |
| 12:07:25 | 23 | for the town manager to make to the chief |
| 12:07:28 | 24 | financial officer of the electric |

| | | |
|---|---|---|
| 12:17:13 | 1 | anybody's veracity as being better than |
| 12:17:16 | 2 | somebody elses or less than somebody elses. |
| 12:17:18 | 3 | I apologize for that, but I try to be as |
| 12:17:20 | 4 | fair as possible. |
| 12:17:21 | 5 | Q. Do you recall whether the investigation |
| 12:17:29 | 6 | concluded that that statement was never |
| 12:17:30 | 7 | made? |
| 12:17:31 | 8 | A. I honestly don't remember. |
| 12:17:33 | 9 | Q. Do you think that Miss Stoyle had any |
| 12:17:43 | 10 | motive to fabricate the allegations set |
| 12:17:46 | 11 | forth in the MCAD complaint? |
| 12:17:49 | 12 | A. I don't doubt her veracity one way or the |
| 12:17:55 | 13 | other. Like I said, I -- |
| 12:17:59 | 14 | Q. Okay. Is it fair to say that the |
| 12:18:02 | 15 | investigation reported facts solicited from |
| 12:18:10 | 16 | various witnesses? |
| 12:18:12 | 17 | A. That's correct. |
| 12:18:13 | 18 | Q. And that the ultimate investigative |
| 12:18:16 | 19 | conclusion was left to the board? |
| 12:18:17 | 20 | A. That is correct. |
| 12:18:19 | 21 | Q. Now do you recall in August of 2003 |
| 12:18:42 | 22 | receiving notice that there was ongoing |
| 12:18:46 | 23 | harassment retaliation involving |
| 12:18:48 | 24 | Miss Stoyle? |

84

| | | |
|---|---|---|
| 12:18:49 | 1 | A. Yes, ma'am. |
| 12:18:50 | 2 | Q. Do you recall receiving a memo in that |
| 12:18:52 | 3 | regard? |
| 12:18:52 | 4 | A. Yes, ma'am. |
| 12:18:54 | 5 | Q. At that time were you the chair? |
| 12:19:12 | 6 | A. I think I was the -- 2004 I think I was the |
| 12:19:17 | 7 | chair of the light department. I was vice |
| 12:19:19 | 8 | chair of the board of selectmen, I think. |
| 12:19:24 | 9 | Q. And the memo was forwarded to you as |
| 12:19:38 | 10 | chairman? Strike that. I want to show you |
| 12:19:41 | 11 | what's been marked as Exhibit Number 2 at |
| 12:19:43 | 12 | the deposition of Lou Amoruso and ask you |
| 12:19:45 | 13 | if you recall that as the memorandum you |
| 12:19:47 | 14 | received regarding ongoing harassment and |
| 12:19:50 | 15 | retaliation? |
| 12:19:53 | 16 | A. Yes. |
| 12:19:53 | 17 | MS. LEONARD: Off the record. |
| 12:19:54 | 18 | (Discussion off the record.) |
| 12:20:08 | 19 | Q. And do you see there that you're referred |
| 12:20:14 | 20 | to as the chairman? |
| 12:20:15 | 21 | A. That's correct. |
| 12:20:17 | 22 | Q. Does that refresh your recollection that |
| 12:20:21 | 23 | you were, in fact, the chairman? |
| 12:20:22 | 24 | A. Yes, ma'am. |

| | | |
|---|---|---|
| 12:22:25 | 1 | Q. Let me stop you there.  Is this what you |
| 12:22:27 | 2 | discussed with Miss Stoyle? |
| 12:22:29 | 3 | A. Yes, and then again the cash -- the issue |
| 12:22:35 | 4 | and the question of cash balances, again, I |
| 12:22:38 | 5 | just -- that's when I tried to figure out |
| 12:22:40 | 6 | how things were going.  That was some of |
| 12:22:42 | 7 | the questions I asked.  I also asked her at |
| 12:22:46 | 8 | that time whether or not we were squared |
| 12:22:48 | 9 | away on funds and pension things. |
| 12:22:51 | 10 | Individual items in here, I don't |
| 12:22:53 | 11 | think I pulled out to ask about.  We did |
| 12:22:56 | 12 | turn the letter over to town counsel for |
| 12:22:58 | 13 | response. |
| 12:22:59 | 14 | Q. Other than this conversation -- strike |
| 12:23:04 | 15 | that.  How long was the conversation? |
| 12:23:06 | 16 | A. Five minutes, ten minutes. |
| 12:23:08 | 17 | Q. Other than the five- to ten-minute |
| 12:23:12 | 18 | conversation that you recall with |
| 12:23:13 | 19 | Miss Stoyle regarding allegations set forth |
| 12:23:15 | 20 | in the August 13th, 2003 memo, did you, |
| 12:23:19 | 21 | yourself, take any steps to investigate |
| 12:23:21 | 22 | these concerns? |
| 12:23:23 | 23 | A. Once it became a legal matter, it's not |
| 12:23:27 | 24 | mine to investigate individually.  I did |

| | | |
|---|---|---|
| 12:23:32 | 1 | caution the rest of my board to please |
| 12:23:34 | 2 | make sure that -- I'm not on good footing |
| 12:23:39 | 3 | with Mr. D'Agostino.  My contact with |
| 12:23:43 | 4 | Mr. D'Agostino, in general, of nature is |
| 12:23:46 | 5 | that it might be controversial.  I usually |
| 12:23:50 | 6 | use Lou Amoruso or Mike McCue and my |
| 12:23:53 | 7 | statement at that time would have been -- |
| 12:23:56 | 8 | it appears as though there is an issue |
| 12:23:58 | 9 | here. |
| 12:23:58 | 10 | Would you please tell |
| 12:24:00 | 11 | Mr. D'Agostino it would be in the best |
| 12:24:02 | 12 | interest of the town to watch what he has |
| 12:24:03 | 13 | to say including Mr. Donovan and the rest |
| 12:24:06 | 14 | of the board. |
| 12:24:07 | 15 | Q.  So is it your testimony that this |
| 12:24:10 | 16 | memorandum was forwarded to the town |
| 12:24:12 | 17 | counsel? |
| 12:24:13 | 18 | A.  Correct. |
| 12:24:14 | 19 | Q.  And that it was left to the town counsel to |
| 12:24:18 | 20 | handle? |
| 12:24:18 | 21 | A.  To respond to, yes. |
| 12:24:20 | 22 | Q.  And that other than what you've just |
| 12:24:23 | 23 | described, there was no action taken on the |
| 12:24:27 | 24 | part of the board? |

| | | |
|---|---|---|
| 12:24:28 | 1 | A. To the best of my knowledge there was not. |
| 12:24:30 | 2 | Q. So no other individual member of the board |
| 12:24:33 | 3 | undertook an investigation? |
| 12:24:34 | 4 | A. I can't speak for the other members of the |
| 12:24:36 | 5 | board. |
| 12:24:36 | 6 | Q. Why were you not on good standing with the |
| 12:24:40 | 7 | town manager at that time? |
| 12:24:42 | 8 | A. We have a difference of opinion of how to |
| 12:24:46 | 9 | proceed with personnel matters and personal |
| 12:24:49 | 10 | matters. |
| 12:24:54 | 11 | Q. And were those personnel matters regarding |
| 12:24:59 | 12 | Miss Stoyle and Mr. Beliveau? |
| 12:25:03 | 13 | A. Probably almost every department had one |
| 12:25:07 | 14 | way or the other. |
| 12:25:07 | 15 | Q. And what was the difference of opinion on |
| 12:25:10 | 16 | personnel matters? |
| 12:25:13 | 17 | A. Issues as to whether or not we were |
| 12:25:18 | 18 | tracking time properly, whether or not he |
| 12:25:24 | 19 | had an attempt to use the authority of the |
| 12:25:30 | 20 | positions to make himself in better |
| 12:25:42 | 21 | standing. |
| 12:25:42 | 22 | Q. What do you mean by that? |
| 12:25:44 | 23 | A. I had an opinion that it was a power |
| 12:25:45 | 24 | control issue, you know, and -- |

90

| | | |
|---|---|---|
| 12:25:53 | 1 | Q. Power control issue between whom? |
| 12:25:55 | 2 | A. Well, I think if you look at it from the |
| 12:25:57 | 3 | whole, we had a period of time where it was |
| 12:26:01 | 4 | this group against this group, and he had |
| 12:26:08 | 5 | direct control over this group, but had |
| 12:26:10 | 6 | lost control of this group. |
| 12:26:12 | 7 | They didn't fit under the umbrella |
| 12:26:14 | 8 | of how he wanted to do things. |
| 12:26:15 | 9 | Q. When you say this group and this group, you |
| 12:26:17 | 10 | mean department heads? |
| 12:26:18 | 11 | A. MMED, I guess Town of Mansfield. |
| 12:26:20 | 12 | Q. So he didn't -- he thought that they didn't |
| 12:26:25 | 13 | want to do things the way he wanted to do |
| 12:26:27 | 14 | them? |
| 12:26:27 | 15 | A. Right or wrong, yes. |
| 12:26:30 | 16 | Q. Say that again. |
| 12:26:32 | 17 | A. Right or wrong, yes. |
| 12:26:35 | 18 | Q. And did that include his -- did that |
| 12:26:44 | 19 | include budgeting issues? |
| 12:26:48 | 20 | A. I don't think he got stuck with that as |
| 12:26:55 | 21 | much once we went to the fixed PILOT. The |
| 12:27:00 | 22 | only issue became after the fixed PILOT |
| 12:27:03 | 23 | was, was the accounting within each |
| 12:27:07 | 24 | individual item accounted for correctly? |

| | | |
|---|---|---|
| 12:27:11 | 1 | Q. When you say right or wrong? |
| 12:27:15 | 2 | A. Well, I can't determine whether these |
| 12:27:17 | 3 | people are always right and these people |
| 12:27:19 | 4 | are always wrong or these people are always |
| 12:27:21 | 5 | wrong and these people are always right, so |
| 12:27:23 | 6 | the right or wrong thing was he wanted to |
| 12:27:26 | 7 | bring certain things over to this side and |
| 12:27:29 | 8 | have them uniform while this department |
| 12:27:33 | 9 | over here was saying, no, they should |
| 12:27:35 | 10 | remain this way and I -- |
| 12:27:37 | 11 | Q. What department are you referring to?  Any |
| 12:27:39 | 12 | particular -- |
| 12:27:40 | 13 | A. MMED and Town of Mansfield collectively |
| 12:27:44 | 14 | being two separate entities. |
| 12:27:47 | 15 | Mr. D'Agostino wanted to bring all the |
| 12:27:48 | 16 | accounting control over to the town side. |
| 12:27:56 | 17 | Q. Did you agree with that? |
| 12:27:57 | 18 | A. Which it has its -- money wise and |
| 12:28:03 | 19 | personnel wise it has its advantages; |
| 12:28:07 | 20 | however, from a separation of two, what I |
| 12:28:11 | 21 | would call, two distinct accounting type of |
| 12:28:15 | 22 | units, it has its advantages being the |
| 12:28:22 | 23 | other way.  Since one isn't done over the |
| 12:28:25 | 24 | other one, at this point in time I can't |

114

| | | |
|---|---|---|
| 01:10:22 | 1 | A. I don't know. |
| 01:10:23 | 2 | Q. Were they prior to the firing of |
| 01:10:25 | 3 | Jack Beliveau? |
| 01:10:27 | 4 | A. I don't believe so. I think this was all |
| 01:10:30 | 5 | afterwards. |
| 01:10:30 | 6 | Q. Do you recall complaints from Kimberly |
| 01:10:41 | 7 | Stoyle after Doctor Beliveau was terminated |
| 01:10:46 | 8 | that her job duties had been diminished? |
| 01:10:51 | 9 | A. There was some conversation and I don't |
| 01:11:07 | 10 | remember whether it was my conversations |
| 01:11:10 | 11 | with Miss Stoyle or conversations with |
| 01:11:15 | 12 | Mr. Babin and John D'Agostino where I heard |
| 01:11:19 | 13 | it, but there was an accusation that her |
| 01:11:24 | 14 | job description was diminished. |
| 01:11:28 | 15 | I believe I was chairman of the |
| 01:11:29 | 16 | board of selectmen at that point in time |
| 01:11:32 | 17 | and just a member of the light commission. |
| 01:11:34 | 18 | I don't think I was chairman of the light |
| 01:11:36 | 19 | commission at that time. |
| 01:11:36 | 20 | Q. Did you make any observations at board of |
| 01:11:39 | 21 | light commissioners' meetings that her role |
| 01:11:41 | 22 | had been diminished? |
| 01:11:45 | 23 | A. Other than -- and I think I had a |
| 01:11:55 | 24 | discussion -- other than the fact that she |

|  |  |
|---|---|
| 01:11:57 1 | felt uncomfortable because Mr. D'Agostino |
| 01:12:00 2 | was on the side and she was on that side. |
| 01:12:04 3 | Mr. Babin did take an overall, more active |
| 01:12:09 4 | role in a full participation to issues that |
| 01:12:14 5 | Miss Stoyle normally took care of other |
| 01:12:18 6 | than just a quick financial report. |
| 01:12:21 7 | Kim was always had another wealth |
| 01:12:23 8 | of information about other things that were |
| 01:12:25 9 | going on and other issues. |
| 01:12:27 10 | Q.  After Doctor Beliveau was fired did |
| 01:12:35 11 | Miss Stoyle have a role in reporting on any |
| 01:12:35 12 | issues at the board of light commissioners' |
| 01:12:38 13 | meeting? |
| 01:12:38 14 | A.  To the best of my recollection she still |
| 01:12:40 15 | did the cost reporting and the budget |
| 01:12:43 16 | reporting.  I mean, I've always -- in all |
| 01:12:50 17 | honestly I've always had the highest regard |
| 01:12:53 18 | for Miss Stoyle and her ability to make |
| 01:12:56 19 | presentations at least the point in time |
| 01:12:58 20 | that I was on the board so. |
| 01:12:58 21 | Q.  Do you recall that the report -- strike |
| 01:13:01 22 | that.  Do you recall that she would |
| 01:13:06 23 | routinely submit a report for the |
| 01:13:08 24 | commissioners to review?  A written report? |

| 01:13:13 | 1 | A. | At our -- |
| 01:13:14 | 2 | Q. | The board of light commissioners' meetings? |
| 01:13:19 | 3 | A. | She always had.  All three years I was on |
| 01:13:25 | 4 | | the board she always had a booklet and a |
| 01:13:27 | 5 | | report.  We just changed the format a |
| 01:13:29 | 6 | | little bit on it.  We didn't change it, it |
| 01:13:31 | 7 | | was just a different presentation. |
| 01:13:32 | 8 | Q. | So after Mr. Babin came on board, do you |
| 01:13:36 | 9 | | recall that the report was reduced? |
| 01:13:39 | 10 | A. | There was -- yes, there was a period of |
| 01:13:47 | 11 | | time where it was reduced. |
| 01:13:49 | 12 | Q. | Do you recall that after Mr. Babin came on |
| 01:13:51 | 13 | | board that she was now seated in the |
| 01:13:57 | 14 | | audience? |
| 01:13:58 | 15 | A. | Yes. |
| 01:14:02 | 16 | Q. | Did you take any steps to investigate the |
| 01:14:07 | 17 | | complaints that her job duties had been |
| 01:14:10 | 18 | | diminished? |
| 01:14:12 | 19 | A. | We were informed that she was still |
| 01:14:14 | 20 | | performing the same work. |
| 01:14:15 | 21 | Q. | By whom? |
| 01:14:16 | 22 | A. | Mr. Babin. |
| 01:14:20 | 23 | Q. | And did you rely on his representations? |
| 01:14:24 | 24 | A. | Yes. |

|  | 1 | CROSS-EXAMINATION |
| 01:26:26 | 2 | BY MS. GRIFFIN: |
| 01:26:28 | 3 | Q. Mr. MacCaffrie, my name is Christine |
| 01:26:31 | 4 | Griffen. I represent Jack Beliveau. As we |
| 01:26:34 | 5 | probably should have made clear earlier, |
| 01:26:36 | 6 | Kim Stoyle's case and Jack Beliveau's case |
| 01:26:39 | 7 | has been combined by the court at least for |
| 01:26:41 | 8 | present purposes. |
| 01:26:41 | 9 | A. Okay. |
| 01:26:42 | 10 | Q. So we're doing all of this at once so you |
| 01:26:44 | 11 | don't have to come back twice. |
| 01:26:46 | 12 | A. Works for me. |
| 01:26:48 | 13 | Q. I take it from the comments that you've |
| 01:26:51 | 14 | made today that you actually enjoyed |
| 01:26:54 | 15 | working with Kim and with Jack Beliveau |
| 01:26:55 | 16 | when you worked in the city, is that |
| 01:26:56 | 17 | correct? |
| 01:26:56 | 18 | A. Yes. |
| 01:26:57 | 19 | MR. KESTEN: Town. |
| 01:26:58 | 20 | Q. Sorry, the town. You found them to be |
| 01:27:00 | 21 | responsible, is that correct? |
| 01:27:02 | 22 | A. All the dealings that they had with me, |
|  | 23 | yes. |
| 01:27:04 | 24 | Q. Accurate? |

EXHIBIT NO. 5

1

1                 UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF MASSACHUSETTS

3        C.A. NO. 05-10354 DPW

4        KIMBERLY STOYLE,                )
                   Plaintiff            )
5                                        )
              vs.                        )
6                                        )
         THE MANSFIELD MUNICIPAL         )
7        ELECTRIC DEPARTMENT,            )
         JOHN D'AGOSTINO, TOWN OF        )
8        MANSFIELD BOARD OF LIGHT        )
         COMMISSIONERS,                  )
9        LOUIS AMORUSO,                  )
         MICHAEL MCCUE,                  )
10       DAVID MCCARTER,                 )
         DANIEL DONOVAN,                 )
11       ROGER ACHILLE AND               )
         STEVEN MACCAFFRIE,              )
12                 Defendants            )

13            DEPOSITION of LOUIS AMORUSO,

14       called as a witness by and on behalf of the

15       Plaintiff, pursuant to the applicable

16       provisions of the Federal Rules of Civil

17       Procedure, before Teresa E. Costello,

18       Registered Professional Reporter, Certified

19       Shorthand Reporter No. 145 2S98, and Notary

20       Public within and for the Commonwealth of

21       Massachusetts, at the offices of

22       McNaught, Cecere & McNaught, 6 Eastman

23       Place, Melrose, Massachusetts, on Tuesday,

24       January 31, 2006, commencing at 10:45 a.m.

COSTELLO COURT REPORTING

21

| | | |
|---|---|---|
| 11:01:07 | 1 | director versus manager, but he is -- the |
| 11:01:10 | 2 | town manager serves as the top person in |
| 11:01:13 | 3 | that department. |
| 11:01:13 | 4 | Q. The top person? |
| 11:01:14 | 5 | A. Yes. |
| 11:01:15 | 6 | Q. Who is the town manager? |
| 11:01:17 | 7 | A. John D'Agostino. |
| 11:01:17 | 8 | Q. Has he also been the town manager since |
| 11:01:20 | 9 | you've been a selectman? |
| 11:01:22 | 10 | A. Yes. |
| 11:01:24 | 11 | Q. And he's the highest level of management in |
| 11:01:30 | 12 | the Light Department, is that correct? |
| 11:01:32 | 13 | A. Correct. |
| 11:01:33 | 14 | Q. Do you supervise him? |
| 11:01:35 | 15 | A. Yes, as a board, as a member of the board. |
| 11:01:39 | 16 | Q. And do you know what his duties and |
| 11:01:46 | 17 | responsibilities are? |
| 11:01:46 | 18 | A. We think we do. |
| 11:01:48 | 19 | Q. Are you responsible for ensuring that |
| 11:01:53 | 20 | Mr. D'Agostino fulfills his duties and |
| 11:01:57 | 21 | responsibilities as both town manager and |
| 11:01:59 | 22 | the manager of the Light Department? |
| 11:02:01 | 23 | A. The board is, yes. |
| 11:02:02 | 24 | Q. And what steps do you take to ensure that |

COSTELLO COURT REPORTING

22

| | | |
|---|---|---|
| 11:02:08 | 1 | he's fulfilling his duties and |
| 11:02:12 | 2 | responsibilities as you know them? |
| 11:02:13 | 3 | A. We talk with him on a regular basis. We |
| 11:02:16 | 4 | receive reports at open meetings, and we |
| 11:02:21 | 5 | make our own observations. |
| 11:02:24 | 6 | Q. Are the duties and responsibilities of the |
| 11:02:34 | 7 | town manager also set forth in the chart? |
| 11:02:37 | 8 | A. Yes. |
| 11:02:38 | 9 | Q. And you've reviewed those? |
| 11:02:40 | 10 | A. Yes. |
| 11:02:41 | 11 | Q. And do you know if they're also part of the |
| 11:02:47 | 12 | chapter of the general laws that govern |
| 11:02:49 | 13 | municipal electric departments? |
| 11:02:53 | 14 | A. I'm not following. |
| 11:02:54 | 15 | Q. That was poorly worded. Do you know if |
| 11:03:00 | 16 | there are any other duties and |
| 11:03:05 | 17 | responsibilities other than those set forth |
| 11:03:09 | 18 | in the town charter for the manager of the |
| 11:03:12 | 19 | Light Department? |
| 11:03:14 | 20 | A. There are state regulations that deal with |
| 11:03:18 | 21 | that. |
| 11:03:20 | 22 | Q. Is that the chapter of the general laws |
| 11:03:33 | 23 | that you referred to earlier or is that |
| 11:03:36 | 24 | some other regulation? |

COSTELLO COURT REPORTING

23

| | | |
|---|---|---|
| 11:03:37 | 1 | A.   I couldn't tell you off the top of my head. |
| 11:03:39 | 2 | Q.   Did you ever review it? |
| 11:03:40 | 3 | A.   I have not reviewed it specifically |
| 11:03:43 | 4 | although I've come across it peripherally |
| 11:03:48 | 5 | in the reading on the board requirements. |
| 11:03:52 | 6 | Q.   Were you on the board at the time that |
| 11:04:02 | 7 | Mr. D'Agostino was hired? |
| 11:04:04 | 8 | A.   No. |
| 11:04:04 | 9 | Q.   Do you know when he was hired? |
| 11:04:08 | 10 | A.   Not specific date, no. |
| 11:04:11 | 11 | Q.   Do you know how long he had been the town |
| 11:04:13 | 12 | manager at the time you -- |
| 11:04:15 | 13 | A.   About two years, I believe.  I'm not sure |
| 11:04:18 | 14 | exactly. |
| 11:04:18 | 15 | Q.   And at the time he was hired as town |
| 11:04:23 | 16 | manager was he also made the manager of the |
| 11:04:26 | 17 | light department? |
| 11:04:28 | 18 | A.   I don't believe so.  I don't know.  I |
| 11:04:32 | 19 | wasn't on the board, so I couldn't tell |
| 11:04:34 | 20 | you. |
| 11:04:34 | 21 | Q.   Has the town manager always been the |
| 11:04:36 | 22 | manager of the light department to your |
| 11:04:38 | 23 | knowledge? |
| 11:04:38 | 24 | A.   No.  He is not. |

COSTELLO COURT REPORTING

46

| | | |
|---|---|---|
| 11:31:51 | 1 | Q. But you remembered it was raised on more |
| 11:31:53 | 2 | than one occasion? |
| 11:31:54 | 3 | A. I remember it was raised on more than one |
| 11:31:55 | 4 | occasion, yes. |
| 11:31:55 | 5 | Q. Was it raised on more than two occasions? |
| 11:31:58 | 6 | A. I'm sure it was. Once it was raised, it |
| 11:32:00 | 7 | was discussed for a while. It kind of died |
| 11:32:02 | 8 | down, and then it sprang back up again. |
| 11:32:04 | 9 | Whether it was a year later or six or seven |
| 11:32:07 | 10 | months later, some time period after it |
| 11:32:09 | 11 | came back up again and was again discussed |
| 11:32:11 | 12 | and looked at. |
| 11:32:12 | 13 | Q. Was it ever resolved? |
| 11:32:15 | 14 | A. Well, depends on who you talk to. |
| 11:32:18 | 15 | Q. In your opinion -- |
| 11:32:20 | 16 | A. It was resolved to our satisfaction. |
| 11:32:22 | 17 | Q. What was done to resolve it? |
| 11:32:23 | 18 | A. The charges that were made against the |
| 11:32:27 | 19 | Electric Light Department were |
| 11:32:28 | 20 | significantly reduced, and it was |
| 11:32:32 | 21 | determined that the treasurer's office |
| 11:32:34 | 22 | would continue to do that work. There was |
| 11:32:39 | 23 | a possibility of using a lock box system in |
| 11:32:42 | 24 | a private bank or in a bank, I'll use that |

COSTELLO COURT REPORTING

47

| | | |
|---|---|---|
| 11:32:48 | 1 | term, but it was decided that the town |
| 11:32:52 | 2 | would continue to provide those services. |
| 11:32:54 | 3 | Q. When you say the charges were reduced, was |
| 11:32:57 | 4 | that as a result of a determination that |
| 11:32:59 | 5 | they were inflated? |
| 11:33:02 | 6 | A. Yes. |
| 11:33:03 | 7 | Q. How did you come to that determination? |
| 11:33:06 | 8 | A. Basically after a good deal of pressure was |
| 11:33:11 | 9 | brought on a lot of people to rethink, to |
| 11:33:14 | 10 | re-look at what actually was being |
| 11:33:17 | 11 | expended, it was agreed by the treasurer's |
| 11:33:19 | 12 | office that the charges were significantly |
| 11:33:21 | 13 | higher than they should have been. |
| 11:33:23 | 14 | Q. So the treasury admitted it? |
| 11:33:26 | 15 | A. Yes, it's my understanding. |
| 11:33:28 | 16 | Q. What was the pressure that you -- |
| 11:33:32 | 17 | A. Trying to get it -- it was put on by a |
| 11:33:33 | 18 | number of people, but by the board, among |
| 11:33:36 | 19 | others, to get it resolved and to come up |
| 11:33:38 | 20 | with a reasonable and rational solution. |
| 11:33:40 | 21 | Q. Do you recall how much the charges were |
| 11:33:44 | 22 | reduced by? |
| 11:33:45 | 23 | A. Pretty significantly.  I don't know the |
| 11:33:47 | 24 | exact number.  It was pretty significant. |

COSTELLO COURT REPORTING

70

| | | |
|---|---|---|
| 11:59:48 | 1 | disagreement. |
| 11:59:48 | 2 | Q. That would be on tape then? |
| 11:59:51 | 3 | A. That would be on tape. |
| 11:59:52 | 4 | Q. And do you recall what the nature of the |
| 11:59:56 | 5 | performance issue was? |
| 11:59:59 | 6 | A. That -- |
| 12:00:00 | 7 | Q. Or the concern raised by Miss Stoyle? |
| 12:00:03 | 8 | A. I think we already talked about one of |
| 12:00:06 | 9 | them. |
| 12:00:06 | 10 | Q. That was the treasury service? |
| 12:00:07 | 11 | A. Treasury services. There was a question I |
| 12:00:09 | 12 | started to talk about that you didn't want |
| 12:00:11 | 13 | to hear about about the posting of amounts |
| 12:00:15 | 14 | and how that accounting occurred. |
| 12:00:22 | 15 | Q. Did you take any steps to investigate those |
| 12:00:25 | 16 | concerns? |
| 12:00:27 | 17 | A. We asked for a full explanation of what was |
| 12:00:33 | 18 | being said and how the numbers related to |
| 12:00:38 | 19 | what the verbal discussion was about, |
| 12:00:40 | 20 | things not being appropriately handled. |
| 12:00:42 | 21 | Q. Explanation from the -- |
| 12:00:44 | 22 | A. We asked for an explanation which involved |
| 12:00:46 | 23 | the town accountant reviewing both what was |
| 12:00:50 | 24 | provided by the Electric Light Department |

| 12:44:56 | 1 | | inserting something anally.  In this case |
| 12:44:59 | 2 | | it was a live animal. |
| 12:45:00 | 3 | Q. | Okay.  Did you view that as sexual |
| 12:45:03 | 4 | | harassment? |
| 12:45:04 | 5 | A. | No.  I just plain thought it was very |
| 12:45:09 | 6 | | crude. |
| 12:45:09 | 7 | Q. | Did you think it was offensive? |
| 12:45:10 | 8 | A. | Yes. |
| 12:45:11 | 9 | Q. | So you're telling me you didn't consider |
| 12:45:21 | 10 | | that to be sexual in nature?  Is that your |
| 12:45:24 | 11 | | testimony? |
| 12:45:24 | 12 | A. | I'm saying that it doesn't strike me as |
| 12:45:27 | 13 | | sexual as much as it struck me as crude. |
| 12:45:34 | 14 | Q. | Anything else?  Strike that.  Had |
| 12:45:37 | 15 | | Mr. Beliveau told you that Miss Stoyle had |
| 12:45:40 | 16 | | complained to him about this e-mail? |
| 12:45:41 | 17 | A. | He did then, yes. |
| 12:45:43 | 18 | Q. | Did he substantiate that it, in fact, had |
| 12:45:52 | 19 | | come to her? |
| 12:45:52 | 20 | A. | He told me that's how he got a copy of it. |
| 12:45:55 | 21 | Q. | Did that add to the hostile work |
| 12:46:00 | 22 | | environment that you'd been informed of up |
| 12:46:02 | 23 | | to that time? |
| 12:46:03 | 24 | A. | That's what he indicated, yes. |

COSTELLO COURT REPORTING

118

| | | |
|---|---|---|
| 12:57:03 | 1 | concerns come to your attention regarding |
| 12:57:06 | 2 | sexual harassment and retaliation against |
| 12:57:09 | 3 | Miss Stoyle? |
| 12:57:10 | 4 | A. I believe I received something complaining |
| 12:57:14 | 5 | about that things had still not gotten |
| 12:57:18 | 6 | better. |
| 12:57:20 | 7 | Q. And I'm showing you a memorandum from |
| 12:57:29 | 8 | Mr. Beliveau to then chairman of the light |
| 12:57:40 | 9 | commission, Steve MacCaffrie, and ask you |
| 12:57:42 | 10 | if you've ever had an opportunity to review |
| 12:57:45 | 11 | that. |
| 12:59:28 | 12 | A. Okay, I believe I did see that. |
| 12:59:30 | 13 | Q. So it's fair to say that as of August 13, |
| 12:59:42 | 14 | 2003, you were put on notice of allegations |
| 12:59:44 | 15 | of continuing sexual harassment and |
| 12:59:46 | 16 | discrimination? |
| 12:59:47 | 17 | A. The board was so notified, yes. |
| 12:59:48 | 18 | Q. Did you -- as a member of the board you |
| 12:59:50 | 19 | were notified? |
| 12:59:51 | 20 | A. Yes. |
| 12:59:51 | 21 | Q. As a result of receiving this memorandum |
| 12:59:53 | 22 | did you take any action, or did the board |
| 12:59:57 | 23 | take any action? |
| 12:59:58 | 24 | A. The chairman said that he would investigate |

COSTELLO COURT REPORTING

| | | |
|---|---|---|
| 01:00:57 | 1 | A. You'd have to talk to Mr. MacCaffrie about |
| 01:01:01 | 2 | how he might have talked to Mr. Lampke. I |
| 01:01:05 | 3 | don't know. |
| 01:01:05 | 4 | Q. You've reviewed this document dated |
| 01:01:09 | 5 | August 13, 2003? |
| 01:01:11 | 6 | A. Yes, August 26, 2003. |
| 01:01:13 | 7 | Q. August 26? |
| 01:01:14 | 8 | A. The memo is 26, but the other memo says |
| 01:01:20 | 9 | August 13th, yes. |
| 01:01:21 | 10 | Q. If found to be true, do you believe that |
| 01:01:24 | 11 | the incident set forth in this document |
| 01:01:27 | 12 | added to the hostile environment at the |
| 01:01:31 | 13 | Electric Department? |
| 01:01:32 | 14 | MR. SKRIP: Objection. |
| 01:01:35 | 15 | THE WITNESS: Can you repeat that? |
| 01:01:36 | 16 | Can you read that back, please? |
| | 17 | (Last question read back |
| 01:01:51 | 18 | by the court reporter.) |
| 01:01:51 | 19 | A. If what found it to be true? |
| 01:01:54 | 20 | Q. If the incident set forth in this document? |
| 01:01:57 | 21 | MR. SKRIP: If you can answer |
| 01:01:58 | 22 | that, go ahead. |
| 01:02:00 | 23 | A. I'm not exactly sure how to answer it |
| 01:02:02 | 24 | because there's Kimberly's, Kimberly's, |

COSTELLO COURT REPORTING

121

| | | |
|---|---|---|
| 01:02:05 | 1 | Kimberly's, Kim has received anonymous |
| 01:02:08 | 2 | phone calls. Kim is aware of some of these |
| 01:02:11 | 3 | things are things that neither I nor the |
| 01:02:15 | 4 | board would have any control over, and so |
| 01:02:24 | 5 | certainly if they were happening, I would |
| 01:02:26 | 6 | have to say that that would add pressure. |
| 01:02:27 | 7 | There's no question. I'm just not sure |
| 01:02:29 | 8 | that we could even determine whether, in |
| 01:02:32 | 9 | fact, they were the case or not or how we |
| 01:02:33 | 10 | would deal with it. The phone calls, the |
| 01:02:35 | 11 | derogatory comments supposedly made |
| 01:02:39 | 12 | according to Mr. Beliveau, publicly I can |
| 01:02:43 | 13 | only recall one statement that was made by |
| 01:02:45 | 14 | anyone. |
| 01:02:45 | 15 | Q. What was that? |
| 01:02:45 | 16 | A. It was by Mr. Donovan who said that he just |
| 01:02:49 | 17 | plain didn't believe it. |
| 01:02:50 | 18 | Q. Didn't believe the -- |
| 01:02:52 | 19 | A. Didn't believe the allegation when it was |
| 01:02:54 | 20 | made. |
| 01:02:54 | 21 | Q. Did he say why? |
| 01:02:56 | 22 | A. That was before. Because he knew |
| 01:02:58 | 23 | John D'Agostino. |
| 01:02:59 | 24 | Q. Was that a response to the initial |

COSTELLO COURT REPORTING

| | | |
|---|---|---|
| 01:03:03 | 1 | complaint in December? |
| 01:03:04 | 2 | A. That was his response to the MCAD |
| 01:03:07 | 3 | complaint. |
| 01:03:07 | 4 | Q. Are you referring to the newspaper article |
| 01:03:09 | 5 | where his statement was published? |
| 01:03:11 | 6 | A. His statement was published in the Sun |
| 01:03:14 | 7 | Chronicle, I believe, and it may have also |
| 01:03:21 | 8 | been in the Mansfield News, I'm not sure |
| 01:03:23 | 9 | which. One or both of the papers ran |
| 01:03:25 | 10 | articles. |
| 01:03:25 | 11 | Q. Is there any procedure with the board for |
| 01:03:28 | 12 | issuing statements or press releases to the |
| 01:03:30 | 13 | media? |
| 01:03:32 | 14 | A. Generally speaking it's to be done through |
| 01:03:34 | 15 | the chairman. That's about the only rule |
| 01:03:37 | 16 | we have. |
| 01:03:38 | 17 | Q. Is that for a statement and a press |
| 01:03:41 | 18 | release? |
| 01:03:42 | 19 | A. That's for statements or press releases, in |
| 01:03:44 | 20 | general. Individuals can answer questions. |
| 01:03:48 | 21 | Q. Mr. Donovan's statement that -- I believe |
| 01:03:54 | 22 | his statement was the allegations were |
| 01:03:58 | 23 | fabricated and farfetched? |
| 01:03:59 | 24 | A. Something along those lines. I don't |

COSTELLO COURT REPORTING

130

| | | |
|---|---|---|
| 02:03:57 | 1 | was filed by Miss Stoyle? |
| 02:03:59 | 2 | A. Yes. |
| 02:04:00 | 3 | Q. I want to show you this document and ask |
| 02:04:03 | 4 | you if that's it, and hopefully I can find |
| 02:04:06 | 5 | my second copy. |
| 02:05:39 | 6 | A. This looks like what I'm assuming is a true |
| 02:05:43 | 7 | and accurate copy. |
| 02:05:49 | 8 | Q. Before I ask you questions on that |
| 02:05:50 | 9 | Affidavit, after the conclusions of the |
| 02:05:55 | 10 | investigation by Attorney Lampke, you |
| 02:06:01 | 11 | received notice of further harassment |
| 02:06:04 | 12 | retaliation as set forth in Exhibits 2 and |
| 02:06:09 | 13 | 3. Were those allegations -- did you view |
| 02:06:14 | 14 | those allegations as less credible given |
| 02:06:18 | 15 | that the initial investigation had found |
| 02:06:21 | 16 | that -- had exonerated Mr. D'Agostino? |
| 02:06:25 | 17 | A. Personally? You want my personal feelings? |
| 02:06:34 | 18 | Q. You read the allegations. I want to know |
| 02:06:35 | 19 | what your personal response was? |
| 02:06:37 | 20 | A. I thought at that point that it was more of |
| 02:06:38 | 21 | what we had seen before, that there was |
| 02:06:40 | 22 | probably a hostile work environment, but |
| 02:06:44 | 23 | that I didn't think -- especially after |
| 02:06:49 | 24 | hearing the report, that it reached the |

COSTELLO COURT REPORTING

| | | |
|---|---|---|
| 02:25:04 | 1 | A. I didn't hear him -- there were problems |
| 02:25:07 | 2 | financially, but I never heard him |
| 02:25:09 | 3 | articulating it as a strictly financial |
| 02:25:11 | 4 | problem. So there were arguments on where |
| 02:25:17 | 5 | monies were placed and how that was going, |
| 02:25:19 | 6 | but there was never a thing saying, you |
| 02:25:22 | 7 | know, our relationship is broken down |
| 02:25:25 | 8 | because of finances. |
| 02:25:26 | 9 | Q. But did you view the managing of MMED funds |
| 02:25:32 | 10 | as a point of contention between the town |
| 02:25:37 | 11 | manager and the director of the light |
| 02:25:41 | 12 | department? |
| 02:25:41 | 13 | A. Certainly on occasion that was the case. |
| 02:25:44 | 14 | Q. I believe you testified earlier that that |
| 02:25:48 | 15 | was in large part the issues that gave rise |
| 02:25:52 | 16 | to the deterioration of the relationship |
| 02:25:56 | 17 | between Mr. D'Agostino and Mr. Beliveau? |
| 02:25:59 | 18 | A. I think that's the case. |
| 02:26:01 | 19 | Q. And how did Mr. D'Agostino view it when you |
| 02:26:07 | 20 | met with him? |
| 02:26:07 | 21 | A. Mr. D'Agostino then and now believes that |
| 02:26:10 | 22 | he is in charge and that unwillingness to |
| 02:26:16 | 23 | go along with what he says is not an |
| 02:26:22 | 24 | acceptable approach. |

| | | |
|---|---|---|
| 03:12:22 | 1 | 2001, did you ever consider that |
| 03:12:28 | 2 | Miss Stoyle's complaint about treatment by |
| 01:12:33 | 3 | Mr. D'Agostino were related to the issues |
| 03:12:35 | 4 | that were complained about regarding? |
| 03:12:39 | 5 | A. I thought these were all it was related to. |
| 03:12:41 | 6 | I didn't think there was any sexual from |
| 03:12:44 | 7 | that point of view; that it was all this |
| 03:12:47 | 8 | causing the tension. |
| 03:12:48 | 9 | Q. Did you believe her when she told you that |
| 01:12:52 | 10 | she felt that she was being mistreated? |
| 03:12:55 | 11 | A. I didn't think that she was lying when she |
| 03:13:00 | 12 | said that she felt she was being |
| 03:13:03 | 13 | mistreated. I thought that she had some |
| 03:13:06 | 14 | legitimate points, and I felt that she was |
| 03:13:09 | 15 | actually in the middle between Jack and |
| 03:13:11 | 16 | John. |
| 03:13:11 | 17 | Q. And did you attribute the way she was being |
| 03:13:15 | 18 | treated -- and I may have asked this |
| 03:13:18 | 19 | already, but did you attribute the way she |
| 03:13:20 | 20 | was being treated by Mr. D'Agostino to |
| 03:13:23 | 21 | issues raised, financial issues that were |
| 03:13:27 | 22 | raised in these memos? |
| 03:13:28 | 23 | A. To some extent, yes. What I'm saying is I |
| 03:13:31 | 24 | felt that the true tension was between |

| | | |
|---|---|---|
| 03:47:16 | 1 | happening. |
| 03:47:16 | 2 | Q. Do you know whether or not Miss Stoyle's |
| 03:47:23 | 3 | duties and responsibilities changed after |
| 03:47:25 | 4 | Mr. Beliveau left? |
| 03:47:27 | 5 | A. I don't believe they changed until after |
| 03:47:34 | 6 | the new person was hired. I don't know for |
| 03:47:38 | 7 | sure. |
| 03:47:39 | 8 | Q. But at some point they changed? |
| 03:47:43 | 9 | A. I would assume they changed, yes. |
| 03:47:45 | 10 | Q. Do you know? |
| 03:47:45 | 11 | A. Well, this is from observation. That's |
| 03:47:47 | 12 | what I'm saying; that no one told me that |
| 03:47:49 | 13 | there was a change in job description along |
| 03:47:52 | 14 | those lines, but there were clear-cut |
| 03:47:55 | 15 | changes that occurred that were visible at |
| 03:47:57 | 16 | public meeting. |
| 03:47:58 | 17 | Q. Why did you assume that they changed? |
| 03:48:00 | 18 | A. Well, because, for example, the new person |
| 03:48:04 | 19 | was doing the presentation of all the |
| 03:48:07 | 20 | financials. That used to be that Kimberly |
| 03:48:12 | 21 | produced all of those or presented them. |
| 03:48:14 | 22 | Q. Did Kimberly any longer take part in |
| 03:48:16 | 23 | meetings for the Board of Light |
| 03:48:21 | 24 | Commissioners? |

EXHIBIT NO. 6

1

```
1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
2
        C.A. NO. 05-10354 DPW
3
        KIMBERLY STOYLE,                    )
4                  Plaintiff               )
                                            )
5              VS.                          )
                                            )
6       THE MANSFIELD MUNICIPAL             )
        ELECTRIC DEPARTMENT,                )
7       JOHN D'AGOSTINO, TOWN OF            )
        MANSFIELD BOARD OF LIGHT            )
8       COMMISSIONERS,                      )
        LOUIS AMORUSO,                      )
9       MICHAEL MCCUE,                      )
        DAVID MCCARTER,                     )
10      DANIEL DONOVAN,                     )
        ROGER ACHILLE AND                   )
11      STEVEN MACCAFFRIE,                  )
                  Defendants                )
12

13

14

                DEPOSITION of MICHAEL MCCUE,
15      called as a witness by and on behalf of
        the Plaintiff, pursuant to the applicable
16      provisions of the Federal Rules of Civil
        Procedure, before Teresa E. Costello,
17      Certified Realtime Reporter, Registered
        Professional Reporter, Certified Shorthand
18      Reporter No. 1452S98, and Notary Public
        within and for the Commonwealth of
19      Massachusetts, at the offices of
        Wolf Block, One Boston Place, Boston,
20      Massachusetts, on Friday, October 13, 2006,
        commencing at 10:00 a.m.
21

22

23

24
```

| 10:40:52 | 1 | Q. | Who is responsible for the day-to-day |
| 10:41:04 | 2 | | supervision of the town manager? |
| 10:41:56 | 3 | A. | No one. |
| 10:41:08 | 4 | Q. | But ultimately is the board responsible for |
| 10:41:12 | 5 | | his acts and omissions? |
| 10:41:16 | 6 | A. | There's ultimate responsibility back to |
| 10:41:26 | 7 | | board of selectmen, I believe. |
| 10:41:27 | 8 | Q. | Excuse me. I can't hear you. |
| 10:41:29 | 9 | A. | I'm sorry. The ultimate responsibility of |
| 10:41:31 | 10 | | the town manager would be back to the board |
| 10:41:35 | 11 | | of selectmen, I believe. |
| 10:41:35 | 12 | Q. | So while you don't supervise his day-to-day |
| 10:41:46 | 13 | | duties and responsibilities, it's your job |
| 10:41:49 | 14 | | to ensure that he carries out his term? |
| 10:41:54 | 15 | A. | Yes. |
| 10:41:55 | 16 | Q. | According to -- |
| 10:41:57 | 17 | A. | Yes. |
| 10:41:57 | 18 | Q. | -- rules and regulations? |
| 10:41:59 | 19 | A. | Yes. |
| 10:41:59 | 20 | Q. | And what steps does the board take to |
| 10:42:06 | 21 | | ensure that the town manager is fulfilling |
| 10:42:08 | 22 | | his duties and responsibilities? |
| 10:42:10 | 23 | A. | What I had stated before. |
| 10:42:13 | 24 | Q. | And that is you receive a report from him? |

| 11:10:42 | 1 | | to the chairman of the board of selectmen. |
| 11:10:45 | 2 | Q. | That's an assumption? |
| 11:10:47 | 3 | A. | Yes, it's an assumption. |
| 11:10:49 | 4 | Q. | Does the town manager have the authority to |
| 11:10:56 | 5 | | promulgate policies without the approval of |
| 11:11:00 | 6 | | the board? |
| 11:11:00 | 7 | A. | Yes. |
| 11:11:01 | 8 | Q. | Does the board of selectmen have the |
| 11:11:25 | 9 | | overall responsibility for public funds? |
| 11:11:30 | 10 | A. | No. |
| 11:11:31 | 11 | Q. | Who does? |
| 11:11:32 | 12 | A. | Town meeting. |
| 11:11:33 | 13 | Q. | But it's fair to say that the board |
| 11:11:39 | 14 | | approves the budget for presentation at |
| 11:11:42 | 15 | | town meeting? |
| 11:11:42 | 16 | A. | The budget is a town manager's. |
| 11:11:51 | 17 | Q. | Is it fair to say the town manager submits |
| 11:11:55 | 18 | | the budget to the board of selectmen? |
| 11:11:57 | 19 | A. | We have -- yes. |
| 11:11:59 | 20 | Q. | And is it fair to say that the board of |
| 11:12:01 | 21 | | selectmen then approve the budget for |
| 11:12:04 | 22 | | submission at the town meeting? |
| 11:12:06 | 23 | A. | We would vote in favor or against, yes. |
| 11:12:10 | 24 | Q. | So it's up to the board to ultimately -- or |

| | | |
|---|---|---|
| 12:05:40 | 1 | Q. How many times did you discuss it with John |
| 12:05:43 | 2 | D'Agostino in executive session? |
| 12:05:44 | 3 | A. Oh, I wouldn't remember that about it. |
| 12:05:48 | 4 | Q. Do you recall discussing the allegations |
| 12:05:50 | 5 | with John? Do you recall discussing |
| 12:05:56 | 6 | the investigative conclusion with |
| 12:05:57 | 7 | Mr. D'Agostino? |
| 12:06:03 | 8 | A. No, and if such happened it would have been |
| 12:06:06 | 9 | in executive session as well. |
| 12:06:11 | 10 | Q. You attended the meetings of board of light |
| 12:06:21 | 11 | commissioners during your tenure, is that |
| 12:06:23 | 12 | correct? |
| 12:06:23 | 13 | A. Yes. |
| 12:06:24 | 14 | Q. You were aware then that Miss Stoyle was |
| 12:06:27 | 15 | vocal regarding what she perceived as |
| 12:06:30 | 16 | financial improprieties? |
| 12:06:34 | 17 | A. She spoke of accounting, internal charges |
| 12:06:46 | 18 | and charges back to the light department, |
| 12:06:47 | 19 | yes. |
| 12:06:48 | 20 | Q. So she was vocal about -- overcharges by |
| 12:06:51 | 21 | the treasurer, do you recall that? |
| 12:06:52 | 22 | A. I remember there was a back and forth in |
| 12:06:55 | 23 | terms of how that should be done in terms |
| 12:06:58 | 24 | of internal charges, internal cost centers, |

| | | |
|---|---|---|
| 12:12:38 | 1 | Q. So the answer is no? |
| 12:12:40 | 2 | A. Yes, no. |
| 12:12:41 | 3 | Q. Did you have any reason to disbelieve her? |
| 12:12:50 | 4 | A. Personal reasons to disbelieve? No. |
| 12:13:02 | 5 | Q. Do you have any reason, personal or |
| 12:13:06 | 6 | otherwise, to disbelieve her? |
| 12:13:09 | 7 | A. Well, base my beliefs, my determinations on |
| 12:13:16 | 8 | the findings of the investigator. |
| 12:13:18 | 9 | Q. What were your beliefs? |
| 12:13:23 | 10 | A. At which time? As a result of the -- |
| 12:13:31 | 11 | Q. The investigation. |
| 12:13:32 | 12 | A. As a result of the investigation? |
| 12:13:35 | 13 | Q. Yes. |
| 12:13:35 | 14 | A. That the allegations don't reach the |
| 12:13:44 | 15 | standard by which one would call them |
| 12:13:44 | 16 | sexual harassment. I based it basically on |
| 12:13:46 | 17 | the findings. |
| 12:13:47 | 18 | Q. Did you consider that the allegations |
| 12:13:51 | 19 | violated the town sexual harassment policy? |
| 12:13:54 | 20 | A. No. |
| 12:13:55 | 21 | Q. You didn't? |
| 12:13:56 | 22 | A. No. |
| 12:13:57 | 23 | Q. Do you consider that the allegations |
| 12:14:00 | 24 | violated the town's e-mail policy? |

| | | |
|---|---|---|
| 12:17:25 | 1 | MR. KESTEN:  Okay, without a |
| 12:17:26 | 2 | question.  Just like to interject. |
| 12:17:31 | 3 | MS. GRIFFIN:  That's not |
| 12:17:33 | 4 | necessary. |
| 12:17:33 | 5 | MR. KESTEN:  But true.  He always |
| 12:17:36 | 6 | has grounds -- |
| 12:17:38 | 7 | MS. GRIFFIN:  That's enough. |
| 12:17:39 | 8 | We're short on time as it is. |
| | 9 | MR. KESTEN:  That's the other |
| 12:17:45 | 10 | thing. |
| 12:17:45 | 11 | Q.  Do you consider an e-mail involving a |
| 12:17:49 | 12 | gerbil climbing up someone's anus to be |
| 12:18:03 | 13 | sexual in nature? |
| 12:18:05 | 14 | A.  No. |
| 12:18:07 | 15 | Q.  You don't? |
| 12:18:08 | 16 | A.  No.  Crude humor. |
| 12:18:16 | 17 | Q.  Are you aware that Mr. D'Agostino admitted |
| 12:18:20 | 18 | to telling Miss Stoyle that she looked |
| 12:18:22 | 19 | delicious? |
| 12:18:23 | 20 | A.  I believe I recall that within the back and |
| 12:18:28 | 21 | forth of the reports or the investigation. |
| 12:18:32 | 22 | Q.  Do you recall that Mr. D'Agostino admitted |
| 12:18:47 | 23 | taking another female employee to lunch for |
| 12:18:50 | 24 | the purposes of helping her get a job?  Not |

| | | |
|---|---|---|
| 12:22:12 | 1 | reported ongoing sexual harassment |
| 12:22:19 | 2 | retaliation? |
| 12:22:20 | 3 | A. Yes. |
| 12:22:20 | 4 | Q. You do? |
| 12:22:21 | 5 | A. I do recall that. |
| 12:22:22 | 6 | Q. And what do you recall about that? |
| 12:22:26 | 7 | A. Other than the report right now -- the fact |
| 12:22:42 | 8 | that that report was made or that |
| 12:22:43 | 9 | allegation was made, I don't remember any |
| 12:22:45 | 10 | of the particulars which I had reviewed |
| 12:22:48 | 11 | some of the stuff. |
| 12:22:50 | 12 | Q. Did you take any steps as a result of the |
| 12:22:54 | 13 | August, 2003, complaint? |
| 12:23:00 | 14 | A. I don't recall what we did. |
| 12:23:03 | 15 | Q. Do you recall doing anything? |
| 12:23:04 | 16 | A. I believe something was done. I don't |
| 12:23:06 | 17 | remember what was done. |
| 12:23:08 | 18 | Q. Was an investigation undertaken? |
| 12:23:17 | 19 | A. For the -- |
| 12:23:19 | 20 | Q. After the August, 2003 complaints? |
| 12:23:24 | 21 | A. I don't recall. I think that may have been |
| 12:23:33 | 22 | something that would have been handled |
| 12:23:35 | 23 | under the jurisdiction of the light |
| 12:23:37 | 24 | department administration, but I don't |

EXHIBIT NO. 7

# Board of Selectmen
## Minutes of
## April 16, 2003

Present:        Chairman Daniel Donovan; Vice Chairman Michael W. McCue; Clerk Steven W.
                MacCaffrie; Selectmen David W. McCarter and Louis P. Amoruso
                Town Manager John O. D'Agostino

The meeting was called to order at 7:30 p.m., followed by the Pledge of Allegiance to the Flag.

## Weekly Business

* Warrant No. 42 in the amount of $2,532,262.24
  **Motion:**  To approve and sign with the exception of Account No. 16130, Voucher No. 95691
  for $6,500 that should be billed to the School Department for the moving of the bleachers
  from Tweeter Center to East Street.
     (MacCaffrie-Amoruso) 5-0 with Selectman McCarter abstaining from Municipal Building
  Committee payroll  **Passes**

  The Town Manager noted payment is coming from the Gift Account that was established from
  the proceeds of the Golf Tournament. He will check on it. *Upon further investigation it was
  determined the Special Projects Division coordinated the work. We are paying it up front and
  will be reimbursed by the School Department.*
  **Motion:**  To approve Voucher No. 95691 for payment, subject to it being reimbursed
     (McCue-McCarter) 4-1 with Selectman MacCaffrie opposed  **Passes**

  **Motion:**  To send the invoice to the School Department for payment
     (McCarter-MacCaffrie) 5-0  **Passes**

* Minutes of April 9, 2003
  **Motion:**  To approve as amended
       (MacCaffrie-Amoruso) 5-0  **Passes**

* Notes from Selectmen's April 8, 2003 Workshop on Parking Regulations
  **Motion:**  To approve
     (MacCaffrie-Amoruso)  4-0-1 with Selectman McCarter abstaining because he was not
  present  **Passes**

* Sign Special Town Meeting Warrant
  **Motion:**  To sign the Warrant for the Special Town Meeting to be held within the Annual
     (MacCaffrie-McCue) 5-0  **Passes**

### Correspondence

- Memorandum from Andres Gazzolo, Finance Committee Chairman, requesting a workshop meeting with Selectmen on Tuesday, April 22nd, or Thursday, April 24th to discuss budget strategies and financial warrant articles to be voted on at Town Meeting
*The Town Manager suggested Thursday, but there may be a conflict. He will work it out with Mr. Gazzolo*

### Town Manager's Report

Town Manager D'Agostino reported:

- Finance Committee has suggested next Thursday for a workshop. He will work out a date with them. If Thursday does not work out, he will suggest either of the following two Tuesdays.

- Next week there will be an executive session on the Hercules Landfill issue. We have implemented some legal strategies and there is a need to discuss litigation strategy and timing. He recommended an executive session be held for this purpose and to update the Board.

- Will speak to Shuan Burke and Bert Cook regarding Selectman MacCaffrie's questions regarding the parking regulations and ask for their response in writing.

- The Town of Mansfield raised a total of $650 for Operation USO Care Packages. The funds have been forwarded and we are no longer accepting donations at this time. He thanked residents for their contributions. *The total donations from the three towns was well over $2,000. as reported by Rep. Betty Poirier.*

- Had a productive meeting with the various unions today. Based on budget projections at this time he will not get into specific numbers. We are trying to achieve staff reductions through attrition. Superintendent Moretti has indicated he is doing the same with the schools. The actual number of layoffs in the School Department will be reduced through attrition. We have realized $300,000 in personal services on the Town-side of the budget. The net loss of teachers appears to be 13.5 at this time. The total projected changes in full-time employee status for the town is 5.09 positions. The State numbers have yet to be received. It is for this reason that Mr. Gazzolo wants to hold a workshop with the Finance Committee and Selectmen. A memorandum of notification has been provided indicating further staff reductions may be necessary. We are currently using a figure of 5.10% reduction after 9C cuts. *Selectman McCue asked what it would be percentage wise compared with the year before.* The House '04 budget minus 5% $5,022,000; 10% = $5.6 million deficit. 15% = $6.2 million   20% - $6.8 million additional cuts. Most of what we're talking about is closing Town Hall on Fridays which would mean a 10.7% salary reduction for all Town employees. We cannot

close this budgetary gap without significant movement on health care issues. We believe the key to balancing the budget in '04 and '05 will be through health insurance concessions. There may be some movement with the Unions. Previous indications have been that the best chance of movement on healthcare would be in the '05 budget. Given the severity of the budget cuts and the impact on the community, it is his desire to get a health care concession sooner than '05. If that can be achieved prior to Town Meeting, we may be able to balance the budget without significant layoffs. There are no guarantees that there won't be any layoffs however. Additional information will be provided as it becomes available. We don't anticipate having a State budget in place until August. Anything we decide prior to June may put us into a deficit situation going into the fiscal year. There may be a summer Special Town Meeting called to balance the budget. *Selectman McCarter offered his support for the Town Manager in what needs to be done.*

**Presentation of Plaques to Firemen**

Acting Chief Robert Bellavance addressed those present, noting it's fitting to do so in this forum as the support of the Fire Department is made possible by the Selectmen, Town Manager, and taxpayers. They do the job because of their desire to provide public service. He noted the February 4th fire on West Street in which Billie and Boda Gould were pulled to safety. Sadly, Mr. Gould passed away as the result of unrelated illness on March 24th.

Lt. Richard Fiske was at home nearby the fire scene when he heard the report of the fire and confirmed it by cell phone. He immediately went to the scene and was told the occupants were not accounted for. He entered the house without the protection of firefighting equipment, lying under the smoke bank and reaching out in a sweeping motion in search of the occupants. He found Mr. Gould and pulled him to safety. When firefighters arrived and entered with equipment, Lt. Puleo halted the crew because with the assistance of the infrared camera they found another occupant. Boda Gould was taken out, treated, transported to the local hospital, and later transferred to Boston. Vital firefighting operations were made possible by North Attleboro and Foxboro.

Lt. Jim Puleo, Lt. Richard Fiske, Firefighter Neil Herrick, Firefighter John Robbins, Firefighter Kevin Fontes, Firefighter/Medics Todd DeCosta; Don Tebeau, John Brunelli, and Keith Hodson have all been previously honored, as have Officers Roy Bain, Frank Archer, William Trudell and Detective Mike Ellsworth of the Mansfield Police Department.

Acting Chief Bellavance and Deputy Chief Towne presented firefighting lifesaving medals to William Burgess, James Puleo, and Richard Fiske. Acting Chief Bellavance noted of Lt. Fiske's actions go above and beyond the call of duty as he responded while off-duty and without benefit of firefighting equipment. He was presented with a Medal of Valor for his heroic efforts.

Billie Gould's daughter was present and thanked the men for giving their family an additional seven weeks with their father.

Tom Leonard of the State Fire Marshall's Office offered his congratulations not only in that capacity but as a former Mansfield Firefighter and Chief.

Norton Fire Chief George Burgess noted it was a great honor to see his son get the award and thanked everyone.

Town Manger D'Agostino said we're looking at our public servants with an eye of admiration. He noted what they've done individually and collectively projects a positive image of this town and he is proud of the work they are doing and the team effort they put forth. He presented plaques to Lt. Richard Fiske for for his heroic acts and to Lt. James Puleo and Firefighter William Burgess for pulling Boda Gould from her burning home on February 4th. He offered his thanks on behalf of the Town for the job they do every day of every year.


**Mansfield Green Discussion**

Present for the discussion were DPW Director Lee Azinheira; DPW Office Manger Betty Amicone; and Town Clerk Helen Christian, who was participating in the discussion because she issues the resident stickers.

Mr. Azinheira referred to his memorandum regarding trash collection. He spoke of discussion about the advisability of requiring a sticker for the use of Mansfield Green, and recommended the institution of a $10 fee for the pick-up of large items. We are one of the few communities who still provide the service curbside and suggested we may be picking up items for more than Mansfield residents. Mr. Azinheira noted the same problem exists with the disposal of computer monitors at Mansfield Green and the need to establish a fee and proof of residency. He recognized that if we go to a sticker that must be purchased, we need to provide personnel on-site and suggested greater use of the senior tax write-off program for this purpose. Last year 2,200 stickers were issued for the use of the resident commuter lot and Mansfield Green. He suggested that if stickers be made a requirement for the use of Mansfield Green, the number issued may be reduced by half. The suggestion was made for a reduced fee for those using only Mansfield Green. A fee of $25 for the Train Station parking was also suggested. The option of a reduced fee for seniors aged 65 and over was also discussed. The cost of having the stickers printed is approximately $1,000 each year.

Selectman Amoruso noted his belief that the first goal was to cover the costs associated with the Mansfield Green Recycling Park. The disposal of large items and white goods is not currently tracked because it's now part of the trash contract. A sticker fee of $10 to obtain a sticker for the item was suggested. Mr. Azinheira suggested the new stickers take effect in January.

Cardboard, paper and plastic disposal fees were discussed, with the thought of requiring them to be recycled curbside rather than having it cost the Town additional expense by disposing of such

at Mansfield Green. The use of clear plastic bags was also mentioned, with it being noted if recyclable materials are placed in with regular trash, they will be seen and any such bags will not be picked up.

Town Manger D'Agostino suggested if we're going to start charging, we should be offering at least the same if not a higher level of service. We've disposed of a large quantity of propane tanks at a cost of $1,600.

Chairman Donovan asked if charging $25 for a sticker will be a problem. The Town Clerk said she would like to see them given out December 1st in order to have a smooth transition. She noted the need to get the system on the computer if we're charging for stickers so that replacement stickers can be tracked and issued when people sell their cars or otherwise can no longer use the sticker and need to get a replacement.

Town Manager D'Agostino spoke about instituting a program whereby people could purchase stickers for special items at Mansfield Green, paying by check with a name and address and with proper photo identification with an address to prove they are a Mansfield resident. Annual stickers should still be issued at Town Hall.

Selectman Amoruso noted it costs more for us to have things taken from Mansfield Green than it does curbside. He suggested if we don't require a special sticker for pickup at curbside and charge at the Green, it would encourage people to schedule curbside pickup of white goods. We want to encourage recycling, but suggested charging when things are picked up curbside equates to a pay as you throw program, in addition to paying for curbside pickup through the tax rate.

Selectman MacCaffrie noted he's always been a proponent of taking at least one day when we get close to the time new stickers are needed of having someone at the Train Station for one day to make them available.

Selectman Amoruso noted our goal is to increase recycling and he does not see the incentive in the proposal to accomplish this. The annual hazardous waste collection will still be held. Because of its proximity to our water source, we don't collect hazardous waste at Mansfield Green. It was suggested that if our fee increases, we could provide additional hazardous waste disposal. Selectman Amoruso asked for something that deals with businesses and commercial operators who are residents of Mansfield, but are disposing of trash that's been generated in the course of their business. He suggested if the fee for disposal of computer monitors, oil, and white goods truly covers the cost of disposal, that the opportunity be offered to non-residents as well for the service as a revenue generator.

Selectman McCue said he believes it's appropriate to cover the costs of the Mansfield Green, but he has a strong objection to extending the fee to those who use commuter parking. He noted having a problem in principle with subsidizing Mansfield Green through commuter parking. He suggested the cost of the stickers may actually be covered by the parking revenue generated. He also suggested the possibility of writing a "G" on some of the stickers and selling them for the

use of the Mansfield Green. *Selectman Amoruso noted the cost of the sticker would then have to be doubled to recoup the cost of the Green.*

Selectman McCarter asked if we had curbside recycling when Mansfield Green was opened. *We did.*

Selectman McCue noted the numbers presented need to be reworked if the $25 sticker will be necessary to use the Green and a $1 sticker issued for commuter parking. Selectman McCarter suggested we also look at the fee of $1 that we now charge for commuter parking. Selectman Amoruso suggested if it were raised to $2 we would have to provide something for it—like a guarantee of a police officer or that it would go toward purchasing more land for parking as it becomes available.

Selectman MacCaffrie said he was looking at dramatically increased assessments from MBTA over the next four years that need to be covered in the cost of resident parking.

The direction of the Board was summarized as being to segregate the costs and establish a fee of no more than $25 for Mansfield Green and $1 for those who want the sticker for commuter parking only. *Selectman McCue noted it's an aggravation if the parking fees already cover the cost of printing the sticker.* The other part of the equation is looking at reducing costs associated with Mansfield Green by eliminating some of the items we're now accepting for disposal. Selectman Amoruso suggested charging a fee only for those items that cannot be picked up curbside with an "item sticker" to be put on the item for disposal.

**Motion:** To support a sticker fee of $25 for Mansfield Green for residential use only, with the sticker being used for the Train Station also, and a sticker fee of $1. for use only at the Commuter Parking Lots.

(McCarter-McCue) 5-0 **Passes**

### Wastewater and Sewer Enterprise

DPW Director Lee Azinheira, DPW Office Manager Betty Amicone, and Wastewater Treatment Plant Manger Kenneth Hackett presented information to the Selectmen. Mr. Azinheira explained at this time the creation of an enterprise account will not cost the ratepayers anything additional.

*Chairman Donovan referred to a letter from Dianne Royle of Riverside Drive objecting to an Enterprise Account based on the fact that only 45% of the town is on sewer and it would make the rates exorbitant.* Mr. Azinheira noted speaking with Mrs. Royle today and pointed out she used some conclusions that were not accurate, although she remained philosophically opposed. He noted our accounting already treats it as an enterprise account and our surplus currently is $1,000,000 that goes into Free Cash instead of being used for wastewater. *Selectman McCarter suggested that although it's inconsistent with his position previously, he believes we need as much flexibility as possible at this time. He would therefore not support it at this point. Selectman Amoruso also noted his opposition for similar reasons. Town Manager D'Agostino spoke about the*

need for it to be used for *Wastewater capital projects*. Mr. Azinheira noted they're in a better position capital-wise than the Water Division. *Selectman McCue noted enterprise accounts make a lot of sense from an accounting and managerial point of view; however, they tend to segregate the costs. He also noted we would lose flexibility at a time when we need as much as possible and suggested this is not the right time to move towards an enterprise account. Chairman Donovan asked when we are required to treat it as an enterprise account by GASBY-34. The Town Manager said it only has to be accounted for an enterprise account. He suggested it is good way to fund a decentralized plant that will be needed in the near future.* Selectman Amoruso suggested that is why there is a benefit to the entire town. Recharging our aquifers is now the main focus. Selectman Amoruso noted industrial waste is better off going to a centralized plant rather than a septic system. Our rates will not support a capital expansion. Selectman MacCaffrie noted everything that is tax deductible is a benefit when taxes are due. An enterprise account would take away that tax deduction for individuals that is available when the cost is incorporated into the tax rate. He was concerned about taking a million dollars away from general revenue and segregating it as an enterprise account. The Town Manager noted the rate has to support the activity, so a certain percentage of the rate set is dedicated to capital expenses. Outside of capital there are operating cost reductions. Concern was expressed that expenditures from an enterprise account are not looked at as critically.

Mr. Azinheira next raised the issue of sewer rates, noting it's been one year since the rate was last set. Expenses and revenues are just about on target as projected. Last year when the rate study was done for three years, he asked they entertain a 4.9 percent increase for FY'04 to provide

**Motion:**    To approve a sewer rate increase of 4.9% for FY 2004 as proposed
        (Amoruso-McCarter) 5-0  **Passes**

### Continuation of Town Manager's Report

- When we look at an option of cutting back hours at Town Hall it will affect most departments except Police and Fire and Library. It will save about $300,000 with a 10.7% reduction in salary, but may result in higher than expected turnover. There are a couple of issues he directed their attention to that outline the current scenario based on present assumptions. Some part time people will no longer be eligible for benefits as a result of reduced hours, and that will also save money. Concessions on health care must happen to avoid additional layoffs. With a concession on health care and an increase from Stabilization, we may be able to salvage these options.

### Selectmen's Old Business

Selectman MacCaffrie:
- Asked for an update on the NEED suit. *As far as we know, Louis is still in jail. We'll try to get an update from Town Counsel Mangiaratti*

- Asked if the delinquent tax titles have been published. *They were in the paper last week.*

Selectman McCue:
- Had discussed appointing representatives to CIP prior to elections.
  **Motion:** To appoint Selectmen McCarter and MacCaffrie as our CIP representatives
    (Amoruso-MacCaffrie) 5-0 **Passes**

Selectman Donovan:
- Suggesting reviewing the Town Manager's contract.
  Selectmen McCarter and McCue have met with him. In December the Board voted to extend the contract for an additional three years. The draft has been provided to everyone and the opportunity for comment has been granted. Selectman McCarter suggested it is now time to vote on it. Page 8 – includes amendments to the agreement that has been in this format since 1997. The format in general is being followed and Attorney Mangiaratti would be required to approve the contract as to form. Selectman McCarter reviewed the changes that have been made:

  Page 2 – boilerplate language – makes the agreement effective from December 1, 2003 to November 30, 2006.

  Page 4 - Severance pay was changed to 6 months from 3 months. The Town Manger explained that the rationale for the change is the length of time it takes to find a new position. The severance pay only applies in the event of non-renewal. Selectman MacCaffrie questioned the length of severance, noting he would have six months while still employed here to be looking for a job. He questioned whether it would result in "slacking off" because there's too much time given to look for another job. Selectman McCarter noted there is no impact at this time. It was suggested each change proposed be voted on as we go along.
  **Motion:** To accept the changes in Section 4 as written
    (McCue-Amoruso) 4-1 with Selectman MacCaffrie opposed **Passes**

  Section 6 – salary - The Town Manager receives a stipend for being the administrative head of the Light Department. That stipend will now become part of the base salary because as a stipend it does not count towards retirement benefits. The $10,000 remains the same, but is treated differently. His present salary is $107,500.12 A 5% increase of $5,370 plus $10,000 stipend would bring the annual salary to $122,876.00 which is comparable to other towns. Selectman MacCaffrie noted it would make him the second highest paid town manager in the district. Town Manager D'Agostino noted that many of the town managers also have an assistant that receives a salary.

  Selectman Amoruso suggested that with all he's done and the fact that he has not received a salary increase in the last year, he believes the Town Manager's salary increase should be more.
  **Motion:** To set the salary at $125,000

(Amoruso-Donovan, passed the gavel to Selectman McCue and seconded the motion)

Selectman MacCaffrie noted it brings the overall package with benefits to an $11,000 increase. Selectman Amoruso said consideration needs to be given to what it would cost to do a search and replace him. He's also had no salary increase in over a year and has done a good job. Selectman Donovan noted the CEO of any organization is always the top paid and this still leaves him four or five down from the top. He will also be taking a cut at the same percentage of other employees and we will not actually be paying this amount.

The motion was amended to make the increase effective July 1, 2003 to coincide with the fiscal year, as spelled out on page 5.

Selectman MacCaffrie questioned the "shall" and "may" of the provision for the Town Manager to be the Director of the Light Department, stating he doesn't believe it should conflict with the Town Charter which says he "may". Selectman McCarter said because we are asking him to do it, the contract says "shall". He noted he has no problem with it at this time, but should we decide to do something different with the Light Department, it may be a disadvantage. Selectman Donovan noted the Charter says he has authority over all departments. Selectman McCue noted it is a worthy motion based on the excellent job the Town Manager has done. He believes, however, going from 5% to 6.9% raises a concern for him about it being in the best interest of the Town in the current economic climate. He stated he would rather stay at the percentage negotiated by the three parties involved. Selectman Donovan noted the Town Manager is not taking health insurance coverage and that saves the Town $10,000 per year. Selectman MacCaffrie pointed out that could change at any time. Selectman McCue suggested what others are being paid should not be the sole driver of how much we pay him. He noted his belief that the Town Manager is worth the additional money, but we cannot always do what we would like to do. Selectman MacCaffrie questioned what message it sends. He would be agreeable to a 2.5% raise with the understanding that it would be increased if the financial situation improves.

**Vote:** on $125,000
2-3 with Selectmen McCarter, MacCaffrie and McCue opposed **Fails**

Selectman McCarter noted it's an individual contract for a certain period of time. The contract only comes up every three years. Selectman MacCaffrie stated the Town Manager's salary can be increased every year. Selectman Amoruso said the contract as he reads it indicates the increase should take effect December 1st. Selectman MacCaffrie pointed out that back in December he brought the issue up because the contract is effective December 1st and the salary is July 1st.

**Motion:**  To approve a salary of $122,876.00 for the Town Manger in accordance with Section 6 effective July 1, 2003.
(Amoruso-McCue) 4-1 with Selectman MacCaffrie opposed

Page 7 - unused vacation time proposed to go from accrued time of ten days to fifteen days.
**Motion:**  To make the change

Selectman MacCaffrie stated he doesn't believe vacation time should be accrued. Selectman McCue suggested it's a change we can grant.
**Vote:** (McCue-McCarter) 5-0  **Passes**

**Motion:** To extend the meeting past the 11:00 p.m. curfew until the completion of the Town Manager's contract discussion.
(Amoruso-McCue) 5-0  **Passes**

Page 8(d) - participation in the Town's group term life insurance program with a $4,000 policy for which the Town pays 80% of the premium.
**Motion:** To approve the changes
(McCue-Amoruso) 5-0  **Passes**

- the Town paying 100% of the premium on a $200,000 term life policy on the life of the Manager. This amounts to about $35 per year.
**Motion:** To approve the changes
(Amoruso-McCue) 5-0  **Passes**

Page 8(e) Deferred Compensation: Increase contribution to 9.765% of Manager's salary to deferred compensation account
**Motion:** To approve
(McCue-McCarter) 4-1 with Selectman MacCaffrie opposed  **Passes**

Selectman McCarter expressed his hope that the contract will be acceptable to the Town Manger.

Chairman Donovan noted the Town Manager has done much for Mansfield and stated he wishes he could be given more.

Selectman MacCaffrie stated he hopes they can continue to work well together.

Selectman McCarter stated he believes the agreement is fair and hopes the Town Manager thinks it.

Town Manager D'Agostino acknowledged that the contract is acceptable to him, although he's not pleased with it.

**Motion:** To sign the contract
(Amoruso-McCarter)  4-1  with Selectman MacCaffrie opposed

The contract will be finalized and reviewed as to form by Town Counsel and will be signed at the next meeting.

## Adjournment

**Motion:**  To adjourn at 11:10 p.m.
         (McCarter-Amoruso) 5-0  **Passes**


*Steven W. MacCaffrie*          *April 23, 2003*
Signature of Clerk          Date of Approval

EXHIBIT NO. 8

1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS

2

3      C.A. NO. 05-10354 DPW

4      KIMBERLY STOYLE,                          )
                    Plaintiff                    )
5             VS.                                )
       THE MANSFIELD MUNICIPAL                   )
6      ELECTRIC DEPARTMENT, JOHN                 )
       D'AGOSTINO, TOWN OF                       )
7      MANSFIELD BOARD OF LIGHT                  )
       COMMISSIONERS, LOUIS                      )
8      AMORUSO, MICHAEL MCCUE,                   )
       DAVID MCCARTER, DANIEL                    )
9      DONOVAN, ROGER ACHILLE                    )
       AND STEVEN MACCAFFRIE,                    )
10            Defendants                         )
                                                 )
11     - - - - - - - - - - - - - - - - - - - - - -
       CONSOLIDATED WITH:
12     C.A. NO. 04-11329                         )
                                                 )
13     DR. JOHN BELIVEAU,                        )
                    Plaintiff                    )
14            VS.                                )
       TOWN OF MANSFIELD MUNICIPAL )
15     ELECTRIC DEPARTMENT,                      )
       JOHN O. D'AGOSTINO,                       )
16            Defendants                         )

17          **DAY II, DEPOSITION** of **MICHAEL MCCUE**,
       called as a witness by and on behalf of the
18     Plaintiff, pursuant to the applicable
       provisions of the Federal Rules of Civil
19     Procedure, before Teresa E. Costello,
       Certified Realtime Reporter, Registered
20     Professional Reporter, Certified Shorthand
       Reporter No. 1452S98, and Notary Public
21     within and for the Commonwealth of
       Massachusetts, at the offices of
22     McNaught, Cecere & McNaught, 6 Eastman
       Place, Melrose, Massachusetts, on Tuesday,
23     March 6, 2007, commencing at 10:14 a.m.

24

```
 1    A.  I do.
 2    Q.  -- 2006?  Do you understand that you're
 3        still under oath today?
 4    A.  I do.
 5    Q.  Do you recall the ground rules that we
 6        discussed before the deposition?
 7    A.  I believe so.
 8            MS. LEONARD:  And can we agree
 9        that the same stipulations will apply to
10        this deposition that we agreed to at the
11        prior one?
12            MR. KESTEN:  Yes.
13            MS. GRIFFIN:  Yes.
14    Q.  Mr. McCue, I believe you testified at your
15        last deposition that you, as a member of
16        the Board of Selectmen, were responsible
17        for budget recommendations?
18    A.  I believe so.
19    Q.  And was that yes?
20    A.  Yes.
21    Q.  And is it fair to say that during your
22        tenure on the Board of Selectmen, balancing
23        the budget has been a challenge?
24    A.  Yes.
```

1    Q.    And you're aware that yearly there are

2          shortfalls in the budget that you need to

3          deal with?

4    A.    Yes.

5    Q.    And that results from a number of things

6          including cuts in municipal funding?

7    A.    Yes.

8    Q.    And creating a budget for the Town of

9          Mansfield requires creative financial

10         planning, isn't that fair?

11   A.    Yes.

12   Q.    Do you recall that the Board of

13         Selectmen -- or I'll direct this question

14         to you as a member of the Board of

15         Selectmen -- was of the opinion that

16         John D'Agostino was excellent in the area

17         of budget planning?

18   A.    Yes.

19   Q.    And that, in fact, that that was one of his

20         strongest suits?

21   A.    Yes.

22   Q.    And are you aware that funds from the

23         electric department were used in the yearly

24         budget to pay for town expenses?

1           MR. KESTEN:  What does that mean?

2           MS. LEONARD:  Well, if he doesn't

3    understand the question, he can tell me.

4   A.  Yes.  I guess maybe you need to explain

5    that a little more.

6   Q.  Okay.  It's fair to say, isn't it, that

7    town expenses for certain town departments

8    were covered by funds from the Mansfield

9    Municipal Electric Department?

10   A.  I believe so.

11   Q.  And is it your opinion or belief that

12    Mr. D'Agostino's use of rate payer funds to

13    balance the town budget was acceptable and

14    appropriate?

15   A.  I believe so, yes.

16   Q.  And it's fair to say that you recall the

17    use of electric department's funds for town

18    expenses being an issue of concern raised

19    by Kimberly Stoyle during your tenure on

20    the board?

21   A.  She spoke of it.

22   Q.  And she spoke of that at Board of Light

23    Commissioners' meetings?

24   A.  Yes.

1              MS. GRIFFIN:  Come on, Lenny.

2              MR. KESTEN:  If you want to find

3         something in there, I could possibly help

4         because I know it better probably than any

5         of you, but okay.

6              MS. LEONARD:  I prefer not.

7              MR. KESTEN:  It's ridiculous.

8              MS. JACOBS:  Well, take your time.

9              MR. KESTEN:  No, no, no.  Don't

10        take your time.  If you can find something,

11        go ahead.  Has Jack memorized it?

12    A.   No.  I would have thought it would have

13        been right here, conclusions and

14        recommendations.  My memory of this is not

15        correct.  There isn't one in there.

16             He doesn't make a recommendation

17        or draw a conclusion.  He just basically

18        tells the board now here's the information,

19        move forward with it.

20    Q.   So he reported facts of interviews to the

21        board?

22    A.   Yes, I believe so.  I believe that's what

23        that is.

24    Q.   Okay.  It's fair to say then that the board

EXHIBIT NO. 9

Page 1

ORIGINAL

Volume: II

Pages: 1-64

Exhibits: 9-12

UNITED STATES DISTRICT COURT

For the District of Massachusetts

CIVIL ACTION NO. 05 10354 DPW

* * * * * * * * * * * * * * * * * *

KIMBERLY STOYLE,                        :

            PLAINTIFF           :

                           :

 v.                                     :

                           :

THE MANSFIELD MUNICIPAL ELECTRIC         :

DEPT., JOHN D'AGOSTINO, TOWN OF          :

MANSFIELD BOARD OF LIGHT                 :

COMMISSIONERS, LOUIS AMORUSO,            :

MICHAEL McCUE, DAVID McCARTER,           :

DANIEL DONOVAN, ROGER ACHILLE, and       :

STEVE MacCAFFRIE,                        :

            DEFENDANTS          :

* * * * * * * * * * * * * * * * * *

   CONTINUED DEPOSITION OF LOUIS AMORUSO, a witness
called on behalf of the Plaintiff, pursuant to the
provisions of the Federal Rules of Civil Procedure,
before Lisa McDonald Valdario, (CSR #130093), a
Registered Professional Reporter and Notary Public
in and for the Commonwealth of Massachusetts, at the
Offices of Law Offices of McNaught, Cecere &
McNaught, Six Eastman Place, Melrose, Massachusetts
02176, on Thursday, August 10, 2006, commencing at
11:22 a.m.

1    corrections or have you found that there are no

2    errors?

3  A  I didn't plan to make any corrections in

4    spelling, and that was about the only thing I

5    found problems with.

6  Q  So it was correct in the form that you read it.

7  A  Yes.  It said if you had corrections to make,

8    send it back.  Otherwise, that was it.  So that

9    was it.

10  Q  I just wanted to clarify because I didn't see it

11    in my records.  Thank you.

12  A  Okay.

13  Q  In day one of your deposition, you had talked

14    about meetings that you had with Kimberly Stoyle

15    and Jack Beliveau and John D'Agostino regarding

16    various complaints, and I won't go over those

17    issues again.

18        MR. KESTEN:  Thank you.

19  Q  But my question to you is, as a result of those

20    meetings, did you report any of the issues

21    raised to other members of the Board of

22    Selectmen?

23  A  At different times, I certainly reported back to

24    members what was going on and what we were

1   A   Yes.

2   Q   Okay.  Did you take into account, when assessing

3       Mr. D'Agostino on budget preparation, the issues

4       that you raised at your last deposition

5       regarding Miss Stoyle's complaints that MMED was

6       being overcharged for various town services?

7   A   Sure.  That was undoubtedly part of the total

8       picture.

9   Q   And notwithstanding those issues raised by Miss

10      Stoyle, you still determined that this was the

11      town manager's strongest suit?

12  A   Yes.

13  Q   Why is that?

14  A   Because of his creativity, and the way he was

15      able to or he was able to manage money and get

16      the most out of what we had for resources.

17  Q   Including contributions by Mansfield Electric.

18  A   Oh, absolutely.  That's part of the budget,

19      yeah.

20  Q   So you considered his performance in that regard

21      to be his strongest suit.

22  A   Not with respect to that specific item, but

23      overall, yes, correct.

24  Q   You considered his conduct in regard to

Page 24

```
 1          MS. LEONARD:  Lenny, you'll have an

 2     opportunity.

 3          MR. KESTEN:  I'm just helping.

 4          MS. LEONARD:  I appreciate your help.  I

 5     really do.

 6          MR. KESTEN:  If you take a look, if

 7     there's a mystery as to why they do it six

 8     months ahead of time, that will help.

 9          MS. LEONARD:  If we could let the witness

10     testify, it will be greatly appreciated.

11   Q    Okay.  In any event, did you take into account

12        the fact that there was an outstanding

13        investigation for sexual harassment and

14        retaliation involving Mr. D'Agostino at the time

15        you decided to renew his contract in April of

16        2003?

17   A    Of course.

18   Q    And that did not impact your decision?

19   A    It had an influence on the decision, but it did

20        not change it.

21   Q    And did you consider, and I'll state it

22        generally, if you can answer it, all of the

23        things that you testified to in your previous

24        deposition regarding issues that arose during
```

Page 25

1  his administration in the prior year?

2  A  Those were certainly all, as I recall them, and

3  in terms of how my mind sorted those relative

4  importances, certainly they were all part of the

5  thinking.

6  Q  So you considered his, all of those issues --

7  A  Yes.

8  Q  -- in determining whether or not to renew his

9  contract.

10  A  Yes.

11  MS. LEONARD:  And off the record.

12  (Off the record.)

13  Q  Do you recall that in July, 2003, the outside

14  investigation by Mr. Lamke was completed?

15  A  I recall it being completed.  I don't know the

16  exact date, but that sounds correct.

17  Q  And did you read the report in its entirety?

18  A  I read a draft of the report in its entirety.

19  Q  So you didn't read the final?

20  A  I don't think there ever was a final.  All we

21  ever saw was something that was stamped Draft.

22  Q  Was it a lengthy document?

23  A  Sure was.

24  Q  Did you meet as a Board regarding the

Page 27

```
 1        cannot give you a definitive answer on that.
 2   Q    Who told him?
 3   A    It would have been the chairman.  I have to tell
 4        you, I'm trying to remember whether we met with
 5        him after we had met with Lamke, and I do not
 6        recall for sure what happened.
 7   Q    Did you discuss the Board's conclusion with
 8        Kimberly Stoyle?
 9   A    No, we did not.
10   Q    And it's fair to say that Mr. Lamke's report,
11        reported facts given to him by various
12        witnesses, isn't that correct?
13   A    Facts and opinions, yes.
14   Q    And it's fair to say, isn't it, that Mr. Lamke
15        left the ultimate investigative conclusion to
16        the Board.
17   A    Yes.
18   Q    And in addition to the facts set forth in
19        Mr. Lamke's report, did you take into account
20        your own assessment of the situation based upon
21        the meetings that you had with Kimberly Stoyle,
22        Jack Beliveau and John D'Agostino, and I mean
23        the meetings that you described at your prior
24        deposition?
```

Page 36

1  A  I remember there was a comment that we had a

2     negative cash balance at some point.  It was

3     after the filing.  I don't recall exact timing,

4     but I do recall it being after that.

5  Q  If I said that that was February of 2003, would

6     that refresh your recollection?

7  A  I'd say you could be as right as anybody else.

8  Q  Do you recall that during the course of that

9     investigation -- strike that.  Do you recall

10    that there was an audit conducted as a result of

11    those accusations?

12 A  I know there was an audit conducted.  I don't

13    know whether it was a result of those

14    accusations or whether it was a regular audit

15    being done.

16 Q  Do you recall the audit for that particular

17    year?

18    MR. KESTEN:  Which audit?  There's one for

19    the town and one for the light department.

20 Q  The electric department audit.

21 A  It would have been for year 2002.

22 Q  3.

23 A  No, if they were doing it in 2003, it would have

24    been for 2002.

1    to me specifically.

2  Q  Was it brought to your attention by anybody?

3  A  It came to my attention I think by other Board

4    members.

5  Q  Do you recall what the issue was?

6  A  Whether or not we were going to have a union for

7    that bargaining group, and whether or not she

8    should be in it, I think was the issue.

9  Q  And you're aware that her membership in that

10    union was being challenged?

11  A  Yes.

12  Q  And did you have an opinion as to whether or not

13    she should be a member of that union?

14  A  Yes, I did.

15  Q  And what was your opinion?

16  A  My opinion was that she didn't belong in it.

17  Q  What was the basis for that opinion?

18  A  That she is in an upper management position,

19    overseeing people, and that that was a, at an

20    executive level that was not applicable to that

21    union, I felt.  Might have been a manager's --

22    there is a manager's union in the town.  That

23    might have been a more appropriate one for her

24    to be in.  But it was mostly for department

Page 43

1       heads.

2   Q   Do you recall if you discussed that issue with

3       the town manager?

4   A   I'm sure we did, but I don't know how

5       extensively.  I don't think it was of any real

6       great extent at all, except being notified; this

7       is what's going on; this is what we're doing,

8       and that's about the extent of it.

9   Q   Are you aware that she eventually did become a

10      member of the union?

11  A   Yes.  I didn't say I was right.  I just said I

12      disagreed.

13          MS. LEONARD:  I'm going to take five

14      minutes and I might be done with him.

15              (Off the record.)

16          MS. BALLIRO:  Are you done?

17          MS. LEONARD:  I'm all done.

18                  CROSS-EXAMINATION

19  BY MS. BALLIRO:

20  Q   Good afternoon, Mr. Amoruso.  I think we met at

21      an earlier deposition in the other case.  I am

22      going to be brief with you but I wanted to just

23      review Exhibit No. 12 with you for a few

24      minutes.  If you could pull that from the --

Page 57

1    members of the police department and fire

2    department?

3 A  I believe that he could.

4 Q  Do you know if John D'Agostino had delegated the

5    hiring and firing authority within the light

6    department to any other person as of the time

7    that Kimberly Stoyle filed her MCAD charge?

8 A  I do not.

9 Q  Do you personally believe that the allegations

10    made by Kimberly Stoyle in her MCAD charge were

11    false, deliberately false?

12 A  I, to be honest with you, I don't know for sure.

13    I think that the filings may have been things

14    that occurred.  I did not feel that they reached

15    the level of being sexual harassment.

16 Q  Okay.  So just to be clear for the record, what

17    you're saying is that you don't necessarily

18    dispute Miss Stoyle's description of events, but

19    dispute that they may have risen to the level of

20    sexual harassment.

21 A  Yeah, I think that's correct, yes.

22                  (Off the record.)

23 Q  You mentioned an individual by the name of Ralph

24    Penny in your earlier testimony today.

Page 59

```
 1   A   If there was a vote, it would be in executive

 2       session.

 3   Q   Have you seen the Counterclaim that was filed

 4       against Kimberly Stoyle in this matter?

 5   A   No.

 6   Q   Did you ever ask to see it?

 7   A   Not that I recall.

 8   Q   Do you know what is alleged in the Counterclaim?

 9   A   No.

10   Q   Would the town or Mr. D'Agostino be permitted to

11       pursue a Counterclaim in this matter without a

12       vote of the Board?

13   A   I don't think so, no.

14   Q   Do you know whether or to what extent

15       Mr. D'Agostino played any role in disseminating

16       the substance of the Counterclaim to the press?

17   A   I do not.

18   Q   Did you read about it in the newspaper?

19   A   I have to say I haven't read about it in the

20       newspaper.  I've had a little problem with my

21       subscription, that the paper boy left and they

22       haven't delivered a newspaper to me for many

23       months, so --

24   Q   Well, what is your understanding as you sit here
```

EXHIBIT NO. 10

Board of Selectmen
Minutes of
January 15, 2003

Present:    Chairman Daniel Donovan; Vice Chairman Michael W. McCue; Clerk Steven W.
           MacCaffrie; and Selectmen David W. McCarter.  Louis P. Amoruso was
           participating in the Cable Review meeting and joined the Selectmen's
           meeting at the conclusion of that meeting.
           Town Manager John O. D'Agostino

The meeting was called to order at 7:30 p.m., followed by the Pledge of Allegiance to the
Flag.

**Weekly Business**

- • Warrant No. 29 in the amount of $5,481,959.14
  **Motion:**  To approve
     (MacCaffrie-McCue) 4-0 with Selectman McCarter abstaining from Municipal
  Building Committee payroll

- • Minutes of January 8, 2003
  **Motion:**  To approve
     (MacCaffrie-McCue) 4-0 **Passes**

- • Minutes of January 8, 2003 Executive Session
  **Motion:**  To approve but not release
     (MacCaffrie-McCue) 4-0 **Passes**

- • Public Entertainment on Sunday License for South Shore Antique Auto Foundation
  Flea Market and Car Show to be held at Tweeter Center May 18th
  **Motion:**  To approve with the condition that all propane used for cooking be permitted
  through the Fire Prevention Office
     (McCue-McCarter) 4-0 **Passes**

- • One Day Beer and Wine License for Tri-County Beagle Club Members Game Dinner
  on Saturday, February 15th – *Chairman Donovan disclosed that he is a member*
  **Motion:**  To approve
     (McCue-MacCaffrie) 4-0 **Passes**

## Correspondence

- • Memorandum from Town Counsel Robert Mangiaratti requesting authorization to file suit on behalf of the Conservation Commission

  **Motion:** To authorize Town Counsel to bring an action on behalf of the Mansfield Conservation Commission

  (McCarter-MacCaffrie for discussion)

  Selectman McCue said he is not prepared to vote on it because he just received the information tonight and has not reviewed it. Selectman McCarter noted it is just a procedural safeguard because Conservation Commission does not have a budget to pay the bill. Selectman MacCaffrie pointed out the request is on behalf of the Conservation Commission and they feel the request is legitimate. They believe the action is necessary to enforce the by-law. *The motion and second were withdrawn to allow time for review and the matter was tabled until next week.*

- • Memorandum from Town Engineer John Sullivan requesting a construction fee waiver for the Train Station Project and Memorandum from Building Inspector Bertram M. Cook regarding construction fee waiver for the Train Station Project *Discussion ensued as to whether a fee waiver fits this situation as GATRA is a Government agency doing a project that is not going to benefit everyone in town, as would a Town project. We're also in a tight budget situation and need the revenue.*

  **Motion:** Not to waive the construction fees for the Train Station Project

  (MacCaffrie-McCue) 4-0 **Passes** *Fees are <u>not</u> waived*

## Board and Committee Appointments

- • World War II Scholarship Committee – an application was received from Phyllis Donovan for reappointment to a term ending January 1, 2008.

  **Motion:** MacCaffrie-McCue 3-0-1 with Selectman Donovan abstaining **Passes**

- • Board of Health – an application and e-mail were received from Kenneth Torman expressing his interest in appointment to a term ending January 1, 2006.

  **Motion:** To appoint Kenneth Torman to the Board of Health

  (MacCaffrie-McCue) 4-0 **Passes**

*Selectmen Amoruso returned from the Cable Advisory Committee meeting and joined the Selectmen's meeting at this point in the evening.*

**Town Manager's Evaluation**

Town Manager Evaluation forms were completed by four of the Selectmen and compiled into a combined form, with the results averaged and all comments included.

Selectman MacCaffrie chose not complete an evaluation form but rather to make a statement regarding the Town Manager's performance.

Chairman Donovan explained the rating scale of 1-10 with 1 being "Needs Considerable Improvement", 5 "Needs Moderate Improvement", and 10 "Needs Little Improvement". The over-all averaged rating of the Town Manager equaled 8.84.

The evaluation included the following areas:
1. 1. Legislative Relations: averaged rating of 8.63
   - -    Responsiveness to and communications with Board of Selectmen, School Committee and Town Meeting Representatives
   - -    Agenda Information
   - -    Quality of response to Selectmen's needs and concerns
   - -    Town Meeting preparation
   - -    Timeliness of reporting
   Comments:
   *Chairman Donovan:*
   The Town Manager is accessible to the Board at all times. Excellent communication with the School Committee. Meets on a regular basis with Town Representatives to discuss the Town budget and keeps everyone informed of the agenda and policies of the Town. Prepared and organized for the Town meetings in a professional manner.

   *Selectman Amoruso:*
   Communication with all parties produced reasonable, balanced budget process.

   *Selectman McCue:*
   Sometimes information reported at Selectmen's meetings could be conveyed prior. Greatly improved relationship with schools.

   *Selectman McCarter:*
   Has had an open door policy and is willing to meet with anyone. State Legislators speak highly of him; had all information ready for Town Meeting; relationship with School Committee has improved dramatically.

2. Public Relations/Communications: averaged rating of 9
   - -    Relations with media
   - -    Handling of public information requests/complaints
   - -    Relations with other public groups and organizations
   - -    Public presentations/education
   Comments:
   *Chairman Donovan:*

Have observed his knowledge and experience in handling all groups and organizations in a very competent manner.

*Selectman Amoruso:*
Very responsive to most groups and individuals. Responds to perceived needs and problems in a similar manner, involving the public with much success.

*Selectman McCue:*
Great relationship with Seniors; tries to involve himself in civic groups and events; has received great support from a range of groups. Always tries to represent Mansfield in a positive manner with the press.

*Selectman McCarter:*
Is always prepared and comfortable when speaking before a group and represents the Town well.

3. Budget Preparation and Administration – Averaged rating of 9
   - - Clarity and accuracy of budgetary information
   - - Responsiveness to indicated Town needs and policy goals
   - - Creativity in developing budgetary alternatives/options
   - - Monitoring of budget administration during the year
   - - Establishment of effective and productive relationship with
     School and Finance Committee

Comments:
*Chairman Donovan:*
Always has the budget completed and balanced on time. Meets with School and Finance Committees to balance the budget. Excellent record.

*Selectman McCue:*
Gave him a 10 which speaks for itself. Did good job last two years in budgeting process. Always creative in finding ways to stretch a buck. Need to be very conservative in settling contracts upcoming year.

*Selectman Amoruso:*
Town Manager's strongest suit. His approach is always creative.

4. Managerial Skills: Averaged rating of 8.5
   - - Organization and planning
   - - Written communication/reports
   - - Ability to develop alternative options and courses of action
   - - Creativity/innovation
   - - Decisiveness

Comments:

*Chairman Donovan:*

Mr. D'Agostino is very well organized for communicating and reporting on a weekly basis the progress, development and achievements of each department. Spoke to many employees and everyone seems to respect him.

*Selectman Amoruso:*

Too many cases of impact bargaining—need to try to reduce the process. Work to improve customer service in Town Hall still has produced somewhat uneven results.

*Selectman McCue:*

Enjoys the support and respect of staff in Town Hall.

*Selectman McCarter:*

Some recent issues that have become problematic, but gave him an 8.5

5. Direction/Supervision of Town Organization:   Averaged rating of 9
   - - Leadership provided to department in addressing Town goals and policy
   - - Coordination of programs/activities
   - - Staff development, growth and recruitment

Comments:

*Chairman Donovan:*

The Town Manager has excellent experience with Town Government and has the ability to improve operational procedures in the best interest of the town.

*Selectman McCue:*

Staff very good and given opportunities to do their thing—however, sometimes Town Manager seems to use them to respond to Selectmen where the response is due from the Town Manager.  Over-all has selected good people to fill positions that were vacant.  Gave him a good mark, but bringing the Electric Department to the same goals has been difficult

*Selectman Amoruso:*

Initiative to improve customer service has been uneven and needs continual work, although there has been improvement. Working to improve disconnects with Electric Department.  Has done an excellent job in selecting staff.

*Selectman McCarter:*

Staff is always very responsive to the Town Manager's requests.

6. 6. Personal and Professional Growth of Town Manager:  Averaged rating of 9

- - Continuing professional education and development
- - Attendance at professional meetings, seminars, and
  Conferences
- - Active membership in state and national professional
  organizations

Comments:

*Chairman Donovan:*

Mr. D'Agostino attends seminars, meetings and conferences which keep him informed of all new state regulations and is very active with local politicians which is an asset to our town. He is always striving to promote new businesses for the town.


*Selectman Amoruso:*

Has improved in professional activities and organizations; increasingly involved without sacrificing Town responsibilities.


*Selectman McCue:*

Respected in his field by contemporaries; attends professional events regularly; member MMMA and other State and National organizations.


7. Overall rating: Averaged rating of 8.75
   - Strengths, weaknesses not otherwise readily measured
   - General Comments

Comments:

*Chairman Donovan:*

The Town Manager is instrumental in obtaining grants to help the citizens of the Town of Mansfield. Also he has a great interest in helping the seniors and the youth of Mansfield.


*Selectman Amoruso:*

John has improved in making more measured responses to questioners; however, he still finds it hard not to make comments on questions that are not always appropriate. This applies to a couple of people only. Has made strong efforts to reach out to involved groups and individuals in activities important to the town. These are the highest grades I have given John percentage-wise in four evaluations.

*Selectman McCue:*

Is pleased to reappoint him for three more years. There has been a clear cut improvement in many areas.


*Selectman McCarter:*

Being Town Manager is a difficult job.  He deals with many issues and many personalities each day and it's impossible to keep everyone happy.  Has best interests of Town at heart and does his best for everyone.  Has accomplished many things which other Town Managers might not have taken on.  Has done projects for youth and elderly during his tenure.  Is an asset to the Town and is a cut above many Town Managers.

*Selectman MacCaffrie*:
Stated he did not rate the Town Manager because he hasn't been a selectman long enough to get a good overview.  He also didn't feel comfortable doing an evaluation after a vote was already taken to rehire him.  He pointed out that over the last month or so they've come to a measure of understanding with each other.  As he's looked at what's happened over the last few years regarding growth and budgetary procedure he's done an excellent job.

Selectman McCue noted Mansfield would have been at a substantial loss if the Town Manager had been chosen and agreed to take the position in Dennis.  Given the times we're in, for us to find someone of John's caliber and skills would have been difficult, if not impossible.  Having him with us for the next few tough years will be invaluable.

Chairman Donovan called for representatives of the Board of Selectmen to negotiate a new contract.  Selectmen McCarter and McCue volunteered.  Selectman MacCaffrie stated he would be willing to do so if someone else does not want to.  It was determined that the subcommittee would be comprised of Selectmen McCarter and McCue.

**Cable License Issues**

Selectman Amoruso reported we still have deficiencies in the cable license that are being worked on.  Attorney Bill August suggested some of the issues we had planned on discussing at this meeting should be held off until we get closer to the renewal of the contract.  The license ends in March, and as a Board it will be necessary to get the recommendations very soon.

Town Manager D'Agostino noted Mr. Foss met with staff and Selectman Donovan yesterday regarding the burial of the cable on North Main Street.  We'll need to schedule a public hearing for Wednesday, February 12th for a renewal vote, and on that date also need to schedule a hearing on the location of the underground wires on North Main Street.  They will meet with the Ascertainment Committee at 6:00 p.m. February 12th and present their recommendations that night.

Verizon's burial of wires is in process and we'll have to work with them in dealing with AT&T's timeline—which is different than that of Verizon. It will be necessary to get Verizon to leave their wires in place until AT&T completes its work. Verizon is ready to bury their wires. The raceways have been completed and they're about eight weeks from completion of their project.

AT&T's timeline is: January 21st - present 60% design plans; January 21-24 - schedule a walkthrough with staff to understand the scope of the work; January 27 - utility review meeting. At that point 100% design plans will be completed and we'll then go forward two weeks to schedule a public hearing. There will be a charge per foot for the review, which AT&T will ask be waived. Mr. Foss will raise the issue that we have a similar utility working in our right of way that has not paid the fee, but that was started prior to the implementation of the policy. They will be ripping up one side of the street out six feet from the curb. Under the existing policy they will be required to use flowable fill and infrared cuts in restoring the road. They've raised the issue that the size of the current raceway is not sufficient to handle all that needs to go in it, which includes the fiber optics. The bottom line is we made a mistake ten years ago in not forcing Verizon to put the wire underground then.

Selectman MacCaffrie noted they're bundling the fiber optics in larger bundles now to get more in there. The Town Manager said we're now requiring utilities to provide larger raceways and a spare. We do not yet have the design plans. Selectman McCue stated he is surprised and concerned that this issue is being raised at this late date. Town Manager D'Agostino noted that if there is a back charge for taking the lines down, AT&T will have to pay for it. He stated this has been the most frustrating aspect of his public career. The issue was raised a year ago and they were asked to do the design plans. The Light Department has been working with both AT&T and Verizon to get them to do this. We now have more of a schedule and that is what's driving the issue currently. An effort is being made to get them to use two crews. They want four months to complete the work. We're giving them 90 days and asking them to use two crews and work 7 a.m. to 5. p.m. Neither AT&T nor Verizon like talking to each other, as they are competitors. Their interests are very different from ours. He noted how contentious the meeting was and said the issue was raised at the last Light Commissioners meeting.

**Town Manager's Report**

The Town Manager reported:

- • The Town will be working with GATRA over the next several weeks to replicate parking spots that will be lost during the construction of the Train Station. GATRA and the Engineering Department will work to design and construct diagonal parking along Old Colony Way for commuters and the spaces will revert to two-hour parking for businesses along North Main Street following the construction. During the

construction they will be numbered spots to replace MBTA spots lost. *Selectman MacCaffrie suggested there could be a cost pass-through to the project's construction costs. Selectman Amoruso asked if we will still be paying MBTA for the spaces lost if we're replicating them on our land. It was determined there's a benefit to us with revenue and maintaining the number of spaces required to satisfy the terms of the agreement.* Some of the spaces will be for "residents only" if resident only spaces are lost elsewhere. The contractor has to provide for safety during the construction. They want to put the construction trailer on the North Common, which he is not enamored with, and it will have to be worked out. *Selectman MacCaffrie suggested dealing with the contractor on this as it is common industry practice to negotiate trade-offs. Selectman Amoruso said he would not be averse to their putting the trailer on the North Common if they would do the underground work in exchange.* He's asked John Sullivan to begin the diagonal parking design on one side of Old Colony Way.

- • We're planning a groundbreaking ceremony for the WWII Veterans Memorial Bike Path sometime in February. State officials will be invited. This project has been ten to twelve years in the making. He noted the number of projects finally moving forward, including these and the Williams Street Bridge. He highlighted our disappointment that the agreement with Norton did not work out and that the bike path will end in Mansfield. He commended Shaun Burke, John Sullivan, and Lorilee Fish for their diligence and efforts in keeping us focused and on track to reach this point. Lt. Col. (Ret.) Lester McGoldrick is working in a covert manner to get the Norton portion moving.

- • Has issued a memo effective immediately asking all department heads to adhere to a strict spending and hiring freeze. We will only commit to essential programs and services and will honor any contracts already entered into. We anticipate shortages in the Health Insurance, Snow and Ice, and Special Education accounts, coupled with shortfalls in revenue from the State. We're looking toward attrition by not filling any positions that become vacant through resignations or retirements. We've achieved a Town operating budget increase of 1.67% in '04 over '03. With significant increases anticipated in Health Care and Property, Liability and Casualty Insurance, a $7.2 million budget deficit is projected. He plans to keep all personnel informed of our progress and hopes to reach a balanced budget without significant reductions in programs and personnel. Current best numbers regarding the shortfall are SBAB reimbursement $552,221; Pupil Transportation Reimbursement of $151,273; and Police Career Incentive Reimbursement of $93,512 – for a total of $797,006.

- • The FY2003 budget is funded by $15,162,789 in State local aid reimbursements per quarter and represents 25.97% of our total budget. This equates to $3,069,029 per quarter or $6.1 million for the final two quarters. If our State aid were cut by 7.6%, this would amount to a total reduction of $466,523, with $376,308 being

Chapter 70 funding.   In addition to the quarterly local aid we're waiting for a total of $797,006 previously mentioned.   In our collective bargaining agreement we have a provision that if we do not receive the amount from the Quinn Bill payments, salaries can be reduced by that amount.   We need to cover deficits in health insurance, unemployment costs, and Medicaid amounting to $144,269.   Combining this with an anticipated State revenue reduction, we're looking to cover a total of $610,792 to $758,115.   The snow and ice deficit is unknown at this time.   We have approximately $25,000 left with the rest of winter ahead of us.   The Board will be informed before any cuts are made.   A mandatory meeting with department heads will be held within 48 hours and there will be a diligent effort to close the gap. *Selectman McCue asked if it makes any sense to look at personnel reductions at this time.*   It will be an option if we cannot close the gap any other way.   Until we know what the actual numbers are going to be, it would be premature.   We need to work cooperatively with the schools on the '03 budget if we have any hope of doing so on the '04 budget.   He anticipated having sufficient information to discuss particulars in the next three to four weeks. *Selectman McCue urged the Town Manager to get the information out upfront and if layoffs are likely, people should be made aware of it.*   The majority of our expenditures are on track for this point in the fiscal year.   With the freeze, additional revenue will be freed up to try to close the gap.   It is likely that it will not be possible to do so completely without affecting programs and personnel.   We do not have money in unemployment, so that line item will have to be funded as well.

**Selectmen's Old Business**

Selectman McCarter:

- • Asked the status of appointing a Fire Chief. *We've called for a weighted, graded exam and it will probably be done by the summer.  Deputy Bellevance is Acting Chief and Richard Towne is serving as Deputy at this time.*

- • Spoke of discussing the expansion of the Senior Work Program and noted his intent to fund it through the Utility Enterprise Accounts.

Selectman MacCaffrie:

- • Said he respects Mr. Dentino highly, but had the opportunity in an MMA Seminar to address senior law officers and the Assistant Attorney General regarding executive session and spending money.  To a person, we did everything right because what was

done pertained to the executive session and what it was about. At the time of the vote the matter was still a matter for executive session and when it is no longer a concern, the information will be released with the minutes. He stated getting much out of the sessions and noted it was substantially worthwhile. We should consider ourselves extremely fortunate after hearing of the problems of other cities and towns.

Selectman Donovan:

- • Attended the Wheelchair game at the High School and it was a wonderful event.

- • Sunday traveled to Somerset to honor Holly Holt's achievement in attaining the Girl Scout Gold Award.

## Selectmen's New Business

Selectman McCarter:

- • Talked about our monetary problems hitting this fiscal year and how decisions we'll have to make will not be popular. He suggested some areas to look at:
Trash fees in such a way as those who don't use the service much will not be hurt; sweep accounts prior to going into next year; cut things the State mandates but does not fund; emergency funding from Light Department; tax on concerts that would benefit us; event parking that would provide income for the town; Stabilization Fund; Reserve Fund; hiring freeze; health insurance re-negotiation with Unions; furloughs. *The Town Manager interjected information received from Moody's regarding our A-1 rating which stated the Town's operations are sound.. A sizable portion of the outstanding debt has been excluded from Proposition 2 ½. He stated we need to protect the financial integrity of the community in whatever we do.*

Selectman Amoruso:

- • May need to look at some of the contracted services we're using and keep every option on the table to handle the severe cutbacks that are necessary.

Selectman MacCaffrie:

- • Department consolidations are one of the things we talked about this weekend. He noted unemployment payments are also a consideration and need to be weighed. *The Town Manager noted we would not sacrifice one department at the expense of another.* Selectman MacCaffrie noted listening to various debates on the issue during the MMA meeting and when it became divisive he spoke out to state this is the time we need to stand together. We're relying on our legislators to help us, and they're not in the trenches every day the way we are in Town Government.

Selectman McCue:

- • Had asked in the past that we have a meeting with other Boards of Selectmen in the area. He spoke with several from the area over the weekend who were receptive to the idea and suggested we need to sit down with those in our area who share common concerns and costs to see if there's something we can do together to get through the next three difficult years. There have been "walls" down between towns in the past, and we need to pursue cooperation on any conceivable level to get us through this. He asked for representatives of our board to work with representatives of other towns. *Selectman Donovan spoke of discussing this with area Selectmen who have expressed interest in approaching our legislators as a group.* Selectman McCue pointed out the ability to use it to reduce costs as well. *The Town Manager will work on it and will contact those in towns contiguous to Mansfield and other towns in this immediate area.*

- • A letter was received from the Lt. Governor asking for input on how they can assist with maximizing our resources. He spoke of his desire to approach the Legislators and ask them to suspend the 40B laws because without our ability to have oversight, they produce a tremendous strain on our resources-- particularly in the area of schools. They will require the funding of additional employees to service the needs of the added residents and it would be reasonable for them to use executive powers to suspend this law for a period of time to allow us to get through the next few difficult years. He stated it was a noble notion when the laws were created, but they've become perverted. This would allow the Legislature a year or so to go back and re-tool this law so that it would revert to what it was intended to be. We could join the network created by Bob Kimball and the Norton Selectmen and use this window of opportunity as a silver lining to the cloud. *Selectman McCarter noted Norton has been outspoken on the issue and has led the fight and agreed that perhaps it is time to join them. He likened 40B regulations to an unfunded mandate.*

- • **Motion:** That we approach the issue through the appropriate channels (Governor's Office) asking them to temporarily suspend the law for those 40B projects that don't yet have a shovel in the ground.

    (McCue-MacCaffrie) 5-0 **Passes**

    Selectman Amoruso said he supports the motion wholeheartedly, but doesn't believe it will solve our budgetary problems. He'd like to see capping Special Ed expenses or supporting some of the proposals for hotel and concert taxes. Selectman McCue noted that for any 40B project starting now, we would need to be providing services next year. Selectman Amoruso said the kind of things he'd like to see from the State are rate setting on health insurance.

    A letter requesting a moratorium from all the cities and towns in Massachusetts will be drafted.

## Questions and Comments

Paul Johnson, Mayflower Drive – disagreed with Selectman Amoruso that there is not an immediate impact from 40B, pointing to the time being spent by the Town to study and fight this. He noted the perversity of the rents being charged and said he believes this brings the towns together and maybe it will be heard.

Mr. Johnson also spoke on the cable debate held previously, noting he was in the telecommunications industry for five years and got out. He suggested what AT&T is doing now is immoral and illegal. They are out of compliance and can be fined and suggested calling Kevin Casey, who is Mr. Foss' superior, at 978-683-5500 – AT&T Corporate Office in Andover. He'll make a difference because he cares and he makes the decisions for the Northeast unit.

Asked if there has been a resolution to the underpayment of retirement funds and the affect on the town. *There is good indication that our level of participation in employees making it up is increasing. It is the annuity portion of the retirement.*

He also offered fiscal discipline suggestions, noting it doesn't go across all departments and pointing out fiscal discipline has not been implemented in the School Department where they were talking about increases in full-time employee counts and buying new trucks. He acknowledged the Selectmen's inability to control school spending, but suggested townspeople take heed and exert some pressure to control the spending on the school-side of the budget. *Selectman McCarter noted their fiscal approach is different, as they begin with a "wish list".* The lights being left on late at the track and field at the High School were also raised as a case in point. He stated it's been said that "Any fool can cut a budget" and he trusts many of the decisions that go through. He questioned the need of buy two new police cruisers and the hiring of a new Fire Chief. He asked if the new ambulance will mean we need to have more paramedics. *Selectman Amoruso noted the intent is to employ more paramedics without hiring additional employees.* He spoke of the proposed Zero Quorum and suggested letting people know how much the meeting not held due to the lack of a quorum actually cost them. He also suggested increasing ticketing (enforced revenue enhancement) which would cover the cost of a police officer and enforcing the by-law regarding the clearing of sidewalks as a means of increasing revenue. *The funding has been reduced from $24,000 to $6,000. for the services of the Police Department in controlling traffic at the Train Station. They are now providing the service during regular duty time unless called out for services. The Police Department should be able to cover that location 90% of the time without calls for service according to the study we had done. The Town Manager will look into it further and ask for a report on the calls for service during that time period.* Mr. Johnson noted the 5:45 p.m. and 6:15 p.m. trains are the most heavily used.

Selectman McCue asked if the Board would consent to his making phone calls tomorrow morning instead of sending out letters regarding the 40B moratorium request. It was agreed that he could do that.

**Adjournment**

**Motion:** To adjourn at 10:28 p.m.
(McCarter-MacCaffrie) 5-0 **Passes**

_Steven W. MacCaffrie_
Signature of Clerk

_January 22, 2003_
Date of Approval

EXHIBIT NO. 11

Board of Selectmen
Annual/Special Town Meeting
Minutes of May 20, 2003

The Board of Selectmen convened at 6:07 p.m. in the High School Auditorium prior to the start of the Annual/Special Town Meeting.

Present were: Michael W. McCue, Chairman; Steven W. MacCaffrie, Vice Chairman; Roger S. Achille, Clerk; and Selectmen David W. McCarter and Louis P. Amoruso

School Committee Members Jean Miller, Michael Trowbridge, Jeff Sankey, Steve Greenberg, Emil Giordano

Finance Committee Members Jack Goldberg, Andres Gazzolo, Jim Lazzara; Frank DelVecchio; Michael Sams; Jeff Lang

Staff: John O. D'Agostino, Town Manager; John Moretti, Superintendent of Schools; Lincoln Lynch, School Department Business Manager; Jack Beliveau, Light Department Director

Town Manager D'Agostino noted there's agreement on how budget will be balanced based on the following assumptions:
1. 1. We're going to use approximately $1.1 million from Stabilization.
2. 2. Not Fund capital budget FY'04
3. 3. $180,000 plus an additional $100,000 in the form of a payment in lieu of taxes (PILOT) from the Light Department to balance budget
4. 4. Put the first $400,000 in Free Cash into the Reserve Fund

Motion: Transfer an additional $100,000 from the Light Department as a PILOT to the general fund
    (Amoruso-McCarter for discussion)

Jack Beliveau noted last year the Light Department generated $1.9 million in profits, and $600,000 was paid to the Town. He slowed down construction that was going to be done in the Fall to await the accumulation of more funds. This $100,000 slows us down by about another month, but is not fatal.

Selectman McCarter noted a month ago Mr. Beliveau said there's no money.

Mr. Beliveau reiterated it was a cash flow problem, which is why construction was delayed. The first issue is that it's important to look at earnings and the ability to support an on-going light department. Second is the cash position. He noted everything looked gloomy when the statement was made—oil was up 50%, we were going into war with Iraq. He stated the importance of having sufficient cash.

Selectman McCarter asked if the additional $100,000 contribution from the Light Department would balance the budget. Town Manager D'Agostino noted the townspeople would still have to decide on the use of Stabilization to do so. Discussion ensued regarding the possibility of Richard Devine requesting that the voters take additional money from Stabilization to restore teacher positions and how that would be handled.

Selectman McCarter raised the question of taking $1.2 million from Stabilization and leaving the Light Department alone. Selectman MacCaffrie noted that as Light Commissioners have a substantial obligation to the Town's businesses who are already paying taxes and don't use the School system. He stated we have a big project coming up to power a substation in East Mansfield that has to be done or we won't have power. The issue of the need to keep as much as possible in Stabilization was further discussed.

Vote: To transfer $100,000 from the Light Department in addition to the $480,000 PILOT   5-0  Passes

Motion  To use $1.1 million from Stabilization
        (McCarter-MacCaffrie) 5-0  Passes

The School Committee, Selectmen and Finance Committee further agreed on this amount and discussed how it would be presented to the voters.

The Selectmen continued their review of Town Meeting Warrant Articles.
Revolving Firearm Funds Article – the Chief is using it.
Motion: To support
        (MacCaffrie-McCarter) 5-0  Passes

Motion:  To reconsider Article No. 15 on the Special Town Meeting Warrant
        ( McCue-McCarter)
Chairman McCue reported that he spoke to a couple of the principals of the Fair Housing Committee and Shaun Burke and they don't really have a good plan of how they would use the $10,000. He would like to bring it back next year if there's a clear explanation we can give to Town Meeting, but is not comfortable going forward with it at this point.
        4-0-1 with Selectman Amoruso abstaining  Passes

Selectmen were advised that there has been a settlement agreement reached in the matter of the Grant Dog Hearing. They were asked to decide if they wanted to accept the agreement or go forward with the scheduled court date. Selectman McCarter said he feels uncomfortable agreeing to the settlement, noting the Board's obligation to all the residents who attended the hearing and voiced their concern about the Grant dog. Chairman McCue reiterated the same concern. It as the consensus of the Selectman that accepting the settlement agreement does not resolve the matter.
Motion: To go forward with lawsuit and recommend the compromise offer
        (Amoruso-McCarter) 3-1-1 (MacCaffrie opposed; Achille abstaining)

Selectman McCue asked if the Selectmen wished to reconsider support of Article 42 to be consistent with the Board's not taking a stand on other zoning change articles.   Following a brief discussion no action was taken.

Motion:  To adjourn at 6:40
       (MacCaffrie-Amoruso)  5-0   Passes


___*Roger S. Achille*___
Signature of Clerk

___*May 28, 2003*___
Date of Approval

EXHIBIT NO. 11A

## Board of Selectmen
### Workshop with Finance Committee to Discuss the FY2004 Town Budget
### April 29, 2003

A workshop meeting was called to discuss ways to address the FY2004 Town of Mansfield budget shortfall.

**Present:** Selectmen Chairman Daniel Donovan; Vice Chairman Michael W. McCue; Clerk Steven W. MacCaffrie; Selectmen Louis P. Amoruso and David W. McCarter.
Finance Committee Chairman Andres Gazzolo, Michael P. Sams, Jeffrey A. Lang, Charlene Lavin, James P. Lazzara, and Jack B. Goldberg.
Also present was Town Manager John O. D'Agostino; Town Accountant Bea Kearney, and Treasurer/Collector Richard Boucher.

The workshop began at 7:00 p.m.

Mr. Gazzolo presented the updated budget. He referred to the $5 million shortfall in the Summary Projections and potential revenue sources identified to date totaling $4,984,000-$5,074,000. These included increasing growth, the health care buy back provision, school's postponement of 1% of increase from April to July 10, 2004, closing Town Hall one day a week (Friday-half day), school cuts, stabilization funds, Electric pilot of an extra $180,000 upfront, Special Ed circuit breaker, and benefits cost reductions. Selectman Donovan suggested the Finance Committee proposal attempts to balance the budget on the backs of those who can least afford it. He also pointed out the Finance Committee last Fall spoke against early retirement, which he said would have saved us money. Mr. Gazzolo said he was told those who retired would have had to be replaced and there would be no savings.

Mr. Gazzolo noted speaking to employees who have indicated the benefits cost reduction proposal will not happen. The Unions are not happy with that and are not willing to negotiate from what he's been told. Mr. D'Agostino stated the Unions are looking for a scapegoat and he did not mention anything about the $1 million. He noted this is the first he's heard of it and stated he is not going to comment on it. He also questioned why people would be calling Mr. Gazzolo. Mr. D'Agostino said he has been dealing with the Unions for a 60/40 split plus dental. Mr. Sams noted we'll know by May 13th when the teachers take a vote. Mr. D'Agostino said there is a meeting scheduled with all employees on May 5th. Selectman MacCaffrie noted the Town Manager actually said there is an $800,000 differential and we are going to attempt to make it up in the health care benefit package. The statement was the only stickler was the teacher's contract is not up for another year. It was generally agreed that this may not be a possibility.

Mr. Gazzolo encouraged the group to agree on items 1 through 8 of the potential revenue sources. Mr. D'Agostino suggested using $2,000 from Stabilization in FY2004 to keep Town Hall open on Fridays. With respect to cost benefit reductions, if that is not achievable we have to propose an equitable split between Schools and Town based on the percentages of the budget, then cut staff. Mr. Gazzolo said we're looking into cuts, but would like to see an extra contribution from the Electric Department for one year. Mr. D'Agostino said he would not support sustaining it beyond one year. Mr. Gazzolo suggested $300,000. Selectman McCarter questioned why it is suggested to take it from the Light Department before taking it from the Town's own money. Mr. Sams noted there are many one-time revenues built into this budget. If we take out more from Stabilization this year and we don't get an override, there will not be sufficient funds next year. Mr. Gazzolo reviewed the assumptions presented in graphic form on page 1 of his handout. The estimate of $3,700,000 is based on these assumptions and we need to have our reserves based on what has occurred over the past few years. Mr. D'Agostino said he is not

comfortable balancing the budget with one-time revenue sources. The Reserve Fund was close to $1 million when he started here and it's taken this long to get it up to where it is today. Mr. Gazzolo pointed out the decrease in State revenue is a major shift in the trend. Mr. D'Agostino noted he would be looking at the '05 budget with some portion of it having to be made up in the '04 budget. If the Quinn bill is not funded, there would be a reduction in salaries. He stated we have to look at increasing our recycling rates and reducing our tonnage. The current cost is $72.69 per ton times 8,600 tons. We've increased to this amount from 7,800 tons since 1997. In the '05 budget we will need to look at a modified plan that keeps it in the tax rate. Mr. Sams noted we're looking at shortages that could go to $3 million in '05 with the built-in increases. Selectman McCarter stated as a general matter, he would rather take $1 million and keep Town Hall open. He noted the proposal is asking employees to take a "double whack" with their increased insurance costs. Town Manager D'Agostino pointed out those items need to be negotiated and are not guaranteed.

Selectman MacCaffrie noted the School's budget hearing the other night was ridiculous—they were cutting teachers that have never even been hired. Mr. D'Agostino noted if we do a Town Hall closing one day per week, we are not going to get the cost reduction benefit. Selectman Amoruso stated the Teacher's Union is not going to agree to a change in the health care cost to benefit the Town Hall employees in keeping it open. Mr. D'Agostino noted all these items have to be impact bargained--health insurance, hours of work, etc. Mr. Gazzolo suggested if those two items are out of the mix, we then have a $2.3 million shortfall. Selectman MacCaffrie stated we should then split it evenly between the Town and School side. Mr. Gazzolo noted the need to have an agreed upon budget going into Town Meeting. Selectman McCarter suggested any layoffs would have to be done 2:1 to cover unemployment for those laid off. The Finance Committee's estimate was it would equate to 35 people between the Town and Schools. The percentage of the School budget versus the Town budget would be factored and the split would be made accordingly.

Selectman McCarter questioned the push to balance the budget by taking money from the Light Department. Selectman MacCaffrie said he has a problem taking someone else's money. Mr. Sams suggested if taking $300,000 from the Light Department doesn't affect the ratepayers, why not do it. Selectman MacCaffrie noted concern that it's only putting off the inevitable. Mr. Sams noted the point makes sense if someone can tell us what the Light Department can and cannot do. If we can put off laying off people for another year, he suggested we should do it. Selectman McCarter said he disagrees with the philosophy of it, but not necessarily doing it. Mr. Lazzara said it would be asking the Light Department to do only what every other town department has been asked to do. They are town employees operating with ratepayers' money. Selectman MacCaffrie pointed out utilities are limited as to how much money they can make. Selectman Amoruso noted it would taking it out of the "Reserve Fund" for the Town or the "Reserve Fund" of the Light Department. It is their sole capital fund to drop back on just as our Stabilization is ours. It's assigned for capital costs for large projects. We need to have the ability to increase electricity to meet the needs of a growing population.

Mr. D'Agostino noted discussion with Jack Beliveau brought out the fact that there is money paid to MMWEC for an accelerated buy-out of our nuclear power obligation. He would not recommend that we take any money under any circumstances from their capital accruals because of what we have facing us. We need to build a sub-station and run the infrastructure. We can only make $1.8 million per year, and we don't have ten years left to build that kind of money. We would be "robbing the future" by taking that money. Mr. Sams said the burden can't just fall back on the Stabilization Fund for everything. Selectman Amoruso noted there needs to be some "sharing of the pain." Selectman McCue suggested there should be some input from Jack Beliveau on this issue. Town Manager D'Agostino pointed out the Selectmen are the Light Commissioners and he is the Manager of the Light Department. They are therefore well represented and will also sit down and discuss this with Mr. Beliveau before such a decision is made.

Mr. Gazzolo said we need to go somewhere else to get the money because the Town cannot afford to lay fifteen people off. Selectman Amoruso asked how we would accomplish that, noting there is already an organized movement to go to Town Meeting and get what they believe the Schools need. Mr. Sams said it's important for the Selectmen to defend the Stabilization Fund. Selectman Amoruso noted Mr. Devine will get up and tell everyone of all the towns will far less stabilization and higher bond ratings and it will be all over. He noted the need for us to be prepared to explain that and agree on it. Mr. D'Agostino suggested he and Mr. Moretti need to meet and agree how the budget is going to be balanced. Mr. Gazzolo suggested Mr. Moretti wants to force us to go to an override next year. Selectman MacCaffrie noted we're being forced for the benefit of the School Department. Anything we give up only goes to the Schools.

Selectman Amoruso asked what happens if we take $300,000 from the Light Department and $300,000 from Reserves—where are we then. Mr. Gazzolo stated it leaves us with a $700,000 deficit. That equates to cutting a total of thirty people. Town Manager D'Agostino said he's hearing now that the Senate numbers are going to be better than the House numbers—however, our budget has to be done by the first of June. Mr. D'Agostino noted the assumption everyone's working on is 5 percent less than the House numbers. If we take the House budget, which is worse than the Governor's but better than we anticipated, we have a $2.8 million reduction based on a $2.6 million deficit using the House budget. However, we're using the benefit cost reduction at $1,000,000, but the health care buy back provision would lessen the impact.

Mr. Gazzolo said we know we have $1.3 million that we have to tackle. We need to know what the Electric Department can do and if they're going to do it. Selectman MacCaffrie said he would not want to tell them, would not like it to become public, and would not want anyone to know about it. Mr. Gazzolo said if we don't do it until the night of Town Meeting, it won't work. We'd be going in divided and undecided. It was pointed out we already know we're not going to have a $1.8 million profit. Selectman Amoruso said there is a way to get the money from the Light Department, but said he's not sure it's the way to go because we'd just be taking it from the residents in another way. Selectman MacCaffrie noted we're making up our shortfall on our side 100%, for which the School Department is reaping the benefit. Mr. Sams said the problem is bad contracts with the teachers that create fixed costs of 85 percent. Selectman MacCaffrie noted we're now paying the $170,000 for transportation, but they're not reducing their budget anyplace else in that amount.

Mr. Gazzolo pointed out any decisions made now will greatly impact next year and every other year. He asked for their guidance. Selectman Donovan noted the $9 million that we pay for schools. Mr. Sams stated it's always balancing the benefit and burden and suggested recommending more than $700,000 is too big a risk. Taking it from the Light Department is a risk, but he suggested it can be made up and is the lesser of the two evils. $300,000 divided by the number of households is insignificant.

Mr. D'Agostino suggested taking the $1 million hit from Stabilization and going for some money from the Light Department. Selectman McCarter said it's more fair to take money needed for the Town budget from taxes. Selectman Amoruso spoke about whether it's fair to do that. Mr. Sams said we're in an unavoidable override situation next year if we take the money from Stabilization. Mr. D'Agostino noted if the worst-case scenario doesn't materialize, we can take the additional revenue in the Fall and put it back into Stabilization. We used $520,000 last year and had $760,000 from Free Cash. Mr. Boucher noted there is another early retirement bill that will be passed in the next couple of days, but that will not help us.

Selectman Donovan said he is not in favor of closing Town Hall. Mr. D'Agostino suggested that when people want services, they're not going to care that staff has been reduced, and we need to face our

inability to meet those needs.

Selectman McCue noted he's in favor of some of the combined approaches. He does not want to start shoveling Stabilization money into a hole we can't fill. Nobody supported an override. We have no measures in operation to reduce our FY'05 budget next year unless we address what we're doing this year. Trash would remain in the budget as an upfront cost according the Mr. D'Agostino. Everyone would get one 65 gallon container and the cost would be included in the tax rate. Anything else would be additional. We're at a $1.2 million gap now. May 13th is the date we have to have an answer.

Selectman MacCaffrie asked, if the Stabilization goes from $750.00 to a million, whether the Finance Committee would support covering the School's transportation costs that are being paid from the Town-side of the budget. Mr. Gazzolo said they support the Town side because they don't think we can operate without the support. If we don't have the $1 million, the School Superintendent has to go for deeper cuts. Mr. D'Agostino suggested that if we can get $300,000 from the Light Department and find it's not going to solve our problem, then we shouldn't go after it. If concessions are not made in health insurance, cuts will have to be made. Furloughs would save morale, but not the amount of money needed.

Mr. Gazzolo concluded the meeting by asking when a decision will be made regarding a contribution from the Light Department. The Light Commissioners are meeting May 12th and they'll have a decision after that. Mr. D'Agostino is cognizant of the fact that we need the input from Mr. Beliveau as Director of the Light Department. Mr. Gazzolo also asked for numbers anticipated for trash collection in the FY'05 budget. Ms. Lavin asked if the trash program can be changed without a vote. Selectman McCue stated Town Meeting would have to approve it. It's voted as part of the budget.

The meeting adjourned at 8:30 p.m.

Respectfully submitted:                              Approved and Accepted:

   *Mary-Lou  Cotton*                                              *Roger  S.  Achille*

Mary-Lou Cotton, Selectmen's Secretary              Roger S. Achille, Clerk

                                         Date: May 28, 2003

EXHIBIT NO. 12

1

1       COMMONWEALTH OF MASSACHUSETTS
        COMMISSION AGAINST DISCRIMINATION
2

3

4       KIMBERLY STOYLE,              )
                 Complainant          )
                                      )
5          VS.                        )    DOCKET NO.
                                      )    02BEM04039
6       TOWN OF MANSFIELD             )
        MUNICIPAL ELECTRIC            )
7       DEPARTMENT, ET AL,            )
                 Respondents          )
8

9

10            DEPOSITION of JACK BELIVEAU,

11      called as a witness by and on behalf of the

12      Complainant, pursuant to the applicable

13      provisions of 804 CMR 1.00 and the

14      Massachusetts Rules of Civil Procedure,

15      before Teresa E. Costello, Registered

16      Professional Reporter, Certified Shorthand

17      Reporter No. 1452S98, and Notary Public

18      within and for the Commonwealth of

19      Massachusetts, at the Meeting Room of Breads

20      N Bits of Ireland, 530 Main Street, Melrose,

21      Massachusetts on Tuesday, September 23,

22      2003, commencing at 10:00 a.m.

23

24

87

| | | |
|---|---|---|
| 1 | Q. | What brought us to this to begin with was |
| 2 | | that I was asking you if at any time you |
| 3 | | reported Miss Stoyle's complaints about |
| 4 | | harassment or inappropriate conduct on |
| 5 | | Mr. D'Agostino's part to anybody else, and |
| 6 | | you started by saying in March of 2001 or |
| 7 | | thereabouts you reported it to Brad Wills. |
| 8 | | Did you ever report her complaints on any |
| 9 | | other occasion? |
| 10 | A. | Yes. |
| 11 | Q. | And when was that? |
| 12 | A. | In late October of 2001. |
| 13 | Q. | And who did you report it to? |
| 14 | A. | Mr. Amoruso. |
| 15 | Q. | Who was Mr. Amoruso? |
| 16 | A. | He was, at the time, the chairman of the |
| 17 | | Board of Light commissioners, so he did take |
| 18 | | over Mr. Wills' seat at some point in time. |
| 19 | | I apologize.  He was the chairman of the |
| 20 | | board of selectmen at the time. |
| 21 | Q. | Did he also sit as a member of the Board of |
| 22 | | Light Commissioners? |
| 23 | A. | Yes. |
| 24 | Q. | And what was -- did you speak with him on |

88

| | | |
|---|---|---|
| 1 | | the phone, in person? |
| 2 | A. | I asked him to come in and meet with myself, |
| 3 | | Miss Stoyle and Gary D'Ambra, line foreman. |
| 4 | Q. | And did that meeting actually take place? |
| 5 | A. | Yes. |
| 6 | Q. | Did you tell him before the meeting what the |
| 7 | | subject matter would be? |
| 8 | A. | I believe I did in generalities. |
| 9 | Q. | And what was the essence of your |
| 10 | | conversation regarding the subject matter? |
| 11 | A. | That there seemed to be attacks, so to |
| 12 | | speak, going on by the town manager towards |
| 13 | | some of the employees in the department and |
| 14 | | that it had felt that this should be brought |
| 15 | | to his attention, that it was inappropriate. |
| 16 | | In the meeting I related some of the past |
| 17 | | events, the foul language, Miss Fitton. |
| 18 | Q. | Where did this meeting take place? |
| 19 | A. | Light Department office conference room. |
| 20 | Q. | And Mr. D'Ambra, Miss Stoyle, yourself and |
| 21 | | Mr. Amoruso were present? |
| 22 | A. | Yes. |
| 23 | Q. | And you raised the foul language? |
| 24 | A. | Yes. |

```
 1    Q.   What else did you raise?

 2    A.   Well, about Miss Fitton, that that had

 3         occurred.

 4    Q.   What, exactly, did you state about Miss

 5         Fitton?

 6    A.   I probably was very short to the effect that

 7         there had been what I considered

 8         inappropriate advances towards Miss Fitton.

 9    Q.   Did he respond to that?

10    A.   No.

11    Q.   He was silent?

12    A.   At least I don't recall his response if

13         there was one.

14    Q.   Did you relate to him -- strike that.

15         Anything else about Miss Fitton?

16    A.   Not that I recall.

17    Q.   Did you relate to him any other complaints

18         that had been made by Miss Stoyle other than

19         the foul language?

20    A.   Not at -- I don't recall other things in

21         that time frame that had happened before

22         that meeting.  There was sort of an

23         atmosphere of tension going on that caused

24         me to call him in to have the meeting.
```

```
 1        conversation?
 2   A.   I don't have a current recall.  You know,
 3        certainly something may pop into my mind.
 4   Q.   When was the next meeting?
 5   A.   Well, it was actually a telephone
 6        conversation between myself and Lou Amoruso.
 7        That was in February of 2002.
 8   Q.   And did you initiate that call?
 9   A.   Yes.
10   Q.   And what was the purpose of the call?
11   A.   Well, there had been events that occurred in
12        that time frame that Kimberly had herself
13        requested a meeting with Mr. Amoruso, and
14        there were in a sense several things going
15        on, and I then called him to discuss some of
16        the issues and events that were going on in
17        the office and had a conversation with him.
18   Q.   Are those issues and events other than those
19        that you've described as her complaints to
20        you regarding harassment?
21   A.   No.  That was the purpose of my, I think,
22        purpose of my phone call.
23   Q.   So did you subsequently meet?
24   A.   No.
```

94

```
 1   Q.  What, specifically, were the --
 2   A.  Well, I take back.  There were some other
 3       discussions, some other issues.  There was a
 4       customer called Rum Runner and there was
 5       discussion of issues associated with that.
 6   Q.  We're focusing on what brings us here today,
 7       and that is the complaint made by Kimberly
 8       Stoyle for harassment.  Were those
 9       complaints that she made to you discussed
10       with him during your telephone conversation
11       in February of 2002?
12   A.  I guess it's easier for me to answer what I
13       discussed than to --
14   Q.  Yes, it is.  Why don't you tell me what you
15       discussed.
16   A.  I discussed there was an issue over pay
17       raises, I think, that had occurred in that
18       same time frame for the women.  There was --
19       I mentioned to him there had been an
20       inappropriate e-mail, but I did not describe
21       it.  I think I used words to the effect that
22       this could be sexual harassment and that
23       there seemed to be different treatment
24       towards some of the women in the department
```

| | | |
|---|---|---|
| 1 | | so to speak. |
| 2 | Q. | Different than who? |
| 3 | A. | Well, different than everyone else.  Some of |
| 4 | | that could have been coincidental, but I was |
| 5 | | basically trying to express a concern. |
| 6 | Q. | Other than the issues regarding pay raises |
| 7 | | and inappropriate e-mail, the possibility |
| 8 | | that there was sexual harassment occurring |
| 9 | | and differential treatment towards some of |
| 10 | | the women in the department, did you talk |
| 11 | | about anything else in that telephone |
| 12 | | conversation of February of 2002? |
| 13 | A. | Well, I mentioned the issue of the Rum |
| 14 | | Runner. |
| 15 | Q. | Anything else with regard to Miss Stoyle? |
| 16 | A. | Not that I recall at this moment. |
| 17 | Q. | As a result of that telephone conversation |
| 18 | | did you have a subsequent meeting? |
| 19 | A. | I don't believe so.  I think Miss Stoyle |
| 20 | | sent an e-mail to Mr. Amoruso towards the |
| 21 | | end of the month saying something to the |
| 22 | | effect of let's give things another try -- |
| 23 | Q. | Did you -- |
| 24 | A. | -- and that sort of avoided the process of |

1        meeting.

2    Q.  Did Miss Stoyle tell you that?

3    A.  I think she copied that e-mail or else I got

4        back an e-mail from Lou that suggested that.

5    Q.  Okay.  Did you get into the specifics of the

6        e-mail?

7    A.  No.

8    Q.  You just said it was an --

9    A.  I described it as an inappropriate e-mail.

10   Q.  Did you get into the specifics of the pay

11       raise issue, or just did you raise these

12       topics generally?

13   A.  I certainly raised that topic generally.

14       Now why it's not clear to me, I had raised

15       it with Brad Wills as well and --

16   Q.  The e-mail or oh, sorry, the pay raise?

17   A.  The pay raise.  Actually both, but --

18   Q.  You raised e-mail with Brad Wills, too?

19   A.  Yes.  Again, describing it as inappropriate.

20   Q.  Okay.  So let me just stop you.  I'm going

21       to digress for a second.  Do you remember

22       when you raised the inappropriate e-mail

23       with Brad Wills?  Was it in the March, 2001

24       conversation?

99

1    Q.   Did you have any conversation with Miss

2         Stoyle about the reasons why she decided not

3         to have a meeting?

4    A.   I don't recall if I did.

5    Q.   Do you have any knowledge of those reasons?

6    A.   No.  I mean, I'd be speculating.

7    Q.   And I don't want you to do that.  When's the

8         next time that you can recall you spoke with

9         anybody regarding complaints to you from

10        Miss Stoyle about Mr. D'Agostino?

11   A.   October of 2002.

12   Q.   So this is eight months after you spoke with

13        Mr. Amoruso?

14   A.   Yes.

15   Q.   And can you tell me, was there a telephone

16        call, a face-to-face meeting?

17   A.   There was a face-to-face meeting with

18        Mr. Amoruso.

19   Q.   And this is October, 2002.  Who was present?

20   A.   Miss Stoyle, myself and Mr. Amoruso.

21   Q.   How did this meeting come about?

22   A.   I believe I requested the meeting.  I sent

23        an e-mail to Mr. Amoruso.

24   Q.   Okay.  And do you recall why you requested

101

| | | |
|---|---|---|
| 1 | Q. | I show you Exhibit Number 6 and ask you if |
| 2 | | this refreshes your recollection regarding |
| 3 | | your conversation or your communication with |
| 4 | | Mr. Amoruso regarding and October, 2002 |
| 5 | | meeting? |
| 6 | A. | Well, this is the e-mail in which I |
| 7 | | requested a meeting.  It ends with, I would |
| 8 | | like to meet at your convenience. |
| 9 | Q. | And having reviewed that do you recall what |
| 10 | | precipitated the meeting? |
| 11 | A. | There were, I believe, several events, but |
| 12 | | what specifically comes to mind is an e-mail |
| 13 | | received by Kimberly with respect to |
| 14 | | software and adopting some software. |
| 15 | Q. | Did you discuss that -- strike that.  What's |
| 16 | | your understanding of this issue regarding |
| 17 | | software? |
| 18 | A. | Mr. D'Agostino had forwarded an e-mail to |
| 19 | | Miss Stoyle accusing us of having |
| 20 | | implemented a software system or program |
| 21 | | without having discussed it with the MIS |
| 22 | | director. |
| 23 | Q. | Did Miss Stoyle give you that e-mail, or was |
| 24 | | it also sent to you? |

```
1    A.   Probably both.

2    Q.   I show you this e-mail and ask you if you

3         recognize that.

4    A.   Yes.

5    Q.   And --

6    A.   This top page.

7    Q.   And both of those e-mails are cc'd -- well,

8         one is to you and one is carbon copied to

9         you?

10   A.   The top one, in particular, is addressed to

11        me and to Kimberly Stoyle.

12   Q.   Does this refresh your recollection

13        regarding issues about software?

14   A.   Yes.

15   Q.   And what were those issues?

16   A.   Well, the issues raised in the e-mail was

17        that we had undertaken some software

18        initiative, and it goes on to talk about in

19        the future all purchase orders over a

20        thousand dollars will be approved

21        electronically which is something that the

22        town is adopting and on the town's MIS

23        system; however, we have not -- we hadn't

24        done anything.
```

104

| | | |
|---|---|---|
| 1 | | MIS systems to the extent that it interfaces |
| 2 | | with the town. |
| 3 | Q. | And if any such interface was to be |
| 4 | | implemented, is it fair to say that |
| 5 | | Mr. Costa would inform you?  Is that part of |
| 6 | | his job? |
| 7 | A. | Well, I was aware of what the town was doing |
| 8 | | in terms of electronic processing, purchase |
| 9 | | orders, but we have very different systems, |
| 10 | | so it didn't involve us. |
| 11 | Q. | Did you have any opinion as to what the -- |
| 12 | | strike that.  You said that you felt that |
| 13 | | there was another agenda.  What did you |
| 14 | | believe that to be? |
| 15 | A. | I didn't know. |
| 16 | Q. | Okay.  And you refer in the last paragraph |
| 17 | | to a hostile work environment intended to |
| 18 | | cause Kim to find another job.  Can you tell |
| 19 | | me what you meant by that in Exhibit 6? |
| 20 | A. | I don't immediately recall, but there had |
| 21 | | been a few incidences along with this |
| 22 | | particular software that seemed to be making |
| 23 | | her uncomfortable. |
| 24 | Q. | The hostile environment that you're |

| | |
|---|---|
| 1 | referring to, did it encompass the |
| 2 | complaints of harassment that Kimberly |
| 3 | reported to you that you've already |
| 4 | discussed? |
| 5 | A. Yes, and it included -- it was in the same |
| 6 | time frame as the NEPA conference. |
| 7 | Q. Are you referring to the 2002 NEPA |
| 8 | conference at which you testified |
| 9 | Mr. D'Agostino told Miss Stoyle she looked |
| 10 | delicious? |
| 11 | A. Yes. |
| 12 | Q. As a result of this e-mail did a meeting |
| 13 | take place? |
| 14 | A. Yes. |
| 15 | Q. Do you recall when that was? |
| 16 | A. October of 2002. I don't recall the |
| 17 | specific day. |
| 18 | Q. Just going back to Exhibit 7, the first page |
| 19 | of Exhibit 7 is an e-mail to you and |
| 20 | Kimberly Stoyle from Mr. D'Agostino. The |
| 21 | second page appears to be an e-mail that was |
| 22 | carbon copied to you, and can you take a |
| 23 | look at that and tell me what your |
| 24 | recollection is of that particular e-mail? |

115

| | | |
|---|---|---|
| 1 | | said, I don't recall -- |
| 2 | Q. | You don't recall? |
| 3 | A. | -- all of them, but now I recall two. |
| 4 | Q. | So once again other than the mention of a |
| 5 | | hostile work environment and general social |
| 6 | | behaviors of Mr. D'Agostino, that you felt |
| 7 | | were inappropriate, you don't recall -- in |
| 8 | | the dialogue regarding the SCADA System, you |
| 9 | | don't recall any conversations about the |
| 10 | | October of 2002 meeting? |
| 11 | | MR. DAVIS:  Object to the form.  Go |
| 12 | | ahead. |
| 13 | Q. | Or do you?  Do you want me to rephrase it? |
| 14 | A. | Go ahead.  Try again.  There's too many |
| 15 | | negatives. |
| 16 | Q. | Did you ever address the issue of sexual |
| 17 | | harassment at the meeting? |
| 18 | A. | Yes. |
| 19 | Q. | What was said in that regard? |
| 20 | A. | That this could be sexual harassment and I |
| 21 | | then went on to say I can't get in |
| 22 | | somebody's head to know what motivates them. |
| 23 | Q. | What was Mr. Amoruso's response? |
| 24 | A. | I don't recall any response. |

116

| 1 | Q. | Do you know if -- |
|---|---|---|
| 2 | A. | He made a comment, something like, Yes, |
| 3 | | John's been acting nuts lately, but I |
| 4 | | assured him that there were four votes to |
| 5 | | win the contract and it was renew his |
| 6 | | contract. |
| 7 | Q. | Meaning what did he -- do you know what he |
| 8 | | meant by that? |
| 9 | | MR. DAVIS:  Objection. |
| 10 | A. | No, other than on its face. |
| 11 | Q. | As a result of the October, 2002 meeting are |
| 12 | | you aware of whether Mr. Amoruso took any |
| 13 | | action with respect to the issues you |
| 14 | | raised? |
| 15 | A. | None that I'm aware of. |
| 16 | Q. | At any other point in time did you bring the |
| 17 | | issues of harassment and inappropriate |
| 18 | | conduct on behalf of Mr. D'Agostino to the |
| 19 | | attention of any member of the Board of |
| 20 | | Light Commissioners after the October, 2002 |
| 21 | | meeting? |
| 22 | A. | Oh, I had another meeting with Mr. Amoruso |
| 23 | | in January of 2003. |
| 24 | Q. | And where was that meeting? |

```
 1   Q.  Is the Town of Mansfield policy the same

 2       policy that's followed by the MMED?

 3   A.  Yes.

 4   Q.  I show that you document and ask you if that

 5       is the policy?

 6   A.  Yes, I believe this to be.

 7             MS. LEONARD:  I'd like to mark that

 8       as the next numbered Exhibit.

 9             (Policy marked as

10             Exhibit Number 17.)

11   Q.  Is this policy distributed to the employees

12       of the town and of MMED?

13   A.  It has been.

14   Q.  Is it distributed on an annual basis?

15   A.  No.

16   Q.  Do you know when the last time it was

17       distributed?

18   A.  January of 2003.

19   Q.  Prior to January, 2003 do you know when it

20       was distributed last?

21   A.  November of 1998.

22   Q.  And what's the basis of your knowledge of

23       that?

24   A.  I received the policy November of 1998 and
```

EXHIBIT NO. 13

I, Gary D'Ambra, hereby state and depose the following to be true and accurate under the penalties of perjury.

In October of 2001, I met with Jack Beliveau, Kimberly Stoyle, and Lou Amoruso for the purposes of discussing problems that were on-going. Specifically, it was mentioned that the Town Manager's behavior towards previous and current women employees appeared to be sexual harassment. Caroline Fitton's name and Kimberly Stoyle's name were mentioned as being two women that D'Agostino seemed to be harassing. What I found hard to understand is that Lou Amoruso didn't blink an eye when we said this. It seemed to have no impact on him. After Kimberly Stoyle's complaint went public, I was disgusted to read in the newspaper that Lou Amoruso claimed to have not been made aware of any harassment. After the articles appeared in the newspaper, I went to Lou Amoruso's workplace to let him know how disappointed I was that he did not tell the truth.

Gary D'Ambra
Line Foreman
Mansfield Municipal Electric

Subscribed & sworn to before me this 5 day of February 2004.

Laurie M. Anderson

LAURIE M. ANDERSON
Notary Public
Commonwealth of Massachusetts
My Commission Expires
May 17, 2007

BELV 002505

EXHIBIT NO. 14

Amoruso

1

VOLUME:   I
PAGES:    1-114
EXHIBITS: See Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CASE NO. 04-11329-DPW

DR. JOHN J. BELIVEAU,                      x
            Plaintiff                      x
                                           x
                                           x
              vs.                          x
                                           x
TOWN OF MANSFIELD MUNICIPAL                x
ELECTRIC DEPARTMENT, JOHN O.               x
D'AGOSTINO,                                x
            Defendants                     x
                                           x

        DEPOSITION of LOUIS AMORUSO, taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before Jill
Kourafas, Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts held at the Law Offices of
Wolf Block, One Boston Place, Boston,
Massachusetts, on Monday, January 9, 2006,
commencing at 2:15 p.m.

_____
        REPORTERS, INC.
GENERAL & TECHNICAL COURT REPORTING
23 MERRYMOUNT ROAD, QUINCY, MA 02169
617.786.7783/FACSIMILE 617.786.7723

2

APPEARANCES OF COUNSEL:

For the Plaintiff:
    WOLF BLOCK SCHORR SOLIS & COHEN, LLP
    (BY:  JULIANE BALLIRO, ESQ.)
    One Boston Place

Amoruso

56

1   Q.   Who was that?

2   A.   His secretary, Eileen Ouelette.

3   Q.   So, Eileen Ouelette sent John D'Agostino a

4        felching email?

5   A.   Yes.

6   Q.   And then he forwarded it to others, including

7        Kimberly Stoyle?

8   A.   Yes.

9             MR. KESTEN:  It's actually kinda

10       funny.

11            MS. BALLIRO:  You would think so,

12       Lenny.

13            MR. KESTEN:  So would you.  It's a

14       fake news story.

15  Q.   What did you think of the email when you

16       heard it?

17  A.   I thought there was some humor to it, but it

18       was really inappropriate.

19  Q.   Did you consider at all the fact that

20       Mr. D'Agostino had sent that email to

21       Kimberly Stoyle even though they obviously

22       had some issues with their communication or

23       with their --

24  A.   I thought it was inappropriate, to be honest

57

1        with you.  I didn't see it as sexual then and

2        I don't see as sexual now.  I see it as

3        crude.

Amoruso

| | | |
|---|---|---|
| 17 | | before the Board of Light Commissioners at |
| 18 | | these -- I take it they were monthly |
| 19 | | meetings? |
| 20 | A. | Yes, usually monthly meetings. |
| 21 | | I always felt he was very |
| 22 | | professional and well-prepared. |
| 23 | Q. | Did you ever get the sense that Mr. Beliveau |
| 24 | | had ever deliberately taken action to make |

26

| | | |
|---|---|---|
| 1 | | Mr. D'Agostino look bad? |
| 2 | A. | Not that I can recall. |
| 3 | Q. | What was your impression of Kimberly Stoyle's |
| 4 | | comportment and demeanor when she made her |
| 5 | | presentation at the monthly meetings? |
| 6 | A. | Usually, it was very professional as well, |
| 7 | | very matter-of-fact and straightforward. |
| 8 | Q. | Were there exceptions to that? |
| 9 | A. | There were a couple. |
| 10 | Q. | Do you recall those exceptions? |
| 11 | A. | I couldn't give you specific ones, but I can |
| 12 | | tell you some of them occurred with respect |
| 13 | | to some of the items I mentioned and our Town |
| 14 | | Treasurer. |
| 15 | Q. | You're speaking about Mr. Boucher? |
| 16 | A. | Yes. |
| 17 | Q. | So, as I understand it, there might have been |
| 18 | | some dispute between Ms. Stoyle and |
| 19 | | Mr. Boucher that surfaced at a meeting or |
| 20 | | two? |
| 21 | A. | Yes.  Publicly, yes. |
| 22 | Q. | Are those meetings on tape, by the way? |

Amoruso

| 23 | A. | Well, whether they have been erased by now, I |
| 24 |    | can't tell you, but they were on tape. |

27

| 1  | Q. | What do you recall about these disputes that |
| 2  |    | surfaced publicly between Kimberly Stoyle and |
| 3  |    | Mr. Boucher? |
| 4  | A. | They were sometimes claims and counterclaims |
| 5  |    | as to what was proper, correct or what was |
| 6  |    | the right way to do things. |
| 7  |    | I think that, from my point of view, |
| 8  |    | they seemed to be more disagreements in |
| 9  |    | approach in most cases, but there were some |
| 10 |    | factual disagreements as well. |
| 11 | Q. | And did you perceive any similar |
| 12 |    | disagreements between Mr. Boucher and |
| 13 |    | Mr. Beliveau? |
| 14 | A. | Only insofar as Mr. Beliveau, he supported |
| 15 |    | Ms. Stoyle's approach. |
| 16 | Q. | Did you ever see public displays back and |
| 17 |    | forth between Mr. Beliveau and Mr. Boucher? |
| 18 | A. | No. |
| 19 | Q. | Now, you were asked to meet with Mr. Beliveau |
| 20 |    | and Ms. Stoyle some time back in March or so |
| 21 |    | of 2001, correct? |
| 22 | A. | That's correct. |
| 23 | Q. | And at that time, were you sitting as the |
| 24 |    | Chairman of the Board? |

28

| 1 | A. | Yes, of the Board of Selectmen. |

EXHIBIT NO. 15

**Kimberly Stoyle**

From:          _Kimberly Stoyle
Sent:          Tuesday, October 01, 2002 11:35 AM
To:            'AMORUSO9@aol.com'
Subject:       Meeting

Hi Lou,

John is inventing issues and acting in a hostile manner
once again. We need to find some other means of
resolving issues as all of our efforts at working together
have been rebuffed. There has only been one way communication.
The weekly meetings lasted for 3 weeks and ended in April
of 2002 per John's lack of attendance.

Please schedule some time to meet with Jack and I to
discuss this hostile work environment.

Thnk You,
Kim

212

1

EXHIBIT NO. 15A

**Kimberly Stoyle**

| | |
|---|---|
| From: | _John Beliveau |
| Sent: | Tuesday, October 01, 2002 4:10 PM |
| To: | _Kimberly Stoyle |
| Subject: | FW: Problems |

-----Original Message-----

| | |
|---|---|
| From: | John Beliveau |
| Sent: | Tuesday, October 01, 2002 4:09 PM |
| To: | 'AMORUSO9@AOL.com' |
| Subject: | Problems |

Lou,

Problems have arisen again. I know that Kim had suggested a meeting last February because she believed John was creating a hostile work environment but called it off because we were giving matters our best effort and the benefit of the doubt. While I am reluctant to involve you, I believe the matter may go beyond the Mansfield line.

I don't often listen to rumors but when several individuals repeat the same threatening remarks, it's time to be cautious. I was told by several individuals that John believes, the Light Department, Kim and I were behind George Dentino's appearance at a Selectmen's meeting regarding the pension withholding issue. (Even if that were true, I don't see it's relevance to personnel matters. I was likewise in the dark and surprised by George's raising it.)

More importantly I was told by two individuals that John was overheard in a local restaurant responding when asked about the pension withholding issue, "The Light Department is behind this. It's Kim and Jack and I'm going to get them out of there." I would typically ignore second hand comments but can't help but place them in the context of what else is happening.

Monday evening there was an exchange between Kim and John regarding a purchase order (with an explanation attached) that John had signed and was now questioning after the bill came in. There had apparently been some prior back and forth between Kim and John prior to Monday. Today, an E-Mail came from John to Kim regarding some MIS issue, that I don't believe happened, accusing us of not working with Lou Costa. It was another shoot first, ask questions later.

There's has been a hostile work environment apparently intended to cause Kim to find another job. (It's apparent to me that she is upset and what has happened has seriously interfered with effective work accomplishment.) There have been other issues too minor to mention but when coupled with a comment about "getting Kim and Jack out of there " these incidents take on a more threatening meaning.

I would like to meet at your convenience. I would also like to get to the bottom of comments regarding, "getting Kim and Jack out of there."

Jack

1

EXHIBIT NO. 16

COPY

Volume: II
Pages: 191-381

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04 11329 DPW

---

DR. JOHN J. BELIVEAU,

      Plaintiff

vs.

TOWN OF MANSFIELD MUNICIPAL
ELECTRIC DEPARTMENT and JOHN
D'AGOSTINO,

      Defendants

---

DAY 2 - VOLUME II

CONTINUED DEPOSITION OF:  KIMBERLY ANN STOYLE

BRODY, HARDOON, PERKINS & KESTEN

One Exeter Plaza

12th Floor

Boston, MA 02116

February 13, 2006

Virginia Dodge
Registered Professional Reporter

DUNN & GOUDREAU

```
 1   have it in his system?

 2   A.    I had complained about it, so I wanted him to see

 3   what he had sent me.

 4   Q.    What did you complain about?

 5         MS. LEONARD:  Objection.  Asked and

 6         answered.

 7         MR. KESTEN:  That's not a valid objection.

 8         Those are reserved.

 9         MS. LEONARD:  It's a form objection.

10         MR. KESTEN:  No, it's not.  Asked and

11         answered is not form.

12   Q.    (By Mr. Kesten)  When did you complain about it?

13   A.    I had -- when I was listening to it, I had said,

14   "Oh, wow.  That's gross."  And then I minimized it.

15   "That's disgusting."

16         And then we had talked about it later, and I said I

17   couldn't believe that he would send that.

18   Q.    How much later did you talk about it?

19   A.    I don't recall exactly how much later.

20   Q.    Days?

21   A.    I don't recall.

22   Q.    Weeks?  Months?

23   A.    I don't know exactly the date.

24   Q.    I didn't ask you exactly the date.
```

DUNN & GOUDREAU

1   A.    I don't recall how many hours or how many months --

2   Q.    I'm not asking you about -- here's my question.

3 Here's the question, Ms. Stoyle. Obviously if you talked

4 about it a few days later, not an issue. And not

5 remembering is fine.

6      The question is: Did you talk about it a year

7 later? Then the question would be: Why did you wait a

8 year to complain?

9   A.    Oh, I didn't wait a year. Immediately I complained.

10 I thought it was gross and disgusting he would send it to

11 me. But I also talked about it beyond that exact day.

12   Q.    And what caused you to talk about it again?

13   A.    We had meetings with Lou Amoruso where we talked

14 about it.

15   Q.    And those meetings happened in '01 and '02, right?

16   A.    We had two meetings, October of '01 and October of

17 '02. I asked for a meeting in February of '02 as well.

18   Q.    Exactly. That's the point. I understand you talked

19 to -- you say you talked about it with Lou Amoruso. But

20 that didn't happen for a year and a half after you got the

21 email, right?

22   A.    No. That would be -- where we formally in a meeting

23 talked about it would have been exactly a year.

24   Q.    Your first meeting with Lou Amoruso was when?

1    today?  As you sit here today, you have no memory.  It's

2    a --

3        MS. LEONARD:  Objection.  You can read her

4        answer back.  I'm not going to allow you to

5        badger the witness today.

6        MR. KESTEN:  If you want to instruct her

7        not to answer, say that.  We'll see how --

8        MS. LEONARD:  Why don't we allow her to

9        read back the answer?

10       MR. KESTEN:  No.  Are you instructing her

11       not to answer?

12       MS. LEONARD:  Yes.  I instruct her not to

13       at this time.

14   Q.   (By Mr. Kesten)  Did you send certain emails related

15   to lawsuits against John D'Agostino and/or the Town to

16   Jack Beliveau at another email address?

17       MS. GRIFFIN:  Objection.

18   A.   I may have.  I do not recall, but I may have.

19   Q.   (By Mr. Kesten)  When did you first start planning a

20   lawsuit --

21       MS. LEONARD:  Objection.

22   Q.   (By Mr. Kesten)  -- against either John D'Agostino

23   or the Town of Mansfield Electric Department?

24       MS. GRIFFIN:  Objection.

1    Q.    That's the person who was telling people about it,

2    right?

3    A.    Right.

4    Q.    And it was right around the time that you heard

5    about this remark by D'Agostino that there was the issue

6    about the radio tower, right?

7    A.    I don't know if that's the same time.  I know the

8    radio tower is September 30, '02.

9    Q.    And there was a second meeting set up with Amoruso,

10   right?

11   A.    Yes.

12   Q.    And did you and Jack discuss why you would have this

13   meeting?

14   A.    Well, I knew we were having it because things had

15   gotten out of hand.  I knew that --

16   Q.    Okay.

17   A.    -- in everything that's happened for several years,

18   what was going on.

19   Q.    Ms. Stoyle, Ms. Stoyle, I'm not asking you what you

20   knew.  I'm asking you whether you discussed it with that

21   man on my right.  That's a simple question.  Did you --

22        MS. LEONARD:  Discussed what?

23        MR. KESTEN:  Having a meeting.

24   A.    I requested the meeting with Lou.

DUNN & GOUDREAU

```
1   Q.    (By Mr. Kester)  You talked to Jack?

2   A.    I requested the meeting and told Jack I wanted a

3   meeting with Lou.

4   Q.    Thank you.  See.  That's the question.

5         So you asked Jack to set up a meeting with Lou,

6   right?  Right?

7   A.    I set up the meeting with Lou.

8   Q.    Did you discuss the meeting with Jack before --

9   A.    I told Jack that I needed a meeting with Lou.  I

10  sent Lou an email --

11  Q.    Okay.

12  A.    -- and told Jack we needed to have a meeting.

13  Q.    Now, did you tell Jack why you needed to have a

14  meeting?

15  A.    Yes.

16  Q.    What did you tell him?

17  A.    Again, it was the harassing environment and the

18  hostility, and it was making my workplace unbearable.

19  Q.    And what was hostile in July, August, September of

20  '02 which caused you to request a second meeting with Lou?

21  What was the hostility?

22  A.    Again, August '02 was the "delicious" whole

23  scenario, which your client admitted to, that he did say

24  that to me.  And I have witnesses.  And he did that in
```

DUNN & GOUDREAU

1   with the town manager."  They don't understand things like
2   that.  It wasn't something that you needed to put in the
3   newspaper.
4       And then you had the selectmen all saying it was a
5   lie and far-fetched.  And Lou saying he didn't know
6   anything, like I was lying about that part, when he knows
7   that -- that was what hurt me, was when -- one of the most
8   hurtful things, when Lou -- I trusted him, and then at the
9   end of the day, he acted like he didn't know anything.
10  There were many things in there.
11  Q.    Anything else?
12  A.    And the way they circled wagons, and then I was
13  still an employee of the Town, too.  They didn't treat me
14  with the same benefit of a doubt.
15      And then they renewed his contract right away.  And
16  then the newspaper even after this came out, "Town Manager
17  Receives High Marks."  Renewed his contract before they
18  evaluated him, and they gave him a big fat raise.  And Lou
19  Amoruso said, "These are the highest marks I've ever
20  given."  It was very hurtful.
21  Q.    Anything else?
22  A.    And then I didn't want D'Agostino at the board of
23  light commissioners meetings, and they wouldn't honor that
24  request.

EXHIBIT NO. 17

# Lynn A. Leonard
## Attorney-At-Law

Telephone: (781) 662-6161
Facsimile: (781) 662-1625
E-mail: LynnALeonard@aol.com

527 Main Street, Suite 8
Melrose, MA 02176

July 22, 2003

**VIA CERTIFIED MAIL AND FACSIMILE**

Robert S. Mangiaratti, Esquire
3 Mill Street
Attleboro, MA 02703

**Re: Kimberly Stoyle**

Dear Attorney Mangiaratti:

Pursuant to Massachusetts General Laws, Chapter 258, §4, on behalf of Kimberly Stoyle, I hereby present claims against the Town of Mansfield (the "Town"), the Board of Selectmen, the Mansfield Municipal Electric Plant ("MMED"), the Board of Light Commissioners, the Town Manager, the Town Treasurer and the Town Accountant. Ms. Stoyle charges the named parties in office during the relevant time period with violations of the Massachusetts whistle-blower doctrine, defamation of character, sexual harassment, retaliation, negligence, intentional infliction of emotional distress and loss of consortium. These claims are based, in part, upon the facts set forth below.

As you know, Ms. Stoyle is the Chief Financial Officer for the Mansfield Municipal Electric Plant. In this capacity, she has been vocal regarding the alleged misuse of funds by the Town and its officials. Specifically, Ms. Stoyle complained to all parties that MMED payments for pension allocations, for treasurer services and other internal charges are significantly inflated. These payments are mandated by the Town and approved by the Board of Selectmen and the Board of Light Commissioners.

Furthermore, Ms. Stoyle complained through her direct supervisor to various Town officials about illegal hiring practices by the Town Manger. As result of exposing a recurring misuse of position, Ms. Stoyle has been subject to false allegations regarding her work performance and ongoing harassment by the Town Manager John D'Agostino, by the Town Treasurer Richard Boucher and by the Town Accountant Beatrice Kearney. This conduct is in direct violation of the Massachusetts whistle-blower doctrine.

Retaliation against Ms. Stoyle continues to date. Notably, various illegal practices by Town officials are still prevalent.

The Town and the MMED are presently aware of the specifics of Ms. Stoyle's sexual harassment and retaliation claims, given that they are pending before the Massachusetts Commission Against Discrimination ("MCAD"). Since the filing of her MCAD complaint, members of the Board of Selectmen and the Board of Light Commissioners have defamed Ms. Stoyle verbally and in writing characterizing her as a promiscuous, money-seeking liar. Her employment has also been threatened. The Town and the MMED, through the Board of Selectmen and the Board of Light Commissioners, have also acted negligently in the failure to remedy Ms. Stoyle's internal complaints and to provide an harassment free work environment. Moreover, their negligent retention of the perpetrator has resulted in ongoing retaliation and exacerbated Ms. Stoyle's injuries.

Ms. Stoyle has suffered immeasurably as a result of the entire course of conduct described above. The severe emotional distress she suffers impacts every aspect of her life including her relationship with her three children. Consequently, she is seeking compensation for her injuries. Please conduct whatever investigation is necessary in order to address these claims. If I receive no response from your office, Ms. Stoyle intends to forward this letter to the Inspector General's Office and to the Ethics Commission and to proceed in accordance M.G.L. c. 258, §4.

Thank you for your attention to this matter.

Very truly yours,

Lynn A. Leonard
Attorney-At-Law

cc: John Davis, Esquire
Steven MacCaffrie, Board of Light Commissioners
Michael McCue, Board of Selectmen
Helen Christiansen, City Clerk

2

EXHIBIT NO. 18

# Memo

**To:**    Steve MacCaffrie, Chairman Mansfield Board of Electric Light
        Commissioners

**From:**  Jack Beliveau, Director, Mansfield Municipal Electric Light Department

**Date:**   August 13, 2003

**Re:**    Question of Continuing Sexual Harassment/Discrimination Re: Kim Stoyle

---

At the conclusion of the Monday August 11, 2003 meeting of the Electric Light Commission, you spoke with me regarding the Massachusetts Commission Against discrimination (MCAD) complaint of Kim Stoyle. Specifically, you asked me, as Kim's immediate supervisor, to inquire of her if she believed there had been any retaliation or continuing harassment of her subsequent to her filing a complaint with the MCAD. You also stated that you believed there was a MCAD regulation that mandated such inquiry.

The answer to your inquiry is, yes, Kim does believe she has been subjected to continuing harassment, discrimination and retaliation as a result of her filing a complaint with the MCAD in December 2002. Specifically, Kim cited to me the following incidents that she believes are some examples of continuing harassment, discrimination or retaliation since the filing of her complaint.

a. Kim believes that statements appearing in the press, attributed to the Town Manager and former and current selectmen, are intended to humiliate Kim and to intimidate Kim and other witnesses and are retaliatory;

b. Kim also believes that the public response of the Town Manager and certain selectmen have emboldened other Town employees to make sexually derogatory comments about Kim, which she also heard about;

c. Kim believes that certain statements made by the Selectmen at Selectmen's meetings are retaliatory and intended to intimidate her and other witnesses;

d. Kim has received anonymous phone calls at home at night which she is certain are connected to and retaliatory to her filing a MCAD complaint;

● Page 1

e. Kim believes the manner in which the Town conducted an investigation of her complaints was not fair, thorough or objective;

f. Kim is aware of repeated sexual comments attributed to the Town Manager made in public places;

g. Kim is aware of repeated derogatory comments regarding her attributed to former and current Selectmen;

h. Kim cites the Town Manager's continued attendance at the Light Commission meetings, in spite of her request that he not attend, as interference with her ability to perform her job;

i. Kim has informed me that memos and false allegations questioning cash balances are retaliatory in that she believes they are unwarranted and untrue claims that adversely reflect upon her performance. She says this is only one example of how she is treated differently and she attributes it to retaliation for her filing a MCAD complaint.

I have observed the adverse emotional impact upon Kim contemporaneous with the occurrence of many of these events. With the exception of the anonymous telephone calls, which I just learned about, all of these matters occurred in public with the knowledge of the Selectmen or Town Manager so there was no need for me to independently report these events subsequent to her filing a formal complaint.

EXHIBIT NO. 19

1

1          UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS
2

3      C.A. NO. 05-10354 DPW

4      KIMBERLY STOYLE,                    )
                Plaintiff                  )
                                           )
5          VS.                             )
                                           )
6      THE MANSFIELD MUNICIPAL             )
       ELECTRIC DEPARTMENT,                )
7      JOHN D'AGOSTINO, TOWN OF            )
       MANSFIELD BOARD OF LIGHT            )
8      COMMISSIONERS,                      )
       LOUIS AMORUSO,                      )
9      MICHAEL MCCUE,                      )
       DAVID MCCARTER,                     )
10     DANIEL DONOVAN,                     )
       ROGER ACHILLE AND                   )
11     STEVEN MACCAFFRIE,                  )
                Defendants                 )

12

13

14

            DEPOSITION of **JOHN D'AGOSTINO**,
15     called as a witness by and on behalf of the
       Plaintiff, pursuant to the applicable
16     provisions of the Federal Rules of Civil
       Procedure, before Teresa E. Costello,
17     Certified Realtime Reporter, Registered
       Professional Reporter, Certified Shorthand
18     Reporter No. 145289S, and Notary Public
       within and for the Commonwealth of
19     Massachusetts, at the offices of
       McNaught, Cecere & McNaught, 6 Eastman
20     Place, Melrose, Massachusetts, on Tuesday,
       August 8th, 2006, commencing at 10:14 a.m.

21

22

23

24

| | | |
|---|---|---|
| 03:24:50 | 1 | Q. Do you remember the substance of the |
| 03:24:52 | 2 | conversation? |
| 03:24:54 | 3 | A. I don't remember specifically, but that, |
| 03:24:59 | 4 | you know, he had received this and that he |
| 03:25:03 | 5 | was going to -- he was going to investigate |
| 03:25:07 | 6 | this or look into it. |
| 03:25:11 | 7 | Q. Do you know if there was an investigation |
| 03:25:13 | 8 | into that? |
| 03:25:13 | 9 | A. I don't believe so. |
| 03:25:15 | 10 | Q. Did he discuss with you each of her |
| 03:25:48 | 11 | complaints? |
| 03:25:49 | 12 | A. I don't believe that we had discussed them |
| 03:25:52 | 13 | in any kind of detail, where we sat down |
| 03:25:59 | 14 | and discussed them. |
| 03:26:00 | 15 | Q. Do you recall making statements to the |
| 03:26:04 | 16 | press regarding Kimberly Stoyle? |
| 03:26:06 | 17 | A. There were press statements made, sure. |
| 03:26:12 | 18 | Q. Do you recall town employees making |
| 03:26:28 | 19 | sexually derogatory comments about |
| 03:26:31 | 20 | Miss Stoyle? |
| 03:26:34 | 21 | A. I don't recall. |
| 03:26:37 | 22 | Q. Do you recall a statement that she walks |
| 03:26:42 | 23 | around with a mattress on her back? |
| 03:26:45 | 24 | A. I do. |

EXHIBIT 19A

D'Agostino4

1

```
 1                            Volume   IV
                              Pages    1 - 168
 2                            Exhibits per index

 3
                    UNITED STATES DISTRICT COURT
 4
                      District of Massachusetts
 5

 6

 7   DR. JOHN J. BELIVEAU,          )
                  Plaintiff         )
 8                                  )
     vs.                            )   Civil Action
 9                                  )   No. 04-11329-BPW
     TOWN OF MANSFIELD MUNICIPAL    )
10   ELECTRIC DEPARTMENT, JOHN O.   )
     D'AGOSTINO,                    )
11                  Defendants      )

12

13          CONTINUED DEPOSITION OF JOHN O. D'AGOSTINO, a

14   witness called by and on behalf of the Plaintiff, taken

15   pursuant to the applicable provisions of the Federal

16   Rules of Civil Procedure, before Sandra L. Bray,

17   Registered Diplomate Reporter, CSR Number 103593, and

18   Notary Public in and for Commonwealth of Massachusetts,

19   at the offices of Wolf Block, One Boston Place, Boston,

20   Massachusetts, on Tuesday, January 11, 2006, commencing

21   at 10:21 a.m.

22
                         REPORTERS, INC.
23             GENERAL & TECHNICAL COURT REPORTING
               23 MERRYMOUNT ROAD, QUINCY, MA 02169
24             617.786.7783/FACSIMILE 617/786.7723
```

2

```
 1   APPEARANCES:

 2        JULIANE BALLIRO, ESQUIRE
          WOLF BLOCK
 3        One Boston Place
          Boston, Massachusetts  02108
 4        on behalf of the Plaintiff
```

D'Agostino4

|     |      |                                                   |
| --- | ---- | ------------------------------------------------- |
| 5   |      | allegation.  Do you see that?                     |
| 6   | A.   | I do.                                             |
| 7   | Q.   | And you responded, "After you learned of          |
| 8   |      | Miss Stoyle's allegations, I stated I would       |
| 9   |      | take whatever action necessary to clear my        |
| 10  |      | name.  I didn't threaten to sue other             |
| 11  |      | employees, and I certainly never explicitly or    |
| 12  |      | implicitly threaten to sue Mr. Beliveau.  In      |
| 13  |      | fact, more than one year has passed since         |
| 14  |      | Ms. Stoyle has filed her charge of                |
| 15  |      | discrimination, and I have not sued any           |
| 16  |      | employee."  Do you see that?                      |
| 17  | A.   | That's correct.                                   |
| 18  | Q.   | Did you give a press statement -- a press         |
| 19  |      | interview to Meredith Holford?                    |
| 20  | A.   | Holford.                                          |
| 21  | Q.   | So you know who Meredith Holford is?              |
| 22  | A.   | Yes.                                              |
| 23  | Q.   | Did you grant Meredith Holford a press            |
| 24  |      | interview following Miss Stoyle's filing of       |

108

|     |      |                                                   |
| --- | ---- | ------------------------------------------------- |
| 1   |      | her charge of discrimination?                     |
| 2   | A.   | Yes.                                              |
| 3   |      | (Article was marked Exhibit Number 46             |
| 4   |      | for identification.)                              |
| 5   | Q.   | Okay.  Mr. D'Agostino, you have before you a      |
| 6   |      | copy of an article written by Meredith           |
| 7   |      | Holford, a staff writer for what newspaper?       |
| 8   | A.   | The Mansfield News.                               |
| 9   | Q.   | The Mansfield News.  It's been marked Exhibit     |
| 10  |      | Number 46 to this deposition, and in the first    |

D'Agostino4

| | | |
|---|---|---|
| 11 | | few paragraphs, she writes, "Town manager John |
| 12 | | D'Agostino says the charges of sexual |
| 13 | | harassment levied on him by Electric |
| 14 | | Department employee Kimberly Stoyle may well |
| 15 | | result in legal action in court, but he |
| 16 | | predicts the tables will turn.  Quote, if |
| 17 | | there is litigation, it will be litigation I |
| 18 | | initiate, unquote, he said in a press |
| 19 | | interview last week.  Quote, I will include |
| 20 | | some citizens as well as some employees, end |
| 21 | | quote." |
| 22 | A. | That's correct. |
| 23 | Q. | Do you deny saying that to Meredith Holford? |
| 24 | A. | No. |

109

| | | |
|---|---|---|
| 1 | Q. | So how is that or why is that not a threat to |
| 2 | | sue other employees? |
| 3 | A. | My intent here, the individuals that I was |
| 4 | | referring to were Carl Clemmey, George |
| 5 | | Dentino, and others who may have been involved |
| 6 | | in initiation of this lawsuit. |
| 7 | Q. | So you believe that somehow George Dentino was |
| 8 | | involved in Kimberly Stoyle's MCAD charge |
| 9 | | against you? |
| 10 | A. | That's my belief. |
| 11 | Q. | What do you base that belief on? |
| 12 | A. | On the fact that that gentleman has spent most |
| 13 | | of the last five years trying to take my |
| 14 | | property right away from me and my employment |
| 15 | | opportunity with the Town by doing whatever he |
| 16 | | can to hurt my reputation, to try to remove me |

```
 7              computer systems, e-mail, and voice mail

 8              systems, correct?

 9      A.      That's correct.

10      Q.      And if you look at the third paragraph from

11              the bottom of the second page of the exhibit,

12              it says that the Town's e-mail system and

13              Internet access should only be used to conduct

14              business on behalf of the Town.  Do you see

15              that?

16      A.      Come again.  I'm sorry.  Which paragraph?

17              Third paragraph down?

18      Q.      Third paragraph from the bottom.  Do you see

19              that says --

20      A.      Fraudulent, harassment, threatening -- is that

21              what you're referring to?

22      Q.      Yes, but in the next sentence, "Furthermore,

23              the Town's e-mail system and Internet access

24              should only be used to conduct business on
```

                                                        62

```
 1              behalf of the Town."  Do you see that?

 2      A.      Yes.

 3      Q.      "Violations of this policy may result in

 4              disciplinary action up to and including

 5              dismissal."  Do you see that?

 6      A.      That's correct.

 7      Q.      Was this the same policy that was in place

 8              when you sent the felching e-mail to Kimberly
```

| | | |
|---|---|---|
| 9 | | Stoyle? |
| 10 | A. | Which e-mail? |
| 11 | Q. | The felching e-mail. |
| 12 | A. | I believe so. |
| 13 | Q. | Did you consider that e-mail to be an e-mail |
| 14 | | used to conduct business on behalf of the |
| 15 | | Town? |
| 16 | A. | No. |
| 17 | Q. | So it was in clear violation of the policy, |
| 18 | | correct? |
| 19 | A. | That's correct. |
| 20 | Q. | Were you ever disciplined by the board for |
| 21 | | sending that e-mail to Kimberly Stoyle? |
| 22 | A. | I don't believe so. |
| 23 | Q. | Well, would you know if you had been? |
| 24 | A. | I probably wouldn't be here, right? |

63

| | | |
|---|---|---|
| 1 | | May I take a break to go to the |
| 2 | | bathroom?  May I do that right now? |
| 3 | | MS. BALLIRO:  Yes. |
| 4 | | (Recess) |
| 5 | | MS. BALLIRO:  Let's mark this. |
| 6 | | (Copy of Greeting Card was marked |
| 7 | | Exhibit Number 41 for identification.) |
| 8 | Q. | Mr. D'Agostino, you have a document before you |
| 9 | | that's been marked Exhibit Number 41 to this |
| 10 | | deposition. |
| 11 | A. | That's correct. |

EXHIBIT NO. 20

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.

TOWN OF MANSFIELD
BOARD OF SELECTMEN

IN THE MATTER OF
JOHN D'AGOSTINO

)
)
)
)

REPORT ON INTERNAL INVESTIGATION REGARDING JOHN D'AGOSTINO

INTERNAL INVESTIGATION
CONDUCTED BY:

JAMES B. LAMPKE, ESQ.

INTER/INTRA DEPARTMENTAL MEMORANDUM
REGARDING POLICY FORMULATION AND PERSONNEL MATTERS,
NOT A PUBLIC RECORD FOR WHICH DISCLOSURE IS MANDATED

3068

.       Regarding allegations of D'Agostino frequenting bars, Amoruso said that about a year and a half ago or so (possibly longer), he said that he had heard some negative complaints that when D'Agostino first came to the community that he spent a lot of time at the Regent and may have gambled.  Amoruso said however that this appears to be past conduct and he has not heard of any similar issues since then.  Amoruso indicated that if there was such a situation, he would certainly hear about it.

According to Amoruso, to his knowledge, D'Agostino rarely goes to restaurants in Town.

Interview of John (Jack) Beliveau (Beliveau).  Beliveau is the Director of the Municipal Light Department (MED).  He was interviewed in his office on February 5, 2003 in the presence of James Pender, Esq., an attorney representing the MED.

Beliveau has a Ph.D. in Management and has an Electrical Professional Engineer classification.  He indicated that he teaches business courses at the University of Rhode Island.  He indicated that he was a civilian employee of the Navy, working in Newport.  He has been the Director for approximately 4 ½ years, since September, 1998.

Beliveau made reference to Article 7 of the Town Charter.  He said that D'Agostino hired him as the Director of the MED.  This was after the prior Manager had been terminated.

Beliveau said that the scope of his authority and responsibility is to operate the entire MED, overseeing operational, fiscal and personnel matters.

Beliveau indicated that he did not have a great deal of contact with D'Agostino after he was hired.  He said that they mostly communicated by email.  Beliveau said that they met at monthly Board meetings and from time to time D'Agostino would discuss matters with him, particularly anything that was controversial.

Beliveau said that he served as Acting Town Manager occasionally a few years ago when D'Agostino was away.  He indicated that he had not done that lately and did not particularly enjoy working in what he described a political environment.

Beliveau said that he hired Stoyle in early 1999.  He said that he was accustomed to hiring people as it was something that he did in his job with the Navy.

Beliveau said that he used a committee of three people to conduct the hiring.  The committee consisted of himself, the Town Accountant, Bea Kearney, and a Financial Assistant in the MED, Kara Cooke.

Beliveau said that the position that Stoyle was hired for was originally called Accounting Officer and then it was changed to Chief Financial Officer (CFO).

Another candidate for the position was Daniel Oodendorf, who was the MED's

former Director of Finances. Beliveau said that he favored Oodendorf and that Kearney and Cooke recommended Stoyle. He went along with their recommendation of Stoyle, who was then selected for the position.

He said that about 20 or so people applied and that he and Gerald Schema narrowed the pool of candidates down to 5.

The selection for Stoyle was unanimous.

Beliveau said that at some point in time the title of the position was changed to Chief Financial Officer. He does not believe he discussed that change with the Town Manager.

Beliveau described Stoyle as extremely knowledgeable and knows the accounting field and computers. He said that she was particularly strong in presentations, including monthly reports that she is responsible for. He said that the MED tries to treat everyone fairly. He said that Stoyle got along well with the other employees. Beliveau said that she was always the one that remembered everyone's birthday and said that she was very pleasant, describing her as someone who you would never see angry or raising her voice.

Beliveau said that Stoyle supervises 5 or 6 employees. In the operational higher archy, Beliveau is in charge of the MED and there are sections under him - Stoyle is in charge of the financial operation, Gary D'Ambra is the Line Foreman in charge of operations and Ann Langille is in charge of engineering.

Re:    Hottleman Interview

Beliveau said that the first time that he became aware that there was a problem between Stoyle and D'Agostino was in February of 2000. This arose when the MED was filling in position in the accounting division.

Beliveau said that D'Agostino said words to the effect that "You are going to hire Ms. Hottleman". This person was Andrea Hottleman. Beliveau said that D'Agostino approached him several times regarding this.

Beliveau said that he had a committee handling this particular appointment. The committee consisted of Stoyle, Cooke, and Laura Anderson. Beliveau said that Hottleman did not make the selection for the top five candidates. Beliveau spoke to the committee about this. Beliveau said that he told D'Agostino that Hottleman did not make the top five and that D'Agostino was upset.

Beliveau said that he intervened with the committee and got Hottleman to be a sixth candidate.

Beliveau said that D'Agostino wanted the interviews canceled. Beliveau told him that the process was too far along to do that and they continued with the interviews.

.      Beliveau said that he became aware of the fact that Hottleman was the wife of a
friend of D'Agostino with whom D'Agostino plays cards.

Beliveau said that D'Agostino insisted on an emergency meeting regarding the
hiring. Beliveau said that at this meeting D'Agostino criticized Stoyle for her work. He
said that was not even the purpose of the meeting. He indicated that Laurie Anderson
was present at this meeting. Beliveau said that D'Agostino also criticized Anderson's
work. Beliveau said that Anderson told him later that she would no longer be in the
same room with D'Agostino.

Beliveau described D'Agostino's conduct as including banging his fist on the desk
and acting in a very hostile manner.

Beliveau said that at this meeting the only discussion concerning Hottleman was
D'Agostino saying she was very qualified. Beliveau said that they tried to explain to
D'Agostino why they did not feel she was qualified.

Beliveau said that the next day Kara Cooke contacted him and told him that
Hottleman was the wife of D'Agostino's card partner and that the husband has a
reputation of being a bookie and that D'Agostino owes him money and that this hiring
related to payment of the debt.

Beliveau said that the next day he went to D'Agostino and told D'Agostino what
was said regarding Hottleman's husband. Beliveau said that he did not tell D'Agostino
that Cooke told him this information. Beliveau said that D'Agostino went on a "witch
hunt" to find out who said these things. Eventually, D'Agostino dropped the matter.

Beliveau said that he initiated a new search for the position that Hottleman had
applied for. The new committee consisted of Jerry Scherma and two people from the
MED. Beliveau asked Scherma to come over and talk to the employees as they were
very upset regarding D'Agostino. Scherma told D'Agostino about this and D'Agostino
then sent Beliveau an email. Beliveau said that he felt that his confidentiality had been
breached by Scherma telling D'Agostino about this matter.

Beliveau said he understands that a year or so later, Hottleman's husband was
convicted as a bookie.

Beliveau said that D'Agostino was very specific concerning the second interview
process that he wanted Hottleman hired. Beliveau said that he told the committee that
D'Agostino felt that Hottleman was qualified and that she was overlooked.

Beliveau said that Hottleman did have a degree in accounting and had been
interviewed in consideration of Stoyle's position.

Re:    Carolyn Fitton

Carolyn Fitton was an employee of the MED. Beliveau said that D'Agostino was
making sexual advances to her. Beliveau said that he observed D'Agostino making

. frequent visits to the office and standing by Fitton. Fitton was the person who handled the MED mail.

Beliveau said that Fitton told him in the Spring of 2000 that she felt that D'Agostino was bothering her in this fashion. She also told Beliveau that "John is inviting me to go to England with him". Beliveau said that this was making Fitton very uncomfortable. Fitton told Beliveau that she said to D'Agostino that she could not afford such a trip. According to Beliveau, Fitton told him that D'Agostino waived his credit card and said words to the effect, "Don't worry".

Beliveau felt something was going on in the office but did not think that involved D'Agostino. He said that he was surprised when Fitton said that it was involving D'Agostino.

The next day, Fitton told Stoyle that she was going back to England, and that she had a fight with her husband. Beliveau told D'Agostino that Fitton had quit and said that D'Agostino emailed him back a note containing a message that "She was a scream of a gal".

Beliveau spoke to D'Agostino and told him regarding the allegation concerning Fitton but he considered the matter moot as Fitton had left the employ of the MED. Beliveau said that D'Agostino did not say anything in response to this.

Beliveau said that maybe he commented to D'Agostino that maybe someone is misinterpreting his actions.

Beliveau said that two weeks later Fitton came back from England and called him to ask for her job back. Beliveau told Stoyle that Fitton could apply. Beliveau did not want any problems. He said that he told Stoyle that he had spoken to D'Agostino regarding the allegations concerning Fitton. At this time, the job search for Fitton's replacement was already underway.

Beliveau said that D'Agostino never said another word to him regarding Fitton or hiring her.

However, at the next MED meeting, Beliveau said that D'Agostino gave Stoyle a note asking that the MED hire the "Brit Bomber". Beliveau said that Stoyle showed the note to him. A copy of this note was produced for the interviewer. Beliveau said that he did not need this problem and that they went forward and hired another individual.

Beliveau wondered why D'Agostino asked Stoyle instead of him. Beliveau said that he found it odd that D'Agostino would want to re-hire Fitton, given her allegation. Beliveau felt very awkward in view of the situation and felt that he had to report the matter to the Town Manager. Beliveau said he also told the Chairman of the MED about this in mid 2000, who was Brad Wills.

Beliveau said that there could be different ways of explaining this

.    In March, 2001, D'Agostino spoke to Stoyle. Beliveau was on vacation that day. Stoyle was upset enough to call Beliveau at home and told him that D'Agostino had called her and used the "F" word.

The issue concerned the payroll due to a snow storm and people who were working around the clock and the payroll increase during that time period.

Beliveau called D'Agostino and asked if he had any questions why employees got time and a half. Beliveau explained that it worked out to actually cost less money that way. Beliveau said that D'Agostino was okay in this conversation, although he recalled that D'Agostino was a bit more agitated that usual.

Beliveau said that normally he would have run the situation by D'Agostino but he felt that it was within his authority and that there was an emergency (the snowstorm).

Beliveau told Stoyle regarding this conversation with D'Agostino. Beliveau also told Brad Wills about this and that Wills was upset that D'Agostino had used foul language.

Beliveau said that he did not receive any subsequent reports that D'Agostino swore at Stoyle.

In October, 2001, Beliveau began to get the feeling that there was a hostile workplace situation developing, between D'Agostino and Stoyle. He was not sure what was fully happening. Beliveau said that he called Lou Amoruso, who was then the Chairman of the Board of Selectmen.

In October, 2001, Beliveau began to feel that there was hostile action taking place and that this was becoming a problem.

Beliveau said that at this time period several things occurred. He said that D'Agostino started going around him and directly to Stoyle. As an example, he said that D'Agostino asked Stoyle why a copier was bought on a credit card. Beliveau said that he spoke to D'Agostino about it who said words to the effect that he wanted to make sure that it does not happen again.

In reference to the meeting with Amoruso, Beliveau said that he asked him to come in for a meeting. Also present were Gary D'Ambra and Stoyle. This meeting took place late in the afternoon.

Beliveau said that he discussed with Amoruso D'Agostino's hostile behavior, which seemed to focus on Stoyle. He told Amoruso regarding the Hottleman matter, Fitton matter and the foul language.

In reference to the PILOT agreement issues. Beliveau said that he reported to the Board of Selectmen in July of 2001 that he felt that the Town was doing the PILOT agreement incorrectly. Beliveau said that for over a year he had raised issues that what was happening on the PILOT agreement was not legal. Nothing however was resolved.

. Beliveau said that someone from the public started asking about this.

Beliveau said he described the problem as being that the Town was billing the MED for services not actually rendered. For example, Beliveau said that every June the MED would get billed from the Town for "internal costs" in the amount of one million dollars. Beliveau said that he had asked for more detail on this. Beliveau said that Ralph Penny, a former member of the Board of Selectmen, had told Beliveau that the Town had been doing this to lower funds at the MED and to get more money for the Town.

Beliveau said that Boucher told him that this is what it costs regarding the MED - i.e. x dollars of his Department (Treasurer's Department) were expended for MED matters. Beliveau wanted there to be some rational regarding what was being charged to the MED.

Brad Wills started talking about using a lock box for $20,000.00 instead of $200,000.00 for services from the Treasurer's Office. Beliveau then had a problem as he was being billed for $200,000.00 when Boucher had told him that the actual cost was $20,000.00.

Beliveau then told the Board that they had to adjust the bill. Beliveau said that D'Agostino did not oppose the adjustment or the figure with him.

Beliveau said that D'Agostino wanted to increase the PILOT agreement to $300,000.00 and that he, Beliveau, went along with that.

Beliveau said that D'Agostino's habit of going straight to Stoyle for information was a change from his prior practice of going straight to Beliveau. Beliveau said that he did not have a problem with this. Beliveau said that when problems arose with this contact with Stoyle, Beliveau would wonder why D'Agostino would not go to him instead of going to Stoyle.

Beliveau said that a meeting was held with Lou Amoruso. At this meeting there was a focus on the hostility that seemed to be directed towards Stoyle from D'Agostino. Beliveau "believes" that "sexual harassment" was mentioned at this meeting.

Beliveau did not know what the nature was, but he felt that the behavior seemed hostile and retaliatory.

In reference to retaliatory contact, Beliveau recalled the way that D'Agostino acted concerning Hottleman and felt "a connection" between D'Agostino and Stoyle arising from the Hottleman situation.

Re:   Century Bank Meeting and Lock Box -

Beliveau said that Boucher made some comments in front of others regarding Stoyle and had told her to "shut up". Beliveau said that Stoyle was upset that D'Agostino did not say anything when this happened. Beliveau was not at the meeting

• and relied on information provided to him from Stoyle. Beliveau recalls that Stoyle told him that Boucher told her to "shut up".

Beliveau said that he spoke to D'Agostino and that D'Agostino confirmed that this was in fact said by Boucher. Beliveau also said that D'Agostino told him that he chastised Boucher over this.

Stoyle felt she was being demeaned in public and that D'Agostino was allowing it to go on.

Beliveau said that he told Stoyle that D'Agostino said that he chastised Boucher for these comments. He described her reaction as "okay".

At the October meeting with Lou Amoruso, various incidents were relayed which they felt showed harassment.

At the meeting, Beliveau did not recall what Amoruso said other than he would speak to D'Agostino.

Amoruso told Beliveau later that he did speak to D'Agostino and that D'Agostino said he had nothing against anyone.

Beliveau and D'Agostino had a meeting where D'Agostino said something. D'Agostino was not angry. That was what they wanted to hear.

Re:    Pay Raise Issue -

This incident occurred in late December, 2001, early January, 2002. Beliveau said that his practice was to compare employees salaries against various municipal surveys and that he would then seek to adjust the salaries as necessary.

In early December, 2001, Beliveau met with D'Agostino. At the same time, Stoyle told Beliveau that she was offered $95,000.00 at another position elsewhere. Her pay at that time was $73,000.00.

Beliveau said that he showed D'Agostino a salary survey and told D'Agostino what he felt was appropriate for Stoyle, Anderson and Langille. Beliveau said that D'Agostino agreed with him.

Following this meeting, Beliveau said that he implemented the pay increases immediately.

Three payroll cycles later, D'Agostino emailed (Beliveau believes this was early January, 2002) to an effect, "hold up on the payroll increases". Beliveau had justified these increases verbally with D'Agostino but had not yet put them in writing.

Beliveau said that D'Agostino told him that he, D'Agostino, may be criticized. Beliveau said that he told D'Agostino that he would "provide pillows to land on".

Beliveau had not understood that D'Agostino was expecting written backup.

Beliveau felt it seemed like D'Agostino was changing his mind. The pay raises were already in place. Beliveau felt it problematic that he would now change his mind. Beliveau emailed this back to D'Agostino and said in the email or a memo why he felt the raises were justified.

Beliveau said that he wrote back with information regarding the School Financial Officer and an MMWEC bookkeeper as having similar functions as Stoyle.

Beliveau said that it was his impression that D'Agostino appeared to be focused on Stoyle in his criticisms.

D'Agostino then sent a memo to Beliveau, which Beliveau felt seemed to focus on Stoyle. Beliveau said that D'Agostino went to her personnel file and had a question regarding her application and when it was signed.

According to Beliveau, Stoyle's application was not dated when she started, but was dated some time thereafter.

D'Agostino requested pay backup on Stoyle and Laurie Anderson. Bellevue had a meeting with D'Agostino where D'Agostino said he would not sign off on any pay or adjustment slips. Beliveau said when he was hired, he was told by the Treasurer that he, the Treasurer, would take any pay adjustment slips and get the Town Manager to sign them.

D'Agostino asked for new slips for Stoyle. Beliveau said that he did not want to do one just for Stoyle. He said that he would do it for everyone, as it appears D'Agostino did not sign off on payroll increases for any MED employees. Beliveau said that D'Agostino told him to "never mind".

After this, Beliveau called Lou Amoruso and told him there were strange things which seemed to involve the three female employees. He reminded Amoruso about the prior meeting. Beliveau does not recall what Amoruso said, but had the impression that he indicated that he would speak to D'Agostino.

Beliveau also told Brad Wills about this incident. Beliveau said that Brad Wills told him that D'Agostino had said that it, the payroll issue, was just a joke.

Re:    October, 2002

Kim Anderson spoke to Stoyle and was very upset about email that she got from D'Agostino. This email accused the MED of implementing a software change and asked why D'Agostino and Lou Costa (IT Manager) were not contacted.

Beliveau said that the night before at the Board meeting there was a confrontation between D'Agostino and Stoyle. There had been disputes about invoices regarding a radio system. The sum of money involved was approximately $14,000.00.

.    Beliveau said that Kim responded to D'Agostino's inquiries.

Beliveau said that D'Agostino then sent the paper work back again, saying he did not approve it. Donna sent the paper work back and pointed out that he had signed the Purchase Orders for this radio system. Beliveau said that at the MED, D'Agostino came over to the table where Stoyle and Beliveau sat and slammed the paper in front of her and said words to the effect, "I can see I signed it." D'Agostino asked if it was going on the water tower. Stoyle told him that she was not familiar with that issue.

Beliveau said that the next day D'Agostino sent an email to Stoyle regarding software. Beliveau said that he got a call from Stoyle, who was upset, as she felt that this situation was like an attack on her.

Beliveau sent an email to D'Agostino on this.

D'Agostino said that the MED was not telling him or Lou Costa, the MIS person, regarding changes in the software. Beliveau said that he spoke to Costa who said that he did not discuss this matter with D'Agostino.

A week or so later, D'Agostino said he wanted the MED to go on an electronic purchase order system. It appeared that is what he may have been getting at in the prior emails.

Beliveau said that he was puzzled as to apparently not having a meeting with Lou Costa on this.

Beliveau said that it appeared to him that D'Agostino was picking on Stoyle. He acknowledged that it could have possibly been to get her to apply for another job.

Beliveau said that around January 9, 2003, after Stoyle had filed the complaint, he met again with Lou Amoruso. Beliveau showed him information and said that is why he thinks Stoyle filed the complaint.

Beliveau said that in October of 2002, Beliveau and Stoyle met with Amoruso. He said that they did not understand why D'Agostino was acting hostile towards Stoyle. Stoyle felt threatened by the email concerning the software issue.

Beliveau said that D'Agostino had lost a lot of weight. Beliveau asked at this meeting with Amoruso if D'Agostino was malnourishing himself. Amoruso said that he noticed changes also and had a few run-ins with D'Agostino.

Re:   The "Sexually Explicit" Email -

Beliveau said that the "sexually explicit" email was sent by D'Agostino to Stoyle. Beliveau became aware of it shortly after it happened. Beliveau said that a day or so before that he was in D'Agostino's office and D'Agostino was listening to email. Beliveau said that D'Agostino invited him to listen to it. Beliveau said that he responded, after listening to a bit of it, "That's disgusting".

Beliveau described the email as involving a gerbil going up a person's rear end.

Beliveau said that a few days later he was in Stoyle's office and she called to his attention the email. Beliveau said that he recognized it as the email he had heard the other day and said words to the effect, "I can't believe he sent that to you". Beliveau said he then left the office.

Beliveau said that Stoyle does not want any controversy and that she is generally happy with her job.

Re:    MEPA Meeting in New Hampshire -

Beliveau said that he was at the MEPA meeting in NH. He said that when they got back, Stoyle told him that D'Agostino said to her "you look delicious". Beliveau said that Stoyle was disgusted by this remark.

Beliveau said that what he did not know at that time were the other actions by D'Agostino at the Conference. This was called to him by the treasurer of MMWEC, who called him after the allegations became public. The treasurer of MMWEC's name is Ron DeCurzio.

Beliveau said that he spoke to DeCurzio about not putting the fact of the complaints being made by Stoyle in the MMWEC news clippings that are sent to MMWE Board members. Beliveau said that DeCurzio told him that he had seen D'Agostino come up to Stoyle at the Rico Petrocelli autographing session. DeCurzio told Beliveau that he spoke to Stoyle at the Conference and that Stoyle told him that D'Agostino had made the "delicious" remark and that she said it was disgusting.

DeCurzio also said that he saw D'Agostino come up behind Stoyle and was whispering in her ear. DeCurzio told Beliveau that he had commented to Stoyle words to the effect that "It looked like your boss was being very friendly" to her. DeCurzio thinks that this is when Stoyle told him regarding the "delicious" remark.

According to DeCurzio, this all happened at the bar.

After Stoyle filed the complaint, Beliveau said that he then re-examined all these incidents and could now see things as showing a pattern. He said that he later learned of the incident at the Westin Hotel.

Beliveau said that just before Stoyle filed the charge, D'Agostino sent over some phone bills with a note asking for the detail on the phone bills. D'Agostino sent this memo directly to Stoyle.

Beliveau said that Stoyle replied that there were no details on these lines as they were data lines.

Beliveau said that D'Agostino replied via email that he was not interested in data lines, but that he wanted the phone bills with the numbers called. Stoyle told him

however that the MED did not have that information and that information was at Town Hall.

Beliveau said that D'Agostino again sent an email to Stoyle asking to the effect, "Why are you withholding this information from me?".

D'Agostino reviews all the bills,

Beliveau said that D'Agostino also said in his email to Stoyle that if she continues to hold this information, it may result in discipline.

Beliveau contacted D'Agostino by email and reminded him that Stoyle works for him. Beliveau said that D'Agostino to him that he wanted Beliveau to go to the phone company and get the phone bills for two years and that he would leave it up to Beliveau to take discipline. According to Beliveau, this email was also sent to Michael Lehane, Esq., the Town's Labor Counsel, and to Stoyle.

Beliveau said that he sent a long memo back to D'Agostino showing him that he had the information at Town Hall and that it has been already crossing his desk and that Beliveau did not understand what the problem was.

Beliveau said that after a Department Head meeting, D'Agostino spoke to him and said that he owes Stoyle an apology over the phone bills and would send one to her. Beliveau said that he agreed that D'Agostino did in fact owe the apology.

Beliveau said that he later told Stoyle that D'Agostino was going to apologize. However, to his knowledge, no such apology was received.

Beliveau said that within a week or so after Stoyle filed her complaint, Beliveau got a copy of the complaint in the mail.

Three weeks after that, Beliveau said there had not been much public disclosure regarding the filing of the complaint.

Beliveau said that around Christmas Eve, Brad Wills took Beliveau to lunch and told him that David McCarter, a Selectman, said to Wills recently, words to the effect that he supposed that Wills knew about this complaint. Wills said that he did not know anything about it. Beliveau only confirmed the filing of a complaint.

A few weeks later, D'Agostino held a press conference on it. Beliveau said that it was stated in the newspaper that D'Agostino said that there is going to be his litigation, and it would be D'Agostino suing some members of the public and some people at the MED.

Beliveau did say that some Selectmen, Dan Donovan and Lou Amoruso, said in a newspaper that the Board was never informed about any harassment.

After this article appeared, Gary D'Ambra was upset and wanted to see Lou

Amoruso. According to Beliveau, D'Ambra said to Amoruso how he could say he did not know of the harassment problems, given that they were at the meetings.

D'Ambra said to the Selectmen that they should hear all the facts and give her an opportunity to respond.

Re:    January 9, 2003 - (Approximately)

Amoruso called Beliveau and said he knew of harassment, but not sexual harassment.

In a later article, Amoruso said he knew there was some problems and some tensions.

Beliveau said that D'Agostino made a statement in the newspaper that the timing of the complaint was done to interfere with his contract renewal. Beliveau said no one in this case ever discussed that.

Beliveau said that he thinks that D'Agostino's threat of discipline regarding the telephone bills is what pushed Stoyle over the edge into making the complaint. Beliveau said that he made a similar observation to Amoruso.

Beliveau said that Lou said to him that it was clear to him that D'Agostino was out to get Stoyle. Amoruso thought that the issue between Stoyle and D'Agostino was over the Treasurer.

Amoruso said that he spoke to D'Agostino but that he was unable to get him to change his behavior.

Beliveau wonders why Amoruso did not do anything if he felt D'Agostino was out to get Stoyle. No one had told Beliveau of any problems with Stoyle. Beliveau now wonders why it is suggested that there is a problem with Stoyle when there were no complaints made before.

Beliveau said, concerning the Town's sexual harassment policy, that within one month of his beginning work, some time in November of 1998, he was given a copy and told to have everyone sign a copy. That was the last he heard of the sexual harassment policy, other than having employees sign that they received it.

Beliveau said that in February of 2002, he spoke to Jerry Scherma about sending out the sexual harassment policy again. Scherma said that it should be sent out and that he would send it out. This did not happen until January of 2003.

Re:    Westin Hotel -

Beliveau said that a couple of months ago Stoyle told him regarding the incident at the Westin Hotel. Stoyle had not told him about this before.

Stoyle told Beliveau that at the conference, D'Agostino invited her to lunch. D'Agostino invited her to see the view from his room before they left for lunch, while he was getting his parking ticket. Beliveau said that Stoyle told him that in the room, she got the idea that D'Agostino had something else in mind because of the way he was looking at her. Beliveau said that Stoyle did not tell him about anything out of the ordinary at lunch.

Re:    Office Manager -

Beliveau said that D'Agostino has called Stoyle the Office Manager. Amoruso said that Laurie Anderson is the Business Manager. On a couple of occasions, D'Agostino referred to Stoyle as Office Manager.

Beliveau thinks that D'Agostino may have said that it was a joke but it was not received as being funny.

D'Agostino said some things to be funny, but they were not always received as being funny.

Beliveau did not correct D'Agostino on this. Beliveau said that he calls Stoyle by her correct title.

Re:    Eileen Plant -

Some time in 2000 or 2001, Plant was in the Town Manager's office. After she left, Beliveau asked Stoyle what was going on and that Stoyle told Beliveau regarding D'Agostino inviting Plant to lunch and that she felt uncomfortable about it.

Re:    PILOT Agreement -

According to Beliveau, Stoyle was involved in these discussions. Stoyle said words to the effect, "How come no one takes this seriously?".

Beliveau recalls D'Agostino saying words to the effect that Stoyle should be a hairdresser. When this statement was made, Bea Kearney and Boucher had left the room. Beliveau said that this was one of those instances where D'Agostino thought he was funny.

Re:    Emails -

Beliveau said that there was a period of time where emails were going back and forth between Town representatives and others. Beliveau said that jokes and social comments are very rare.

Beliveau said that after the Carol Fitton incident, that D'Agostino does not come by as often.

Beliveau said that MED meetings are held at the Town Hall.

Beliveau said that Stoyle would refer to D'Agostino by his first name.

Re:    Pension Costs -

Beliveau said that a citizen asked about the MED's pension costs. Beliveau had not looked at this before. He sent D'Agostino an email. Beliveau found that the Treasurer did not have a good rationale for the costs, which were in the $70,000.00 range.

Beliveau said that he has detected resistance from the Treasurer's Office.

Beliveau said that Kara Cooke had contacted Jerry Scherma and requested that he come to speak to the employees.

Beliveau said that there was an incident in which he cannot recall if it was D'Agostino or some one else who may have referred to some of these problems as being because of the "fat Jew", referring to Kara Cooke. He is not sure if he heard this or if he heard from some one else that D'Agostino or Tom Hottleman had said this.

Beliveau said that he likes D'Agostino, but he is uncomfortable with the situation.

Beliveau said that two times after the Hottleman hiring, there were two other hirings and that D'Agostino called him into his office and mentioned that there was a woman and before D'Agostino could say anything further, Beliveau said that he cut him off and said that he would not discuss it with D'Agostino.

Beliveau said that he has a professional relationship with D'Agostino.

Beliveau said that he understands that D'Agostino frequents the Regents Café and sometimes goes there with Selectmen.

In reference to the offensive email, Beliveau produced a copy of it on his computer, indicating that it was sent on or about October 18, 2000 from D'Agostino to Stoyle. The email was played for the undersigned. It appears to be something reportedly to be a story from the *LA Times* about a "feltching session" and supposedly involved a gerbil. The Salt Lake City Hospital was mentioned as the location.

Beliveau said that Stoyle burst into tears two times over the newspaper articles.

Interview of **Richard Boucher** (Boucher), at Town Hall. Boucher is the Treasurer-Collector for the Town of Mansfield. Boucher said that this July he will have been here seven years.

Boucher discussed various issues that existed between the Municipal Light Department (MED) and his office.

In reference to the lockbox situation, Boucher said that there was perpetual

It has been suggested that Amoruso agreed that D'Agostino wanted to get rid of Stoyle. Amoruso however says that he never said that to be the case. He reports that he may have said words to the effect "Maybe he does.", in reply to Beliveau suggesting that D'Agostino wanted to get rid of Stoyle. He states that he was not necessarily agreeing with that statement, but rather just making a comment in the conversation.

While Stoyle may believe that the discussion at this meeting addressed the sexual harassment aspect of the hostility, neither of the other two persons present support that as having been discussed. Perhaps because of the awkwardness of discussing sexual harassment, Stoyle may not have focused on it sufficiently for the others to clearly see the sexual harassment aspect. However, even if that is the case, the Town still did not know of the sexual harassment aspect of this from this meeting.

In analyzing the totality of this situation, the following question has been considered and are addressed in this report:

### Did inappropriate conduct occur?

By the reasonable inferences to be drawn from the facts, inappropriate conduct as noted above did occur. However, in other instances as noted above, inappropriate conduct did not occur or no finding can be made as there are insufficient facts to warrant a determination of inappropriate or appropriate conduct.

It is indeed unfortunate that Stoyle feels that she has been treated inappropriately. No employee should feel that way and of course no employee should be subjected to any inappropriate conduct. She appears to be capable and

Page 54 of Internal Investigation Report
Re: John D'Agostino

3124

professional. No references have been presented which relate to not performing her duties well.

A review of this matter also indicates that the Town took appropriate action consistent with the law and its policies. An investigation was commenced and steps were taken to ensure that the complainant/employee not to be in contact with the alleged harasser. The complainant/employee indicated that these steps were acceptable to her.

## CONCLUSION AND RECOMMENDATION

Based on the above, the Town will now address whether the incidents found to have been inappropriate conduct constitute sexual harassment. If so, the Town should take appropriate remedial action and action to ensure that such conduct does not occur again.

It is recommended that the Town remind all officials and personnel of the prohibitions on sexual harassment and other inappropriate conduct. While privacy considerations dictate that specifics of this matter not be identified in such a reminder, it is important for any employer or institution to remind those associated with it of the rules of appropriate conduct. A necessary component of any institution's activities to prevent harassment and other inappropriate conduct is to periodically remind those associated with it of the prohibition and procedure for reporting such conduct.

The undersigned has sought to reasonably and appropriately determine the facts. The Board should consider the matter in view of the facts and law in Appendix C

Page 55 of Internal Investigation Report
Re: John D'Agostino

3126

and upon the advice of counsel.

This report is transmitted to the Town for such action as is deemed appropriate.

Respectfully submitted,

JAMES B. LAMPKE, ESQ

Date: August 20, 2003

3126

EXHIBIT 20A

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

DOCKET NO. 02BEM04039

KIMBERLY A. STOYLE,                    )
    Complainant,                       )
                            )
                            )
v.                                     )
                            )
TOWN OF MANSFIELD,                     )
MUNICIPAL LIGHT PLANT, ET. AL.         )
    Respondent.                        )
_____   )

POSITION STATEMENT OF RESPONDENT,
JOHN D'AGOSTINO, INDIVIDUALLY AND AS TOWN MANAGER

      This case involves allegations of sexual harassment based on a sexually hostile

work environment as proscribed by M.G.L. c. 151B, § 4(16A), as well as claims of gender

discrimination and retaliation  in violation of M.G.L. c. 151B, §§ 4(1) & 4(4),

respectively, brought by Kimberly Stoyle, Chief Financial Officer of the Town of

Mansfield Municipal Electric Department ("MMED").  John D'Agostino is the Town

Manager for the Town of Mansfield ("Town"), as well as Manager of the MMED.  The

Respondent denies that the Complainant was subjected to a sexually hostile work

environment, and further denies that the Complainant was discriminated against on the

basis of gender or retaliated against for engaging in protected activity.

      Pursuant to 804 C.M.R. § 1.03(7), John D'Agostino (hereinafter referred to as the

"Respondent") submits the following Position Statement in response to the Complainant's

charges.

for workers' compensation.[3] The Respondent denies that the "Armaggedon" e-mail was unwelcome or that the Complainant took offense.

3. The Respondent denies that he ever made any such comment to the Complainant.

4. The Respondent denies that he ever made any such comments to the Complainant. In further responding, the Respondent states that the meeting was heated and tense. Words similar to those alleged by the Complainant were, however, spoken by the Complainant herself either at the meeting or shortly thereafter. After complaining "Why doesn't anyone listen to reason?", the Complainant asked "What do I have to do, cut my hair and get fat in order for people to listen to me?" No one, including Mr. D'Agostino, ever stated such words <u>to</u> the Complainant.

5. The Respondent admits that he once said "You look delicious" to the Complainant as they were sitting down to dinner with several other attendees at a NPPA Conference in North Conway, NH. The Respondent denies, however, that his comment was of a sexual nature; it was intended merely as a compliment. The Respondent denies, as well, that his comment was unwelcome or that the Complainant took offense. The Respondent further denies that the Complainant timely or appropriately

---

[3] Although "Dog Day Afternoon" details a sexual encounter among animals, the Respondent does not mean to suggest the joke is "sexually charged," any more than "Armaggedon" is sexually charged.

3

EXHIBIT NO. 21

## Lynn A. Leonard

**From:** "BRAD WILLS" <BMSWILLS@peoplepc.com>
**To:** "jack Beliveau" <Beliveau@mansfieldelectric.com>
**Sent:** Sunday, January 11, 2004 6:39 PM
**Subject:** Fw: brad

---------

**From:** BRAD WILLS[SMTP:BMSWILLS@PEOPLEPC.COM]
**Sent:** Sunday, January 11, 2004 5:39:29 PM
**To:** jack Beliveau
**Subject:** Fw: brad
**Auto forwarded by a Rule**

----- Original Message -----
**From:** BRAD WILLS
**To:** jack beliveau
**Sent:** Saturday, January 10, 2004 10:36 AM
**Subject:** brad

Hi Jack I just recalled the Christmas Eve. morning Dave McCarter came over and said both Jack and Kim should be fired. Jack forgets the time the board protected him from Kim Gisel. He should protect the board from Kim Stoyle. Then you and I went to Cheg Du for lunch. Remember me telling you that? Brad

EXHIBIT NO. 22

## AGREEMENT

AGREEMENT, made and entered into this 5th day of July, 2000, by and between the Town of Mansfield, a Massachusetts municipality, hereinafter called Town, and John D'Agostino of Mansfield, Massachusetts, hereinafter called Manager.

### WITNESSETH

WHEREAS, Town desires to employ the services of said John D'Agostino as Town Manager of the Town of Mansfield as provided in Article Four and other pertinent provisions of the Town Charter; and

WHEREAS, Town desires to provide certain benefits, establish certain conditions of employment, and to set working conditions of said Manager; and

WHEREAS, it is the desire of the Town to: (1) retain the service of said Manager and to provide inducement for him to remain in such employment, (2) to make possible full work and productivity and to assure Manager's morale and peace of mind with respect to future security, and (3) to provide a just means for terminating Manager's service for just cause; and

WHEREAS, Manager desires to accept such employment as the Town Manager of said Town;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties agree as follows:

### SECTION ONE: DUTIES:

Town hereby agrees to employ said John D'Agostino as Town Manager of said Town to perform the functions and duties specified in the Town Charter, including, but not

ı

**KS 0340**

limited to Article 4 of the Town Charter, and any other legally permissible and proper duties and functions as the Selectmen shall from time to time assign.

The Town Manager shall also serve as Manager of the Mansfield Municipal Electric Department in accordance with Article 4, Section 4-2 of the Town Charter.

SECTION TWO: TERM:

A.    The term of this Agreement shall commence on December 1, 2000, and run until November 30, 2003. Manager agrees to remain in the exclusive employ of the Town during the term hereof, and neither to accept other employment nor to become employed by any other employer until said termination date, unless said termination date is changed as hereinafter provided. The term "employed" shall not be construed to include occasional teaching, writing, or consulting performed on the Manager's time off, the same to be such as not to interfere with or conflict in any way with the Manager's general duties to the Town and are conducted in accordance with the provisions of Article 4 of the Town Charter.

SECTION THREE:    REMOVAL, TERMINATION, RESIGNATION, SUSPENSION, DEFINITION OF JUST CAUSE:

A.    The Selectmen of the Town (hereinafter "Selectmen") may remove the Manager from office and terminate his employment prior to the expiration of his term for just cause in accordance with Section 9-7 of the Town Charter.

B.    The Selectmen may suspend the Manager with full pay and benefits at any time during the term of this Agreement, but only if:

2

**KS 0341**

1.    a majority of the Selectmen and the Manager agree, or

2.    after a public hearing, a majority of the Selectmen votes to suspend the Manager for just cause, as defined below, provided however, that the Manager shall be given written notice, setting forth any charges at least ten (10) days prior to such hearing by the Selectmen bringing such charges.

C.    For the purpose of suspension, termination of employment or removal from office, the definition of just cause shall includes, but is not limited to, the following:

1.    Malfeasance -- defined as wrongdoing or misconduct by a public official or the commission of an act which is unlawful.

2.    Misfeasance -- defined as the doing of a lawful act in an unlawful or improper manner so that there is an infringement on the rights of others.

3.    Nonfeasance -- defined as the failure to do what duty requires to be done.

4.    Violation of the Town Charter.

5.    Unauthorized exercise of the responsibility and authority of the Board of Selectmen or actions in direct contradiction with the express policies of the Selectmen.

6.    Disability which prevents Manager from performing essential functions of his office.

D.    Resignation:  The Manager may resign upon three months written notice to the Selectmen.

E.    Expiration of Term:  The Manager's employment shall expire at the end of his term unless such term is extended or renewed by the Board of Selectmen.

3

KS 0342

SECTION FOUR: REAPPOINTMENT AND SEVERANCE PAY:

At least seven (7) months prior to the expiration of the Manager's term, the Manager shall notify the Selectmen in writing of the pending expiration of this Agreement. At least six (6) months prior to the expiration of the Manager's term, the Selectmen shall inform the Manager as to whether the Town will re-appoint the Manager to another term. If the Manager is not re-appointed to another term and the Manager is willing and able to perform his duties, then the Town shall pay the Manager three (3) months salary, capped at $25,384.68 and health benefits as severance pay at the end of his term. Such severance pay shall be paid in the same installments as Manager received while employed by the Town.

SECTION FIVE: DISABILITY:

The Town shall comply with all such applicable state and federal laws concerning employee disability.

SECTION SIX: SALARY:

The Town agrees to pay the Manager for his services rendered pursuant hereto a starting annual salary of $110,000.00 payable in installments at the same time as other employees of the Town are paid. This amount includes a $10,000.00 stipend for his services as the Manager of the Mansfield Municipal Light Department.

The Town may increase said base salary and/or other benefits of the Manager in such amount and to such extent as the Selectmen may deem desirable on the basis of annual salary review of said Manager. Such salary review and changes in compensation shall be done at such time so that compensation changes shall coincide with the fiscal year of the Town effective July 1. The salary review should take place on or about November 1 of the

4

**KS 0343**

preceding fiscal year.

### SECTION SEVEN: PERFORMANCE REVIEW:

Annually, the Selectmen and the Manager shall define such goals and performance objectives which they determine necessary for the proper operation of the Town and in attainment of the policy objectives of the Board of Selectmen and shall further establish a relative priority among those various goals and objectives, said goals and objectives to be reduced to writing. They shall generally be attainable within the time limitations as specified and the annual operating and capital budgets and appropriations provided. The Selectmen shall review and evaluate the performance of the Manager at least once annually in advance of the adoption of the annual operating budget. Said review and evaluation shall be in accordance with the specific criteria developed by the Selectmen and the above-referenced goals and performance objectives set during the previous year. The Manager shall have an opportunity to participate in the development of said criteria. Further, the Chairman of the Board of Selectmen shall provide the Manager with a summary written statement of the findings of the Selectmen and provide an adequate opportunity for the Manager to discuss his evaluation with the Selectmen. A copy of the evaluation shall be made part of the Manager's personnel file along with any written responses made by the Manager. In effecting the provisions of this Section, the Board of Selectmen and Manager mutually agree to abide by the provisions of applicable law.

### SECTION EIGHT: HOURS OF WORK:

It is recognized that the Manager must devote a great deal of time outside the normal office hours to the business of the Town, because of the professional nature of the position

5

KS 0344

of Town Manager, and it is understood that the hours of work will not be specified.

### SECTION NINE: AUTOMOBILE:

The Manager's official duties require the use of an automobile. The Manager shall have exclusive use of a Town vehicle, including personal use, except, however, if Manager intends to use said vehicle outside of New England, he shall obtain prior approval of the Chairman of the Board of Selectmen, which approval shall not be unreasonably withheld. The Town shall be responsible for all costs relating to the operation and maintenance of said vehicle.

### SECTION TEN: PROFESSIONAL DUES:

Employer agrees to pay for the professional dues and subscriptions of John D'Agostino necessary for his continuation and full participation in state associations and in not more than three (3) national associations, and further agrees to pay for attendance, lodging and meals at not more than three (3) national association meetings per year.

### SECTION ELEVEN: INDEMNIFICATION:

For acts performed in good faith and without gross negligence and in the belief that he is acting in the interest of the Town, the Town agrees to defend, save harmless, and indemnify the Manager against any tort, professional liability claim, or demand or other legal action arising out of an alleged act or omission occurring in the performance of the Manager's official duties as Town Manager. Willful torts and criminal acts are excepted.

### SECTION TWELVE: BONDING:

The Town shall bear the full cost of any fidelity or other bonds required of the Manager under any Massachusetts state law or Town ordinance.

**KS 0345**

SECTION THIRTEEN:  VACATION AND FRINGE BENEFITS:

A.    For each year of the term of this Agreement, Manager shall have four (4) weeks paid vacation and five (5) personal days, not to be taken more than two consecutive weeks at a time unless pre-approved by the Board of Selectmen.  Manager shall provide reasonable advance notice to the Chairman of the Board of Selectmen of when he intends to take such vacation time and personal days.  For the purpose of calculating vacation time for any part of a year, vacation time shall accrue at a rate of one and two-thirds (1 2/3) days per month of completed service.  Unused and accrued vacation time may be carried from one year into the next year, however, accrued, unused vacation time shall not exceed ten (10) days.  To the extent that unused, accrued vacation time exceeds ten (10) days, such excess shall be deemed waived and forfeited by the Manager.  Personal days may not be carried from one year to another.

B.    All other provisions of the Town Charter, By-Laws, regulations, rules, and policies of the Town relating to sick leave and holidays as they exist from time to time shall also apply to the Manager.

C.    Town agrees to provide a family health insurance plan for Manager and pay a portion of the premium in accordance with the benefit policies currently applicable to other municipal employees.

D.    1. Group Life Insurance

The Manager may participate in the Town's group term life insurance program which provides employees with a $5,000.00 policy for which the

7

**KS 0346**

Town pays $50% of the premium.

2. Voluntary Life Insurance Plan

Manager may participate in the voluntary life insurance plan which allows Town employees to purchase group term life insurance.

3. Term Insurance

The Town shall pay 80% of the premium on a $200,000.00 term life insurance life policy on the life of the Manager, except that the Town's share of the premium shall not exceed $500.00 per year. The policy shall be selected and obtained by the Manager.

E.    Deferred Compensation: Employer shall contribute eight (8%) percent of Manager's salary to the Manager's 457(k) deferred compensation program to be selected by the Manager. This contribution shall be distributed into investments solely determined by John D'Agostino.

F.    The Town shall provide the Manager with participation in the Bristol County Retirement System in accordance with the usual practices of the Town.

## SECTION FOURTEEN: NOTICES:

Notices pursuant to this Agreement shall be given by deposit in the custody of the United States Postal Service, postage prepaid, addressed as follows:

1.    Employer:          Board of Selectmen
                         Six Park Row
                         Mansfield, MA 02048

2.    Employee:          John D'Agostino
                         12 Park Avenue
                         Mansfield, MA 02048

8

**KS 0347**

IN WITNESS THEREOF, the parties hereunto set their seals.

Employee:

_John D'Agostino_    9-12-00

Employer:                             Approved as to Form:

Town of Mansfield
Board of Selectmen

_Bradford E. Wills_

_Daniel Donovan_

_Louis P. Amorus_

                                     Robert S. Mangiaratti, Town Counsel
Dated: _9-12-00_

10

KS 0348

EXHIBIT 22A

## AGREEMENT

AGREEMENT, made and entered into this _23rd_ day of _April 2003_, by and between the Town of Mansfield, a Massachusetts municipality, hereinafter called Town, and John D'Agostino of Mansfield, Massachusetts, hereinafter called Manager.

### WITNESSETH

WHEREAS, Town desires to employ the services of said John D'Agostino as Town Manager of the Town of Mansfield as provided in Article Four and other pertinent provisions of the Town Charter; and

WHEREAS, Town desires to provide certain benefits, establish certain conditions of employment, and to set working conditions of said Manager; and

WHEREAS, it is the desire of the Town to: (1) retain the service of said Manager and to provide inducement for him to remain in such employment, (2) to make possible full work and productivity and to assure Manager's morale and peace of mind with respect to future security, and (3) to provide a just means for terminating Manager's service for just cause; and

WHEREAS, Manager desires to accept such employment as the Town Manager of said Town;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties agree as follows:

### SECTION ONE: DUTIES:

Town hereby agrees to employ said John D'Agostino as Town Manager of said Town to perform the functions and duties specified in the Town Charter, including, but not limited to Article 4 of the Town Charter, and any other legally permissible and proper duties

1

**KS 0349**

and functions as the Selectmen shall from time to time assign.

The Town Manager shall also serve as Manager of the Mansfield Municipal Electric Department in accordance with Article 4, Section 4-2 of the Town Charter.

SECTION TWO: TERM:

A.    The term of this Agreement shall commence on December 1, 2003, and run until November 30, 2006. Manager agrees to remain in the exclusive employ of the Town during the term hereof, and neither to accept other employment nor to become employed by any other employer until said termination date, unless said termination date is changed as hereinafter provided. The term "employed" shall not be construed to include occasional teaching, writing, or consulting performed on the Manager's time off, the same to be such as not to interfere with or conflict in any way with the Manager's general duties to the Town and are conducted in accordance with the provisions of Article 4 of the Town Charter.

SECTION THREE:  REMOVAL, TERMINATION, RESIGNATION, SUSPENSION, DEFINITION OF JUST CAUSE:

A.    The Selectmen of the Town (hereinafter "Selectmen") may remove the Manager from office and terminate his employment prior to the expiration of his term for just cause in accordance with Section 9-7 of the Town Charter.

B.    The Selectmen may suspend the Manager with full pay and benefits at any time during the term of this Agreement, but only if:

1.    a majority of the Selectmen and the Manager agree, or

2.    after a public hearing, a majority of the Selectmen votes to suspend the

2

KS 0350

Manager for just cause, as defined below, provided however, that the Manager shall be given written notice, setting forth any charges at least ten (10) days prior to such hearing by the Selectmen bringing such charges.

C.     For the purpose of suspension, termination of employment or removal from office, the definition of just cause shall includes, but is not limited to, the following:

1.     Malfeasance -- defined as wrongdoing or misconduct by a public official or the commission of an act which is unlawful.

2.     Misfeasance -- defined as the doing of a lawful act in an unlawful or improper manner so that there is an infringement on the rights of others.

3.     Nonfeasance -- defined as the failure to do what duty requires to be done.

4.     Violation of the Town Charter.

5.     Unauthorized exercise of the responsibility and authority of the Board of Selectmen or actions in direct contradiction with the express policies of the Selectmen.

6.  Disability which prevents Manager from performing essential functions of his office.

D.  Resignation: The Manager may resign upon three months written notice to the Selectmen.

E.  Expiration of Term: The Manager's employment shall expire at the end of his term unless such term is extended or renewed by the Board of Selectmen.

3

**KS 0351**

SECTION FOUR: REAPPOINTMENT AND SEVERANCE PAY:

At least seven (7) months prior to the expiration of the Manager's term, the Manager shall notify the Selectmen in writing of the pending expiration of this Agreement. At least six (6) months prior to the expiration of the Manager's term, the Selectmen shall inform the Manager as to whether the Town will re-appoint the Manager to another term. If the Manager is not re-appointed to another term and the Manager is willing and able to perform his duties, then the Town shall pay the Manager six (6) months salary, ($61,438) and health benefits as severance pay at the end of his term. Such severance pay shall be paid in the same installments as Manager received while employed by the Town. The Town shall not be liable for such severance pay in the event that the Manager's employment is terminated for "just cause" as defined herein.

SECTION FIVE: DISABILITY:

The Town shall comply with all such applicable state and federal laws concerning employee disability.

SECTION SIX: SALARY:

The Town agrees to pay the Manager for his services rendered pursuant hereto a starting annual salary of $122,876.00 payable in installments at the same time as other employees of the Town are paid. This amount includes a $10,000.00 stipend which becomes part of the Town Manager's Base Salary as the Manager of the Mansfield Municipal Light Department.

The Town may increase said base salary and/or other benefits of the Manager in such amount and to such extent as the Selectmen may deem desirable on the basis of annual salary review of said Manager. Such salary review and changes in compensation shall be

4

KS 0352

done at such time so that compensation changes shall coincide with the fiscal year of the Town effective July 1. The salary review should take place on or about November 1 of the preceding fiscal year.

### SECTION SEVEN: PERFORMANCE REVIEW:

Annually, the Selectmen and the Manager shall define such goals and performance objectives which they determine necessary for the proper operation of the Town and in attainment of the policy objectives of the Board of Selectmen and shall further establish a relative priority among those various goals and objectives, said goals and objectives to be reduced to writing. They shall generally be attainable within the time limitations as specified and the annual operating and capital budgets and appropriations provided. The Selectmen shall review and evaluate the performance of the Manager at least once annually in advance of the adoption of the annual operating budget. Said review and evaluation shall be in accordance with the specific criteria developed by the Selectmen and the above-referenced goals and performance objectives set during the previous year. The Manager shall have an opportunity to participate in the development of said criteria. Further, the Chairman of the Board of Selectmen shall provide the Manager with a summary written statement of the findings of the Selectmen and provide an adequate opportunity for the Manager to discuss his evaluation with the Selectmen. A copy of the evaluation shall be made part of the Manager's personnel file along with any written responses made by the Manager. In effecting the provisions of this Section, the Board of Selectmen and Manager mutually agree to abide by the provisions of applicable law.

### SECTION EIGHT: HOURS OF WORK:

It is recognized that the Manager must devote a great deal of time outside the normal

5

**KS 0353**

office hours to the business of the Town, because of the professional nature of the position of Town Manager, and it is understood that the hours of work will not be specified.

### SECTION NINE: AUTOMOBILE:

The Manager's official duties require the use of an automobile. The Manager shall have exclusive use of a Town vehicle, including personal use, except, however, if Manager intends to use said vehicle outside of New England, he shall obtain prior approval of the Chairman of the Board of Selectmen, which approval shall not be unreasonably withheld. The Town shall be responsible for all costs relating to the operation and maintenance of said vehicle.

### SECTION TEN: PROFESSIONAL DUES:

Employer agrees to pay for the professional dues and subscriptions of John D'Agostino necessary for his continuation and full participation in state associations and in not more than three (3) national associations, and further agrees to pay for attendance, lodging and meals at not more than three (3) national association meetings per year.

### SECTION ELEVEN: INDEMNIFICATION:

For acts performed in good faith and without gross negligence and in the belief that he is acting in the interest of the Town, the Town agrees to defend, save harmless, and indemnify the Manager against any tort, professional liability claim, or demand or other legal action arising out of an alleged act or omission occurring in the performance of the Manager's official duties as Town Manager. Willful torts and criminal acts are excepted.

### SECTION TWELVE: BONDING:

The Town shall bear the full cost of any fidelity or other bonds required of the Manager under any Massachusetts state law or Town ordinance.

**KS 0354**

SECTION THIRTEEN: VACATION AND FRINGE BENEFITS:

A.    For each year of the term of this Agreement, Manager shall have four (4) weeks paid vacation and five (5) personal days, not to be taken more than two consecutive weeks at a time unless pre-approved by the Board of Selectmen.  Manager shall provide reasonable advance notice to the Chairman of the Board of Selectmen of when he intends to take such vacation time and personal days. For the purpose of calculating vacation time for any part of a year, vacation time shall accrue at a rate of one and two-thirds (1 2/3) days per month of completed service.  Unused and accrued vacation time may be carried from one year into the next year, however, accrued, unused vacation time shall not exceed fifteen (15) days.  To the extent that unused, accrued vacation time exceeds fifteen (15) days, such excess shall be deemed waived and forfeited by the Manager.  Personal days may not be carried from one year to another.

B.    All other provisions of the Town Charter, By-Laws, regulations, rules, and policies of the Town relating to sick leave and holidays as they exist from time to time shall also apply to the Manager.

C.    Town agrees to provide a family health insurance plan for Manager and pay a portion of the premium in accordance with the benefit policies currently applicable to other municipal employees.

D.    1. Group Life Insurance

The Manager may participate in the Town's group term life insurance program which provides employees with a $4,000.00 policy for which the Town pays 80% of the premium.

2. Voluntary Life Insurance Plan

7

KS 0355

Manager may participate in the voluntary life insurance plan which allows Town employees to purchase group term life insurance.

3. Term Insurance

The Town shall pay 100% of the premium on a $200,000.00 term life insurance life policy on the life of the Manager. The policy shall be selected and obtained by the Manager.

E.   Deferred Compensation:   Employer shall contribute (9.765%) percent of Manager's salary to the Manager's 457(k) deferred compensation program to be selected by the Manager.   This contribution shall be distributed into investments solely determined by John D'Agostino.

F.   The Town shall provide the Manager with participation in the Bristol County Retirement System in accordance with the usual practices of the Town.

### SECTION FOURTEEN: NOTICES:

Notices pursuant to this Agreement shall be given by deposit in the custody of the United States Postal Service, postage prepaid, addressed as follows:

1.   Employer:                Board of Selectmen
                             Six Park Row
                             Mansfield, MA  02048

2.   Employee:               John D'Agostino
                             12 Park Avenue
                             Mansfield, MA  02048

Alternatively, notices required pursuant to this Agreement may be personally served in the same manner as is applicable to civil judicial practice. Notice shall be deemed given as of the date of personal service or as of the date of deposit of such written notice in the course of transmission in the United States Postal Service.

8

KS 0356

SECTION SIXTEEN: GENERAL PROVISIONS:

A.     This Agreement shall constitute the entire Agreement between the parties.

B.     This Agreement shall be binding upon and inure to the benefit of the heirs at law and executors of the Manager.

C.     The Agreement may be reopened for revision at any time during its term upon the mutual consent of both parties.  Except, however, to be effective, any such revisions must be in writing and signed by both parties.

D.     If any provision, or any portion thereof, contained in this Agreement is held unconstitutional, invalid, or unenforceable, the remainder of this Agreement, or portion thereof shall be deemed severable and shall not be affected and shall remain in full force and effect.

IN WITNESS THEREOF, the parties hereunto set their seals.

Employee:

John D'Agostino

Employer:                                              Approved as to Form:

Town of Mansfield
Board of Selectmen

Robert S. Mangiaratti, Town Counsel
Dated: april 18 2008

9

**KS 0357**

EXHIBIT NO. 23

Statement read at July 23, 2003 Selectmen's meeting (Transcribed from audio/visual tape of meeting):

"We're going to finish this meeting with a statement from the Board concerning an action in executive session and I'm basically going to read this and leave it at that."

"Kimberly Stoyle, an employee of the Electric Department of the Town of Mansfield, filed a sexual harassment complaint with the Massachusetts Commission on Discrimination on or about December 3, 2002 against the Town of Mansfield, John D'Agostino, the Town Manager. Immediately upon becoming aware of Ms. Stoyle's allegations of sexual harassment, the town carefully adhered to its sexual harassment policy. The Town took the following steps. The town made arrangements in the work place so that Mr. D'Agostino would not have direct contact with Ms. Stoyle. The Selectmen retained an independent investigator and directed him to thoroughly investigate the allegations made by Ms. Stoyle.

The Selectmen contacted the Town's insurer to protect the financial interests of the Town. The Selectmen chose James B. Lampke, esq. of Hingham, MA to serve as an independent investigator. He is a highly respected municipal lawyer who has specialized training and extensive experience in conducting internal investigations.

Mr. Lampke investigated each allegation (on) set forth in Ms. Stoyle's complaint and every other alleged incident that she told him about when he interviewed her. Mr. Lampke interviewed a total of sixteen witnesses including Ms. Stoyle and examined numerous

documents in the course of his investigation. Mr. Lampke met with the Selectmen on two

different occasions and provided them with a detailed report of his findings. By unanimous

vote 5-0, the Board of Selectmen on June 25, 2003, determined that the Town Manager,

John D'Agostino, did not engage in sexual harassment of Kimberly Stoyle. The Selectmen

based their decision on the detailed factual findings made by the independent investigator

and the law as advised by Town Council and the publication entitled "Sexual Harassment in

the Workplace Guidelines" written by the Massachusetts Commission Against

Discrimination."

EXHIBIT NO. 24

ENTER CHARGE NUMBER
___ FEPA
___ EEOC

## CHARGE OF DISCRIMINATION

This Form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

Massachusetts Commission Against Discrimination and EEOC
(State or Local Agency, if any)

RECEIVED

DEC - 5 2002

Name (Indicate Mr., Ms., or Mrs.)
**Ms. Kimberly A. Stoyle**

| STREET ADDRESS     CITY, STATE AND ZIP CODE | COUNTY | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| **138 Old Elm Street, Mansfield, MA  02048** | **Bristol** | **(508) 339-0008** |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

NAME                                    NO. OF EMPLOYEES/MEMBERS
**Town of Mansfield Municipal Electric Plant**

TELEPHONE NUMBER (Include Area Code)
**(978) 744-4734**

STREET ADDRESS               CITY, STATE AND ZIP CODE
**125 High Street, Suite 4, Mansfield, MA  02048**

**For service only, Attn: Jack Beliveau, Director**

NAME
**The Town of Mansfield**
**John D'Agostino, Town Manager, Individually**

TELEPHONE NUMBER (Include Area Code)
**(508) 261-7370**

STREET ADDRESS
**Six Park Row, Mansfield, MA  02048**

CITY, STATE, AND ZIP CODE

CHARGE OF DISCRIMINATION BASED ON (Check appropriate box(es))

DATE OF MOST RECENT OR
CONTINUING DISCRIMINATION TOOK
PLACE:
**November 2002**

___ Race   ___ Color   X Sex   ___ Religion   ___ National Origin

___ Age   X Retaliation   ___ Other (Specify)

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s))

## SEE ATTACHED EXHIBIT A
## COMPLAINT OF KIMBERLY A. STOYLE

✓ I also want this charge filed with the EEOC.
I will advise the agencies if I change my address or telephone Number and I will cooperate fully with them in the processing Of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and accurate.

Date  11/29/02          *Kimberly A. Stoyle*
                        Charging party (Signature)

*Lynn A. Leonard*, Notary
NOTARY – When necessary to meet State and Local Requirements

I swear or affirm that I have read the above charge and that It is true to the best of my knowledge, information and belief

SIGNATURE OF COMPLAINANT
*Kimberly A. Stoyle*
SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)   11/29/02

*Commission expires 12/13/03*

626

**EXHIBIT A**
**COMPLAINT OF KIMBERLY STOYLE**

I have been employed as the Chief Financial Officer for the Town of Mansfield Municipal Electric Plant since March of 1999. During the course of my employment, I have been the victim of gender-based and sexual harassment perpetrated by the Mansfield Town Manager, John D'Agostino. In addition, Mr. D'Agostino has retaliated against me for reporting his conduct. Incidents of discrimination include, but are not limited to, the following acts:

## I. GENDER-BASED AND SEXUAL HARASSMENT

1. In August 1999, at a conference for the Northeast Public Power Association, Mr. D'Agostino suggested at the lunch hour that I come to his hotel room to "check out the view."

2. In October 2000, Mr. D'Agostino sent me a sexually charged audio e-mail message detailing a sexual encounter involving an animal.

3. In or about April 2002, during a discussion regarding pension allocations, Mr. D'Agostino stated: "The only accounting I am familiar with is a broad plus a brain equals a problem."

4. In or about June 2002, after I voiced my opinion on the issue of payment in lieu of taxation and asked Mr. D'Agostino, "Why doesn't anyone listen to reason?" Mr. D'Agostino stated that I was too pretty and that no one would take me seriously. He further stated that maybe people would listen to me if I cut my hair and got fat. He also said that I should have been a hairdresser because then I could talk as much as I wanted and maybe someone would listen.

5. In August 2002, at a conference for the Northeast Public Power Association, Mr. D'Agostino stated: "You look delicious."

I indicated to Mr. D'Agostino after each incident of harassment that I was offended by his conduct. I also reported his conduct on numerous occasions beginning in 1999 to the Director of the Mansfield Municipal Electric Plant. The Director in turn reported Mr. D'Agostino's conduct to the Chairman of the Town of Mansfield Board of Municipal Electric Commissioners. Despite repeated complaints, the harassment continues.

1

## II. RETALIATION

1. In December 2001, Mr. D'Agostino attempted to retract an effective salary increase pre-authorized by him.

2. In October 2002, Mr. D'Agostino reprimanded me for failing to consult with the Town MIS Director regarding an integrated purchase order system. His criticism was contrived and retaliatory, given that the Electric Plant has no such system.

3. In October and November 2002, Mr. D'Agostino falsely accused me of failing to provide telephone account information that he requested. Mr. D'Agostino then attempted to initiate disciplinary action against me, despite that I thoroughly and timely responded to his request.

Based upon the foregoing facts and other incidents, I charge the Town of Mansfield Municipal Electric Plant, the Town of Mansfield and John D'Agostino with sexual and gender-based harassment and retaliation in violation of M.G.L. c. 151B and Title VII of the Civil Rights Act of 1964. I am seeking emotional distress damages and other compensatory damages as a result of their unlawful conduct.

EXHIBIT NO. 25



**TOWN OF MANSFIELD**
**SEXUAL HARASSMENT POLICY**

All employees have the right to work in an environment free from all forms of discrimination and harassing conduct.

The Town of Mansfield believes that sexual harassment is a form of misconduct which undermines the integrity of the employment relationship, and demeans both sexes. The Town of Mansfield expects all employees to conduct themselves in a professional manner with concern and respect for their colleagues, members, and the public.

Verbal or physical behavior towards an employee of the Town of Mansfield which constitutes unsolicited and unwelcome sexual overtures or conduct is unlawful and is forbidden by the Town of Mansfield.

Sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, when submission to, or rejection of, such conduct or communication is either an explicit or implicit term or condition of employment, or is used as a basis for making employment decisions.

Additionally, any such unwelcome conduct or communications which have the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment is likewise prohibited.

The key to understanding what constitutes sexual harassment lies in the word "unwelcome". Sexual harassment can take the form of verbal abuse, such as sexual insults, suggestive comments, demands for sex, and dirty jokes. It may entail physical touching and "horseplay". It may also take the form of visual materials such as cartoons, pictures, or photographs.

Employees who believe they are the subject of sexual harassment should immediately report the conduct to their supervisor and/or to the sexual harassment officer. The sexual harassment officer shall be appointed by the Town Manager, and shall be responsible for promoting awareness of the Town of Mansfield's sexual harassment policy and related issues, and shall be available to all staff to receive reports of sexual harassment, and to help facilitate pursuant investigations. If either of these persons is the source of the alleged harassment, the employee should report the problem to the Town Manager.

All reports of harassment will be investigated promptly and in an impartial and as confidential a manner as possible, under the supervision of the sexual harassment officer, to ensure prompt and appropriate action. Any employee who is found, after appropriate investigation, to have engaged in sexual harassment of another employee, will be subject to disciplinary action as determined by the Town Manager, up to and including termination of employment, depending on the circumstances.

If an employee is not satisfied with the handling of a report, or action taken, then the employee may file a written grievance with the Town Manager.

A written grievance should state the nature of the claim, the names of the parties involved, and the relief requested. Once the Town Manager has received a written grievance, he or she will convene a meeting to discuss the grievance with the employee. Within ten days after the discussion, the Town Manager will prepare a written response which will include the proposed relief. If the employee is dissatisfied with the proposed relief, he or she may file a written complaint with the Town Manager. The Town Manager will take appropriate action to investigate the complaint and consider the proposed relief, including taking the matter to the Board of Selectmen, if necessary, for further investigation and action.

No employee will be subject to any form of coercion, intimidation, retaliation, interference, or discrimination for filing a sexual harassment report.

**Attachment A**
**Employee Acknowledgment and Receipt Form**

I hereby acknowledge that the Town of Mansfield's Sexual Harassment policy has been explained to me and/or that I have received, read and understood a copy of the policy and the procedures contained therein.

_____
Employee name (please print)


_____
Employee signature


_____
Department/Division


_____
Witness


_____
Date

EXHIBIT NO. 26

1

1                                              Volume I
                                            Pages 1-76
2
                          UNITED STATES DISTRICT COURT
3                           DISTRICT OF MASSACHUSETTS

4                                        C.A. NO. 04 11329 DPW

5    DR. JOHN J. BELIVEAU,               :
                    Plaintiff,           :
6                                        :
     vs.                                 :
7                                        :
     TOWN OF MANSFIELD MUNICIPAL         :
8    ELECTRIC DEPARTMENT and             :
     JOHN D'AGOSTINO,                    :
9                    Defendants.         :

10

11

12            DEPOSITION of BRADFORD E. WILLS, taken on behalf
       of the Defendant, John D'Agostino, pursuant to the
13     applicable provisions of the Massachusetts Rules of
       Federal Procedure, before Barbara M. Montijo, a
14     Registered Professional Reporter and Notary Public
       within and for the Commonwealth of Massachusetts, at
15     the offices of Brody, Hardoon, Perkins & Kesten,
       One Exeter Plaza, Boston, Massachusetts, on
16     August 18, 2005, commencing at 2:00 p.m.

17

18

19

20
                            DUNN & GOUDREAU
21                  COURT REPORTING SERVICE, INC.
                            One State Street
22                        Boston, MA  02109
                            (617) 742-6900
23

24

22

```
 1   A.   Yes.

 2   Q.   And you say the Commissioners voted for you to have

 3        this?

 4   A.   Yes.

 5   Q.   While you were gone?

 6   A.   When I was in Florida on vacation and I came back.

 7   Q.   Did you get called in emergencies in your role as

 8        Chairman of the Light Commissioners?

 9             THE WITNESS:  Emergencies?

10             MR. KESTEN:  Yes.

11   A.   Like?

12   Q.   What's a cell phone for?

13   A.   Well, different constituents call you with problems,

14        outages.  Jack and I would work on the monthly agenda

15        for the monthly meeting.  I would Nextel John.

16   Q.   John who?

17   A.   D'Agostino.

18   Q.   Prior to the call that you got from Jack Beliveau

19        telling you that there was this conversation in which

20        John had used the "F" word with Kim, John D'Agostino,

21        had you heard of any issues or problems between

22        anyone in the Light Department and John D'Agostino?

23   A.   Problems?  Problems?  Not that I recall.

24   Q.   During your tenure as a Selectman/Light Commissioner,
```

```
 1        did you hear anything about the hiring controversy

 2        with Andrea Hottleman?

 3   A.   I believe Jack had mentioned it to me; that John

 4        wanted him to hire him -- or his wife.  His wife, was

 5        it?

 6   Q.   Whose wife?

 7   A.   Hottleman's.  What was the name you just said?

 8   Q.   Do you know Tommy Hottleman?

 9   A.   No, I didn't.

10   Q.   Have you ever heard the name?

11   A.   I've heard the name, but I don't know him.

12   Q.   How did you hear the name, in what context?

13   A.   Jack had mentioned it to me, but being a townie, my

14        cousin had played cards up at the Regent and I think

15        he was at the Regent.  So, I think I've heard his

16        name through the course of time.  I don't know him.

17        I wouldn't know him if I bumped into him.

18   Q.   As a townie, you were aware that there were card

19        games at the Regent?

20   A.   Yeah.

21   Q.   What kind of card games would they play?

22   A.   To be honest with you, I don't know.  I would assume

23        Poker.  I don't know.

24   Q.   Pitch?
```