UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KIMBERLY STOYLE,<br>      Plaintiff<br><br>v.<br><br>THE MANSFIELD MUNICIPAL ELECTRIC<br>DEPARTMENT, JOHN D'AGOSTINO,<br>THE TOWN OF MANSFIELD BOARD OF<br>LIGHT COMMISSIONERS, LOUIS AMORUSO,<br>MICHAEL McCUE, DAVID McCARTER,<br>DANIEL DONOVAN, ROGER ACHILLE<br>AND STEVEN MacCAFFRIE,<br><br>      Defendants | C.A. No. 05-10354-DPW |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR,
IN THE ALTERNATIVE, FOR A NEW TRIAL**

  Now comes the plaintiff, Kimberly Stoyle, and respectfully requests that this Honorable Court deny Defendant's Motion for Judgment Notwithstanding the Verdict ("JNOV"), or in the Alternative, For a New Trial. As grounds therefore, plaintiff states that there is sufficient evidence to support the jury's verdict.

  **I. Standard of Review**

  To set aside a verdict based on the evidence, defendant must show that the verdict was against the great weight of the evidence or that there was a clear miscarriage of justice. Havinga v. Crowley Towing and Transp. Co., 24 F.3d 1480, 1482-83 (1st Cir. 1994). Defendant cannot satisfy this standard. Defendant's Motion omits significant evidence presented at trial in support of plaintiff's retaliation claims. The Court must examine all the evidence, in the light most

favorable to the plaintiff, drawing all possible inferences in her favor. Id. at 1483. Applying this standard, defendant's Motion must be denied.

    **II.    The Evidence Supports Retaliation Claims under Title VII, G.L. 151B and G.L. c. 149**

A retaliation claim requires proof that the plaintiff (1) engaged in protected conduct; (2) was subjected to adverse employment action; and that (3) there was a causal connection between the first and second elements. Valentin-Almeyda v. Municipality of Aguadilla, 477 F.3d 85 (1st Cir. 2006). Plaintiff's formal Complaint to the Massachusetts Commission Against Discrimination ("MCAD") constitutes protected activity under Title VII[1], G.L. 151B[2] and G.L. c. 149.[3] Plaintiff's objection to and refusal to participate in illegal financial practices is also protected activity under G.L. c. 149.[4] The jury determined that these activities were motivating factors in defendants' decision to take adverse employment action against the plaintiff. See, Jury Verdict Form, pp. 5-6.

An "adverse action" is one that would be materially adverse to a reasonable employee or job applicant. Burlington Northern & Santa Fe Railway Company v. Sheila White, 126 S.Ct. 2405, 2409, 2416 (2006). This requires a retaliation plaintiff show that the challenged action would dissuade a reasonable worker from making or supporting a charge of discrimination. Id. An adverse action by a supervisor is an action of the employer. Foley v. Commonwealth Electric Co., 312, F.3d 517, 521 (1st Cir. 2002).

---

[1] 42 U.S.C. §2000e-3.

[2] M.G.L. c. 151B, § (4).

[3] M.G.L. c. 149, §185 (b) (1), (2) and (3).

[4] Id.

Plaintiff presented sufficient evidence that she filed an MCAD claim in good faith and that she reported financial improprieties based upon a reasonable belief that John D'Agostino misappropriated funds from the Mansfield Municipal Electric Department ("MMED"). There was also substantial evidence that the MMED and D'Agostino took adverse action against the plaintiff in retaliation for these protected activities. The supporting evidence is as follows:

1. John D'Agostino is the Mansfield Town Manager appointed as Manager of the MMED with supervisory authority over its employees. (Testimony of Kimberly Stoyle and Jack Beliveau).

2. In June 1999, plaintiff questioned the legitimacy of a bill submitted by D'Agostino for treasurer's services in the amount of $150,000. Plaintiff believed that it was illegal to authorize payment for charges not legitimately incurred. D'Agostino assured plaintiff that the charges were representative of the treasurer's services. (Testimony of Kimberly Stoyle).

3. In August 1999, plaintiff rejected D'Agostino's sexual advances in a hotel room at a professional conference. (Testimony of Kimberly Stoyle).

4. On October 12, 1999, Dr. Beliveau put his and plaintiff's concerns regarding inflated Payments in Lieu of Taxes and Other Services in writing to D'Agostino and to the Board of Light Commissioners ("Board"). (Testimony of Jack Beliveau and Kimberly Stoyle; Trial Exhibit 10).[5]

5. In January 2000, plaintiff reported to her supervisor, Dr. Jack Beliveau, that D'Agostino sexually harassed another MMED employee, Carolyn Fitton. (Testimony of Kimberly

---

[5] The trial exhibits are in the process of being updated electronically and converted to CD rom, which will be provided to the Court under separate cover.

3

Stoyle).  Dr. Beliveau discussed this allegation with D'Agostino.  (Testimony of Jack Beliveau).

6. In February 2000, D'Agostino criticized plaintiff's work performance and acted in a hostile manner toward her.  (Trial Exhibit 12; Testimony of Kimberly Stoyle).

7. In June 2000, plaintiff again raised the issue of excessive internal charges for treasurer's services in the amount of $133,000.  Again, D'Agostino assured plaintiff that the charges were representative of the services rendered.  (Trial Exhibit 279A; Testimony of Kimberly Stoyle).

8. In October 2000, D'Agostino sent plaintiff a sexually explicit email involving anal sex with an animal.  (Trial Exhibit 16; Testimony of Kimberly Stoyle).

9. In December 2000, plaintiff reported to Dr. Beliveau that D'Agostino sexually harassed yet another Town employee.  (Testimony of Kimberly Stoyle).

10. In March 2001, D'Agostino used vulgar language in a telephone call to plaintiff.

11. In June 2001, plaintiff solicited a quote from Century Bank to outsource the collection of electric bills.  Century Bank quoted plaintiff a fee of $18,000 to perform the same services that the treasurer performed at an average yearly cost of approximately $140,000.  During a discussion with Century Bank representatives on this issue, Mr. Boucher told plaintiff to "shut up" and that she "didn't know anything."  Mr. D'Agostino was also present and acquiesced in Mr. Boucher's hostile treatment of plaintiff.  (Trial Exhibit 265; Testimony of Kimberly Stoyle).

12. On June 26, 2001, Dr. Beliveau put plaintiff's concerns about Payments to the Town at an Unsustainable Level in writing to D'Agostino and to the Board.  (Testimony of Jack Beliveau and Kimberly Stoyle; Trial Exhibit 21).

13. On July 26, 2001, Dr. Beliveau again put his and plaintiff's concerns regarding inflated Payments in Lieu of Taxes in writing to D'Agostino and to the Board.  (Testimony of Jack Beliveau and Kimberly Stoyle; Trial Exhibit 25).

14. In October 2001, plaintiff and Dr. Beliveau reported to Board Chairman Lou Amoruso that D'Agostino engaged in conduct that appeared to be sexual harassment against plaintiff and Carolyn Fitton.  Misuse of MMED funds by D'Agostino was also raised at this meeting.  (Testimony of Kimberly Stoyle, Jack Beliveau and Gary D'Ambra).

15. In December 2001, plaintiff complained to Dr. Beliveau that D'Agostino leered at her and made an obscene gesture with his tongue at an MMED Christmas party.  Plaintiff ignored D'Agostino at the party.  (Testimony of Kimberly Stoyle).

16. In January 2002, D'Agostino attempted to rescind plaintiff's pay raise, which had been approved in November 2001.  D'Agostino continued to question plaintiff's compensation and employment status for several months thereafter.  He scrutinized her personnel file, singled her out regarding the approval process for prior pay raises and questioned her job title and the date of her job application.  He also began referring to plaintiff as the Office Manager instead of the Chief Financial Officer.  (Testimony of Kimberly Stoyle and Jack Beliveau).

17. In February 2002, plaintiff complained again to Dr. Beliveau and to Mr. Amoruso that D'Agostino's behavior created an escalating hostile work environment.  (Trial Exhibit 77; Testimony of Kimberly Stoyle).

18. In April 2002, plaintiff expressed her belief that MMED was being overcharged by approximately $70,000 for pension costs.  D'Agostino retaliated with a derogatory, gender-based statement that "a broad plus a brain equals a problem."  (Testimony of Kimberly Stoyle).

19. In June 2002, D'Agostino approved the overcharge to MMED for pension allocations. (Trial Exhibit 279C).  At the same time, plaintiff suspected that the Town's bill to MMED for health insurance costs was also inflated.  Plaintiff refused to pay the bill.  D'Agostino responded to plaintiff's complaints regarding overcharges, again, with retaliatory gender-based harassment.  D'Agostino told plaintiff that if she cut her hair and got fat or became a hairdresser, someone might listen to her.  (Testimony of Kimberly Stoyle and Jack Beliveau).

20. On August 14, 2002, Dr. Beliveau again put his and plaintiff's concerns regarding Payments in Lieu of Taxes in writing to D'Agostino and to the Board.  Discussions regarding internal charges continued throughout the summer of 2002.  (Testimony of Jack Beliveau and Kimberly Stoyle; Trial Exhibit 52).

21. In August 2002, at a professional conference, D'Agostino whispered in plaintiff's ear that she "looked delicious" in the presence of her eleven-year-old son.  Plaintiff rebuffed his advance.  (Testimony of Kimberly Stoyle).

22. In October 2002, D'Agostino began a series of contrived accusations against the plaintiff.  He alleged that she authorized the installation of a purchase order software upgrade without prior approval from or coordination with the Town MIS manager.  In fact, no such software upgrade had ever been installed.  (Trial Exhibits 56, 60; Testimony of Kimberly Stoyle).

23. In October 2002, plaintiff requested another meeting with Mr. Amoruso to discuss the continuing hostile environment that D'Agostino created.  (Trial Exhibit 54).  Plaintiff, Dr. Beliveau and Mr. Amoruso subsequently met at the MMED offices.  The focus of the discussion was sexual harassment, financial improprieties and retaliation against plaintiff.  (Testimony of Kimberly Stoyle and Jack Beliveau).  At the conclusion of this

6

meeting, Amoruso told Ralph Penney about the alleged sexual harassment. (Testimony of Ralph Penney).

24. In October 2002, D'Agostino also requested information regarding telephone records from plaintiff and then purposely ignored and/or misconstrued all attempts by plaintiff to reasonably respond to his inquiry. (Trial Exhibit 60; Testimony of Kimberly Stoyle). In November 2002, he recommended that Dr. Beliveau take disciplinary action against plaintiff, despite that she had fully complied with his requests. (Trial Exhibit 60, Enclosure 9).

25. In December 2002, plaintiff filed a Charge of Discrimination with the MCAD in which she accused D'Agostino of gender-based harassment, sexual harassment and retaliation. (Trial Exhibit 155). In January 2003, D'Agostino publicly threatened to sue employees as a result of plaintiff's charge. (Trial Exhibit 109).

26. Board Chairman Daniel Donovan reported to the Mansfield News that plaintiff's MCAD claim was fabricated before he saw the complaint. The Board immediately voted to renew D'Agostino's contract, gave him a glowing performance evaluation and a large pay raise. Lou Amoruso, who the plaintiff had reported her concerns to on several occasions, stated: "These are the highest marks that I have ever given John." The Board acted prior to the completion of an investigation into plaintiff's claims. (Trial Exhibits 64, 72, 109, 285; Testimony of Daniel Donovan).

27. In February 2003, the Town Treasurer and the Town Accountant issued a memorandum falsely accusing plaintiff of carrying a negative cash balance of over $1 million. (Trial Exhibit 68). Plaintiff believed these allegations were related to the filing of her MCAD complaint two months earlier. (Testimony of Kimberly Stoyle). The Treasurer and

Accountant worked under the direction of D'Agostino, who was aware of and supported this accusation. (Testimony of Bea Kearney).

28. As a result of the memorandum, Dr. Beliveau hired James Goulet to audit the financial accounts of MMED. (Testimony of Jack Beliveau). Mr. Goulet requested copies of the Town audits for purposes of his investigation. (Trial Exhibit 79). D'Agostino intentionally delayed the production of documents requested by the auditor. (Trial Exhibit 76; Testimony of James Goulet).

29. On July 9, 2003, Dr. Beliveau again put his and plaintiff's concerns regarding Town overcharges in writing to D'Agostino and to the Board. (Testimony of Jack Beliveau and Kimberly Stoyle; Trial Exhibit 80).

30. In August 2003, Dr. Beliveau notified the Board that sexual harassment and retaliation against the plaintiff was ongoing. (Trial Exhibit 83).

31. In August 2003, plaintiff was interviewed by the Ethics Commission regarding D'Agostino's influence over the hiring of a financial assistant. (Testimony of Kimberly Stoyle).

32. In January 2004, D'Agostino rejected plaintiff's application to become a member of the Professional Union. Plaintiff successfully appealed the denial before the Massachusetts Labor Relations Commission in April of 2004. (Testimony of Kimberly Stoyle).

33. In January 2004, D'Agostino interviewed Gary Babin for the position of MMED Director. D'Agostino discussed with Babin his "vision" for the MMED. (Testimony of John D'Agostino and Gary Babin).

34. In May 2004, D'Agostino hired Gary Babin as the new MMED Director. Mr. Babin immediately diminished plaintiff's rank as Chief Financial Officer by eliminating her major job responsibilities. Plaintiff was excluded from all meetings, discussions and

decisions concerning the financial operations of MMED. (Testimony of Kimberly Stoyle; Trial Exhibits 261-262). Mr. Babin reduced her financial report from fourteen pages to two pages and ordered plaintiff to sit in the audience at Board meetings rather than with the Board and other Town officials, as she had in the past. (Testimony of Kimberly Stoyle).

35. In June 2004, Mr. Boucher attended a Treasurer and Collector's Conference also attended by Brian Feeney of Century Bank. Regarding Dr. Beliveau's termination, Mr. Boucher reported to Feeney, "*We* got the director. The bitch is next." (Trial Exhibit 110; Testimony of Kimberly Stoyle) (emphasis added).

36. In June 2004, D'Agostino reinstated the Town's illegal practices of overcharging MMED for pension costs and GIS services. (Trial Exhibit 279E). The total internal services bill increased by approximately $300,000. (Trial Exhibits 279D and 279E). Plaintiff complained about the overcharges to Mr. Babin, who related her concerns to D'Agostino. (Testimony of Kimberly Stoyle; Trial Exhibit 113).

37. In June 2004, plaintiff discovered that Mr. Boucher was illegally borrowing money from MMED's Depreciation Fund. On November 7, 2002, the Town borrowed $800,000 without notice to MMED. On November 21, 2002, the Town borrowed an additional $550,000. Plaintiff believed that this was an illegal practice. Plaintiff brought this to the attention of Mr. Babin. (Trial Exhibit 61; Testimony of Kimberly Stoyle). Babin discussed the issue with D'Agostino. (Testimony of Gary Babin, Trial Exhibit 123, p. 2).

The Supreme Court has determined that a mixed motive case, like the plaintiff's, can proceed on circumstantial evidence alone. Desert Palace, Inc. v. Costa, 539 U.S. 90, 93-95 (2003). That is, the jury is free to consider the believability of an explanation for defendant's actions in determining whether it is a cover-up or pretext for discrimination. Moreover, a causal

9

connection may be shown by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Burrus v. United Tel. Co., 683 F.2d 339, 343 (10th Cir.), cert. denied, 459 U.S. 1071 (1982). Plaintiff complained about sexual harassment and objected to illegal financial practices. D'Agostino had the authority to alter the terms and conditions of plaintiff's employment, and his retaliation against her escalated as plaintiff continued to complain.

D'Agostino subjected plaintiff to ongoing adverse employment action including negative evaluation of her work performance, threat to retract her pay raise, threat of disciplinary action and termination, diminution of her job duties, rejection of her union application and sexual/gender-based harassment. The lack of credibility of defendants' witnesses coupled with the temporal nexus between plaintiff's protected activities and D'Agostino's adverse employment action gives rise to an inference of retaliatory motive.

### III.     The Evidence Supports Retaliation under 42 U.S.C. 1983

In order to prevail on a Section 1983 claim, the plaintiff must prove by a preponderance of evidence that (1) the defendant was acting under color of law; and that (2) the defendant's conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States. Tatro v. Kervin, 41 F.3d 9, 14 (1st Cir. 1994). To prevail on a §1983 claim based on a violation of her First Amendment rights, plaintiff must also prove that her expression involved matters of public concern; that (2) her interest in commenting upon those matters outweighed the employer's interests in the efficient performance of its public services; and that (3) her protected speech was a substantial or motivating factor in the adverse employment actions." Lewis v. City of Boston, 321, F.3d 207, 218 (1st Cir. 2003).

The evidence outlined in Section II, *supra*, is sufficient to support a violation of 42 U.S.C. 1983.  As the MMED and Town Manager, John D'Agostino was acting under color of state law. D'Agostino had a custom and practice, well-accepted by the Board, of engaging in financial improprieties including the misappropriation ratepayer funds.  D'Agostino retaliated against the plaintiff for exposing and refusing to participate in these activities.  There is a public concern in the supervisory tolerance of a pattern of escalating harassment against a Chief Financial Officer for reporting financial irregularities that affect the municipal ratepayers.  See Baron v. Suffolk County Sheriff's Department, 402 F.3d 225, 232 (1st Cir. 2005) (there is an inherent public concern in the alleged supervisory tolerance of a pattern of escalating co-worker harassment launched against a corrections officer for reporting an infraction by a fellow officer in a prison setting and then complaining about the harassment.)  Defendant waived the right to object to the failure to give an instruction on plaintiff's 1983 claim by neglecting to specify such objection at the time of trial.  See Brewer v. Marshall, 119 F.3d 993, 1001-02 (1st Cir. 1997).

### IV. The Court Has Discretion to Award Punitive Damages Against John D'Agostino

The Court entered judgment against D'Agostino for punitive damages in the amount of $500,000.  Defendant argues that this was improper on the grounds that D'Agostino was not listed on the jury verdict slip.  However, it is within the Court's discretion to resolve issues which should have been, but were not, covered by the jury verdict questions.  Fed. R. Civ. P. 49(a)(3) ensures that, if the submitted questions omit any material issue of fact, the district court may itself make a finding.  Anderson v. Cryovac, Inc., 862 F.2d 910 (1st Cir. 1988).  The rule invests the trial judge with extensive powers to resolve issues which should have been, but were not,

11

covered by the interrogatories. Id. at 916. Accordingly, this Court rightfully exercised its discretion in awarding punitive damages against D'Agostino.

Furthermore, the Court entered Judgment against D'Agostino consistent with the jury instructions. The jury instructions, which explained the jury verdict questions in detail, stated unambiguously that there were two defendants, the MMED and John D'Agostino, and that the two defendants were effectively one in the same.[6] D'Agostino received fair notice of both the conduct that would subject him to penalty and the severity of the penalty when he was served with plaintiff's Complaint. He was named individually and liable for punitive damages under both G.L. 151B and 42 U.S.C. 1983. It was D'Agostino's burden to introduce evidence of his financial condition, if he intended to argue that the jury's award of punitive damages was excessive. Fishman v. Clancy, 763 F.2d 485, 490 (1st Cir. 1996). D'Agostino never presented evidence of his financial status to the jury for consideration.

### V. Conclusion

Based upon the foregoing, plaintiff respectfully requests that this Honorable Court deny defendant's Motion for JNOV or, in the Alternative, For a New Trial.

---

[6] See, Plaintiff's Opposition to Defendant's Motion for Reconsideration.

                                        Respectfully submitted,
                                        Kimberly Stoyle
                                        By her Attorney


/s/ Lynn A. Leonard
_____

Lynn A. Leonard
Attorney At Law
527 Main Street, Suite 8
Melrose, MA  02176
(781) 662-6161
B.B.O. No. 561662

Dated:  October 23, 2007